## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

RIO GRANDE INTERNATIONAL STUDY )
CENTER )
1 West End Washington St., Bldg. P-11 )
Laredo, Texas 78040, )
)
RAMIRO R. RAMIREZ )
2719 Mile 4 N )
Mercedes, TX 78570, )
)
CARRIZO/COMECRUDO NATION OF )
TEXAS )
c/o Earthjustice )
1625 Massachusetts Avenue, NW, Suite 702 )
Washington, D.C. 20036, )
) Civ. No.
)
ELSA HULL )
103 Laurel )
San Ygnacio, TX 78067, )
)
LABOR COUNCIL FOR LATIN AMERICAN ) **COMPLAINT FOR**
ADVANCEMENT ) **DECLARATORY AND**
815 16th Street, NW, 3rd Floor ) **INJUNCTIVE RELIEF**
Washington, DC 20006, )
)
CALIFORNIA WILDERNESS COALITION )
1736 Franklin Street, 9th Floor )
Oakland, CA 94612, and )
)
GREENLATINOS )
801 Pennsylvania Ave, NW #1010 )
Washington, DC 20004, )
)
         Plaintiffs, )
   v. )
)
DONALD J. TRUMP, in his official capacity as )
President of the UNITED STATES OF AMERICA )
1600 Pennsylvania Avenue, NW )
Washington, D.C. 20500, )
)
PATRICK M. SHANAHAN, in his official capacity as )
Acting Secretary of the UNITED STATES )
DEPARTMENT OF DEFENSE )
1000 Defense Pentagon )
Washington, D.C. 20301, )

1

KIRSTJEN M. NIELSEN, in her official capacity as )
Secretary of the UNITED STATES DEPARTMENT )
OF HOMELAND SECURITY )
245 Murray Lane, SW, Mail Stop 0485 )
Washington, DC 20528-0485, and )
)
STEVEN T. MNUCHIN, in his official capacity as )
Secretary of the UNITED STATES DEPARTMENT )
OF THE TREASURY )
1500 Pennsylvania Avenue, NW )
Washington, D.C. 20220, )
)
              Defendants. )

## INTRODUCTION

1.     The Rio Grande International Study Center, Ramiro R. Ramirez, the Carrizo/Comecrudo Nation of Texas, Elsa Hull, the Labor Council for Latin American Advancement, California Wildlife Coalition, and GreenLatinos bring this action seeking relief from the President's unlawful declaration of a national emergency and accompanying actions unlawfully diverting funding to construct a wall at the United States-Mexico border (the "southern border").

2.     There is no national emergency supporting the President's Proclamation on Declaring a National Emergency Concerning the Southern Border of the United States ("Emergency Declaration").[1]  Instead, it is a fabrication to seize emergency powers in an attempt to accomplish a long-standing campaign promise—a "big beautiful wall"—that Congress, since President Trump's inauguration, has repeatedly and explicitly refused to fund.  But the National Emergencies Act does not allow the President to declare an emergency completely untethered to the facts on the ground.  Nor do the other statutory authorities the President invokes—the powers

---

[1] Proclamation No. 9844, Declaring a National Emergency Concerning the Southern Border of the United States, 84 Fed. Reg. 4949 (Feb. 15, 2019), https://www.whitehouse.gov/presidential-actions/presidential-proclamation-declaring-national-emergency-concerning-southern-border-united-states/.

to activate Ready Reserve military troops and divert Department of Defense spending for military construction—authorize construction of a wall that is unrelated to military activities and would not accomplish the stated aims of the emergency declaration.

3.      Moreover, the President's blatant disregard for the exclusive power of Congress to appropriate money and to designate the purpose for which that money shall be spent violates the Appropriations Clause and the separation of powers embedded in the Constitution.

4.      The President's overreach has real and dire impacts for communities living along the border, including many of the Plaintiffs here.  An executive abuse of power to construct a wall against the will of Congress disregards the authority vested in the people's representatives. It endangers property, parks, wetlands, and wildlife habitats.  It threatens to desecrate graves and spiritual ancestral sites; divide neighbors; alienate border communities, researchers, and nature lovers from the Rio Grande River; defile landscapes; and militarize communities.  The President's callous misrepresentation of the vibrant, thriving, cities and towns along the border as ridden with crime and illegal narcotics adds insult to injury.

5.      For these reasons, Plaintiffs ask this Court to declare that the President's Emergency Declaration and accompanying White House Statement[2] setting forth his plan to obtain his preferred funding for a border wall (collectively "Executive Actions") are unauthorized by the Constitution and laws of the United States and to enjoin the Secretaries of Defense, Homeland Security, and Treasury from taking any action pursuant to the President's unlawful Executive Actions.

---

[2] Office of the White House, *President Donald J. Trump's Border Security Victory* (Feb. 15, 2019), https://www.whitehouse.gov/briefings-statements/president-donald-j-trumps-border-security-victory/.

## JURISDICTION AND VENUE

6.     This Court has federal question jurisdiction over this action under 28 U.S.C. § 1331 because this action arises under the United States Constitution, the Administrative Procedure Act ("APA"), the National Emergencies Act ("NEA"), and other federal statutes.

7.     The Court is authorized to award the requested declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, the APA, 5 U.S.C. § 706(2), and its equitable powers.

8.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(e)(1).  Each Defendant is an officer of the United States sued in his or her official capacity and resides in this district.

## PARTIES

9.     Plaintiff RIO GRANDE INTERNATIONAL STUDY CENTER:

a.     Plaintiff Rio Grande International Study Center ("RGISC," pronounced "risk") is a public interest, not-for-profit advocacy organization chartered by the State of Texas in 1994, and located in Laredo, Texas.

b.     RGISC's mission is "to preserve and protect the Rio Grande-Rio Bravo, its watershed and environment, through awareness, advocacy, research, education, stewardship and bi-national collaboration for the benefit of present and future generations."

c.     Running along two nations and multiple Pueblos, the Rio Grande, or Rio Bravo, as it is known in Mexico, is an international river extending roughly 1,900 miles that provides water and life to approximately 6 million people.  The river basin covers 355,500 square miles—across three U.S. states and five Mexican states—and encompasses a diverse range of eco-systems, climates, geology, hydrology, cultures and traditions.

d.      The river serves as a critical wildlife corridor, and is home to a wide diversity of plants and vegetation.  In South Texas, it serves as the meeting point for the Central and Mississippi flyways, making it one of the most important bird migration routes in North America for hundreds of species of birds.  The Rio Grande is particularly important to RGISC and the surrounding communities because it is the area's only source of drinking water.

e.      RGISC's activities include a monthly program to monitor the health of the river.  For over 20 years, RGISC scientists have conducted monthly water quality testing at multiple designated testing sites located along Laredo's stretch of the Rio Grande.  The data collected at each of these sites is submitted to federal and state authorities and is part of the Texas Clean Rivers Program database.

f.      RGISC is also working with the United States Geological Survey on a four-year pilot program to conduct real time water quality monitoring and flood inundation modeling of the river.

g.      Every year in early February, RGISC hosts a four-day Laredo Birding Festival, which is an important source of revenue for RGISC.  The festival attracts more than 150 birders, who we take to observe birds along the Rio Grande in Webb and Zapata counties.

h.      RGISC also leads Community Paddles along the river several times a year to raise awareness of the beauty and ecological importance of the Rio Grande.  The Community Paddles generate revenue for RGISC.

i.      RGISC members have conducted and continue to conduct research along the banks of the Rio Grande, behind Laredo College.

j.      Every October since 2009, RGISC has organized a large-scale student water-testing project throughout the entire Rio Grande basin with nearly 2,500 students from the U.S. and Mexico.  The Rio Research Roundup is an award-winning student outreach project that

has been recognized by the U.S. EPA (RGISC was named a Gulf Guardian in 2017 for this work) and by the Mexican Senate in Mexico City.  During the Roundup, students take a field trip to test the waters of the river or one of its tributaries.  Students collect water and then submit their data, artwork, short essays, short videos, and Public Service Announcements.  Construction of a border wall would severely restrict the access of many student teams to the river to conduct this river monitoring.  RGISC obtains multiple grants and sponsorships for this project and its general operations, which would be put at risk by a wall.

    k.  On February 1, 2019, RGISC Executive Director Tricia Cortez attended a "State of the Border" address by the interim chief for the U.S. Border Patrol's Laredo Sector, Felix Chavez.  Chief Chavez announced that Customs and Border Protection ("CBP") has requested construction of 150 river miles of permanent, impermeable barrier, including 55 miles of Laredo's middle reach as a "top funding priority" for the wall.

    l.  Construction of a barrier along Laredo's stretch of the Rio Grande River would significantly and adversely affect RGISC's ability to fulfill its mission.  The Rio Grande is prone to flooding in this section of the river, making it likely that the barriers would have to be constructed out of the flood plain and set back from the river.  This would cut off RGISC's access to the river and prevent RGISC from conducting its scientific research and other programs, including but not limited to water quality monitoring, the Birding Festival, and Community Paddles.  RGISC would lose the revenue it relies on from these activities.

    m.  The wall would also cause damage to the river and wetland ecosystems and the wildlife that rely on the ecosystem.  It would that destroy city parks and trail systems and deform the skyline and landscape.  New walls would make it even more difficult for wildlife to move across the border including animals such as the critically endangered ocelot, which is native to Texas.  This wall would reduce the roaming area of impacted wildlife by as much as

75%, reducing the exchange of genetic material, which would make wildlife more vulnerable to disease and would ultimately lead to endangerment and possible extinction.

        n.      Buildup of natural debris and garbage against the wall would disrupt the natural flow of water, exacerbating severe flooding in the area, which could lead to millions of dollars in property damage and even the loss of life.

        10.     Plaintiff RAMIRO R. RAMIREZ:

        a.      Plaintiff Ramiro R. Ramirez is a landowner in Hidalgo County, Texas. Dr. Ramirez holds the deed to the historic Jackson Ranch Church and Cemetery, which is the burial site of several of Dr. Ramirez's ancestors.  Dr. Ramirez's great-grandfather, Martin Jackson, built the chapel on the property in 1874.

        b.      The Jackson Ranch Church and the nearby Eli Jackson Cemetery were both designated State Historical Markers (1983 and 2005, respectively) by the Texas Historical Commission.  The Jackson Ranch Cemetery has a Hidalgo County Historical Commission Marker (1987).  Both cemeteries are burial sites for members of the Jackson Family.  The Jackson Ranch Church was the first Protestant Church in the Rio Grande Valley and the oldest one still standing in the area.

        c.      The Ranch was also an important stop on the Underground Railroad in South Texas.  Nathaniel Jackson (Dr. Ramirez's great-great-grandfather) played a significant role in aiding fleeing slaves beginning as early as 1857, as well as in establishing a forerunner of the Jackson Ranch Church near the current site.

        d.      In the fall of 2018, Dr. Ramirez learned that the Texas Historical Commission contacted CBP regarding the potential impacts that border wall construction would have on the Jackson Ranch Church and Cemetery and the Eli Jackson Cemetery.  Dr. Ramirez and other members of the Jackson Family submitted comments to CBP outlining their concerns

about the negative impacts that wall construction would have on the church and burial sites of their ancestors.

e.       CBP confirmed that the wall would be constructed on top of the levee that runs just north of the Jackson Ranch Church and Cemetery and abuts the Eli Jackson Cemetery.



f.       As illustrated by the map[3] above, if constructed on the levee, the border wall would cut off direct access to the Jackson Ranch and Cemetery, stranding the property in a

---

[3] Texas Historical Commission, Aff. of Dedication for Cemetery Purposes for the Eli Jackson Cemetery, Ex. A (Jan. 2, 2005).

no man's land between the Rio Grande River and the wall.  Dr. Ramirez would be unable to freely access his property, and access would also be difficult—if not impossible—for family members to be able to visit the resting place of their ancestors, worshippers who attend the church, and other visitors hoping to see the historic site.  This isolation of the Jackson Ranch and Cemetery would also result in devaluation of the property.  Additionally, the wall's construction may result in increased flooding which threatens to damage the property.

g.      Dr. Ramirez would be irreparably harmed by wall construction activities at the Eli Jackson Cemetery, which abuts the levee, as this would result in the exhumation and desecration of his ancestors' remains.  CBP plans to clear the land extending 150 feet south of the levee, which would disturb graves within the Eli Jackson Cemetery.

h.      Dr. Ramirez is determined to protect the sacred gravesites of his ancestors and the church that his great-grandfather built.  The construction of the border wall would result in Dr. Ramirez losing access to his land and losing a cultural and spiritual connection to his history and ancestors.

11.    Plaintiff CARRIZO/COMECRUDO NATION OF TEXAS:

a.      Plaintiff Carrizo/Comecrudo Nation of Texas (Esto'k Gna Nation) is a voluntary association comprised of indigenous peoples whose ancestors have inhabited the Rio Grande (Amahatau Mete'l) delta for hundreds of years or more.

b.      Historically, the Spanish referred to the indigenous peoples living in the delta as Carrizos.  The Mexicans referred to these same indigenous peoples as Comecrudos.

c.      Members of the Carrizo/Comecrudo Nation of Texas historically lived and traded up and down the Rio Grande delta.  The Nation's last stronghold was in Mission, Texas. The Nation's Council Chairman is Juan B. Mancias.

d.      The mission of the Carrizo/Comecrudo Nation of Texas is to maintain the constant connection to and preservation of their ancestors and relatives.  The Nation seeks to strengthen, encourage and preserve its identity by sustaining Carrizo/Comecrudo language and lifeways.  By doing so, the Nation reinforces the historical, artistic and cultural contributions of the Carrizo/Comecrudo peoples.

e.      The objectives of the Carrizo/Comecrudo Nation of Texas include restoring and protecting sacred sites along the southern border and securing a land base in order to maintain the connection with its ancestors and ensure adequate housing for its peoples.

f.      Among other locations in the Rio Grande delta, ancestors of the Carrizo/Comecrudo Nation are buried at the Eli Jackson Cemetery and Jackson Ranch Cemetery.

g.      In the fall of 2018, Chairman Juan Mancias learned that CBP is planning to construct levee border wall in Hidalgo County.  If constructed on the levee, the border wall would cut off access to the Jackson Ranch and Cemetery, stranding the property in a no man's land between the Rio Grande River and the wall.  Members of the Carrizo/Comecrudo Nation would be unable to visit the resting place of their ancestors.

h.      The Carrizo/Comecrudo Nation would be irreparably harmed by wall construction activities at the Eli Jackson Cemetery, which abuts the levee.  Construction would result in the exhumation and desecration of its members' ancestors' remains.  CBP plans to clear the land extending 150 feet south of the levee would disturb graves within the Eli Jackson Cemetery.

i.      Construction of the wall would divide the Carrizo/Comecrudo Nation.  It would further isolate families divided by the border, making communication and gathering more difficult.

        j.      The Carrizo/Comecrudo Nation is committed to protecting its ancestral burial sites.  The construction of the border wall would harm the Nation's mission of restoring and protecting its sacred sites along the southern border and maintaining the constant connection to their ancestors.

      12.     Plaintiff ELSA HULL:

        a.      Plaintiff Elsa Hull is resident of Zapata County, Texas.  Ms. Hull's home, where she has lived with her two daughters for 15 years, is on a three-acre lot located within 200 yards of the Rio Grande, about 40 miles south of Laredo at 103 Laurel in San Ygnacio, TX 78067.

        b.      Ms. Hull values her property for the access it provides to the Rio Grande. Ms. Hull and her family use their property and the river area for kayaking, birding, and wildlife observing.

        c.      In February 2019, Ms. Hull learned that CBP was planning to build permanent, impermeable barriers on 150 river miles in Webb and Zapata Counties.

        d.      Construction of a wall along her stretch of the Rio Grande threatens to cut off Ms. Hull's access to the river, disrupt the wildlife she values observing, diminish her use and enjoyment of her land, and reduce her property's value.

        e.      Buildup of natural debris and garbage against the wall would disrupt the natural flow of water, exacerbating severe flooding in the area, and damaging her property and her home.  The increased risk of flooding and loss of access to the Rio Grande would reduce the value of her property.

      13.     Plaintiff LABOR COUNCIL FOR LATIN AMERICAN ADVANCEMENT:

        a.      Plaintiff Labor Council for Latin American Advancement ("LCLAA") is a nonprofit organization that was founded to improve workers' rights and increase the influence of

Latino workers in the political process by educating, organizing and mobilizing Latinos within and outside of the labor movement.

        b.      LCLAA represents the interests of more than 2 million Latino workers in the American Federation of Labor-Congress of Industrial Organizations ("AFL-CIO"), The Change to Win Federation, Independent Unions and all its membership.

        c.      LCLAA has long advocated for comprehensive immigration reform that takes into consideration demographic changes, national security, family reunification, and the impact of trade agreements on immigration to the United States.  LCLAA believes that immigration policies need to protect the civil and human rights of all immigrants.

        d.      To ensure that LCLAA focuses on the plight of aspiring citizens and the need to create a streamlined immigration process that is effective, fair, and just, LCLAA has commenced a campaign entitled "Roadmap to Citizenship."  The mission of this campaign is to raise awareness about the need to create an immigration process which would bring over twelve million new American immigrants out of the shadows, broaden the tax base, foster economic growth, improve national security, and reinforce the founding principles of inclusiveness and fairness that America embodies.

        e.      President Trump's Emergency Declaration and the accompanying Executive Actions are part of the Administration's strategy to discourage immigration and prevent people from seeking asylum in the U.S.[4]  This frustrates LCLAA's mission and work toward an immigration process that is effective, fair, and just by unreasonably and unlawfully targeting immigrants and asylum seekers at the southern border, almost all of whom are Latino.

---

[4] Michael Tackett et al., *Migrants Seeking Asylum Must Wait in Mexico, Trump Administration Says*, N.Y. Times (Dec. 20, 2018), https://www.nytimes.com/2018/12/20/us/politics/mexico-trump-asylum-seekers-migrants.html.

f.      As a result of President Trump's Emergency Declaration and associated Executive Actions, LCLAA has had to divert resources from its work to further its mission and support its members.  Staff time and resources that would otherwise have been spent on LCLAA's campaigns, including immigration policy advocacy, are now being used to oppose the President's attempt to sidestep Congress in an effort to build a border wall.

14.     Plaintiff CALIFORNIA WILDERNESS COALITION:

a.      Plaintiff California Wilderness Coalition ("CalWild") is a nonprofit membership and advocacy organization based in Oakland, California.  CalWild has approximately 600 members and more than 10,000 supporters.  Thirty-seven of CalWild's members live near the Jacumba Wilderness, which is located on the California-Mexico Border.

b.      CalWild's mission is to protect and restore California's wildest natural landscapes and watersheds on federal public lands.  These important wild places provide clean air and water, refuges for wildlife, and outstanding opportunities for recreation and spiritual renewal for people.  CalWild is the only statewide organization dedicated solely to protecting and restoring the wild places and native biodiversity of California's public lands.

c.      CalWild protects wild landscapes through public education, legislation and advocacy.  CalWild engages in local organizing to educate thought leaders, elected officials, and communities about the importance of protecting wild spaces.  CalWild builds coalitions and works with Congress to secure wilderness designation for public lands.

d.      CalWild is concerned about the negative impacts of the border wall on California's wild lands and on federal public lands throughout the border States, particularly in wilderness areas.  The areas of California's borderlands where construction of a wall is most likely include the Otay Mountain Wilderness Area in the CBP's San Diego Sector, and the Jacumba Wilderness Area in CBP's El Centro Sector.  Construction of a wall through these

wilderness areas threatens dozens of sensitive plant and animal species native to these desert ecosystems that are listed as "endangered," "threatened," or "rare."

e.      New walls would make it even more difficult for wildlife to move across the border including animals such as the jaguar—which have begun to return to various parts of the borderlands after a long absence.  This wall would reduce the roaming area of impacted wildlife by as much as 75%, reducing the exchange of genetic material, which would make wildlife more vulnerable to disease and would ultimately lead to endangerment and possible extinction.

f.      CalWild's advocacy has included opposing bills that would exempt CBP from bedrock conservation laws such as the Wilderness Act and Endangered Species Act with regard to their activities at or near the border with Mexico, including, among other things, the construction and maintenance of roads and physical barriers within wilderness areas, damaging their wilderness characteristics.  CalWild also works to protect the California desert including by working on the California Desert Protection and Recreation Act and the Desert Renewable Energy Conservation Plan, which encompasses the southeastern part of the California-Mexico border and includes Jacumba Wilderness.

g.      CalWild has had to divert resources from its advocacy and education activities to address President Trump's Emergency Declaration and associated Executive Actions.  Staff time and resources that would otherwise have been spent on CalWild's campaigns, including protecting wilderness areas near and along the border, are now being used to oppose the President's decision to declare a national emergency in an effort to build a border wall.

15.     Plaintiff GREENLATINOS:

a.      Plaintiff GreenLatinos is a national non-profit organization that convenes a broad coalition of Latino leaders committed to addressing national, regional, and local environmental, natural resources, and conservation issues that significantly affect the health and welfare of the Latino community in the United States.  Latinos can be of any race, including white, indigenous, African American, and Asian American people.

b.      GreenLatinos provides an inclusive table at which its members establish collaborative partnerships and networks to improve the environment; protect and promote conservation of land and other natural resources; amplify the voices of minority, low-income, and tribal communities; and train, mentor, and promote the current and future generations of Latino environmental leaders for the benefit of the Latino community and beyond.  GreenLatinos develops and advocates for policies and programs to advance this mission.

c.      The GreenLatinos Core Policy Priorities include: (1) Environmental Justice, Civil Rights & Public Engagement; (2) Indigenous Rights and Sovereignty; (3) Climate and Clean Air; (4) Toxics and Pesticide; and (5) Clean Water.

d.      GreenLatinos has long advocated for comprehensive immigration reform that takes into consideration equal justice, human rights, immigrant rights, demographic changes, national security, family reunification, and environmental impacts of the border wall on the United States.  For example, GreenLatinos and its members have presented testimony before the House Natural Resources Committee and its Members on the impact of the wall on people, places, and values.

e.      The Emergency Declaration and accompanying Executive Actions are part of the Administration's discriminatory strategy to discourage immigration and prevent people from seeking asylum in the U.S.

f.      The Declaration and Actions frustrate GreenLatinos' mission and work toward an immigration process that is effective, fair, and just at the southern U.S. border and beyond.  As a result of the Emergency Declaration and associated Executive Actions, GreenLatinos has diverted resources including time and money from its other work to further its mission and support its members.  Staff time and resources that would otherwise have been spent on GreenLatinos' core priorities and related programs and activities, such as member outreach and engagement and planning for the 2019 GreenLatinos National Summit, are being spent to oppose the President's attempt to sidestep Congress in an effort to fund and build a border wall, to the irreparable harm and detriment of GreenLatinos, its mission, and its members.

16.      Defendant DONALD J. TRUMP is the President of the United States of America. He is responsible for the actions and decisions that Plaintiffs challenge in this action.  He issued the Emergency Declaration and associated Executive Actions in contravention of the Constitution and laws of the United States. Plaintiffs sue Donald Trump in his official capacity.

17.      Defendant UNITED STATES DEPARTMENT OF DEFENSE ("DOD") is the federal agency to which Congress has appropriated the military construction and drug interdiction funding implicated by the President's Executive Actions.  Defendant PATRICK M. SHANAHAN is Acting Secretary of Defense.  He is responsible for overseeing DOD, including the U.S. Army Corps of Engineers, and ensuring that DOD actions comply with applicable laws. Acting Secretary Shanahan is responsible for exercising military construction authority and spending under 10 U.S.C. § 2808, for reprogramming funds under 10 U.S.C. § 284, for deploying Ready Reserve units to the southern border under 10 U.S.C. § 12302, and for taking other action to use or support the use of those authorities, including, if necessary, the transfer and acceptance of jurisdiction over border lands.  Plaintiffs sue Acting Secretary Shanahan in his official capacity.

18.     Defendant UNITED STATES DEPARTMENT OF HOMELAND SECURITY

("DHS") is the federal agency responsible for providing border security along the United States-

Mexico border in a manner consistent with the laws and Constitution of the United States.  CBP

falls within DHS.  Defendant KIRSTJEN M. NIELSEN is Secretary of DHS.  She is responsible

for overseeing DHS and ensuring that DHS actions comply with applicable laws.  Plaintiffs sue

Defendant Nielsen in her official capacity.

19.     Defendant UNITED STATES DEPARTMENT OF THE TREASURY (the

"Treasury") is the federal agency responsible for the Treasury Forfeiture Fund implicated by the

President's Emergency Declaration and accompanying actions.  Defendant Steven T. Mnuchin is

Secretary of the Treasury.  He is responsible for directing money from the Treasury Forfeiture

Fund for use to build a wall at the southern border.  Plaintiffs sue Secretary Mnuchin in his

official capacity.

## LEGAL BACKGROUND

### I.     The United States Constitution

20.     The framers of the United States Constitution carefully distributed the powers and

responsibilities of government between the three Branches because they understood that

concentration of unchecked power in one body would lead to tyranny.  "The accumulation of all

powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many,

and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition

of tyranny."  The Federalist No. 47 (James Madison).  This careful separation of powers is

fundamental to our form of government.

21.     The Constitution grants Congress the exclusive power to decide how the

government spends money. The Constitution's Appropriations Clause provides that "No Money

shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S.

Const. art. I, § 9, cl. 7.  The Spending Clause grants Congress alone the "Power To lay and collect Taxes . . . to pay the Debts and provide for the common Defence and general Welfare of the United States."  U.S. Const. art. I, § 8, cl. 1.  When "the decision to spend [is] determined by the Executive alone, without adequate control by the citizens' Representatives in Congress, liberty is threatened."  *Clinton v. City of New York*, 524 U.S. 417, 451 (1998) (Kennedy, J., concurring).

22.     The Constitution also grants Congress the exclusive power to make laws.  The Presentment Clause requires that all bills passed by the House of Representatives and the Senate be presented to the President for signature.  The President then has the choice to sign or veto the bill.  U.S. Const. art. I, § 7, cl. 2.  The President may propose measures to Congress, but otherwise the President's role in our system of checks and balances is to execute the laws Congress has enacted, not to make the laws himself.  U.S. Const. art. II, § 3.

23.     While the President is the commander in chief of the Army and Navy of the United States, U.S. Const. art. II, § 2, the Constitution charges Congress with oversight of the military.  U.S. Const. art. I, § 8.  Pursuant to this power, Congress passed the Posse Comitatus Act, 18 U.S.C. §1385, which bars the military from engaging in domestic law enforcement except where expressly authorized by the Constitution or Congress.

## II.     The National Emergencies Act (50 U.S.C. §§ 1601-1651)

24.     Congress enacted the National Emergencies Act ("NEA") in 1976 to rein in the power of the President.  The NEA terminated existing emergencies and created a new legal framework to prevent the President from exercising unbounded authority to declare emergencies and to continue states of emergency in perpetuity.  50 U.S.C. § 1601 *et seq*.  The NEA's purpose was to ensure that "the extraordinary powers which now reside in the hands of the Chief Executive . . . could be utilized only when emergencies actually exist"; that "[r]eliance on

emergency authority, intended for use in crisis situations would no longer be available in non-crisis situations"; and that "the United States travels a road marked by carefully constructed legal safeguards." S. Rep. No. 94-1168, at 2 (1976).

25.     The NEA does not itself create any emergency powers.  Instead, during a period of national emergency, it authorizes the President to declare such emergency and invoke existing statutory authorities to address it.  50 U.S.C. § 1621.  The President must specify which statutes he proposes to invoke: "When the President declares a national emergency, no powers or authorities made available by statute for use in the event of an emergency shall be exercised unless and until the President specifies the provisions of law under which he proposes that he, or other officers will act."  50 U.S.C. § 1631.  He must also publish the proclamation of a national emergency in the Federal Register and transmit it to Congress. *Id*.  The NEA thus permits the President to direct the use of certain resources, but only in a qualifying emergency and only in the manner and to the extent that Congress has previously authorized by statute.

**III.     Statutory Authorities Invoked in the Emergency Declaration**

26.     President Trump's Emergency Declaration invokes emergency powers under two statutes:  10 U.S.C. § 2808(a), which permits certain military construction activities during national emergencies; and 10 U.S.C. § 12302, which authorizes the Secretaries of the Army, Navy, Air Force, and Homeland Security to order any unit of the Ready to Reserve to active duty during a national emergency.

27.     In the White House Statement accompanying the Emergency Declaration, the President referenced additional, non-emergency statutory authorities to be used to accomplish the President's goal building a border wall:  10 U.S.C. § 284, which allows DOD to engage in specified counterdrug activities for the Department of Defense; and 31 U.S.C. § 9705, which governs the Treasury Forfeiture Fund.

A.    *Emergency Military Construction Authority (10 U.S.C. § 2808(a))*

28.    Congress has the power to make and limit military appropriations, raise and support armies, provide for and maintain a navy, declare war, and provide for organizing and calling forth the national guard.  U.S. Const. art. I, § 8.

29.    The Military Construction Codification Act provides a narrow exception to the requirement of congressional authorization for all military construction projects. It provides that, in the event the President declares war or a national emergency under the NEA that "requires use of the armed forces," the Secretary of Defense "may undertake military construction projects . . . not otherwise authorized by law *that are necessary to support such use of the armed forces*." 10 U.S.C. § 2808(a) (emphasis added).

30.    For purposes of section 2808(a), Congress defines the term "military construction" as "any construction, development, conversion, or extension or any kind carried out with respect to a military installation . . . or any acquisition of land or construction of a defense access road."  10 U.S.C. § 2801(a).  Congress defined "military installation" as a "base, camp, post, station, yard, center, or other activity under the jurisdiction of the Secretary of a military department . . . ."  *Id*. § 2801(d)

B.    *Emergency Power to Call Ready Reserve to Active Duty (10 U.S.C. § 12302)*

31.    Section 12302 authorizes the Secretaries of the Army, Navy, Air Force, and Homeland Security, "[i]n a time of national emergency declared by the President," to order any unit in the Ready Reserve to activity duty for not more than 24 consecutive months.  10 U.S.C. § 12302(a).

C.    *Authority to Support Counter-Drug Activities (10 U.S.C. § 284)*

32.    Section 284 authorizes the Secretary of Defense to assist civilian law enforcement with drug enforcement activities.  10 U.S.C. § 284.  It states that the Secretary of Defense "may

provide support for the counterdrug activities or activities to counter transnational organized crime" of any law enforcement agency. *Id.* § 284(a). Such support may include "[c]onstruction of roads and fences and installation of lighting to block drug smuggling corridors across international boundaries of the United States." *Id.* § 284(b)(7).

33.     Section 284(h)(1)(B) requires the Secretary of Defense to give Congress fifteen-days' written notice before providing such support, including "a description of any *small scale construction project* for which support is provided." 10 U.S.C. § 284(h)(1)(B) (emphasis added). The statute defines "small scale construction" as "construction at a cost not to exceed $750,000 for any project." *Id.* § 284(i)(3).

34.     The statute also provides that "the Secretary of Defense shall require a civilian law enforcement agency to which support is provided under this chapter to reimburse the Department of Defense for that support." 10 U.S.C. § 277(a).

**D.     Authority to Transfer Funds from Treasury Forfeiture Fund (31 U.S.C. § 9705)**

35.     Congress established the Treasury Forfeiture Fund to permit the use of forfeited funds for specifically delineated law enforcement purposes relating to the seizure and forfeiture program. *See* 31 U.S.C. § 9705(a).

36.     Section 9705(g)(4)(B) provides that after required reserves and required transfers, "any unobligated balances remaining in the Fund . . . shall be available to the Secretary . . . for obligation or expenditure in connection with the law enforcement activities of any Federal agency. . . ." 31 U.S.C. § 9705(g)(4)(B). Any expenditure "in excess of $500,000 with respect to an unobligated balance described in subparagraph (B) may not be made by the Secretary unless the Appropriations Committees of both Houses of Congress are notified at least 15 days in advance of such obligation or expenditure." *Id.* § 9705(g)(4)(C).

**FACTUAL ALLEGATIONS**

**I.      Congress Has Considered and Rejected President Trump's Requests for Funding to Construct a Border Wall.**

37.      When Congress has deemed it appropriate, Congress has exercised its Article I authority to legislate and appropriate funds for the construction of barriers and related infrastructure along the southern border.  For example, the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, div. C, 110 Stat. 3009–546, authorized $12 million for construction of fencing and road improvements near the San Diego, California, border with Mexico.

38.      In 2007 and 2008, Congress passed appropriations bills allocating more than $2 billion for customs and border protection fencing, infrastructure and technology.  *See* Department of Homeland Security Appropriations Act, 2007, Pub. L. No. 109-295, 120 Stat. 1355 (2006); Consolidated Appropriations Act, 2008, Pub. L. No. 110-161, div. E, 121 Stat. 1844 (2007).

39.      There is currently 705 miles of primary, secondary, or tertiary fencing along the southern border.[5]

40.      Since President Trump took office in January 2017, Congress has repeatedly considered and rejected his requests for appropriations to fund construction of a border wall.  In March 2017, the President asked Congress for $1.4 billion for the border wall for the remainder of fiscal year 2017, and an additional $2.6 billion for fiscal year 2018.  On May 1, 2017, Congress agreed on a bipartisan bill to fund the government through September 30, 2017, rejecting the President's request for wall funding but increasing spending on border security by

---

[5] U.S. Customs and Border Protection, *Mileage of Pedestrian and Vehicle Fencing by State* (last updated Aug. 2, 2017), https://www.cbp.gov/sites/default/files/assets/documents/2017-Sep/Border%20Patrol%20Fence%20Totals.pdf.

$1.5 billion.  Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, 131 Stat. 135 (2017).

41.     On March 23, 2018, Congress rejected the President's request for $1.6 billion to build a border wall in the Rio Grande Valley in Texas.  Congress instead allocated $1.6 billion for border security including new technology and repairs to existing barriers, as well as $641 million for about 33 miles of fencing that had been authorized by the Secure Fence Act of 2006. Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, § 230, 132 Stat. 348 (2018).

42.     On December 11, 2018, during his most recent budget negotiations with Congress, the President requested $5.7 billion in wall funding and declared that he would not sign any funding legislation—including legislation unanimously approved by the Senate to keep the government funded through February 8, 2019—without $5 billion to build his proposed border wall.  At a televised meeting with Congressional leaders to discuss the funding deadline, President Trump said that if he did not get that funding, he would be "proud to shut down the government."[6]

43.     Administration officials explained that the President's $5.7 billion request would "fund construction of a total of approximately 234 miles of new physical barrier and fully fund the top 10 priorities in CBP's Border Security Improvement Plan."  *See* Jan. 6, 2019 letter from Russell T. Vought, OMB Acting Director, to Senator Richard Shelby, Appropriations Committee Chairman.[7]  Congress did not accede to the President's demands.

44.     On December 21, 2018, the United States entered into a partial government shutdown.  President Trump threatened to draw the shutdown out for "a very long period of

---

[6] C-SPAN, *President Trump Meeting with Democratic Leaders* (Dec. 11, 2018), https://www.c-span.org/video/?455813-1/president-trump-democratic-leaders-clash-border-funding.
[7] *See* Letter from Russell T. Vought, OMB Acting Director, to Senator Richard Shelby, Appropriations Committee Chairman (Jan. 6, 2019), https://www.whitehouse.gov/wp-content/uploads/2019/01/Final-Shelby-1-6-19.pdf.

time—months or even years"—unless Congress gave him the funds he was demanding for the

border wall.[8]  Despite holding a significant portion of the federal government hostage by forcing

a partial government shutdown and publicly claiming responsibility for the shutdown, President

Trump again failed to persuade Congress to agree to his demands.

45.     As the shutdown continued, President Trump attempted to strike a compromise.

He announced on January 19, 2019, that he was willing to temporarily extend the Deferred

Action for Childhood Arrivals and Temporary Protected Status programs in exchange for $5.7

billion for a border wall.  Congressional leaders explicitly rejected the proposal as a "non-starter"

that merely put forth previously rejected offers to build a border wall.

46.     Frustrated by Congress's consistent rejection of his demand for funding, President

Trump threatened to declare a national emergency and build a wall without congressional

approval.  On January 9, 2019, he stated that "I have an absolute right to do national emergency

if I want," and that his "threshold" for invoking the emergency would be if he "can't make a deal

with people that are unreasonable."[9]

47.     On January 25, 2019, after the shutdown had dragged on for 35 days—the longest

shutdown in the nation's history—President Trump agreed to sign legislation that would keep the

government open until February 15, 2019.  This stopgap legislation did not include any funding

for a border wall.  In ending the government shutdown, the President stated that if he were

---

[8] Sheryl Gay Stolberg and Michael Tackett, *Trump Suggests Government Shutdown Could Last for "Months or Even Years,"* N.Y. Times (Jan. 4, 2019), https://www.nytimes.com/2019/01/04/us/politics/democrats-trump-meeting-government-shutdown.html.
[9] Greg Sargent, *Trump: I have the "absolute right" to declare a national emergency if Democrats defy me*, Wash. Post (Jan. 9, 2019), https://www.washingtonpost.com/opinions/2019/01/09/trump-i-have-absolute-right-declare-national-emergency-if-democrats-defy-me/.

unable to "work with the Democrats and negotiate," then "obviously we'll do the emergency because that's what it is. It's a national emergency."[10]

48.     After the shutdown ended, a bipartisan committee of negotiators from the House and Senate began work on a compromise appropriations bill that would include some funding for border security.  While the negotiations were ongoing, Acting White House Chief of Staff Mick Mulvaney stated that "[w]e'll take as much money as [Congress] can give us and then we'll go off and find the money someplace else…but [the wall] is going to get built with or without Congress."[11]

49.     On February 15, 2019, Congress agreed on a funding deal—the Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, 133 Stat. 13 (2019).  The agreement included $1.375 billion for pedestrian fencing along 55 miles of the Rio Grande Valley Sector of the border and exempted certain parks and other sensitive areas from construction. *Id*. § 230(a)(1); *id*. § 231.

50.     Congress specifically prohibited the use of any appropriated funds in specific sections of the Rio Grande Valley, forbidding the use of any funds to construct a barrier "(1) within the Santa Ana Wildlife Refuge; (2) within the Bentsen-Rio Grande Valley State Park; (3) within La Lomita Historical Park; (4) within the National Butterfly Center; or (5) within or east of the Vista del Mar Ranch tract of the Lower Rio Grande Valley National Wildlife Refuge." Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, § 231, 133 Stat. 13 (2019).

---

[10] Steven Nelson, *Trump warns he'll "obviously" declare national emergency if talks fail to result in wall funding*, Wash. Exam'r (Jan. 25, 2019), https://www.washingtonexaminer.com/news/white-house/trump-warns-hell-obviously-declare-national-emergency-if-talks-fail-to-result-in-wall-funding.
[11] Alexander Bolton, *Mulvaney: Trump Can "move money around" to get wall funding*, The Hill (Feb. 10, 2019), https://thehill.com/homenews/administration/429313-mulvaney-trump-can-move-money-around-to-get-wall-funding.

51.     In addition, Congress forbade the use of appropriated funds for construction within the city limits of Roma, Texas; Rio Grande City, Texas; Escobares, Texas; La Grulla, Texas; and within Salineño, Texas, until local government officials and the public have had an opportunity to comment on any plans for construction.  Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, § 232, 133 Stat. 13 (2019).

52.     In passing the 2019 Appropriations Act, Congress made clear that it was not appropriating any funds for construction of a wall.  Senator Patrick Leahy, Vice Chairman of the Senate Appropriations Committee, and a member of the negotiating committee, stated, "The agreement does not fund President Trump's wasteful wall."  165 Cong. Rec. S1362 (daily ed. Feb 14, 2019) (statement of Sen. Leahy).  Senator Chuck Schumer, the Senate Minority Leader, noted, "The agreement will provide smart border security, increasing support for technologies at our ports of entry. It will not fund the President's expensive, ineffective wall."  165 Cong. Rec. S1363 (daily ed. Feb. 14, 2019) (statement of Sen. Schumer).  In the House, Representative David Price declared, "This agreement denies the President billions of dollars for an unnecessary wall."  165 Cong. Rec. H2019 (daily ed. Feb. 14, 2019) (statement of Rep. Price); *see also* 165 Cong. Rec. H2020 (daily ed. Feb. 14, 2019) (statement of Rep. Aguilar) ("What this bill will not do is . . . fund the President's wall from sea to shining sea, a wall that he said Mexico would pay for.").

53.     President Trump stated that he was "not happy" with Congress's compromise deal and would find "other methods" to finance a wall without Congress.[12]

---

[12] Kevin Liptak, Dana Bash, and Kaitlan Collins, *Trump "not happy" with deal, weighing options for building wall*, CNN (Feb. 12, 2019), https://www.cnn.com/2019/02/12/politics/trump-executive-action-options/index.html.

## II.     Trump's Emergency Declaration and Associated Actions

54.     President Trump signed the Consolidated Appropriations Act on February 15, 2019.  That same day, he issued the Emergency Declaration and the accompanying plan to obtain funding for his border wall.

55.     The Emergency Declaration claims there is a "border security and humanitarian crisis that threatens core national security interests and constitutes a national emergency," and that the border is an entry point for "criminals, gang members, and illicit narcotics."  The Declaration asserts: "[t]he problem of large-scale unlawful migration through the southern border is long-standing, and despite the executive branch's exercise of existing statutory authorities, the situation has worsened in certain respects in recent years.  In particular, recent years have seen sharp increases in the number of family units entering and seeking entry to the United States and an inability to provide detention space for many of these aliens while their removal proceedings are pending."

56.     The Declaration invokes the National Emergencies Act, declares that the purported emergency "requires use of the Armed Forces," and directs the Secretary of Defense or the Secretary of relevant military departments to "order as many units or members of the Ready Reserve to active duty as the Secretary concerned, in the Secretary's discretion, determines to be appropriate to assist and support the activities of the Secretary of Homeland Security at the southern border."

57.     The Declaration also invokes "the construction authority provided in section 2808 of title 10, United States Code" and directs the Secretaries of Defense, Interior, and Homeland Security to "take all appropriate actions, consistent with applicable law, to use or support the use of the authorities herein invoked."

58.     The accompanying White House Statement asserts that in addition to existing funding in Homeland Security appropriations, $6.7 billion "will be available to build the border wall once a national emergency is declared and additional funds have been reprogramed."  This includes diversion of: $601 million from the Treasury Forfeiture Fund; up to $2.5 billion under the Department of Defense funds transferred for Support for Counterdrug Activities (10 U.S.C. § 284); and up to $3.6 billion reallocated from Department of Defense military construction projects under the President's declaration of a national emergency (10 U.S.C. § 2808).  These funds could be used for new projects, including "new levee wall, new and replacement primary pedestrian barrier, new vehicle-to-pedestrian barrier, and new secondary barrier."

59.     The Proclamation does not refer to the 2019 Consolidated Appropriations Act. However, at a press conference announcing the Emergency Declaration, President Trump acknowledged that he received limited funding from Congress for construction along the border but stated that he is "not happy with it . . . I could do the wall over a longer period of time.  I don't need to [declare a national emergency].  But I'd rather do it much faster."[13]

60.     In a letter to the President the same day, the House Judiciary Committee expressed its concern over the Emergency Declaration:

> Congress has entrusted you and your predecessors with emergency authority in order to respond quickly and effectively to real crises, such as wars and natural disasters.  The Judiciary Committee, which has jurisdiction over the National Emergencies Act, did so based on an understanding that the President would "take care that the laws be faithfully executed" and would resort to this authority only when absolutely necessary.  By fabricating an emergency in order to bypass the political process for allocating a budget, you appear to be abusing both this trust and your own oath of office.

---

[13] The White House, *Remarks by President Trump on the National Security and Humanitarian Crisis on our Southern Border* (Feb. 15, 2019), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-national-security-humanitarian-crisis-southern-border/.

Feb. 15, 2019 letter from U.S. House of Reps. Jud. Comm. To Pres. Trump.[14]

61.     On February 26, 2019, the House passed legislation with bi-partisan support disapproving of and terminating President Trump's Emergency Declaration.  H.R.J. Res. 46, 116th Cong. (2019).

62.     On March 14, 2019, the Senate passed H.R.J. Res. 46, formally disapproving of and terminating President Trump's Emergency Declaration.

63.     That same day, President Trump announced he would veto the Joint Resolution.[15]

## III.     There is No Emergency and President Trump's Actions are *Ultra Vires*

64.     The purpose of the National Emergencies Act is to allow the President to invoke emergency powers in urgent, unanticipated situations in which there is no time for Congress to deliberate and act in response.  That is not the situation here.

65.     Dating back to his speech announcing his candidacy for President in June 2015, President Trump has claimed that a border wall is needed to stop illegal immigration, because Mexico is "sending people that have lots of problems, and they're bringing those problems with us [sic].  They're bringing drugs.  They're bringing crime.  They're rapists." [16]  In that same speech he stated that as President he would  build the wall and have Mexico pay for it.  In a speech shortly before the 2016 presidential election, President Trump stated that "[o]n day one [of his Administration], we will begin working on an impenetrable, physical, tall, power [sic],

---

[14] Letter from U.S. House of Reps. Comm. on the Judiciary to President Trump (Feb. 15, 2019), https://judiciary.house.gov/sites/democrats.judiciary.house.gov/files/documents/National%20Emergency%20Letter%20Final_0.pdf.

[15] Erica Werner, Seung Min Kim, and John Wagner, *Senate votes to reject Trump's emergency declaration, setting up president's first veto*, Wash. Post (Mar. 14, 2019), https://www.washingtonpost.com/politics/trump-renews-veto-threat-as-senate-prepares-to-rebuke-him-on-national-emergency/2019/03/14/2efbea36-4647-11e9-aaf8-4512a6fe3439_story.html?utm_term=.153a20391c6e.

[16] Time Staff, *Here's Donald Trump's Presidential Announcement Speech*, Time (June 16, 2015), http://time.com/3923128/donald-trump-announcement-speech/.

beautiful southern border wall" to "help stop the crisis of illegal crossings" and "stop the drugs and the crime from pouring into our country."[17]

66.     President Trump admits that the circumstances surrounding the alleged "crisis at the border" have not significantly changed since his inauguration as President in January 2017. Indeed, he acknowledged this when he stated that the "emergency" at the border "began a long time [ago] . . . in 2014."[18]

67.     The President issued the Emergency Declaration more than two years after he took office and six weeks after first publically suggesting that he could "do" a national emergency to secure funding that Congress in the exercise of its appropriations powers refused to grant. During that time, Congress acted multiple times, voting not to fund a border wall that would extend across the entire southern border, and instead passing legislation appropriating funds for limited repair and construction of fencing in particular locations along the border.  This is not a situation in which Congress has not had time to deliberate and act in response to needs at the border.  Congress has deliberated.  Congress has acted.  And Congress has refused to fund President Trump's border wall.

68.     Moreover, President Trump's claim that an unprecedented flood of migrants is causing an immigration enforcement crisis amounting to a "national emergency" is not supported by the facts.

---

[17] *Transcript of Donald Trump's Immigration Speech*, N.Y. Times (Sep. 1, 2016), https://www.nytimes.com/2016/09/02/us/politics/transcript-trump-immigration-speech.html.
[18] The White House, *Remarks by President Trump Before Marine One Departure* (Jan. 10, 2019), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-marine-one-departure-30/.

69.    According to CBP data, apprehensions at the border are actually near historic lows, with fewer than 400,000 apprehensions in FY2018[19] compared to over 1.6 million in FY2000.[20]  In FY2017, CBP made the fewest apprehensions since FY2000.

70.    During this same time span, there were dramatic increases in the number of border patrol agents utilized to patrol the southwest border between the ports of entry.  From 2000 to 2017, CBP increased its border patrol agent staffing nationwide by 111%, from 9,212 to 19,437 agents.[21]  In September 2017, DHS published a report in which it concluded that "the southwest land border is more difficult to illegally cross today than ever before."[22]

71.    President Trump cites as a basis for the Emergency Declaration "sharp increases in the number of family units entering and seeking entry to the United States and an inability to provide detention space for many of these aliens while their removal proceedings are pending." However, construction of a wall would have no impact on the number of asylum-seekers presenting themselves at authorized ports of entry, which they have a legal right to do under 8 U.S.C. § 1158(a).

72.    President Trump's attempts to connect migration at the southern border with crime and illegal narcotics are also unfounded.  Most illegal drugs enter the country through legal ports of entry, not across the open border.  CBP data show that from January through August

---

[19] U.S. Customs and Border Protection, *Southwest Border Migration FY2018*, https://www.cbp.gov/newsroom/stats/sw-border-migration/fy-2018 (last accessed Mar. 14, 2019).

[20] U.S. Border Patrol, *BP Total Apps FY1925-FY2017*, https://www.cbp.gov/sites/default/files/assets/documents/2017-Dec/BP%20Total%20Apps%20FY1925-FY2017.pdf.

[21] U.S. Border Patrol, *BP Staffing FY1992-FY2017*, https://www.cbp.gov/sites/default/files/assets/documents/2017-Dec/BP%20Staffing%20FY1992-FY2017.pdf.

[22] Dept. of Homeland Security, Office of Immigration Statistics, *Efforts by DHS to Estimate Southwest Border Security between Ports of Entry* (Sept. 2017), https://www.dhs.gov/sites/default/files/publications/17_0914_estimates-of-border-security.pdf.

2018, 88 percent of cocaine, 90 percent of heroin, 87 percent of methamphetamine, and 80

percent of fentanyl seized by Border Patrol were seized by Field Operations at ports of entry.

Indeed, drug seizures outside legal points of entry have significantly decreased in recent years—

from 2012 to 2017, total drug seizures outside ports of entry dropped 62%.[23]

73.     In addition, a June 2018 report by the Cato Institute analyzed American

Community Survey data from the U.S. Census Bureau and concluded that immigrants do not

increase local crime rates, are less likely to cause crime than their native-born peers, and are less

likely to be incarcerated than native-born Americans.  In Texas, illegal immigrants represented 56

percent fewer criminal convictions than native-born Americans in 2015.[24]

74.     A 2018 study examining national crime rates from 1990 to 2014 found "that

undocumented immigration does not increase violence" and in fact "[i]ncreases in the

undocumented immigrant population within states are associated with significant decreases in the

prevalence of violence."[25]

75.     The most recent Worldwide Threat Assessment, issued by the Direct of National

Intelligence on January 29, 2019, discusses migration, terrorism and transnational crime around

the world.  The Assessment notes that "high crime rates and weak job markets" will continue to

cause people to flee violence in their home countries and seek asylum in the U.S.  However, it

does not describes the situation at the border as an emergency, crisis, or threat.[26]  At the January

---

[23] U.S. Customs and Border Protection, *CBP Enforcement Statistics FY2018*, https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics (last visited Mar. 14, 2019).
[24] Michelangelo Landgrave and Alex Nowrasteh, *Incarcerated Immigrants in 2016 Their Numbers, Demographics, and Countries of Origin*, Cato Institute Immigration Research and Policy Brief (June 4, 2018), https://object.cato.org/sites/cato.org/files/pubs/pdf/irpb7.pdf.
[25] Michael T. Light and Ty Miller, *Does Undocumented Immigration Increase Violent Crime?*, Criminology (Mar. 25, 2018), https://onlinelibrary.wiley.com/doi/abs/10.1111/1745-9125.12175.
[26] Daniel R. Coats, Director of Nat. Intelligence, *Worldwide Threat Assessment of the US Intelligence Community* (Jan. 29, 2019), https://www.dni.gov/files/ODNI/documents/2019-ATA-SFR---SSCI.pdf.

29, 2019, hearing of the Senate Intelligence Committee where the report was presented, the heads of the Office of the Director of National Intelligence, Federal Bureau of Investigation, and Central Intelligence Agency testified about international threats to the United States. "None of the officials said there is a security crisis at the U.S.-Mexico border, where Trump has considered declaring a national emergency so that he can build a wall."[27]

### IV. The President's Emergency Declaration and Diversion of Funding to Construct the Border Wall Injure Plaintiffs.

76.     President Trump's Emergency Declaration, the militarization of the border, and additional wall construction along the border causes immediate and concrete harm to the Plaintiffs.

77.     President Trump has directed the Department of Homeland Security, Department of Defense, and the Army Corps of Engineers to create a prioritized list of border segments for wall construction.  On December 12, 2018, the Department of Homeland Security published a statement asserting:

> if funded at $5B in FY 2019 DHS expects to construct more than 330 miles of border wall in the U.S. Border Patrol's highest priority locations across the Southwest border.  DHS is positioned to construct 215 miles of Border Patrol's highest priority border wall miles including:
>
> - ~5 miles in San Diego Sector in California
> - ~14 miles in El Centro Sector in California
> - ~27 miles in Yuma Sector in Arizona
> - ~9 miles in El Paso Sector in New Mexico
> - ~55 miles in Laredo Sector in Texas
> - ~104 miles in Rio Grande Valley Sector in Texas[28]

---

[27] Shane Harris, *Testimony by Intelligence Chiefs on Global Threats Highlights Differences with President*, Wash. Post (Jan. 29, 2019), https://www.washingtonpost.com/world/national-security/intelligence-officials-will-name-biggest-threats-facing-us-during-senate-hearing/2019/01/28/f08dc5cc-2340-11e9-ad53-824486280311_story.html.
[28] Dept. of Homeland Security, *Walls Work* (Dec. 12, 2018), https://www.dhs.gov/news/2018/12/12/walls-work.

78.     Plaintiff RGISC is located in on the campus of Laredo College, which is in the Laredo Sector in Texas.  At a State of the Border address in Laredo on Feb. 1, 2019, Felix Chavez, interim chief for the U.S. Border Patrol's Laredo Sector, announced that CBP has requested construction of 150 river miles of permanent, impermeable barrier.[29]

79.     CBP has specifically identified 55 miles of Laredo's middle reach as a "top funding priority" for the wall.  This area represents the heart of Laredo's community center.  It includes downtown, the Laredo College campus, densely populated middle- and low-income residential areas, and prime parks, trails and habitat for recreation, kayaking and birding, which have made Laredo and the lower Rio Grande Valley a major destination for eco-tourists.

80.     The Emergency Declaration and diversion of funding for border wall construction frustrates RGISC's organizational mission by interrupting RGISC's key programs of scientific research, eco-tourism, and community awareness. Since the announcement of the Emergency Declaration, RGISC has had to spend considerable resources to attend community meetings, meet with CBP officials, educate its staff and the public about DHS' and CPS's plans for wall construction, and organize the community and local governments to oppose this harmful construction.

81.     As described above, the imminent construction of at least 55 miles of border wall threatens to completely restrict RGISC's access to the Rio Grande and the parks and trails along the river.  This will significantly and adversely affect RGISC's ability to fulfill its mission by preventing RGISC from conducting its scientific research and other programs, including water

---

[29] Melissa R. Cigarroa and Tricia Cortez, *Wall will threaten Laredo's water and environment*, LMT Online (Feb. 8, 2019), https://www.lmtonline.com/opinion/commentary/article/Wall-will-threaten-Laredo-s-water-and-13602429.php?utm_campaign=hptexas.

quality monitoring, the Birding Festival, and Community Paddles.  RGISC will lose the revenue it relies on from these activities.

82.     Plaintiff Elsa Hull's home and property are located approximately 40 miles south of Laredo, in Zapata County.  The Emergency Declaration and diversion of funding directly threatens Ms. Hull's property.  Construction of a wall along her stretch of the Rio Grande threatens to cut off Ms. Hull's access to the river, disrupt the wildlife she values observing, diminish her use and enjoyment of her land, and devalue her property.

83.     CBP's plans to construct a portion of the border wall on top of the levee that runs just north of the Jackson Ranch and Cemetery and abuts the Eli Jackson Cemetery would cut off access to the cemeteries, stranding the property in a no man's land between the Rio Grande River and the wall.  Dr. Ramirez, who owns that property, would be unable to freely access the property to visit the resting place of his ancestors and worship at the church that his great-grandfather built.  This isolation of the Jackson Ranch Church and Cemetery would also devalue his property.  The border wall would also increase the risk of flooding that would further damage his property.

84.     Plaintiff Carrizo/Comecrudo Nation of Texas would be irreparably harmed by wall construction activities at the Eli Jackson Cemetery, which abuts the levee, which would result in the exhumation and desecration of their ancestors' remains.  The Carrizo/Comecrudo Nation is committed to protecting its ancestral burial sites.  The construction of the border wall would harm the Nation's mission of restoring and protecting its sacred sites along the southern border and maintaining the constant connection to their ancestors.

85.     President Trump's Emergency Declaration and the accompanying Executive Actions frustrate LCLAA's mission and work toward an immigration process that is effective, fair, and just by unreasonably targeting immigrants and asylum seekers at the southern border,

almost all of whom are Latino.  As a result of President Trump's Emergency Declaration and associated actions, Plaintiffs LCLAA has had to divert resources from fulfilling its mission to opposing the President's effort to sidestep Congress in an effort to build a border wall.

86.     President Trump's Emergency Declaration and accompanying Executive Actions frustrate the mission of CalWild.  CalWild has had to divert resources from its advocacy and education activities to address President Trump's Emergency Declaration and associated actions. Staff time and resources that would otherwise have been spent on CalWild's campaigns, including protecting wilderness areas near and along the border, are now being used to oppose the President's decision to declare a national emergency in an effort to build a border wall.

87.     President Trump's Emergency Declaration and accompanying Executive Actions have frustrated GreenLatinos' mission because they have caused GreenLatinos to divert staff time and resources from its work in support of its core programs and activities, such as member outreach and engagement and planning for the 2019 GreenLatinos National Summit.  Instead, GreenLatinos has had to devote these resources to opposing the President's unlawful border wall.

88.     For these reasons, the Emergency Declaration has caused immediate and concrete injury to Plaintiffs.  A declaration from this Court that the President's Emergency Declaration is unlawful and an order from this Court enjoining federal officials from acting upon it would remedy Plaintiffs' injuries.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
*Ultra Vires* **Action in Violation of Consolidated Appropriation Act 2019, the National Emergencies Act, 10 U.S.C. § 2808, 10 U.S.C. § 284, and 31 U.S.C. § 9705**

89.     Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

90.     Plaintiffs have a right of action to enjoin and declare unlawful official action that are *ultra vires* and exceed the President's statutory authority.

91.     Congress enacted and the President signed into law the Consolidated Appropriations Act of 2019, which sets specific limits on appropriations for border fencing, the location of new fencing, and the design of new fencing.  Because the Emergency Declaration and accompanying White House Statement direct construction of border wall segments that violate each of these limits on new border fencing appropriations, locations, and design, they are *ultra vires*.

92.     The Emergency Declaration is also *ultra vires* because no colorable emergency within the meaning of the NEA exists to invoke the statute.

93.     The statutes the President relies on, 10 U.S.C. §§ 284, 2808 and 31 U.S.C § 9705, do not authorize wall construction outside of the limits set by Congress in the Consolidated Appropriations Act of 2019.

94.     10 U.S.C. § 2808 does not authorize border wall construction as directed by the Emergency Declaration and the accompanying statement because construction of the border wall: (a) is not a "military construction project"; (b) does not "require[] use of the armed forces"; and (c) is not "necessary to support such use of the armed forces."

95.     Defendants have acted *ultra vires* in seeking to divert funding pursuant to 10 U.S.C. § 284 because construction under § 284 is limited to "drug smuggling corridors" and Defendants have not identified particular drug smuggling corridors requiring construction of a wall at the border.

96.     The President cannot fund the border wall from the Treasury Forfeiture Fund because 31 U.S.C. § 9705 restricts use of those funds to specified purposes and construction of a border wall does not meet the requirements of the statute.

97.     For these reasons, Defendants' diversion of funding toward the construction of a border wall is *ultra vires* and unlawful.

## SECOND CLAIM FOR RELIEF
### Violation of U.S. Const. art. I, § 9, cl. 7—Appropriations Clause

98.     Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

99.     Plaintiffs have a right of action to enjoin and declare unlawful official action that is *ultra vires*.

100.     The Constitution grants to Congress the exclusive power to spend money on and to designate the purpose for which the money shall be spent.

101.     Article I, Section 9, Clause 7 provides "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."

102.     The Emergency Declaration and associated Statement violate the Appropriations Clause improperly attempts to use the NEA and other statutes to override Congress's explicit refusal to pass legislation funding for the full extent of the border wall and instead setting specific limits on appropriations for border fencing, the location of new fencing, and the design of new fencing.

103.     For these reasons, Defendants' diversion of funding toward the construction of a border wall is unconstitutional.

## THIRD CLAIM FOR RELIEF
### Violation of U.S. Const. arts. I and II—Separation of Powers

104.     Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

105.     Plaintiffs have a non-statutory right of action to enjoin and declare unlawful official action that is *ultra vires*.

106.    The United States Constitution provides that "[a]ll legislative Powers . . . shall be vested in [the] Congress."   U.S. Const. art. I, § 1.  The Spending Clause, grants Congress the exclusive power "To lay and collect Taxes . . . to pay the Debts and provide for the common Defence and general Welfare of the United States."  U.S. Const. art. I, § 8, cl. 1.

107.    The Appropriations Clause of the U.S. Constitution provides that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."  U.S. Const. art. I, § 9, cl. 7.

108.    The Presentment Clause requires that all bills passed by the House of Representatives and the Senate be presented to the President for signature.  The President then has the choice to sign or veto the bill.  U.S. Const. art. I, § 7, cl. 2.

109.    There is no provision in the Constitution that authorizes the President to enact, amend, or repeal statutes, including appropriations already approved by Congress and signed into law by the President.  *Clinton v. City of New York*, 524 U.S. 417, 438 (1998).

110.    Defendants have violated the doctrine of separation of powers embedded in the Constitution by taking executive action to fund a border wall for which Congress has refused to appropriate funding.

## FOURTH CLAIM FOR RELIEF
**Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2) by the Agency Defendants**

111.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

112.    The APA requires this Court to hold unlawful and set aside any agency action that is "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2).

113.     Defendant DHS has identified priority areas for border wall construction and "increased [Customs and Border Protection's] capacity to execute" the full $5.7 billion in funding that the President requested.[30]   These priority areas are outside the 55 miles within the Rio Grande Valley that Congress authorized in the Consolidated Appropriations Act of 2019.

114.     Defendant Department of the Treasury notified the leaders of the House and Senate Appropriations Committees that it intends to provide $601 million in Fiscal Year 2019 out of the Treasury Forfeiture Fund "to support law enforcement border security efforts conducted by U.S. Customs and Border Protection."[31]   The funds will be available for border wall construction in two tranches.  The first, of up to $242 million, is available for obligation as of March 2, 2019.  The second tranche of $359 will be available thereafter "subject to the receipt of additional anticipated forfeitures."

115.     On information and belief, DOD is formulating a plan for reallocating funds from DOD military construction projects to border wall construction as directed by the President's Emergency Declaration.

116.     These actions violate the Consolidated Appropriations Act, 2019, 10 U.S.C. § 2808, 10 U.S.C. § 284, and 31 U.S.C. § 9705.  They also violate the Appropriations Clause and the separation of powers laid out in Articles I and II of the Constitution.

117.     Agency Defendants have also acted arbitrarily and capriciously in failing to articulate how these actions will address the circumstances allegedly giving rise to the national emergency.

---

[30] Letter from Russel T. Vought, Acting Director, Office of Management and Budget, to Hon. Richard Shelby, Chairman, U.S. Senate Committee on Appropriations (Jan. 6, 2019), https://www.whitehouse.gov/wp-content/uploads/2019/01/Final-Shelby-1-6-19.pdf.
[31] Letter from David F. Eisner, Acting Secretary for Management, Department of the Treasury, to Hon. Nita M. Lowey, Chairwoman, U.S. House of Reps. Committee on Appropriations and Hon. Richard Shelby, Chairman, U.S. Senate Committee on Appropriations (Feb. 15, 2019).

118.    The Agencies' actions in furtherance of the Emergency Declaration are therefore unlawful and should be enjoined and set aside.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

A.    Declare that the President's Emergency Declaration is unauthorized by and contrary to the Constitution and laws of the United States;

B.    Enjoin Defendant Secretaries of the DOD, DHS and Treasury from taking action to build a border wall using funds from Defense Department military construction projects or the Treasury Asset Forfeiture Fund, or on any basis that depends on the President's unlawful emergency declaration and associated actions;

C.    Award Plaintiffs their reasonable costs of litigation, including reasonable attorneys' fees and costs, pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

D.    Grant Plaintiffs such further and additional relief as the Court may deem just and proper.

Respectfully submitted,

DATED:  March 14, 2019

/s/ Sarah H. Burt
SARAH H. BURT
California Bar No. 250378
(appearing under LCvR 83.2(c)(1))
Earthjustice
50 California Street, Suite 500
San Francisco, CA  94111
Tel: (415) 217-2000
Fax: (415) 217-2040
sburt@earthjustice.org


/s/ Tania Galloni
TANIA GALLONI
Florida Bar. No. 619221
(appearing under LCvR 83.2(c)(1))
Earthjustice
4500 Biscayne Blvd., Ste 201
Miami, FL  33137

Tel: (305) 440-5432
tgalloni@earthjustice.org


  /s/ Marisa C. Ordonia
Marisa C. Ordonia
Washington Bar No. 48081
(appearing under LCvR 83.2(c)(1))
Earthjustice
705 Second Avenue, Suite 203
Seattle, WA  98104-1711
Ph.: (206) 343-7340
Fax: (206) 343-1526
mordonia@earthjustice.org


DATED:  March 14, 2019          /s/ Gordon E. Sommers
GORDON E. SOMMERS (D.C. Bar No. 1034060)
Earthjustice
1625 Massachusetts Ave., NW, Suite 702
Washington, DC 20036
gsommers@earthjustice.org
Tel: 202-667-4500
Fax: 202-667-2356
gsommers@earthjustice.org


*Attorneys for Plaintiffs Rio Grande International
Study Center, Ramiro R. Ramirez, the
Carrizo/Comecrudo Nation of Texas, Elsa Hull,
Labor Council for Latin American Advancement,
California Wilderness Coalition, and GreenLatinos*