## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RIO GRANDE INTERNATIONAL STUDY CENTER<br>1 West End Washington St., Bldg. P-11<br>Laredo, Texas 78040,<br><br>RAMIRO R. RAMIREZ<br>2719 Mile 4 N<br>Mercedes, TX 78570,<br><br>CARRIZO/COMECRUDO NATION OF TEXAS<br>c/o Earthjustice<br>1625 Massachusetts Avenue, NW, Suite 702<br>Washington, D.C. 20036,<br><br>ELSA HULL<br>103 Laurel Road<br>San Ygnacio, TX 78067,<br><br>JOSEPH HEIN<br>5204 South Lake Dr.<br>Laredo, TX  78043<br><br>LABOR COUNCIL FOR LATIN AMERICAN ADVANCEMENT<br>815 16th Street, NW, 3rd Floor<br>Washington, DC 20006,<br><br>CALIFORNIA WILDERNESS COALITION<br>1736 Franklin Street, 9th Floor<br>Oakland, CA 94612, and<br><br>GREENLATINOS<br>801 Pennsylvania Ave, NW #1010<br>Washington, DC 20004,<br><br>　　　　　Plaintiffs,<br>　　　v.<br><br>DONALD J. TRUMP, in his official capacity as President of the UNITED STATES OF AMERICA<br>1600 Pennsylvania Avenue, NW<br>Washington, D.C. 20500, | Civ. No. 1:19-cv-00720 (TNM)<br><br>**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

MARK T. ESPER,[1] in his official capacity as            )
Acting Secretary of the UNITED STATES                    )
DEPARTMENT OF DEFENSE                                     )
1000 Defense Pentagon                                    )
Washington, D.C. 20301,                                  )
                                                         )
KEVIN K. MCALEENAN, in his official capacity as          )
Acting Secretary of the UNITED STATES                    )
DEPARTMENT OF HOMELAND SECURITY[2]                       )
245 Murray Lane, SW, Mail Stop 0485                      )
Washington, DC 20528-0485, and                           )
                                                         )
STEVEN T. MNUCHIN, in his official capacity as           )
Secretary of the UNITED STATES DEPARTMENT                )
OF THE TREASURY                                          )
1500 Pennsylvania Avenue, NW                             )
Washington, D.C. 20220,                                  )
                                                         )
              Defendants.                                 )
                                                         )

## INTRODUCTION

1.      The Rio Grande International Study Center, Ramiro R. Ramirez, the

Carrizo/Comecrudo Nation of Texas, Elsa Hull, Joseph Hein, the Labor Council for Latin

American Advancement, California Wildlife Coalition, and GreenLatinos bring this action

seeking relief from the President's unlawful declaration of a national emergency and

accompanying actions unlawfully diverting funding to construct a wall at the United States-

Mexico border (the "southern border").

2.      There is no national emergency supporting the President's Proclamation on

Declaring a National Emergency Concerning the Southern Border of the United States

("Emergency Declaration").[3]  Instead, it is a fabrication to seize emergency powers in an attempt

---

[1] On June 17, 2019, President Trump named Mark Esper to replace Patrick Shanahan as Acting
Secretary of Defense.
[2] On April 7, 2019, President Trump named Kevin McAleenan to replace Kirstjen Nielsen as
Acting Secretary of the Department of Homeland Security.
[3] Proclamation No. 9844, Declaring a National Emergency Concerning the Southern Border of

to accomplish a long-standing campaign promise—a "big beautiful wall"—that Congress, since President Trump's inauguration, has repeatedly and explicitly refused to fund.  But the National Emergencies Act does not allow the President to declare an emergency completely untethered to the facts on the ground.  Nor do the emergency authorities the President invokes—the powers to activate Ready Reserve military troops and divert Department of Defense spending for military construction—authorize construction of a wall that is unrelated to military activities and would not accomplish the stated aims of the emergency declaration.

3.      Moreover, the President has instructed his subordinates to divert additional sources of Department of Defense and Treasury funds that Congress allocated for other purposes in an effort to secure appropriations that Congress denied him for the border wall. [4]  This blatant disregard for the exclusive power of Congress to appropriate money and to designate the purpose for which that money shall be spent violates the Appropriations Clause and the separation of powers embedded in the Constitution, as well as the Defense and Treasury funding statutes the administration invokes.

4.      The President's overreach has real and dire impacts for communities living along the border, including the Plaintiffs.  An executive abuse of power to construct a wall against the will of Congress disregards the authority vested in the people's representatives.  It endangers property, parks, wetlands, and wildlife habitats.  It threatens to desecrate graves and spiritual ancestral sites; divide neighbors; alienate border communities, researchers, and nature lovers from the Rio Grande River; defile landscapes; and militarize communities.  The President's

---

the United States, 84 Fed. Reg. 4949 (Feb. 15, 2019), https://www.whitehouse.gov/presidential-actions/presidential-proclamation-declaring-national-emergency-concerning-southern-border-united-states/.

[4] Office of the White House, *President Donald J. Trump's Border Security Victory* (Feb. 15, 2019), https://www.whitehouse.gov/briefings-statements/president-donald-j-trumps-border-security-victory/.

callous misrepresentation of the vibrant, thriving, cities and towns along the border as ridden with crime and illegal narcotics adds insult to injury.

5.     For these reasons, Plaintiffs ask this Court to declare that the President's Emergency Declaration and accompanying executive actions to obtain his preferred funding for a border wall (collectively "Executive Actions") are unauthorized by the Constitution and laws of the United States and to enjoin the Secretaries of Defense, Homeland Security, and Treasury from taking any action pursuant to the President's unlawful Executive Actions.

## JURISDICTION AND VENUE

6.     This Court has federal question jurisdiction over this action under 28 U.S.C. § 1331 because this action arises under Article I, section 9, clause 7 of the United States Constitution, the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 807-706, the National Emergencies Act ("NEA"), 50 U.S.C. §§ 1601-1651, the Consolidated Appropriations Act of 2019, Pub. Law. No. 116-6, and other federal statutes.

7.     The Court is authorized to award the requested declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, the APA, 5 U.S.C. § 706(2), and its equitable powers.

8.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(e)(1).  Each Defendant is an officer of the United States sued in his or her official capacity and resides in this district.

## PARTIES

9.     Plaintiff RIO GRANDE INTERNATIONAL STUDY CENTER:

a.     Plaintiff Rio Grande International Study Center ("RGISC," pronounced "risk") is a public interest, not-for-profit advocacy organization chartered by the State of Texas

in 1994, and located in Laredo, Texas.  It has a staff of one full-time employee (as of June 2019), and four part-time employees.

       b.     RGISC's mission is "to preserve and protect the Rio Grande-Rio Bravo, its watershed and environment, through awareness, advocacy, research, education, stewardship and bi-national collaboration for the benefit of present and future generations."

       c.     RGISC's activities include a monthly program to monitor the health of the river.  For 25 years, RGISC scientists have conducted monthly water quality testing at multiple designated testing sites located along Laredo's stretch of the Rio Grande.  The data collected at each of these sites is submitted to federal and state authorities and is part of the Texas Clean Rivers Program database.

       d.     RGISC is also working with the United States Geological Survey on a five-year pilot program to conduct real time water quality monitoring and flood inundation modeling of the river at five sites in Webb and Zapata counties.

       e.     Every year in early February, RGISC hosts a four-day Laredo Birding Festival, which is an important source of revenue for RGISC.  The festival attracts more than 150 birders, whom RGISC staff and volunteers take to observe birds along the Rio Grande in Webb and Zapata counties.

       f.     RGISC also leads Loving Laredo community paddles along the river several times a year to raise awareness of the beauty and ecological importance of the Rio Grande.  The Community Paddles generate revenue for RGISC.

       g.     RGISC members have conducted and continue to conduct research related to invasive species and pollinators along the banks of the Rio Grande, behind Laredo College.

       h.     Every October since 2009, RGISC has organized a large-scale student water-testing project throughout the entire Rio Grande basin with nearly 2,500 students from the

U.S. and Mexico.  The Rio Research Roundup is an award-winning student outreach project that has been recognized by the U.S. EPA (RGISC was named a Gulf Guardian in 2017 for this work) and by the Mexican Senate in Mexico City.  During the Roundup, students take a field trip to scientifically test the waters of the river or one of its tributaries.  Students collect water, submitting samples to XX laboratories and then submit additional artwork, short essays, short videos, and Public Service Announcements for the competition.  RGISC obtains multiple grants and sponsorships for this project and its general operations, which would be put at risk by a wall.

       i.      The City of Laredo has asked RGISC to operate an educational center (the "South Laredo Nature and Birding Center" or "SoLa Center") to promote appreciation of the flora, fauna and wildlife of the region.  Using federal Community Development Block Grant dollars, the City of Laredo recently purchased the building to be used for this purpose, as well as the adjoining land.  RGISC has invested substantial staff time and resources into developing plans for the educational center, which, with its adjoining riverfront system, would become the first large-scale publically accessible nature trail system in South Laredo.

       j.      RGISC has also been working with the City of Laredo to designate two areas along the river, near the downtown area as the city's first nature preserve and first birding sanctuary.  These downtown areas are a documented a critical frontier of rare neotropical visiting bird species from Mexico and Central America, and provide a first migratory stopover for these species in the United States.  Approximately 3,000 people have visited the area annually to see the Amazon Kingfisher and Blue Bunting, and over the years thousands have come to view Laredo's prized bird, the Morelet's Seedeater (formerly the White-collared Seedeater), as well as dozens of other uncommon South Texas birds known to the area.

    10.    Plaintiff RAMIRO R. RAMIREZ:

a.      Plaintiff Ramiro R. Ramirez is a landowner in Hidalgo County, Texas. Dr. Ramirez holds the deed to the historic Jackson Ranch Church and Cemetery, which is the burial site of several of Dr. Ramirez's ancestors.  Dr. Ramirez's great-grandfather, Martin Jackson, built the chapel on the property in 1874.

b.      The Jackson Ranch Church and the nearby Eli Jackson Cemetery were both designated State Historical Markers (1983 and 2005, respectively) by the Texas Historical Commission.  The Jackson Ranch Cemetery has a Hidalgo County Historical Commission Marker (1987).  Both cemeteries are burial sites for members of the Jackson Family.  The Jackson Ranch Church was the first Protestant Church in the Rio Grande Valley and is the oldest one still standing in the area.

c.      The Ranch was also an important stop on the Underground Railroad in South Texas.  Nathaniel Jackson (Dr. Ramirez's great-great-grandfather) played a significant role in aiding fleeing slaves beginning as early as 1857, as well as in establishing a forerunner of the Jackson Ranch Church near the current site.

d.      In the fall of 2018, Dr. Ramirez learned that the Texas Historical Commission contacted Customs and Border Protection ("CBP") regarding the potential impacts that border wall construction would have on the Jackson Ranch Church and Cemetery and the Eli Jackson Cemetery.  Dr. Ramirez and other members of the Jackson Family submitted comments to CBP outlining their concerns about the negative impacts that wall construction would have on the church and burial sites of their ancestors.

e.      Dr. Ramirez is determined to protect the sacred gravesites of his ancestors and the church that his great-grandfather built.  The construction of the border wall would result in Dr. Ramirez losing access to his land and losing a cultural and spiritual connection to his history and ancestors.

11.     Plaintiff CARRIZO/COMECRUDO NATION OF TEXAS:

a.      Plaintiff Carrizo/Comecrudo Nation of Texas (Esto'k Gna Nation) is a voluntary association comprised of indigenous peoples whose ancestors have inhabited the Rio Grande (Amahatau Mete'l) delta for hundreds of years or more.  Today the Nation has approximately 1,200 members.

b.      Historically, the Spanish referred to the indigenous peoples living in the delta as Carrizos.  The Mexicans referred to these same indigenous peoples as Comecrudos.

c.      Members of the Carrizo/Comecrudo Nation of Texas historically lived and traded up and down the Rio Grande delta.  The Carrizo/Comecrudo people traveled by canoe and lived in villages up and down the Rio Grande River, from the village of Juliame (near present day Marfa, Texas) to the mouth of the river at Bocachica.  Cultural artifacts and burial sites have been found along the border where the villages once stood.  The Nation's last stronghold was in Mission, Texas.

d.      The Nation currently has a Tribal Council that represents all of the Carrizo/Comecrudo clans.  The Council Chairman is Juan B. Mancias.  The Nation holds an annual meeting where the general assembly and council vote on major decisions.  Many of the Nation's members live in the Rio Grande Valley and in the Texas panhandle; others come from out of state to attend the annual meeting.

e.      The mission of the Carrizo/Comecrudo Nation of Texas is to maintain the constant connection to and preservation of their ancestors and relatives.  The Nation seeks to strengthen, encourage and preserve its identity by sustaining Carrizo/Comecrudo language and lifeways.  By doing so, the Nation reinforces the historical, artistic and cultural contributions of the Carrizo/Comecrudo peoples.

f.      The objectives of the Carrizo/Comecrudo Nation of Texas include restoring and protecting sacred sites along the southern border and securing a land base in order to maintain the connection with its ancestors and ensure adequate housing for its peoples.

g.      Chairman Mancias and other members of the Nation are concerned that wall construction near the Rio Grande River will uncover the remains of their ancestors and desecrate their cultural artifacts.

h.      Among other locations in the Rio Grande delta, ancestors of the Carrizo/Comecrudo Nation are buried at the Eli Jackson Cemetery and Jackson Ranch Cemetery, and within the Santa Ana Wildlife Refuge.

i.      The Carrizo/Comecrudo Nation is committed to protecting its ancestral sites along the border where its villages once stood.  The construction of the border wall would harm the Nation's ability to protect its sacred burial sites, maintain connection to their ancestors, and preserve cultural artifacts essential to their identity and culture.

12.    Plaintiff ELSA HULL:

a.      Plaintiff Elsa Hull is resident of Zapata County, Texas.  Ms. Hull's home, where she has lived with her two daughters for 15 years, is on a three-acre lot located within 200 yards of the Rio Grande, about 40 miles south of Laredo at 103 Laurel in San Ygnacio, TX 78067.

b.      Ms. Hull values her property for the access it provides to the Rio Grande. Ms. Hull and her family use their property and the river area for kayaking, birding, and wildlife observing.

13.    Plaintiff JOSEPH HEIN:

a.      Plaintiff Joseph Hein is a landowner, rancher, and small business owner in Webb and Zapata counties, Texas.  Mr. Hein's ranch consists of 579.9 acres of land that extends for three-quarters of a mile along the Rio Grande and straddles the Webb and Zapata county line.

b.      The property was originally purchased by Mr. Hein's great-great grandfather and has been passed down through his family for nearly 100 years.  Mr. Hein, a retired school teacher, purchased his siblings' interests in the ranch and, among other activities, raises spotted Appaloosa horses on the property.

c.      Mr. Hein's ranch is divided into three parts so he can pasture rotate his horses by cycling where they graze every four months.  The horses drink from the river and the Rio Grande is the only source of water on the whole property.

d.      Mr. Hein also operates an aoudad (a non-native wild sheep) hunting business on the property, both to control the population of aoudads on the land and to generate some additional income.

e.      Mr. Hein goes out to his ranch three to four times a week and often brings his 12-year-old twin daughters out to the property on weekends.  In addition to operating his business on the property, Mr. Hein enjoys spending time there with his family and observing the wildlife there.  He is afraid that his daughters will not be able to enjoy the property in the way that he has if the President's border wall is constructed.

f.      Mr. Hein's immediate and extended family and friends also use the property to gather together and for recreation.  Mr. Hein's family and friends occasionally come out to the property to fish, barbecue, and to hunt.

14.     Plaintiff LABOR COUNCIL FOR LATIN AMERICAN ADVANCEMENT:

a.      Plaintiff Labor Council for Latin American Advancement ("LCLAA") is a nonprofit organization that was founded to improve workers' rights and increase the influence of

Latino workers in the political process by educating, organizing and mobilizing Latinos within and outside of the labor movement.

b.       LCLAA represents the interests of more than 2 million Latino workers in the American Federation of Labor-Congress of Industrial Organizations ("AFL-CIO"), The Change to Win Federation, Independent Unions and all its membership.

c.       LCLAA has long advocated for comprehensive immigration reform that takes into consideration demographic changes, national security, family reunification, and the impact of trade agreements on immigration to the United States.  LCLAA believes that immigration policies need to protect the civil and human rights of all immigrants.

d.       To ensure that LCLAA focuses on the plight of aspiring citizens and the need to create a streamlined immigration process that is effective, fair, and just, LCLAA has commenced a campaign entitled "Roadmap to Citizenship."  The mission of this campaign is to raise awareness about the need to create an immigration process which would bring over twelve million new American immigrants out of the shadows, broaden the tax base, foster economic growth, improve national security, and reinforce the founding principles of inclusiveness and fairness that America embodies.

15.       Plaintiff CALIFORNIA WILDERNESS COALITION:

a.       Plaintiff California Wilderness Coalition ("CalWild") is a nonprofit membership and advocacy organization based in Oakland, California.  CalWild has approximately 600 members and more than 10,000 supporters.

b.       Thirty-seven of CalWild's members live near the Jacumba Wilderness, which is located on the California-Mexico border in CBP's El Centro Sector.  CalWild's members include individuals who hike, recreate, and enjoy watching wildlife in the Jacumba Wilderness.

c.      CalWild's mission is to protect and restore California's wildest natural landscapes and watersheds on federal public lands.  These important wild places provide clean air and water, refuges for wildlife, and outstanding opportunities for recreation and spiritual renewal for people.  CalWild is the only statewide organization dedicated solely to protecting and restoring the wild places and native biodiversity of California's public lands.

d.      CalWild protects wild landscapes through public education, legislation and advocacy.  CalWild engages in local organizing to educate thought leaders, elected officials, and communities about the importance of protecting wild spaces.  CalWild builds coalitions and works with Congress to secure wilderness designation for public lands.

e.      CalWild's advocacy has included opposing bills that would exempt CBP from bedrock conservation laws such as the Wilderness Act, the Endangered Species Act, and the National Environmental Policy Act ("NEPA") with regard to their activities at or near the border with Mexico, including, among other things, the construction and maintenance of roads and physical barriers within wilderness areas, damaging their wilderness characteristics. CalWild also works to protect the California desert including by working on the California Desert Protection and Recreation Act and the Desert Renewable Energy Conservation Plan, which encompasses the southeastern part of the California-Mexico border and includes Jacumba Wilderness.

f.      CalWild is concerned about the negative impacts of the border wall on California's wild lands and on federal public lands throughout the border States, particularly in wilderness areas.  The areas of California's borderlands where construction of a wall is imminent include the Otay Mountain Wilderness Area in the CBP's San Diego Sector, and the Jacumba Wilderness Area in CBP's El Centro Sector.  Construction of a wall through these wilderness

areas threatens dozens of sensitive plant and animal species native to these desert ecosystems that are listed as "endangered," "threatened," or "rare."

16.     Plaintiff GREENLATINOS:

a.     Plaintiff GreenLatinos is a national non-profit membership organization that convenes a broad coalition of Latino leaders committed to addressing national, regional, and local environmental, natural resources, and conservation issues that significantly affect the health and welfare of the Latino community in the United States.  Latinos can be of any race, including white, indigenous, African American, and Asian American people.

b.     GreenLatinos has members that live in and around the U.S. borderlands, including in El Paso, Texas, Las Cruces, New Mexico, Tucson and Yuma, Arizona, and El Centro, California.

c.     GreenLatinos provides an inclusive table at which its members establish collaborative partnerships and networks to improve the environment; protect and promote conservation of land and other natural resources; amplify the voices of minority, low-income, and tribal communities; and train, mentor, and promote the current and future generations of Latino environmental leaders for the benefit of the Latino community and beyond.  GreenLatinos develops and advocates for policies and programs to advance this mission.

d.     GreenLatinos has a small staff of four employees that work on the organization's Core Policy Priorities.  The GreenLatinos Core Policy Priorities include: (1) Environmental Justice, Civil Rights & Public Engagement; (2) Indigenous Rights and Sovereignty; (3) Climate and Clean Air; (4) Toxics and Pesticide; and (5) Clean Water.

e.     GreenLatinos has long advocated for comprehensive immigration reform that takes into consideration equal justice, human rights, immigrant rights, demographic changes, national security, family reunification, and environmental impacts of the border wall on the

United States.  For example, GreenLatinos and its members have presented testimony before the House Natural Resources Committee and its Members on the impact of the wall on people, places, and values.

17.    Defendant DONALD J. TRUMP is the President of the United States of America. He is responsible for the actions and decisions that Plaintiffs challenge in this action.  He issued the Emergency Declaration and associated Executive Actions in contravention of the Constitution and laws of the United States. Plaintiffs sue Donald Trump in his official capacity.

18.    Defendant UNITED STATES DEPARTMENT OF DEFENSE ("DOD") is the federal agency to which Congress has appropriated the military construction and drug interdiction funding implicated by the President's Executive Actions.  Defendant MARK ESPER is Acting Secretary of Defense.  He is responsible for overseeing DOD, including the U.S. Army Corps of Engineers, and ensuring that DOD actions comply with applicable laws.  Acting Secretary Esper is responsible for exercising military construction authority and spending under 10 U.S.C. § 2808, for reprogramming funds under 10 U.S.C. § 284, for deploying Ready Reserve units to the southern border under 10 U.S.C. § 12302, and for taking other action to use or support the use of those authorities, including, if necessary, the transfer and acceptance of jurisdiction over border lands.  Plaintiffs sue Acting Secretary Esper in his official capacity.

19.    Defendant UNITED STATES DEPARTMENT OF HOMELAND SECURITY ("DHS") is the federal agency responsible for providing border security along the United States-Mexico border in a manner consistent with the laws and Constitution of the United States.  CBP falls within DHS.  Defendant Kevin K. McAleenan is Acting Secretary of DHS.  He is responsible for overseeing DHS and ensuring that DHS actions comply with applicable laws. Plaintiffs sue Defendant McAleenan in his official capacity.

20.     Defendant UNITED STATES DEPARTMENT OF THE TREASURY (the "Treasury") is the federal agency responsible for the Treasury Forfeiture Fund implicated by the President's Emergency Declaration and accompanying actions.  Defendant Steven T. Mnuchin is Secretary of the Treasury.  He is responsible for directing money from the Treasury Forfeiture Fund for use to build a wall at the southern border.  Plaintiffs sue Secretary Mnuchin in his official capacity.

## LEGAL BACKGROUND

### I.     The United States Constitution

21.     The framers of the United States Constitution carefully distributed the powers and responsibilities of government between the three Branches because they understood that concentration of unchecked power in one body would lead to tyranny.  "The accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny."  The Federalist No. 47 (James Madison).  This careful separation of powers is fundamental to our form of government.

22.     The Constitution grants Congress the exclusive power to decide how the government spends money. The Constitution's Appropriations Clause provides that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7.  The Spending Clause grants Congress alone the "Power To lay and collect Taxes . . . to pay the Debts and provide for the common Defence and general Welfare of the United States."  U.S. Const. art. I, § 8, cl. 1.  When "the decision to spend [is] determined by the Executive alone, without adequate control by the citizens' Representatives in Congress, liberty is threatened."  *Clinton v. City of New York*, 524 U.S. 417, 451 (1998) (Kennedy, J., concurring).

23.     The Constitution also grants Congress the exclusive power to make laws.  The Presentment Clause requires that all bills passed by the House of Representatives and the Senate be presented to the President for signature.  The President then has the choice to sign or veto the bill.  U.S. Const. art. I, § 7, cl. 2.  The President may propose measures to Congress, but otherwise the President's role in our system of checks and balances is to execute the laws Congress has enacted, not to make the laws himself.  U.S. Const. art. II, § 3.

24.     While the President is the commander in chief of the Army and Navy of the United States, U.S. Const. art. II, § 2, the Constitution charges Congress with oversight of the military.  U.S. Const. art. I, § 8.  Pursuant to this power, Congress passed the Posse Comitatus Act, 18 U.S.C. §1385, which bars the military from engaging in domestic law enforcement except where expressly authorized by the Constitution or Congress.

## II.     The 2019 Consolidated Appropriations Act (Pub. Law No. 116-6)

25.     Congress passed and the President signed into law the 2019 Consolidated Appropriations Act on February 15, 2019.  Congress enacted the measure after extensive debate, including a government shutdown, over the appropriate funding levels for border wall construction.

26.     In the 2019 Consolidated Appropriations Act, Congress authorized and appropriated the expenditure of $1.375 billion to repair certain existing border fencing or barriers and to provide for 55 miles of new fencing in the Rio Grande Valley Sector, using a previously deployed design.  This was less funding, fewer miles of fencing, and a different design than the President had proposed in his fiscal year 2019 budget request.

## III.    The National Emergencies Act (50 U.S.C. §§ 1601-1651)

27.     Congress enacted the National Emergencies Act ("NEA") in 1976 to rein in the power of the President.  The NEA terminated existing emergencies and created a new legal

framework to prevent the President from exercising unbounded authority to declare emergencies and to continue states of emergency in perpetuity.  50 U.S.C. § 1601 *et seq.*  The NEA's purpose is to ensure that "the extraordinary powers which now reside in the hands of the Chief Executive . . . could be utilized only when emergencies actually exist"; that "[r]eliance on emergency authority, intended for use in crisis situations would no longer be available in non-crisis situations"; and that "the United States travels a road marked by carefully constructed legal safeguards."  S. Rep. No. 94-1168, at 2 (1976).

28.     The NEA does not itself create any emergency powers.  Instead, during a period of national emergency, it authorizes the President to declare such emergency and invoke existing statutory authorities to address it.  50 U.S.C. § 1621.  The President must specify which statutes he proposes to invoke: "When the President declares a national emergency, no powers or authorities made available by statute for use in the event of an emergency shall be exercised unless and until the President specifies the provisions of law under which he proposes that he, or other officers will act."  50 U.S.C. § 1631.  He must also publish the proclamation of a national emergency in the Federal Register and transmit it to Congress. *Id.*  The NEA thus permits the President to direct the use of certain resources, but only in a qualifying emergency and only in the manner and to the extent that Congress has previously authorized by statute.

## IV.     Statutory Authorities Invoked in the Emergency Declaration and Accompanying White House Statement

29.     President Trump's Emergency Declaration invokes emergency powers under two statutes:  10 U.S.C. § 2808(a), which permits certain military construction activities during national emergencies; and 10 U.S.C. § 12302, which authorizes the Secretaries of the Army, Navy, Air Force, and Homeland Security to order any unit of the Ready to Reserve to active duty during a national emergency.

30.     In the White House Statement accompanying the Emergency Declaration, the President referenced additional, non-emergency statutory authorities to be used to accomplish the President's goal of building a border wall:  10 U.S.C. § 284, which allows DOD to engage in specified counterdrug activities for the Department of Defense; and 31 U.S.C. § 9705, which governs the Treasury Forfeiture Fund.  Use of these statutory authorities does not require a declaration of national emergency.

### A.     *Emergency Military Construction Authority (10 U.S.C. § 2808(a))*

31.     Congress has the power to make and limit military appropriations, raise and support armies, provide for and maintain a navy, declare war, and provide for organizing and calling forth the national guard.  U.S. Const. art. I, § 8.

32.     The Military Construction Codification Act provides a narrow exception to the requirement of congressional authorization for all military construction projects. It provides that, in the event the President declares war or a national emergency under the NEA that "requires use of the armed forces," the Secretary of Defense "may undertake military construction projects . . . not otherwise authorized by law *that are necessary to support such use of the armed forces*." 10 U.S.C. § 2808(a) (emphasis added).

33.     For purposes of section 2808(a), Congress defines the term "military construction" as "any construction, development, conversion, or extension of any kind carried out with respect to a military installation . . . or any acquisition of land or construction of a defense access road."  10 U.S.C. § 2801(a).  Congress defined "military installation" as a "base, camp, post, station, yard, center, or other activity under the jurisdiction of the Secretary of a military department . . . ."  *Id*. § 2801(c)(4).

### B.     *Emergency Power to Call Ready Reserve to Active Duty (10 U.S.C. § 12302)*

34.     Section 12302 authorizes the Secretaries of the Army, Navy, Air Force, and Homeland Security, "[i]n a time of national emergency declared by the President," to order any unit in the Ready Reserve "to active duty for not more than 24 consecutive months."  10 U.S.C. § 12302(a).

### C.     Authority to Support Counter-Drug Activities (10 U.S.C. § 284)

35.     Section 284 authorizes the Secretary of Defense to assist civilian law enforcement with drug enforcement activities.  10 U.S.C. § 284.  It states that the Secretary of Defense "may provide support for the counterdrug activities or activities to counter transnational organized crime" of any law enforcement agency.  *Id*. § 284(a).  Such support may include "[c]onstruction of roads and fences and installation of lighting to block drug smuggling corridors across international boundaries of the United States."  *Id*. § 284(b)(7).

36.     Section 284(h)(1)(B) requires the Secretary of Defense to give Congress fifteen-days' written notice before providing such support, including "a description of any *small scale construction project* for which support is provided."  10 U.S.C. § 284(h)(1)(B) (emphasis added). The statute defines "small scale construction" as "construction at a cost not to exceed $750,000 for any project."  *Id*. § 284(i)(3).

37.     The statute also provides that "the Secretary of Defense shall require a civilian law enforcement agency to which support is provided under this chapter to reimburse the Department of Defense for that support."  10 U.S.C. § 277(a).

### D.     Authority to Transfer Funds from Treasury Forfeiture Fund (31 U.S.C. § 9705)

38.     Congress established the Treasury Forfeiture Fund to permit the use of forfeited funds for specifically delineated law enforcement purposes relating to the seizure and forfeiture program.  *See* 31 U.S.C. § 9705(a).

39.     Section 9705(g)(4)(B) provides that after required reserves and required transfers, "any unobligated balances remaining in the Fund . . . shall be available to the Secretary . . . for obligation or expenditure in connection with the law enforcement activities of any Federal agency. . . ."  31 U.S.C. § 9705(g)(4)(B).  Any expenditure "in excess of $500,000 with respect to an unobligated balance described in subparagraph (B) may not be made by the Secretary unless the Appropriations Committees of both Houses of Congress are notified at least 15 days in advance of such obligation or expenditure."  *Id*. § 9705(g)(4)(C).

## V.     The National Environmental Policy Act (42 U.S.C. §§ 4321 et seq.)

40.     NEPA is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a) (1978).  Congress enacted NEPA to "encourage productive and enjoyable harmony between man and his environment . . . to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; [and] to enrich the understanding of the ecological systems and natural resources important to the Nation . . . ." 42 U.S.C. § 4321.

41.     To achieve this purpose, NEPA requires a federal agency to analyze the environmental impacts of a particular action before it proceeds.  *Id.* § 4332(2)(C).  In addition, the agency must notify the public of its proposed actions and allow the public to comment on the fully-disclosed environmental impacts of those projects.  *See* 40 C.F.R. § 1501.2.

42.     The cornerstone of NEPA is the environmental impact statement ("EIS").  NEPA requires a federal agency to conduct an EIS for all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C); *see also* 40 C.F.R. § 1501.4. "Federal actions" include "new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated or approved by federal agencies."  40

C.F.R. § 1508.18(a).  "'Major Federal actions' includes actions with effects that may be major

and that are potentially subject to Federal control and responsibility."  *Id.* § 1508.18.

43.    To determine whether a federal action will result in significant environmental

impacts and requires an EIS, the federal agency may first conduct an environmental assessment

("EA").  40 C.F.R. § 1501.4.  An EA must "provide sufficient evidence and analysis for

determining whether to prepare an environmental impact statement or a finding of no significant

impact."  *Id.* § 1508.9.  If a federal agency makes a finding of no significant impact, it may avoid

conducting an EIS.  *Id.* § 1501.4.

44.    The goals of an EIS are to "provide a full and fair discussion of significant

environmental impacts" associated with a federal decision and to "inform decisionmakers and

the public of the reasonable alternatives which would avoid or minimize adverse impacts or

enhance the quality of the human environment."  *Id.* § 1502.1.

45.    Accordingly, in an EIS a federal agency must: (1) "rigorously explore and

objectively evaluate all reasonable alternatives" to the proposed action, 42 U.S.C. § 4332(2)(C);

40 C.F.R. § 1502.14(a); (2) identify and disclose to the public all direct, indirect, and cumulative

impacts of the proposed action and each reasonable alternative, 42 U.S.C. § 4332(2)(C); 40

C.F.R. §§ 1502.16, 1508.7 – 1508.8; and (3) consider possible mitigation measures to reduce

such impacts to the environment, 40 C.F.R. § 1502.14(f).

46.    A federal agency must prepare a draft EIS and must request comments on the

draft EIS from relevant federal agencies, interested state, local and tribal governments, the

public, and other interested parties.  40 C.F.R. § 1503.1(a).  The federal agency must assess and

consider any comments in preparing the final EIS.  *Id.* § 1503.4(a).

47.    The Council on Environmental Quality ("CEQ"), established under NEPA within

the Executive Office of the President, is responsible for promulgating regulations to implement

NEPA.  *Id.* §§ 1500 – 1508.  CEQ regulations require each federal agency "as necessary" to adopt procedures to "supplement" the CEQ regulations.  *Id.* § 1507.3(a).  The Department of Homeland Security has not promulgated regulations to implement NEPA, but has issued an Instruction Manual.  U.S. Dep't of Homeland Security, *Instruction Manual 023-01-001-01, Revision 01, Implementation of the National Environmental Policy Act (NEPA)* (Nov. 6, 2014), ("DHS NEPA Manual").  The Manual specifically includes "proposed construction, land use, activity, or operation that has the potential to significantly affect environmentally sensitive areas" as actions "normally requiring" the preparation of at least an EA.  *Id.* at V-9.


## FACTUAL ALLEGATIONS

**I.      Congress Has Considered and Rejected President Trump's Requests for Funding to Construct a Border Wall.**

48.      When Congress has deemed it appropriate, Congress has exercised its Article I authority to legislate and appropriate funds for the construction of barriers and related infrastructure along the southern border.  For example, the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, div. C, 110 Stat. 3009–546, authorized $12 million for construction of fencing and road improvements near the San Diego, California, border with Mexico.

49.      In 2007 and 2008, Congress passed appropriations bills allocating more than $2 billion for customs and border protection fencing, infrastructure and technology.  *See* Department of Homeland Security Appropriations Act, 2007, Pub. L. No. 109-295, 120 Stat. 1355 (2006); Consolidated Appropriations Act, 2008, Pub. L. No. 110-161, div. E, 121 Stat. 1844 (2007).

50.     There is currently 705 miles of primary, secondary, or tertiary fencing along the southern border.[5]

51.     Since President Trump took office in January 2017, Congress has repeatedly considered and rejected his requests for appropriations to fund construction of a border wall.  In March 2017, the President asked Congress for $1.4 billion for the border wall for the remainder of fiscal year 2017, and an additional $2.6 billion for fiscal year 2018.  On May 1, 2017, Congress agreed on a bipartisan bill to fund the government through September 30, 2017, rejecting the President's request for wall funding but increasing spending on border security by $1.5 billion.  Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, div. F, 131 Stat. 135 (2017).

52.     On March 23, 2018, Congress rejected the President's request for $1.6 billion to build a border wall in the Rio Grande Valley in Texas.  Congress instead allocated $1.571 billion for border security including new technology and repairs to existing barriers, as well as $692 million for about 39 miles of fencing that had been authorized by the Secure Fence Act of 2006. Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, § 230, 132 Stat. 348 (2018).

53.     On December 11, 2018, during his most recent budget negotiations with Congress, the President requested $5.7 billion in wall funding and declared that he would not sign any funding legislation—including legislation unanimously approved by the Senate to keep the government funded through February 8, 2019—without $5 billion to build his proposed border wall.  At a televised meeting with Congressional leaders to discuss the funding deadline,

---

[5] U.S. Customs and Border Protection, *Mileage of Pedestrian and Vehicle Fencing by State* (last updated Aug. 2, 2017), https://www.cbp.gov/sites/default/files/assets/documents/2017-Sep/Border%20Patrol%20Fence%20Totals.pdf.

President Trump said that if he did not get that funding, he would be "proud to shut down the government."[6]

54.     Administration officials explained that the President's $5.7 billion request would "fund construction of a total of approximately 234 miles of new physical barrier and fully fund the top 10 priorities in CBP's Border Security Improvement Plan."  Jan. 6, 2019 letter from Russell T. Vought, OMB Acting Director, to Senator Richard Shelby, Appropriations Committee Chairman.[7]  Congress did not accede to the President's demands.

55.     On December 21, 2018, the United States entered into a partial government shutdown.  President Trump threatened to draw the shutdown out for "a very long period of time—months or even years"—unless Congress gave him the funds he was demanding for the border wall.[8]  Despite holding a significant portion of the federal government hostage by forcing a partial government shutdown and publicly claiming responsibility for the shutdown, President Trump again failed to persuade Congress to agree to his demands.

56.     As the shutdown continued, President Trump attempted to strike a compromise. He announced on January 19, 2019, that he was willing to temporarily extend the Deferred Action for Childhood Arrivals and Temporary Protected Status programs in exchange for $5.7 billion for a border wall.  Congressional leaders explicitly rejected the proposal as a "non-starter" that merely put forth previously rejected offers to build a border wall.

---

[6] C-SPAN, *President Trump Meeting with Democratic Leaders* (Dec. 11, 2018), https://www.c-span.org/video/?455813-1/president-trump-democratic-leaders-clash-border-funding.
[7] Letter from Russell T. Vought, OMB Acting Director, to Senator Richard Shelby, Appropriations Committee Chairman (Jan. 6, 2019), https://www.whitehouse.gov/wp-content/uploads/2019/01/Final-Shelby-1-6-19.pdf.
[8] Sheryl Gay Stolberg and Michael Tackett, *Trump Suggests Government Shutdown Could Last for "Months or Even Years,"* N.Y. Times (Jan. 4, 2019), https://www.nytimes.com/2019/01/04/us/politics/democrats-trump-meeting-government-shutdown.html.

57.     Frustrated by Congress's consistent rejection of his demand for funding, President Trump threatened to declare a national emergency and build a wall without congressional approval.  On January 9, 2019, he stated that "I have the absolute right to do national emergency if I want," and that his "threshold" for invoking the emergency would be if he "can't make a deal with people that are unreasonable."[9]

58.     On January 25, 2019, after the shutdown had dragged on for 35 days—the longest shutdown in the nation's history—President Trump agreed to sign legislation that would keep the government open until February 15, 2019.  This stopgap legislation did not include any funding for a border wall.  In ending the government shutdown, the President stated that if he were unable to "work with the Democrats and negotiate," then "obviously we'll do the emergency because that's what it is. It's a national emergency."[10]

59.     After the shutdown ended, a bipartisan committee of negotiators from the House and Senate began work on a compromise appropriations bill that would include some funding for border security.  While the negotiations were ongoing, Acting White House Chief of Staff Mick Mulvaney stated that "[w]e'll take as much money as [Congress] can give us and then we'll go off and find the money someplace else…but [the wall] is going to get built with or without Congress."[11]

---

[9] Greg Sargent, *Trump: I have the "absolute right" to declare a national emergency if Democrats defy me*, Wash. Post (Jan. 9, 2019), https://www.washingtonpost.com/opinions/2019/01/09/trump-i-have-absolute-right-declare-national-emergency-if-democrats-defy-me/.
[10] Steven Nelson, *Trump warns he'll "obviously" declare national emergency if talks fail to result in wall funding*, Wash. Exam'r (Jan. 25, 2019, 4:21 PM), https://www.washingtonexaminer.com/news/white-house/trump-warns-hell-obviously-declare-national-emergency-if-talks-fail-to-result-in-wall-funding.
[11] Alexander Bolton, *Mulvaney: Trump Can "move money around" to get wall funding*, The Hill (Feb. 10, 2019 10:30 AM), https://thehill.com/homenews/administration/429313-mulvaney-trump-can-move-money-around-to-get-wall-funding.

60.     On February 15, 2019, Congress agreed on a funding deal—the Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, 133 Stat. 13 (2019).  The agreement included $1.375 billion for pedestrian fencing along 55 miles of the Rio Grande Valley Sector of the border and exempted certain parks and other sensitive areas from construction. *Id*. § 230(a)(1); *id*. § 231.

61.     Congress specifically prohibited the use of any appropriated funds in specific sections of the Rio Grande Valley, forbidding the use of any funds to construct a barrier "(1) within the Santa Ana Wildlife Refuge; (2) within the Bentsen-Rio Grande Valley State Park; (3) within La Lomita Historical Park; (4) within the National Butterfly Center; or (5) within or east of the Vista del Mar Ranch tract of the Lower Rio Grande Valley National Wildlife Refuge." Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, § 231, 133 Stat. 13 (2019).

62.     In addition, Congress forbade the use of appropriated funds for construction within the city limits of Roma, Texas; Rio Grande City, Texas; Escobares, Texas; La Grulla, Texas; and within Salineño, Texas, until local government officials and the public have had an opportunity to comment on any plans for construction.  Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, § 232, 133 Stat. 13 (2019).

63.     In passing the 2019 Appropriations Act, Congress made clear that it was not appropriating any funds for construction of a wall.  Senator Patrick Leahy, Vice Chairman of the Senate Appropriations Committee, and a member of the negotiating committee, stated, "The agreement does not fund President Trump's wasteful wall."  165 Cong. Rec. S1362 (daily ed. Feb 14, 2019) (statement of Sen. Leahy).  Senator Chuck Schumer, the Senate Minority Leader, noted, "The agreement will provide smart border security, increasing support for technologies at our ports of entry. It will not fund the President's expensive, ineffective wall."  165 Cong. Rec. S1363 (daily ed. Feb. 14, 2019) (statement of Sen. Schumer).  In the House, Representative

David Price declared, "This agreement denies the President billions of dollars for an unnecessary wall." 165 Cong. Rec. H2019 (daily ed. Feb. 14, 2019) (statement of Rep. Price); *see also* 165 Cong. Rec. H2020 (daily ed. Feb. 14, 2019) (statement of Rep. Aguilar) ("What this bill will not do is . . . fund the President's wall from sea to shining sea, a wall that he said Mexico would pay for.").

64.   President Trump stated that he was "not happy" with Congress's compromise deal and would find other methods to finance a wall without Congress.[12]

## II.   Trump's Emergency Declaration and Associated Actions

65.   President Trump signed the Consolidated Appropriations Act on February 15, 2019.  That same day, he issued the Emergency Declaration and the accompanying plan to obtain funding for his border wall.

66.   The Emergency Declaration claims there is a "border security and humanitarian crisis that threatens core national security interests and constitutes a national emergency," and that the border is an entry point for "criminals, gang members, and illicit narcotics."[13]  The Declaration asserts: "[t]he problem of large-scale unlawful migration through the southern border is long-standing, and despite the executive branch's exercise of existing statutory authorities, the situation has worsened in certain respects in recent years.  In particular, recent years have seen sharp increases in the number of family units entering and seeking entry to the

---

[12] Kevin Liptak, Dana Bash, and Kaitlan Collins, *Trump "not happy" with deal, weighing options for building wall*, CNN (Feb. 12, 2019, 4:44 PM), https://www.cnn.com/2019/02/12/politics/trump-executive-action-options/index.html.

[13] Proclamation No. 9844, Declaring a National Emergency Concerning the Southern Border of the United States, 84 Fed. Reg. 4949 (Feb. 15, 2019), https://www.whitehouse.gov/presidential-actions/presidential-proclamation-declaring-national-emergency-concerning-southern-border-united-states/.

United States and an inability to provide detention space for many of these aliens while their

removal proceedings are pending."[14]

67.     Invoking "the authority vested in [the President] by the Constitution and the laws

of the United States of America, including sections 201 and 301 of the National Emergencies

Act," the Declaration asserts that the purported emergency "requires use of the Armed Forces."[15]

The Declaration then directs the Secretary of Defense or the Secretary of relevant military

departments to "order as many units or members of the Ready Reserve to active duty as the

Secretary concerned, in the Secretary's discretion, determines to be appropriate to assist and

support the activities of the Secretary of Homeland Security at the southern border."[16]

68.     The Declaration also invokes "the construction authority provided in section 2808

of title 10, United States Code"[17] and directs the Secretaries of Defense, Interior, and Homeland

Security to "take all appropriate actions, consistent with applicable law, to use or support the use

of the authorities herein invoked."[18]

69.     The accompanying White House Statement asserts that in addition to existing

funding in Homeland Security appropriations, $6.7 billion "will be available to build the border

wall once a national emergency is declared and additional funds have been reprogrammed."

This includes diversion of: "$601 million from the Treasury Forfeiture Fund"; "[u]p to $2.5

billion under the Department of Defense funds transferred for Support for Counterdrug Activities

(10 U.S.C. § 284)"; and "[u]p to $3.6 billion reallocated from Department of Defense military

construction projects under the President's declaration of a national emergency (10 U.S.C. §

---

[14] *Id.*
[15] *Id.*
[16] *Id.*
[17] *Id.*
[18] *Id.* at 4949 – 4950.

2808)."  These funds could be used for new projects, including "new levee wall, new and replacement primary pedestrian barrier, new vehicle-to-pedestrian barrier, and new secondary barrier."

70.     The Proclamation does not refer to the 2019 Consolidated Appropriations Act. However, at a press conference announcing the Emergency Declaration, President Trump acknowledged that he received limited funding from Congress for construction along the border but stated that he is "not happy with it . . . I could do the wall over a longer period of time.  I don't need to [declare a national emergency].  But I'd rather do it much faster."[19]

71.     In a letter to the President the same day, the House Judiciary Committee expressed its concern over the Emergency Declaration:

> Congress has entrusted you and your predecessors with emergency authority in order to respond quickly and effectively to real crises, such as wars and natural disasters.  The Judiciary Committee, which has jurisdiction over the National Emergencies Act, did so based on an understanding that the President would "take care that the laws be faithfully executed" and would resort to this authority only when absolutely necessary.  By fabricating an emergency in order to bypass the political process for allocating a budget, you appear to be abusing both this trust and your own oath of office.

Feb. 15, 2019 letter from U.S. House of Reps. Jud. Comm. To Pres. Trump.[20]

72.     On February 26, 2019, the House passed legislation with bi-partisan support disapproving of and terminating President Trump's Emergency Declaration.  H.R.J. Res. 46, 116th Cong. (2019).

---

[19] The White House, *Remarks by President Trump on the National Security and Humanitarian Crisis on our Southern Border* (Feb. 15, 2019), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-national-security-humanitarian-crisis-southern-border/.

[20] Letter from U.S. House of Reps. Comm. on the Judiciary to President Trump (Feb. 15, 2019), https://judiciary.house.gov/sites/democrats.judiciary.house.gov/files/documents/National%20Emergency%20Letter%20Final_0.pdf.

73.     On March 14, 2019, the Senate passed H.R.J. Res. 46, formally disapproving of and terminating President Trump's Emergency Declaration.

74.     On March 15, 2019, President Trump vetoed the Joint Resolution.[21]

75.     The House voted 248-181 to override the President's veto, which fell short of the required two-thirds majority.  165 Cong. Rec. 2, 799, 2,814-15 (2019).

## III.     There is No Emergency and President Trump's Actions are *Ultra Vires*

76.     The purpose of the National Emergencies Act is to allow the President to invoke emergency powers in urgent, unanticipated situations in which there is no time for Congress to deliberate and act in response.  That is not the situation here.

77.     Dating back to his speech announcing his candidacy for President in June 2015, President Trump has claimed that a border wall is needed to stop illegal immigration, because Mexico is "sending people that have lots of problems, and they're bringing those problems with us [sic].  They're bringing drugs.  They're bringing crime.  They're rapists."[22]  In that same speech he stated that as President he would build the wall and have Mexico pay for it.  In a speech shortly before the 2016 presidential election, President Trump stated that "[o]n day one [of his Administration], we will begin working on an impenetrable, physical, tall, power [sic], beautiful southern border wall" to "help stop the crisis of illegal crossings" and "stop the drugs and the crime from pouring into our country."[23]

---

[21] *Veto Message to the House of Representatives for H.J. Res. 46*, The White House (Mar. 15, 2019), https://www.whitehouse.gov/briefings-statements/veto-message-house-representatives-h-j-res-46/.

[22] Time Staff, *Here's Donald Trump's Presidential Announcement Speech*, Time (June 16, 2015), http://time.com/3923128/donald-trump-announcement-speech/.

[23] *Transcript of Donald Trump's Immigration Speech*, N.Y. Times (Sep. 1, 2016), https://www.nytimes.com/2016/09/02/us/politics/transcript-trump-immigration-speech.html.

78.     President Trump admits that the circumstances surrounding the alleged crisis at the border have not significantly changed since his inauguration as President in January 2017. Indeed, he acknowledged this when he stated that the "emergency" at the border "began a long time [ago] . . . in 2014."[24]

79.     The President issued the Emergency Declaration more than two years after he took office and six weeks after first publicly suggesting that he could "do" a national emergency to secure funding that Congress in the exercise of its appropriations powers refused to grant. During that time, Congress acted multiple times, voting not to fund a border wall that would extend across the entire southern border, and instead passing legislation appropriating funds for limited repair and construction of fencing in particular locations along the border.  This is not a situation in which Congress has not had time to deliberate and act in response to needs at the border.  Congress has deliberated.  Congress has acted.  And Congress has refused to fund President Trump's border wall.

80.     Moreover, President Trump's claim that an unprecedented flood of migrants is causing an immigration enforcement crisis amounting to a "national emergency" is not supported by the facts.

81.     According to CBP data, apprehensions at the border are actually near historic lows, with fewer than 400,000 apprehensions in FY2018[25] compared to over 1.6 million in FY2000.[26]  In FY2017, CBP made the fewest apprehensions since FY2000.

---

[24] The White House, *Remarks by President Trump Before Marine One Departure* (Jan. 10, 2019), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-marine-one-departure-30/.

[25] U.S. Customs and Border Protection, *Southwest Border Migration FY2018*, https://www.cbp.gov/newsroom/stats/sw-border-migration/fy-2018 (last visited June 21, 2019).

[26] U.S. Border Patrol, *Total Illegal Alien Apprehensions By Month FY 2000-FY 2018* (last visited June 21, 2019), https://www.cbp.gov/sites/default/files/assets/documents/2019-Mar/bp-total-monthly-apps-sector-area-fy2018.pdf.

82.     During this same time span, there were dramatic increases in the number of border patrol agents utilized to patrol the southwest border between the ports of entry.  From 2000 to 2017, CBP increased its border patrol agent staffing nationwide by 111%, from 9,212 to 19,437 agents.[27]  In September 2017, DHS published a report in which it concluded that "the southwest land border is more difficult to illegally cross today than ever before."[28]

83.     President Trump cites as a basis for the Emergency Declaration "sharp increases in the number of family units entering and seeking entry to the United States and an inability to provide detention space for many of these aliens while their removal proceedings are pending."  However, construction of a wall would have no impact on the number of asylum-seekers presenting themselves at authorized ports of entry, which they have a legal right to do under 8 U.S.C. § 1158(a).

84.     President Trump's attempts to connect migration at the southern border with crime and illegal narcotics are also unfounded.  Most illegal drugs enter the country through legal ports of entry, not across the open border.  CBP data show that from January through August 2018, 88 percent of cocaine, 90 percent of heroin, 87 percent of methamphetamine, and 80 percent of fentanyl seized by Border Patrol were seized by Field Operations at ports of entry.  Indeed, drug seizures outside legal points of entry have significantly decreased in recent years— from 2012 to 2017, total drug seizures outside ports of entry dropped 62%.[29]

---

[27] U.S. Border Patrol, *USBP Staffing FY1992-FY2018* (last visited June 21, 2019), https://www.cbp.gov/sites/default/files/assets/documents/2019-Mar/Staffing%20FY1992-FY2018.pdf.
[28] Dept. of Homeland Security, Office of Immigration Statistics, *Efforts by DHS to Estimate Southwest Border Security between Ports of Entry* (Sept. 2017), https://www.dhs.gov/sites/default/files/publications/17_0914_estimates-of-border-security.pdf.
[29] U.S. Customs and Border Protection, *CBP Enforcement Statistics FY2018* (last visited June 21, 2019), https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics-fy2018.

85.     In addition, a June 2018 report by the Cato Institute analyzed American Community Survey data from the U.S. Census Bureau and concluded that immigrants do not increase local crime rates, are less likely to cause crime than their native-born peers, and are less likely to be incarcerated than native-born Americans.  In Texas, illegal immigrants represented 56 percent fewer criminal convictions than native-born Americans in 2015.[30]

86.     A 2018 study examining national crime rates from 1990 to 2014 found "that undocumented immigration does not increase violence" and in fact "[i]ncreases in the undocumented immigrant population within states are associated with significant decreases in the prevalence of violence."[31]

87.     The most recent Worldwide Threat Assessment, issued by the Director of National Intelligence on January 29, 2019, discusses migration, terrorism and transnational crime around the world.  The Assessment notes that "high crime rates and weak job markets" will continue to cause people to flee violence in their home countries and seek asylum in the U.S.  However, it does not describes the situation at the border as an emergency, crisis, or threat.[32]  At the January 29, 2019, hearing of the Senate Intelligence Committee where the report was presented, the heads of the Office of the Director of National Intelligence, Federal Bureau of Investigation, and Central Intelligence Agency testified about international threats to the United

---

[30] Michelangelo Landgrave and Alex Nowrasteh, *Incarcerated Immigrants in 2016 Their Numbers, Demographics, and Countries of Origin*, Cato Institute Immigration Research and Policy Brief (June 4, 2018), https://object.cato.org/sites/cato.org/files/pubs/pdf/irpb7.pdf.

[31] Michael T. Light & Ty Miller, *Does Undocumented Immigration Increase Violent Crime?*, Criminology (Mar. 25, 2018), https://onlinelibrary.wiley.com/doi/abs/10.1111/1745-9125.12175.

[32] *Worldwide Threat Assessment of the US Intelligence Committee: Hearing Before the S. Select Comm. on Intelligence,* 116th Cong. (2019) (statement of Daniel R. Coats, Dir. of Nat'l Intelligence) https://www.dni.gov/files/ODNI/documents/2019-ATA-SFR---SSCI.pdf.

States. "None of the officials said there is a security crisis at the U.S.-Mexico border, where

Trump has considered declaring a national emergency so that he can build a wall."[33]

## IV.   The Government Has Initiated the Process of Diverting Funds to Build President Trump's Wall

88.   On February 15, 2019, the Department of Treasury approved a request from DHS

to make available up to $601 million from the Treasury Forfeiture Fund for border wall

construction; $242 million of these funds would be available for obligation as of March 2, 2019,

with the remaining $359 million to be transferred and available for obligation before the end of

2019.

89.   On February 25, 2019, DHS submitted a request to the Department of Defense for

assistance to construct approximately 200 miles of barriers to block drug-smuggling corridors

under Section 284.  The funds required to construct 200 miles of barriers far exceeds the funds

currently available in the Drug Interdiction and Counter-Drug Activities account—Congress

appropriated $881.5 million for that purpose in fiscal year 2019.  A White House Fact Sheet

entitled "The Funds Available to Address the National Emergency at Our Border"[34] states that

"DOD will augment existing counterdrug funds by transferring up to $2.5 billion from other

DOD accounts" so as to "direct needed funds to the border" through the FY 2019 Drug

Interdiction and Counter-Drug Activities account.  The White House relies on the limited

---

[33] Shane Harris, *Testimony by Intelligence Chiefs on Global Threats Highlights Differences with President*, Wash. Post (Jan. 29, 2019), https://www.washingtonpost.com/world/national-security/intelligence-officials-will-name-biggest-threats-facing-us-during-senate-hearing/2019/01/28/f08dc5cc-2340-11e9-ad53-824486280311_story.html.

[34] Office of the White House, *The Funds Available to Address the National Emergency at Our Border* (Feb. 26, 2019), https://www.whitehouse.gov/briefings-statements/funds-available-address-national-emergency-border/.

transfer authority provided by Section 8005 of the 2019 Department of Defense Appropriations Act, Pub. Law No. 115-245.

90.     On March 25, 2019, the Department of Defense confirmed the transfer of $1 billion from previously appropriated Military Personnel accounts—including military pay and pension funds—to the depleted Drug Interdiction and Counter-Drug Activities account for further diversion to DHS wall construction.

91.     That same day, the Acting Secretary of Defense approved the diversion of funds from DOD's counter-narcotics support budget for three "drug-smuggling corridors" identified by DHS:  one located in New Mexico—El Paso Project 1—and two located in Arizona—Yuma Sector Projects 1-2.  Construction on these projects was slated to begin as soon as May 25, 2019.[35]

92.     On March 20, 2019, DHS provided DOD with a prioritized list of proposed border wall projects that would purportedly improve the effectiveness of the armed forces supporting DHS in securing the southern border under Section 2808.

93.     On April 11, 2019, the Acting Secretary of Defense instructed the Chairman of the Joint Chiefs of Staff to provide, by May 10, 2019, a detailed assessment of whether and how specific military construction projects could support the use of the armed forces under Section 2808, and to identify existing military construction projects of sufficient value to provide up to $3.6 billion of funding to be diverted for such projects.  In his Fiscal Year 2020 budget request to

---

[35] Construction on these projects has been enjoined.  *Sierra Club v. Trump*, -- F.Supp.3d--, 2019 WL 2247689 (May 24, 2019).  In *Sierra Club v. Trump*, a case raising claims almost identical to those raised here, the U.S. District Court for the Northern District of California determined that the plaintiffs "are likely to show that Defendants' actions exceeded their statutory authority, and that irreparable harm will result from those actions."  *Id.* at *30.

Congress, President Trump requested $3.6 billion to "backfill funding reallocated in FY 2019 to build border barriers."

94.     Meanwhile, President Trump and his subordinates have repeatedly stated that construction on the border wall is moving forward.  On March 6, 2019, then Secretary Kirstjen Nielsen testified before the House of Representatives' Homeland Security Committee that the proposed border wall would involve constructing a "little more than 700" miles of barriers.  On March 8, 2019, President Trump wrote on Twitter that "the Wall is being built and is well under construction.  Big impact will be made.  Many additional contracts are close to being signed.  Far ahead of schedule despite all of the Democrat Obstruction and Fake News!" The following day he reiterated that "Major sections of Wall are being built" and "MUCH MORE" would "follow shortly.  On March 14, he added that "the Wall" is "already under major construction."

95.     On May 8, 2019, then Acting Secretary Shanahan testified before the Senate Defense Appropriations Subcommittee, that: "We now have on contract sufficient funds to build about 256 miles of barrier," explaining that this funding derived in part from "treasury forfeiture funds, as well as reprogramming."[36]  Acting Secretary Shanahan estimated that "sixty-three new miles will come online" from these contracts in the next six months, or "half a mile a day."  The same day, DOD reported selecting twelve companies to compete for up to $5 billion worth of border barrier construction contracts.[37]

96.     The next day, in further response to DHS's February 25, 2019 request for support under Section 284, then Acting Secretary Shanahan authorized an additional $1.5 billion in

---

[36] *Acting Defense Secretary Shanahan Testifies on Fiscal Year 2020 Budget Request*, C-SPAN (May 8, 2019), https://www.c-span.org/video/?460437-1/acting-defense-secretary-shanahan-testifies-2020-budget-request.

[37] U.S. Dep't of Def., *Contracts for May 8, 2019* (May 8, 2019), https://dod.defense.gov/News/Contracts/Contract-View/Article/1842189/.

funding for border barrier construction on four projects: one located in California—El Centro

Project 1—and three located in Arizona—Tucson Sector Projects 1–3.  Construction on these

sections of the wall could begin as early as July 2019.

**V.    The President's Emergency Declaration and Diversion of Funding to Construct the Border Wall Injure Plaintiffs.**

97.    President Trump's Emergency Declaration, the militarization of the border, and

additional wall construction along the border causes immediate and concrete harm to the

Plaintiffs.

*A.    Wall Construction will Severely Impact Wildlife and Ecosystems Along the Rio Grande River and in the Deserts of the U.S.-Mexico Borderlands.*

98.    The federal government has designated the Rio Grande as an American Heritage

River deserving of special protection and preservation.  Running along two nations and multiple

Pueblos, the Rio Grande, or Rio Bravo, as it is known in Mexico, is an international river

extending roughly 1,900 miles that provides water and life to approximately 13 million people.

The river basin covers 355,500 square miles—across three U.S. states and five Mexican states—

and encompasses a diverse range of eco-systems, climates, geology, hydrology, cultures and

traditions.

99.    The river serves as a critical wildlife corridor, and is home to a wide diversity of

flora and fauna.  In South Texas, it serves as the meeting point for the Central and Mississippi

flyways, making it one of the most important bird migration routes in North America for

hundreds of species of birds.  The Rio Grande is particularly important to Texas-based Plaintiffs

and the surrounding communities because it is the area's only source of drinking water.

100.    The Rio Grande ecosystem is struggling to overcome past disturbances, and

would be harmed by additional impacts, especially activities as harmful as wall construction.

Construction of a border wall along any segment of the river would adversely affect water

quality downstream.  Construction activity along the river will destabilize soil leading to increased sedimentation in the river, and reducing water quality.  This will damage the river and surrounding wetland ecosystems and affect wildlife that relies on those ecosystems such as federally endangered and threatened mussels species (Texas Hornshell and Mexican Fawnfoot). Wall construction would facilitate the spread of invasive plants that already threaten the plants that naturally characterize the area.

101.    Construction in urban areas such as Laredo would destroy city parks and trail systems, and impact dense low-income and middle-income neighborhoods, and deform the skyline and landscape.

102.    Wall construction also increases the likelihood and severity of flooding which would present serious risks for landowners as well as wildlife.  The area around the Lower Rio Grande Valley is a flood-prone area.  The construction of a wall will increase soil erosion and alter natural water flows as well as patterns of wildfire, exacerbating the risks for both animals and people.[38]  Barriers can be catastrophic during natural flood events as they trap nearby wildlife, causing them to drown or starve.[39]  During rains and seasonal flooding, the barriers can act as dams, exacerbating the impacts of flooding and causing millions of dollars in property damage and even the loss of life.  For example, fencing constructed between 2006 and 2008, caused debris to accumulate during a seasonal flash flood, which then "acted as [a] dam[],"

---

[38] Laura Parker, *6 Ways the Border Wall Could Disrupt the Environment*, Nat'l Geographic (Jan. 10, 2019), https://www.nationalgeographic.com/environment/2019/01/how-trump-us-mexico-border-wall-could-impact-environment-wildlife-water/; *see also* Robert Peters et al., *Nature Divided, Scientist United: US - Mexico Border Wall Threatens Biodiversity and Binational Conservation*, 68 BioScience 740, (2018), https://doi.org/10.1093/biosci/biy063.
[39] U.S. Dep't of the Interior, Fish & Wildlife Serv., *in Reply Refer To: FWS/R2/NWRS/Coastal TX/066633* (last visited June 21, 2019).

producing "pool[s of water] two-to-seven feet high."[40]  This flooding contributed to the drowning deaths of two individuals.[41]

103.    A wall presents a barrier not only to people but also to plants and animals whose natural habitats and migration routes traverse both sides of the border.  The U.S.-Mexican border region has the highest rate of species endangerment in the U.S.[42]  It is home to around 31% of the species listed as endangered by the U.S. Department of Interior.  Currently, "4.5 million hectares of US and Mexican protected areas [within 80 km of the border] are managed for biodiversity conservation," and "18% of the borderlands contain protected lands," including "four . . . contiguous binational habitat corridors."[43]  According to an article in Bioscience signed by more than 2,500 scientists from 43 countries, the construction of a wall will bisect the geographic range of 1,506 native animals and plants, including 62 species listed as critically endangered, endangered, or vulnerable by the International Union for Conservation of Nature.[44]  These species include a variety of bird species, as well as larger terrestrial mammals such as mountain lions, bears, deer and antelope, jaguarondi and the critically endangered ocelot, all of which have large home ranges.  This wall would reduce the roaming area of impacted wildlife by as much as 75%, reducing the exchange of genetic material, which would make wildlife more vulnerable to disease and would ultimately lead to endangerment and possible extinction.

---

[40] Parker, *supra*.

[41] Dan Mills, *Border Wall Environmental Impacts*, Sierra Club, (last visited June 21, 2019), https://content.sierraclub.org/grassrootsnetwork/sites/content.sierraclub.org.activistnetwork/files/teams/documents/border%20wall%20enviro%20handout.pdf.

[42] Peters, *supra*, at 740; *see also* Rick Van Schoik, *Conservation Biology in the U.S.-Mexican Border Region*, WorldWatch, Nov./Dec. 2004, at 36, http://www.worldwatch.org/system/files/EP176C.pdf.

[43] Peters, *supra*, at 742.

[44] Peters, *supra*, at 740.

104.    A wall also presents a high risk of disrupting seed distribution and gene flow for plants and animals that could contribute to their extinction.  On the Mexican side of the border, there are 85 endangered species of plants and animals.[45]  Wall construction will disrupt the natural seed distribution of native plants provided by wind and wildlife.[46]  A September 2017 draft letter by the U.S. Fish and Wildlife Services warned that additional miles of impenetrable border would preclude access to habitats by federally listed endangered animals and reduce habitat connectivity in portions of the existing wildlife corridor.[47]  This would not only affect animal movement but also affect access to traditional water sources, and reduce the potential for gene flow.  Infrastructure associated with construction of a wall, such as roads, lights, and operating bases will cause degradation to vegetation, and kill animals through habitat loss and fragmentation.[48]  This habitat fragmentation separates wildlife from territory, food and water, as well as from potential mates.[49]  It also disrupts annual or seasonal migration routes.  For many endangered species, reduced and fragmented habitat is a key factor leading to their endangerment; additional reduction and fragmentation of habitat can only push those species closer to extinction.[50]

### B.    *Diversion of Funds to Build the Border Wall Directly Harms Plaintiffs.*

105.    Notwithstanding these ecological harms, President Trump has directed the Department of Homeland Security, Department of Defense, and the Army Corps of Engineers to

---

[45] Van Schoik, *supra*, at 36.

[46] Good Neighbor Environmental Board (GNEB), Environmental Quality and Border Security: A 10-year Retrospective, (September 2017) http:// www.scgcorp.com/images/assets/services/2-tech_writing_&_editing/products/18th_GNEB_Layout_RF508_FINAL_APPROVED_V2_508.pdf.

[47] U.S. Dep't of the Interior, Fish & Wildlife Serv., *in Reply Refer To: FWS/R2/NWRS/Coastal TX/066633* (last visited June 21, 2019).

[48] Peters, *supra*, at 741.

[49] Mills, *supra.*

[50] *See, e.g.*, Peters, *supra*, at 741.

create a prioritized list of border segments for wall construction.  On December 12, 2018, the

Department of Homeland Security published a statement asserting:

> if funded at $5B in FY 2019 DHS expects to construct more than 330 miles of border wall in the U.S. Border Patrol's highest priority locations across the Southwest border.  DHS is positioned to construct 215 miles of Border Patrol's highest priority border wall miles including:
>
> - ~5 miles in San Diego Sector in California
> - ~14 miles in El Centro Sector in California
> - ~27 miles in Yuma Sector in Arizona
> - ~9 miles in El Paso Sector in New Mexico
> - ~55 miles in Laredo Sector in Texas
> - ~104 miles in Rio Grande Valley Sector in Texas[51]

106.    Plaintiff RGISC is located in on the campus of Laredo College, which is in the

Laredo Sector in Texas.  At a State of the Border address in Laredo on Feb. 1, 2019, Felix

Chavez, interim chief for the U.S. Border Patrol's Laredo Sector, announced that CBP has

requested construction of 150 river miles of permanent, impermeable barrier.  CBP has

specifically identified 55 miles of Laredo's middle reach as a "top funding priority" for the

wall.[52]  This area represents the heart of Laredo's community center.  It includes downtown, the

Laredo College campus, densely populated middle- and low-income residential areas, and prime

parks, trails and habitat for recreation, kayaking and birding.

107.    Construction of a barrier along Laredo's stretch of the Rio Grande River would

significantly and adversely affect RGISC's ability to fulfill its mission.  The Rio Grande is prone

to flooding in this section of the river, making it likely that the barriers would have to be

constructed out of the flood plain and set back from the river.  This would cut off RGISC's

---

[51] Dept. of Homeland Sec., *Walls Work* (Dec. 12, 2018), https://www.dhs.gov/news/2018/12/12/walls-work.

[52] Melissa R. Cigarroa and Tricia Cortez, *Wall Will Threaten Laredo's Water and Environment*, LMT Online (Feb. 8, 2019), https://www.lmtonline.com/opinion/commentary/article/Wall-will-threaten-Laredo-s-water-and-13602429.php?utm_campaign=hptexas.

access to the river and prevent RGISC from conducting its scientific research and other programs, including but not limited to water quality monitoring, the Birding Festival, and Community Paddles.  RGISC would lose the revenue it relies on from these activities.

108.    Construction of a border wall in and around the Laredo Sector would threaten RGISC's ability to launch the South Laredo Nature and Birding Center, both because it has diverted organizational resources from its core missions to focusing on the problems border wall construction will bring to the region, and because construction will itself harm the ecosystems that the educational center is designed to feature.  Construction of a border wall will interfere with RGISC's ability to raise money to operate the educational center, draw visitors for the purpose of appreciating the area's unique ecosystems, and generate the resources from visitors to maintain the educational center.

109.    The Emergency Declaration and diversion of funding for border wall construction frustrates RGISC's organizational mission by interrupting RGISC's key programs of scientific research, eco-tourism, and community awareness.  As a result of the Defendants' actions, RGISC has had to put on hold much of its work related to the South Laredo Nature and Birding Center as well as other projects, including addressing permit violations and other illegal activities that are threatening the health and integrity of the river.  Since the announcement of the Emergency Declaration, RGISC has had to spend considerable resources to attend community meetings, meet with CBP officials, educate its staff and the public about DHS' and CBP's plans for wall construction, and organize the community and local governments to oppose this harmful construction.  RGISC has had to prioritize combatting the threats posed by border wall construction over other activities, including advocacy projects, community-based events, and fundraising and grantwriting.  In June 2019, RGISC hired its second full-time staffer to work in part on border wall issues.

110.    Mr. Hein's ranch is located approximately 20 miles downstream from downtown Laredo, straddling the border of Webb and Zapata counties within CBP's Laredo Sector.  In early 2019,  Mr. Hein read a statement from Representative Henry Cuellar in the Laredo Morning Times newspaper that the wall would include most of Webb and Zapata counties. Because Mr. Hein's property abuts the river and straddles those two counties, and because CBP has declared its intention to build 150 river miles of impermeable barrier in the Laredo Sector, Mr. Hein fears that border wall construction will adversely affect his interests.

111.    Construction of the wall would diminish Mr. Hein's use and enjoyment of his land, reduce his property's value, and harm his business.  If constructed on the property, the wall would cut off access to the river, which is the property's sole water supply, and Mr. Hein would no longer be able to operate his horse ranch.  Even if the wall is not built on his property, construction upstream would adversely impact the water quality and ecosystems on his property and would harm the wildlife that uses the property.  He is particularly concerned that future generations of the Hein Family will be deprived of enjoying the land in the way former generations have been able to.

112.    Plaintiff Elsa Hull's home and property are located approximately 40 miles downstream of Laredo, in Zapata County within CBP's Laredo Sector.  In February 2019, Ms. Hull learned that CBP was planning to build permanent, impermeable barriers on 150 river miles in Webb and Zapata Counties.

113.    Construction of a wall along her stretch of the Rio Grande threatens to cut off Ms. Hull's access to the river, disrupt the wildlife she values observing, increase the risk of damage to her property due to flooding, diminish her use and enjoyment of her land, and reduce her property's value.

114.    Dr. Ramirez's property, the Jackson Ranch Church and Cemetery and the Eli Jackson Cemetery, are located further downstream in the Rio Grande Valley Sector.  CBP confirmed that the wall would be constructed on top of the levee that runs just north of the Jackson Ranch Church and Cemetery and abuts the Eli Jackson Cemetery.



ELI JACKSON CEMETERY
Also known as Eli Jackson Brewster Cemetery and Jackson
Family Cemetery
Cemetery No. HG-C072
Hidalgo County

115.    As illustrated by the map[53] above, if constructed on the levee, the border wall will cut off direct access to the Jackson Ranch and Cemetery, stranding the property in a no man's land between the Rio Grande River and the wall.  Dr. Ramirez will be unable to freely access his property, and access will also be impeded for family members visiting the resting

---

[53] Texas Historical Commission, Aff. of Dedication for Cemetery Purposes for the Eli Jackson Cemetery, Ex. A (Jan. 2, 2005).

place of their ancestors, worshippers attending the church, and other visitors hoping to see the historic site.  This isolation of the Jackson Ranch and Cemetery would also result in devaluation of the property.

116.    Wall construction activities at the Eli Jackson Cemetery, which abuts the levee, would further irreparably harm Dr. Ramirez because it would result in the exhumation and desecration of his ancestors' remains.  Additionally, the wall's construction will result in increased risk of flooding which threatens to damage the property.

117.    The Carrizo/Comecrudo Nation of Texas would also be irreparably harmed by wall construction activities at the Eli Jackson Cemetery.  The Eli Jackson cemetery is located on the grounds of the Nation's ancestral villages of El Capote of the Crane, Canyon and Bear clans. Construction would result in the exhumation and desecration of its members' ancestors' remains. Even if the wall were not to run directly through the cemetery, nearby wall construction would contribute to flooding that would threaten the burial site.

118.    Construction of the wall would divide the Carrizo/Comecrudo Nation, whose people are indigenous to lands on both sides of the U.S.-Mexico border.  It would further isolate families divided by the border, making communication and gathering more difficult.

119.    The Carrizo/Comecrudo Nation is concerned that the border wall will be built without adequate public input and opportunity for the Nation's members to be heard.  The Nation is afraid that the wall will be built without adequate environmental review or adequate accounting for and protection of the Nation's cultural artifacts.  In light of the lack of safeguards, Chairman Mancias fears that when ancestors' remains are encountered during wall construction, the Nation will not be notified and graves will be desecrated and lost.

120.    The Carrizo/Comecrudo Nation is committed to protecting its ancestral burial sites along the Rio Grande River.  The construction of the border wall would harm the Nation's

mission of restoring and protecting its sacred sites along the southern border and maintaining the constant connection to their ancestors.

121.     On the opposite end of the U.S.-Mexico border, in the El Centro Sector in California, CalWild's members use the Jacumba Wilderness for recreation and enjoy the area for its natural beauty and wilderness values.  On February 25, 2019, the Department of Homeland Security requested the Department of Defense's assistance in constructing approximately 15 miles of new pedestrian fencing in the El Centro Sector.  On May 9, 2019, the Acting Secretary of Defense approved the El Centro project, and $1.5 billion dollars was transferred from the Department of Defense Drug Interdiction and Counter-Drug Activities account to the Army for fence and road construction and lighting installation for four projects, including the El Centro project.  A contract for the El Centro project was awarded on May 16, 2019.  The new pedestrian fencing in the El Centro Sector will begin approximately 10 miles west of the Calexico Port of Entry and continue west for 15.25 miles in Imperial County.  The planned wall will cross into the Jacumba Wilderness.

122.     Construction of a wall within or adjacent to the Jacumba Wilderness will disrupt the migration patterns of wildlife and the wall itself will mar the scenic vistas of the wilderness area.  The wall's bright lights will also disrupt wildlife and its accompanying roads will further disrupt wildlife habitat.  CalWild's members use and experience of this scenic wilderness will be degraded by construction of a border wall.

123.     The new wall will also cause harm to the endangered Peninsular big horn sheep, whose habitat includes the area in the El Centro Sector where construction is planned.  Ewes within the Jacumba area depend on natural resources from both the U.S. and Mexico.  The California Fish and Wildlife Department has found that habitat loss and fragmentation threaten the recovery of the sheep, and that current border security activities already cause disturbances

"within lamb-rearing habitat and movement corridors in designated wilderness areas."[54]  Wall construction would only exacerbate these impacts.  The California Fish and Wildlife Department also stated that "[a] fence along the U.S.-Mexico border would prohibit movement to, and use of, prelambing and lamb rearing habitat and summer water sources."[55]

124.    New walls would also make it even more difficult for other wildlife to move across the border, including animals such as the jaguar—which have begun to return to various parts of the borderlands after a long absence.

125.    President Trump's Emergency Declaration and accompanying Executive Actions frustrate the mission of CalWild.  CalWild has had to divert resources from its advocacy and education activities to address President Trump's Emergency Declaration and associated actions.  Staff time and resources that would otherwise have been spent on CalWild's campaigns, including protecting wilderness areas near and along the border, are now being used to oppose the President's decision to declare a national emergency in an effort to build a border wall.

126.    The border wall will have drastic impacts on LCLAA, its members, and Latino communities throughout the country and particularly in the borderlands.  LCCLA has chapters in San Diego and in Texas.  The border wall will negatively affect the quality of life of border communities by separating border cities from each other and making collaboration more difficult.  Moreover, LCLAA hears on a daily basis how the President's actions have increased racial profiling and hate speech directed against Latinos.

127.    President Trump's Emergency Declaration and the accompanying Executive Actions frustrate LCLAA's mission and work toward an immigration process that is effective,

---

[54]  Janene Colby & Randy Botta, *California Department of Fish and Wildlife Peninsular Bighorn Sheep 2016-17 Annual Report* 23-24 (last visited June 21, 2019), https://nrm.dfg.ca.gov/FileHandler.ashx?DocumentID=153346&inline.
[55] *Id.* at 24.

fair, and just by unreasonably targeting immigrants and asylum seekers at the southern border, almost all of whom are Latino.  As a result of President Trump's Emergency Declaration and associated Executive Actions, LCLAA has had to divert resources from its work to further its mission and support its members.  Staff time and resources that would otherwise have been spent on LCLAA's campaigns, including immigration policy advocacy, are now being used to oppose the President's attempt to sidestep Congress in an effort to build a border wall.  For instance, LCLAA's Executive Director and Policy Director are now spending five and ten percent of their respective time addressing border wall issues, including engaging with membership and other organizations about opposition to the wall, engaging in advocacy in Congress, and talking to the media.

128.     President Trump's Emergency Declaration and accompanying Executive Actions have also harmed GreenLatinos and its members.  GreenLatinos members are concerned about the increased militarization and negative environmental impacts that will come with construction of the border wall in and near their communities.  GreenLatinos members have expressed that the President's Emergency Declaration and Executive Actions have created an environment of heightened fear within their communities.  Moreover, some GreenLatinos members have been the target of hate speech due to their perceived national origin and they believe it is connected to the President's actions and rhetoric around the border wall.

129.     GreenLatinos has experienced decreased turnout for certain events because of fear connected to the proposed border wall and concomitant increased militarization of the border.  For instance, GreenLatinos held a hiking event in Tucson where they also intended to discuss the border wall.  The organization did outreach and received several RSVPs, but, unlike past events, not many people attended the event.  GreenLatinos staff reached out to those who did not attend and several people said that even though they wanted to go, they did not attend because they felt

unsafe going to a publicly advertised event to talk about opposition to the border wall in an area with heavy CBP presence.

130.    The Executive Order and accompanying Executive Actions have frustrated GreenLatinos' mission because they have caused GreenLatinos to divert staff time and resources from its work in support of its core programs and activities, such as member outreach and engagement and planning for the 2019 GreenLatinos National Summit.  Instead, GreenLatinos has had to devote these resources to opposing the President's unlawful border wall.

131.    GreenLatinos' policy director in particular has had to focus a significant portion of her time on addressing the Declaration and Executive Actions, including responding to member concerns related to the border wall, organizing community events in Arizona to discuss border wall impacts, and meeting with members of Congress to discuss how the proposed wall will impact GreenLatinos and its members.  This has taken away from her ability to work on other issues that GreenLatinos' members have asked the organization to work on, such as access to safe and affordable drinking water and landscape conservation out west.  Investing staff time and resources into opposing the Declaration and Executive Actions has meant that GreenLatinos has had to turn away other opportunities and has led to an inability to meet member requests regarding other priority issues.

132.    For these reasons, the Emergency Declaration has caused immediate and concrete injury to Plaintiffs.  A declaration from this Court that the President's Emergency Declaration is unlawful and an order from this Court enjoining federal officials from acting upon it would remedy Plaintiffs' injuries.

### CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF
### *Ultra Vires* Action in Violation of Consolidated Appropriation Act 2019, the National Emergencies Act, 10 U.S.C. § 2808, 10 U.S.C. § 284, and 31 U.S.C. § 9705

133.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

134.    Plaintiffs have a right of action to enjoin and declare unlawful official action that is *ultra vires* and exceeds the President's statutory authority.

135.    The Emergency Declaration is *ultra vires* because no colorable emergency within the meaning of the NEA exists to invoke the statute.

136.    Congress enacted and the President signed into law the Consolidated Appropriations Act of 2019, which sets specific limits on appropriations for border fencing, the location of new fencing, and the design of new fencing.  The President and the Secretaries of Defense and Homeland Security are acting *ultra vires* by spending approximately $8.1 billion to build a wall across the border far beyond the limitations of the Consolidated Appropriations Act.

137.    The statutes the President relies on, 10 U.S.C. §§ 284, 2808 and 31 U.S.C § 9705, do not authorize wall construction outside of the limits set by Congress in the Consolidated Appropriations Act of 2019.

138.    10 U.S.C. § 2808 does not authorize border wall construction as directed by the Emergency Declaration and the accompanying statement because construction of the border wall: (a) is not a "military construction project"; (b) does not "require[] use of the armed forces"; and (c) is not "necessary to support such use of the armed forces."

139.    Defendants have acted *ultra vires* in seeking to divert funding pursuant to 10 U.S.C. § 284 because construction under § 284 is limited to "drug smuggling corridors" and Defendants have not identified particular drug smuggling corridors requiring construction of a wall at the border.

140.     Use of the Treasury Forfeiture Fund under 31 U.S.C. § 9705 to construct the border wall violates the Consolidated Appropriations Act of 2019.  Congress did not authorize use of the Treasury Forfeiture Fund to pay for construction of a border wall.  The President cannot fund the border wall from the Treasury Forfeiture Fund because 31 U.S.C. § 9705 restricts use of those funds to specified purposes and construction of a border wall does not meet the requirements of the statute.

141.     For these reasons, Defendants' diversion of funding toward the construction of a border wall is *ultra vires* and unlawful.

**SECOND CLAIM FOR RELIEF**
**Violation of U.S. Const. art. I, § 9, cl. 7—Appropriations Clause**

142.     Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

143.     Plaintiffs have a right of action to enjoin and declare unlawful official action that is *ultra vires* and exceeds the President's constitutional authority.

144.     The Constitution grants to Congress the exclusive power to spend money on and to designate the purpose for which the money shall be spent.

145.     Article I, Section 9, Clause 7 provides "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."

146.     The President's Emergency Declaration, his instruction to the Secretaries of Defense, Homeland Security, and the Treasury to spend approximately $8.1 billion to build a wall across the southern border, and the Defendant agencies' actions pursuant to those instructions, violate the Appropriations Clause.  The Defendants improperly attempt to use the NEA, 10 U.S.C. § 2808, 10 U.S.C. § 284, and 31 U.S.C. § 9705 to override Congress's explicit refusal to pass legislation funding for the full extent of the border wall and instead setting

specific limits on appropriations for border fencing, the location of new fencing, and the design of new fencing.

147.     For these reasons, Defendants' diversion of funding toward the construction of a border wall is unconstitutional.

### THIRD CLAIM FOR RELIEF
### Violation of U.S. Const. arts. I and II—Separation of Powers

148.     Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

149.     Plaintiffs have a non-statutory right of action to enjoin and declare unlawful official action that is *ultra vires* and exceeds the President's constitutional authority.

150.     The United States Constitution provides that "[a]ll legislative Powers . . . shall be vested in [the] Congress."  U.S. Const. art. I, § 1.  The Spending Clause, grants Congress the exclusive power "To lay and collect Taxes . . . to pay the Debts and provide for the common Defence and general Welfare of the United States."  U.S. Const. art. I, § 8, cl. 1.

151.     The Appropriations Clause of the U.S. Constitution provides that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."  U.S. Const. art. I, § 9, cl. 7.

152.     The Presentment Clause requires that all bills passed by the House of Representatives and the Senate be presented to the President for signature.  The President then has the choice to sign or veto the bill.  U.S. Const. art. I, § 7, cl. 2.

153.     There is no provision in the Constitution that authorizes the President to enact, amend, or repeal statutes, including appropriations already approved by Congress and signed into law by the President.  *Clinton v. City of New York*, 524 U.S. 417, 438 (1998).

154.     The President's Emergency Declaration, his instruction to the Secretaries of

Defense and Homeland Security to spend approximately $8.1 billion to build a wall across the

southern border for which Congress has refused to appropriate funding, and the Defendant

agencies' actions pursuant to those instructions, violate the doctrine of separation of powers

embedded in the Constitution.

**FOURTH CLAIM FOR RELIEF**
**Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)**

155.     Plaintiffs incorporate by reference the allegations contained in the preceding

paragraphs as if fully set forth herein.

156.     The APA requires this Court to hold unlawful and set aside any agency action that

is "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B)

contrary to constitutional right, power, privilege, or immunity; [or] (C) in excess of statutory

jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2).

157.     The Department of the Treasury's approval of $601 million in Fiscal Year 2019

out of the Treasury Forfeiture Fund border wall construction violates the Consolidated

Appropriations Act, 2019, 31 U.S.C. § 9705, the Appropriations Clause and the separation of

powers laid out in Articles I and II of the Constitution.

158.     The Department of Defense's transfer of $1 billion from previously appropriated

Military Personnel accounts—including military pay and pension funds—to the Drug

Interdiction and Counter-Drug Activities account for further diversion to DHS for wall

construction violates the 2019 Consolidated Appropriations Act, 10 U.S.C. § 284, and the

Appropriations Clause and the separation of powers laid out in Articles I and II of the

Constitution.

159.    The Acting Secretary of Defense's approval of $2.5 billion in funds from DOD's Drug Interdiction and Counter-Drug Activities account for the El Paso Project 1, the Yuma Sector Projects 1-2, the El Centro Project 1, and the Tucson Sector Projects 1–3, and the Department of Homeland Securities' actions in furtherance of those projects, violate the 2019 Consolidated Appropriations Act, 10 U.S.C. § 284, and the Appropriations Clause and the separation of powers laid out in Articles I and II of the Constitution.

160.    The Department of Defense's assessment of specific military construction projects to support the use of the armed forces pursuant to the Emergency Declaration, and its identification of existing military construction projects of sufficient value to provide $3.6 billion of funding to be diverted for border wall construction pursuant to the Emergency Declaration, violate the 2019 Consolidated Appropriations Act, 10 U.S.C. § 2808, and the Appropriations Clause and the separation of powers laid out in Articles I and II of the Constitution.

161.    Agency Defendants have also acted arbitrarily and capriciously in failing to articulate how these actions will address the circumstances allegedly giving rise to the national emergency.

162.    The Agencies' actions in furtherance of the Emergency Declaration and the President's instruction to spend approximately $8.1 billion to build a wall across the southern border are therefore unlawful and should be enjoined and set aside.

### FIFTH CLAIM FOR RELIEF
### Violation of National Environmental Policy Act,

163.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

164.    The Secretaries of Defense, Homeland Security, and the Treasury must ensure that their agencies prepare an environmental impact statement on major Federal actions

"significantly affecting the quality of the human environment," and prepare an environmental

assessment to determine whether any such significant effects exist.  42 U.S.C. § 4332(2)(C);

*Robertson v. Methow Valley Citizen Council*, 490 U.S. 332, 348 (1989).  The requirement to

prepare an environmental assessment is "meant both to guarantee an agency will 'consider every

significant aspect of the environmental impact of a proposed action' and 'inform the public' that

it has done so."  *Natural Resources Defense Council v. U.S. Nuclear Regulatory Commission*,

879 F.3d 1202, 1207 (D.C. Cir. 2018) (quoting *Robertson v. Methow Valley Citizen Council*, 490

U.S. at 349).

165.   NEPA requires that the Defendants involve the public in preparing and

considering environmental documents that implement the Act.  40 C.F.R. § 1506.6 (1978); *id.* §

1506.6(b)(1) (requiring federal agencies to "[p]rovide public notice of NEPA-related hearings,

public meetings, and the availability of environmental documents so as to inform those persons

and agencies who may be interested or affected").

166.   Border wall construction is a final agency action, for purposes of the Defendants'

obligations under NEPA.

167.   Defendants Esper, McAleenan, and Mnuchin violate NEPA and NEPA's

implementing regulations by authorizing border wall construction pursuant to the President's

Emergency Declaration without first conducting the necessary environmental assessment of the

impacts of the border wall projects in light of the potentially significant impacts that they will

have, including both cumulative effects and the effects of connected actions.

168.   Defendants Esper, McAleenan, and Mnuchin have failed to involve the public in

its decision-making processes and environmental assessment of border wall construction.  This

failure to provide for any public participation in relation to their approval of border wall

construction violates NEPA and its implementing regulations.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that this Court:

A.    Declare that the President's Emergency Declaration, his instruction to the Secretaries of Defense, Homeland Security, and the Treasury to spend approximately $8.1 billion to build a wall across the southern border, and the Defendant agencies' actions pursuant to those instructions, are unauthorized by and contrary to the Constitution and laws of the United States;

B.    Enjoin Defendant Secretaries of Defense, Homeland Security and the Treasury from taking action to build a border wall using funds reallocated under 10 U.S.C. § 2808, 10 U.S.C. § 284, or 31 U.S.C. § 9705, or on any basis that depends on the President's unlawful Emergency Declaration and associated actions;

C.    Award Plaintiffs their reasonable costs of litigation, including reasonable attorneys' fees and costs, pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

D.    Grant Plaintiffs such further and additional relief as the Court may deem just and proper.

Respectfully submitted,

DATED:  June 21, 2019

/s/ Sarah H. Burt
SARAH H. BURT
California Bar No. 250378
(appearing under LCvR 83.2(c)(1))
Earthjustice
50 California Street, Suite 500
San Francisco, CA  94111
Tel: (415) 217-2000
Fax: (415) 217-2040
sburt@earthjustice.org

/s/ Tania Galloni
TANIA GALLONI
Florida Bar. No. 619221
(appearing under LCvR 83.2(c)(1))
Earthjustice
4500 Biscayne Blvd., Ste 201
Miami, FL  33137

Tel: (305) 440-5432
tgalloni@earthjustice.org


  /s/ Marisa C. Ordonia
Marisa C. Ordonia
Washington Bar No. 48081
(appearing under LCvR 83.2(c)(1))
Earthjustice
705 Second Avenue, Suite 203
Seattle, WA  98104-1711
Ph.: (206) 343-7340
Fax: (206) 343-1526
mordonia@earthjustice.org


DATED:  June 21, 2019

  /s/ Gordon E. Sommers
GORDON E. SOMMERS (D.C. Bar No. 1034060)
Earthjustice
1625 Massachusetts Ave., NW, Suite 702
Washington, DC 20036
gsommers@earthjustice.org
Tel: 202-667-4500
Fax: 202-667-2356
gsommers@earthjustice.org


*Attorneys for Plaintiffs Rio Grande International
Study Center, Ramiro R. Ramirez, the
Carrizo/Comecrudo Nation of Texas, Elsa Hull,
Joseph Hein, Labor Council for Latin American
Advancement, California Wilderness Coalition, and
GreenLatinos*