# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| RIO GRANDE INTERNATIONAL STUDY CENTER (RGISC), *et al.*, | | |
| | Plaintiffs, | Civil Action No. 1:19-cv-00720 (TNM) |
| v. | | |
| DONALD J. TRUMP, in his official capacity as President of the United States of America, *et al.*, | | |
| | Defendants. | |

## DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), Defendants respectfully move to dismiss Plaintiffs' Amended Complaint for lack of subject-matter jurisdiction and for failure to state a claim upon which relief can be granted.  The bases for this Motion are set forth in the accompanying Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss.  A proposed order is also attached.


Dated:  July 12, 2019

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

JAMES M. BURNHAM
Deputy Assistant Attorney General

JOHN R. GRIFFITHS
Director, Federal Programs Branch

ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch


/s/ *Andrew I. Warden*

ANDREW I. WARDEN (IN Bar No. 23840-49)
Senior Trial Counsel, Federal Programs Branch

/s/ *Kathryn C. Davis*
KATHRYN C. DAVIS (D.C. Bar No. 985055)
MICHAEL J. GERARDI
LESLIE COOPER VIGEN (D.C. Bar No. 1019782)
RACHAEL L. WESTMORELAND
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Tel: (202) 616-8298
Fax: (202) 616-8470
Email: Kathryn.C.Davis@usdoj.gov

*Counsel for Defendants*

2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| RIO GRANDE INTERNATIONAL STUDY CENTER (RGISC), *et al.*, | |
| Plaintiffs, | Civil Action No. 1:19-cv-00720 (TNM) |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States of America, *et al.*, | |
| Defendants. | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
<u>DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT</u>**

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................... 1

BACKGROUND ....................................................................................................... 4

I.    Congress's Express Authorization of Border Barrier Construction ................................ 4

II.   Congress's Authorization for DoD Support of DHS's Border Security Efforts ............... 5

III.  DoD's Current Support for DHS's Efforts to Secure the Southern Border ..................... 6

IV.   The President's Proclamation Declaring a National Emergency at the
      Southern Border ................................................................................................. 7

V.    The Use of Spending Authorities for Barrier Construction ........................................ 9

STATUTORY FRAMEWORK ................................................................................... 10

I.    National Emergencies Act ................................................................................. 10

II.   31 U.S.C. § 9705 ............................................................................................. 15

III.  10 U.S.C. § 284 ............................................................................................... 15

IV.   10 U.S.C. § 2808 ............................................................................................. 17

PLAINTIFFS' CLAIMS ........................................................................................... 19

STANDARD OF REVIEW ....................................................................................... 19

ARGUMENT ........................................................................................................... 20

I.    The Court Lacks Jurisdiction. ........................................................................... 20

      A.    Plaintiffs' Challenge to the President's Declaration of a National Emergency
            Should Be Dismissed. ............................................................................. 21

            1.    The NEA Evidences Congress's Intent to Preclude Judicial Review ...... 21

            2.    Plaintiffs' Challenge to the President's National Emergency
                  Declaration Presents a Nonjusticiable Political Question ..................... 25

            3.    The President Should Be Dismissed as a Party to this Lawsuit
                  Because There is No Cause of Action Against the President and
                  Plaintiffs Cannot Obtain Equitable Relief Against the President. .......... 29

B.      The Court Lacks Jurisdiction to Hear Plaintiffs' NEPA Claims Because NEPA Has Been Waived. ................................................................................... 32

C.      With the Exception of CalWild, Plaintiffs Have Not Alleged Article III Standing. ................................................................................................................ 34

      1.      Plaintiffs Do Not Allege Particularized Injuries Based on the Alleged Environmental Harms of Border Wall Construction................. 34

      2.      Plaintiffs Ramirez and Carrizo/Comecrudo Do Not Satisfy the Traceability and Redressability Prongs of Article III's Standing Requirement. .................................................................................... 35

            a.  Plaintiffs do not satisfy the traceability prong.................................... 35

            b.  Plaintiffs do not satisfy the redressability prong. ............................. 37

      3.      Plaintiff Hull Has Not Sustained Any Alleged Injury-in-Fact................. 38

      4.      Plaintiff RGISC's and Plaintiff Hein's Claims Are Not Ripe. ............... 38

      5.      LCLAA and GreenLatinos Lack Both Organizational and Representational Standing. ....................................................................... 41

II.     Plaintiffs Have Not Satisfied the APA's Threshold Requirements for Review of Agency Action. ................................................................................................... 48

A.      No "Final Agency Action" Exists With Respect to § 2808. ................................ 49

B.      Even If There Were Final Agency Action, the Use of § 2808 Authority Is Committed to Agency Discretion by Law. ......................................................... 50

C.      The Use of § 9705 Authority Is Committed to Agency Discretion by Law. ....... 53

III.    Plaintiffs Have Not Stated a Statutory Claim. ................................................. 54

A.      Plaintiffs Fail To State a Claim Under the APA................................................. 55

      1.      31 U.S.C. § 9705 ....................................................................................... 55

      2.      10 U.S.C. § 284 ......................................................................................... 56

      3.      10 U.S.C. § 2808 ....................................................................................... 57

      4.      The Consolidated Appropriations Act ...................................................... 59

B.      Plaintiffs' Ultra Vires Claims Must Be Dismissed. ........................................... 62

IV.   Plaintiffs' Constitutional Claims Must Be Dismissed. ................................................... 63

CONCLUSION.......................................................................................................................... 65

# TABLE OF AUTHORITIES

## CASES

*Abbott Labs. v. Gardner*,
  387 U.S. 149 (1967),
  *overruled on other grounds in Califano v. Sanders*, 430 U.S. 99 (1977) .......................... 39, 40

*AFL-CIO v. Kahn*,
  618 F.2d 784 (D.C. Cir. 1979) ............................................................................................. 65

*Al-Aulaqi v. Panetta*,
  35 F. Supp. 3d 56 (D.D.C. 2014) ........................................................................................... 5

*Allen v. Wright*,
  468 U.S. 737 (1984), *overruled on other grounds in*
  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014) ......................... 35

*Am. Petroleum Inst. v. E.P.A.*,
  683 F.3d 382 (D.C. Cir. 2012) ............................................................................................. 41

*Ange v. Bush*,
  752 F. Supp. 509 (D.D.C. 1990) ........................................................................................... 51

*Ariz. Pub. Serv. Co. v. E.P.A.*,
  211 F.3d 1280 (D.C. Cir. 2000) ........................................................................................... 41

*Ariz. State Leg. v. Ariz. Indep. Redistricting Comm'n*,
  135 S. Ct. 2652 (2015) ......................................................................................................... 23

*Arizona v. United States*,
  567 U.S. 387 (2012) ....................................................................................................... 28, 56

*Armstrong v. Exceptional Child Ctr., Inc.*,
  135 S. Ct. 1378 (2015) ......................................................................................................... 30

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ......................................................................................... 20, 36, 38, 54

*Baker v. Carr*,
  369 U.S. 186 (1962) ....................................................................................................... 26, 27

*Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.*,
  502 U.S. 32 (1991) ............................................................................................................... 62

*Beacon Prods. Corp. v. Reagan,*
   633 F. Supp. 1191 (D. Mass. 1986) ................................................................ 23, 25

*Beacon Prods. Corp. v. Reagan,*
   814 F.2d 1 (1st Cir. 1987) ............................................................................... 14, 23

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ........................................................................................ 20, 38

*Bennett v. Spear,*
   520 U.S. 154 (1997) .............................................................................................. 49

*Block v. Cmty. Nutrition Inst.,*
   467 U.S. 340 (1984) ........................................................................................ 21, 24

*Building & Const. Trades Dep't., AFL-CIO v. Martin,*
   961 F.2d 269 (D.C. Cir. 1992) ............................................................................. 60

*Byrd v. EPA,*
   174 F.3d 239 (D.C. Cir. 1999) ......................................................................... 34, 38

*CASA de Maryland, Inc. v. Trump,*
   355 F. Supp. 3d 307 (D. Md. 2018) ..................................................................... 32

*Cause of Action Inst. v. Eggleston,*
   224 F. Supp. 3d 63 (D.D.C. 2016) ....................................................................... 21

*Centro Presente v. DHS,*
   332 F. Supp. 3d 393 (D. Mass. 2018) .................................................................. 32

*Chang v. United States,*
   859 F.2d 893 (Fed. Cir. 1988) .............................................................................. 25

*Chichakli v. Szubin,*
   No. 3:06-CV-1546-N, 2007 WL 9711515 (N.D. Tex. June 4, 2007),
   *aff'd in part, vacated in part,* 546 F.3d 315 (5th Cir. 2008) ................................ 26

*Chlorine Inst., Inc. v. Fed. R.R. Admin.,*
   718 F.3d 922 (D.C. Cir. 2013) ............................................................................. 39

*City of Arlington v. FCC,*
   569 U.S. 290 (2013) ........................................................................................ 55, 58

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013) ........................................................................................ 36, 47

*Ctr. for Responsible Sci. v. Gottlieb,*
  346 F. Supp. 3d 29 (D.D.C. 2018) ................................................................... 43, 46

*Dalton v. Specter,*
  511 U.S. 462 (1994) ............................................................................... *passim*

*Defs. of Wildlife v. Chertoff,*
  527 F. Supp. 2d 119 (D.D.C. 2007) ................................................................. 29, 33

*Dinh Tran v. Dep't of Treasury,*
  351 F. Supp. 3d 130 (D.D.C. 2019) ...................................................................... 5

*Dist. No. 1, Pac. Coast Dist., Marine Eng'rs' Beneficial Ass'n v. Mar. Admin.,*
  215 F.3d 37 (D.C. Cir. 2000) ........................................................................ 50, 52

*Doe 2 v. Shanahan,*
  917 F.3d 694 (D.C. Cir. 2019) ........................................................................... 29

*Doe 2 v. Trump,*
  319 F. Supp. 3d 539 (D.D.C. 2018) ..................................................................... 31

*Donovan v. Carolina Stalite Co.,*
  734 F.2d 1547 (D.C. Cir. 1984) ......................................................................... 60

*El-Shifa Pharm. Indus. Co. v. United States,*
  607 F.3d 836 (D.C. Cir. 2010) .............................................................. 19, 27, 51

*Elk Grove Unified Sch. Dist. v. Newdow,*
  542 U.S. 1 (2004), *abrogated on other grounds by Lexmark Int'l, Inc. v.*
  *Static Control Components,* 134 S. Ct. 1377 (2014) ................................................ 42

*Equal Rights Ctr. v. Post Properties, Inc.,*
  633 F.3d 1136 (D.C. Cir. 2011) ......................................................................... 44

*Fiallo v. Bell,*
  430 U.S. 787 (1977) ................................................................................. 29, 39

*Fla. Audubon Soc'y v. Bentsen,*
  94 F.3d 658 (D.C. Cir. 1996) ........................................................................... 37

*Food & Water Watch, Inc. v. Vilsak,*
  808 F.3d 905 (D.C. Cir. 2015) ............................................................. 41, 42, 43

*Franklin v. Massachusetts,*
  505 U.S. 788 (1992) ...................................................................................... 31

*Freedom Republicans, Inc. v. Fed. Election Comm'n*,
  13 F.3d 412 (D.C. Cir. 1994) ................................................................................ 36

*Friends of the Earth, Inc. v. Laidlaw Env't Srvs., Inc.*,
  528 U.S. 167 (2000) ........................................................................................... 35

*FW/PBS, Inc. v. City of Dallas*,
  493 U.S. 215 (1990) ........................................................................................... 40

*Gilligan v. Morgan*,
  413 U.S. 1 (1973) ............................................................................................... 47

*Griffith v. FLRA*,
  842 F.2d 487 (D.C. Cir. 1988) ............................................................................ 58

*Gringo Pass, Inc. v. Kiewit Sw. Co.*,
  No. CV-09-251-TUC-DCB, 2012 WL 12905166 (D. Ariz. Jan. 11, 2012),
  *aff'd sub nom. Gringo Pass, Inc. v. United States*, 542 F. App'x 642 (9th Cir. 2013) ............... 7

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*,
  527 U.S. 308 (1999) ...................................................................................... 30, 31

*Haitian Refugee Ctr. v. Gracey*,
  809 F.2d 794 (D.C. Cir. 1987) ............................................................................ 33

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982) ........................................................................................... 41

*Hawaii v. Trump*,
  859 F.3d 741 (9th Cir. 2017), *vacated as moot and remanded*, 138 S. Ct. 377 (2017) ........... 32

*Heckler v. Chaney*,
  470 U.S. 821 (1985) ...................................................................................... 45, 46

*In re Korean Air Lines Disaster of Sept. 1*,
  597 F. Supp. 613 (D.D.C. 1984) ......................................................................... 47

*Industria Panificadora, S.A. v. United States*,
  763 F. Supp. 1154 (D.D.C. 1991),
  *aff'd on other grounds*, 957 F.2d 886 (D.C. Cir. 1992) ......................................... 47

*INS v. Chadha*,
  462 U.S. 919 (1983) ........................................................................................... 15

*Interstate Nat. Gas Ass'n of Am. v. FERC*,
  494 F.3d 1092 (D.C. Cir. 2007) ...................................................................... 46, 47

*Int'l Academy of Oral Medicine & Toxicology v. FDA*,
    195 F. Supp. 3d 243 (D.D.C. 2018) ................................................................. 44, 45

*Int'l Refugee Assistance Project v. Trump*,
    857 F.3d 554 (4th Cir.), *as amended* (May 31, 2017), *as amended* (June 15, 2017),
    *cert. granted*, 137 S. Ct. 2080 (2017), and *vacated and remanded sub nom.*
    *Trump v. Int'l Refugee Assistance*, 138 S. Ct. 353 (2017 .............................. 31

*Japan Whaling Ass'n v. Am. Cetacean Soc'y*,
    478 U.S. 221 (1986) ................................................................................. 26

*Jerome Stevens Pharms., Inc. v. FDA*,
    402 F.3d 1249 (D.C. Cir. 2005) ............................................................... 20

*Kaempe v. Myers*,
    367 F.3d 958 (D.C. Cir. 2004) ......................................................... 5, 20, 57

*Karahalios v. Nat'l Fed'n of Fed. Emps., Local* 1263,
    489 U.S. 527 (1989) ................................................................................. 24

*Kleindienst v. Mandel*,
    408 U.S. 753 (1972) ................................................................................. 28

*Leedom v. Kyne*,
    358 U.S. 184 (1958) ........................................................................... 62, 63

*Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State, Bureau of Consular Affairs*,
    104 F.3d 1349 (D.C. Cir. 1997) ............................................................... 50

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ......................................................................... 34, 48, 45

*Lujan v. Nat'l Wildlife Fed.*,
    497 U.S. 871 (1990) ........................................................................... 33, 49

*Massachusetts v. EPA*,
    549 U.S. 497 (2007) ................................................................................. 19

*Mathews v. Diaz*,
    426 U.S. 67 (1976) ................................................................................... 29

*Middlesex Cty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*,
    453 U.S. 1 (1981) ..................................................................................... 22

*Mississippi v. Johnson*,
    71 U.S. (4 Wall.) 475 (1866) ............................................................... 24, 30

*Mittleman v. Postal Regulatory Comm'n,*
    757 F.3d 300 (D.C. Cir. 2014) ............................................................. 63

*Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ............................................................................. 55

*N. Am. Butterfly Ass'n v. Nielsen,*
    No. 17-2651, 2019 WL 634596 (D.D.C. Feb. 14, 2019) .................... 5, 33

*Nat'l Air Traffic Controllers Ass'n AFL-CIO v. FSIP,*
    437 F.3d 1256 (D.C. Cir. 2006) ........................................................... 62

*Nat'l Oilseed Processors Ass'n v. Occupational Safety & Health Admin.,*
    769 F.3d 1173 (D.C. Cir. 2014) ..................................................... 39, 40

*Nat'l Park Hospitality Ass'n v. Dep't of the Interior,*
    538 U.S. 803 (2003) ...................................................................... 38, 41

*Nat'l Taxpayers Union, Inc. v. United States,*
    68 F.3d 1428 (D.C. Cir. 1995) ............................................... 41, 46, 47

*New England Anti-Vivisection Soc. v. U.S. Fish & Wildlife Serv.,*
    208 F. Supp. 3d 142 (D.D.C. 2016) ................................................... 45

*New Jersey v. United States,*
    91 F.3d 463 (3d Cir. 1996) ................................................................ 28

*Newdow v. Roberts,*
    603 F.3d 1002 (D.C. Cir. 2010) ......................................................... 31

*NFFE v. United States,*
    905 F.2d 400 (D.C. Cir. 1990) ..................................................... 50, 52

*Nixon v. Fitzgerald,*
    457 U.S. 731 (1982) ...................................................................... 24, 30

*North Dakota v. United States,*
    495 U.S. 423 (1990) ........................................................................... 52

*Nyunt v. Chairman, Broad. Bd. of Govs.,*
    589 F.3d 445 (D.C. Cir. 2009) ..................................................... 54, 62

*Orloff v. Willoughby,*
    345 U.S. 83 (1953) ............................................................................. 52

*PETA v. USDA*,
  797 F.3d 1087 (D.C. Cir. 2015) ..................................................................... 42, 43

*Plyler v. Doe*,
  457 U.S. 202 (1982) ............................................................................. 24, 27, 30

*Pub. Serv. Comm'n v. Wycoff Co.*,
  344 U.S. 237 (1952) ..................................................................................... 39

*Public Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*,
  489 F.3d 1279 (D.C. Cir. 2007) ................................................................. 19, 36

*Reliable Automatic Sprinkler Co. v. Consumer Product Safety Comm'n*,
  324 F.3d 726 (D.C. Cir. 2003) ....................................................................... 49

*Sadowski v. Bush*,
  293 F. Supp. 2d 15 (D.D.C. 2003) .................................................................. 28

*Saget v. Trump*,
  345 F. Supp. 3d 287 (E.D.N.Y. 2018) ............................................................. 32

*Salazar v. Ramah Navajo Chapter*,
  567 U.S. 182 (2012) ..................................................................................... 59

*Santiago v. Rumsfeld*,
  No. CV04-1747-PA, 2004 WL 3008724 (D. Or. Dec. 29, 2004),
  *aff'd*, 403 F.3d 702 (9th Cir. 2005) *and aff'd,* 407 F.3d 1018 (9th Cir. 2005) ........................ 25

*Sardino v. Fed. Reserve Bank of N.Y.*,
  361 F.2d 106 (2d Cir. 1966) ........................................................................... 25

*Save Our Heritage Org. v. Gonzalez*,
  533 F. Supp. 2d 58 (D.D.C. 2008) .................................................................... 5

*Sears, Roebuck & Co. v. USPS*,
  844 F.3d 260 (D.C. Cir. 2016) .................................................................. 54, 62

*Sec'y of Labor v. Twentymile Coal Co.*,
  456 F.3d 151 (D.C. Cir. 2006) ....................................................................... 50

*Sherley v. Sebelius*,
  644 F.3d 388 (D.C. Cir. 2011) ....................................................................... 59

*Sierra Club v. EPA*,
  292 F.3d 895 (D.C. Cir. 2002) ....................................................................... 34

*Sierra Club v. Jackson*,
 648 F.3d 848 (D.C. Cir. 2011) ........................................................ 50, 52

*Sierra Club v. Morton*,
 405 U.S. 727 (1972) ............................................................................ 42

*Simon v. E. Ky. Welfare Rights Org.*,
 426 U.S. 26 (1976) ........................................................................ 29, 42

*Soudavar v. Bush*,
 46 F. App'x 731 (5th Cir. 2002) ......................................................... 25

*Spann v. Colonial Vill., Inc.*,
 899 F.2d 24 (D.C. Cir. 1990) ............................................................. 42

*Steel Co. v. Citizens for a Better Env't*,
 523 U.S. 83 (1998) ........................................................................ 34, 37

*Swan v. Clinton*,
 100 F.3d 973 (D.C. Cir. 1996) ........................................................ 31, 32

*Trudeau v. FTC*,
 456 F.3d 178 (D.C. Cir. 2006) ................................................. 50, 62, 63

*United States v. Amirnazmi*,
 645 F.3d 564 (3d Cir. 2011) ..................................................... 14, 22, 25

*United States v. Brignoni-Ponce*,
 422 U.S. 873 (1975) ............................................................................ 27

*United States v. Delgado-Garcia*,
 374 F.3d 1337 (D.C. Cir. 2004) .......................................................... 29

*United States v. Groos*,
 616 F. Supp. 2d 777 (N.D. Ill. 2008) ................................................. 25

*United States v. Spawr Optical Research, Inc.*,
 685 F.2d 1076 (9th Cir. 1982) ....................................................... 25, 27

*United States v. Yoshida Int'l, Inc.*,
 526 F.2d 560 (C.C.P.A. 1975) ............................................................ 25

*Veterans & Reservists for Peace in Vietnam v. Reg'l Comm'r of Customs, Region II*,
 459 F.2d 676 (3d Cir. 1972) ............................................................... 25

*Von Aulock v. Smith*,
    720 F.2d 176 (D.C. Cir. 1983) ............................................................... 35

*Winpisinger v. Watson*,
    628 F.2d 133 (D.C. Cir. 1980) ......................................................... 34, 36

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ............................................................................ 64

*Ziglar v. Abbasi*,
    137 S. Ct. 1843 (2017) ................................................................... 24, 31

*Zivotofsky ex rel. Zivotofsky v. Clinton*,
    566 U.S. 189 (2012) ............................................................................ 27

**STATUTES**

5 U.S.C. § 701(a)(2) .................................................................. 48, 50, 53

5 U.S.C. § 704 ................................................................................. 48

5 U.S.C. § 706(2) ......................................................................... 19, 54

6 U.S.C. § 211(c)(2) ........................................................................... 56

8 U.S.C. § 1103 ................................................................................ 5

8 U.S.C. § 1325 ............................................................................... 56

10 U.S.C. § 101(f)(4) ......................................................................... 58

10 U.S.C. §§ 271–83 ........................................................................... 6

10 U.S.C. § 284 ......................................................................... *passim*

10 U.S.C. § 2801 ......................................................................... 18, 58

10 U.S.C. § 2808 ....................................................................... *passim*

18 U.S.C. § 545 .............................................................................. 56

21 U.S.C. § 865 .............................................................................. 56

31 U.S.C. § 9705 ...................................................................... *passim*

50 U.S.C. § 1601 ............................................................................. 10

50 U.S.C. § 1621 ................................................................................................ 10, 22

50 U.S.C. § 1622 ............................................................................................ 12, 14, 22

50 U.S.C. § 1631 .................................................................................................... 12

50 U.S.C. §§ 1631, 1641 ......................................................................................... 22

National Emergencies Act (NEA),
    Pub. L. No. 94-412, 90 Stat. 1255 (1976)
    (codified as amended at 50 U.S.C. §§ 1601-1651) ............................................. 10

National Defense Authorization Act for Fiscal Year 1991,
    Pub. L. No. 101-510, 104 Stat 1485 (1990) ...................................................... 16

Foreign Relations Authorization Ac,
    Pub. L. No. 104-208 Div. C., Title I § 102(a), 110 Stat. 3009 (1996) ...................... 5

REAL ID Act of 2005,
    Pub. L. No. 109-13, Div. B, Title I § 102, 119 Stat. 231, 302, 306 ......................... 5

Secure Fence Act of 2006,
    Pub. L. No. 109-367, 120 Stat. at 2638–39 ..................................................... 5, 56

Consolidated Appropriations Act, 2008,
    Pub. L. No. 110-161, 121 Stat 1844 (2007) ........................................................ 5

Consolidated Appropriations Act, 2019,
    Pub. L. No. 116-6, 133 Stat 13 (2019) ........................................................ *passim*

**FEDERAL RULES**

Federal Rule of Civil Procedure 12(b) ...................................................... 19, 20, 21, 65

**LEGISLATIVE MATERIALS**

Hr'g Before the S. Comm. on Armed Servs. Subcomm. on Emerging Threats and Capabilities,
    1999 WL 258030 (Apr. 27, 1999) (Testimony of Barry R. McCaffrey, Dir. of the Office of
    Nat'l Drug Control Policy) ........................................................................ 6, 16

S. Appropriations Hr'g on the DHS FY 2018 Budget,
    2017 WL 2311065 (May 25, 2017) ................................................................... 5

Summary, H.R. J. Res. 46, 116th Cong. (2019),
    https://www.congress.gov/bill/116th-congress/house-joint-resolution/46 ............... 23

## ADMINISTRATIVE AND EXECUTIVE MATERIALS

Blocking Assets and Prohibiting Transactions With Significant Narcotics Traffickers,
  60 Fed. Reg. 54579 (Oct. 21, 1995).......................................................................... 13

Declaration of a National Emergency and Invocation of Emergency Authority Relating to the
  Regulation of the Anchorage and Movement of Vessels,
  Proc. No. 6867, 61 Fed. Reg. 8843 (Mar. 1, 1996).................................................. 12

Declaration of National Emergency by Reason of Certain Terrorist Attacks,
  Proc. No. 7463, 66 Fed. Reg. 48199 (Sept. 14, 2001) ............................................ 18

Declaration of a National Emergency With Respect to the 2009 H1N1 Influenza Pandemic,
  Proc. No. 8443, 74 Fed. Reg. 55439 (Oct. 23, 2009) ............................................. 12

Modifying and Continuing the National Emergency With Respect to Cuba and Continuing To
  Authorize the Regulation of the Anchorage and Movement of Vessels,
  Proc. No. 9398, 81 Fed. Reg. 9737 (Feb. 24, 2016) ............................................... 13

Prohibiting the Importation of Rough Diamonds From Sierra Leone,
  66 Fed. Reg. 7389 (Jan. 18, 2001) .......................................................................... 12

Border Security and Immigration Enforcement Improvements,
  82 Fed. Reg. 8793 (Jan. 25, 2017).......................................................................... 6

Continuation of the National Emergency With Respect to Certain Terrorist Attacks,
  83 Fed. Reg. 46067 (Sept. 10, 2018) ...................................................................... 18

Continuation of the National Emergency With Respect to Iran,
  83 Fed. Reg. 56251 (Nov. 8, 2018).......................................................................... 13

Declaring a National Emergency Concerning the Southern Border of the United States,
  84 Fed. Reg. 4949 (Feb. 15, 2019) ......................................................................... 1

Declaration of a National Emergency With Respect to the 2009 H1N1 Influenza Pandemic,
  74 Fed. Reg. 55439 (Oct. 23, 2009)........................................................................ 12

Determination Pursuant to § 102 of IIRIRA,
  84 Fed. Reg. 17185–87 (Apr. 24, 2019) ................................................................. 56

Determination Pursuant to § 102 of IIRIRA,
  84 Fed. Reg. 17187–88 (Apr. 24, 2019) ................................................................. 56

Border Security and Immigration Enforcement Improvements,
  Exec. Order No. 13767, 82 Fed. Reg 8793 ............................................................ 6

Blocking Property of Certain Persons Contributing to the Situation in Burundi,
   Exec. Order No. 13712, 80 Fed. Reg. 73633 ....................................................................... 2, 12

Chemical and Biological Weapons Proliferation,
   Exec. Order No. 12735, 55 Fed. Reg. 48587 (Nov. 16, 1990) ........................................... 2, 13

Blocking Iraqi Government Property and Prohibiting Transactions with Iraq,
   Exec. Order No. 12722, 55 Fed. Reg. 31803 ........................................................................... 18

National Emergency Construction Authority,
   Exec. Order No. 12734, 55 Fed. Reg. 48099 ........................................................................... 18

Proliferation of Weapons of Mass Destruction,
   Exec. Order No. 12938, 59 Fed. Reg. 58099 ........................................................................... 13

National Emergency Construction Authority,
   Exec. Order No. 12978, 66 Fed. Reg. 58343 ........................................................................... 13

Continuation of the National Emergency With Respect to Sierra Leone and Liberia,
   Exec. Order No. 13194, 67 Fed. Reg. 2547 ............................................................................. 12

National Emergency Construction Authority,
   Exec. Order No. 13235, 66 Fed. Reg. 58343 ........................................................................... 18

Blocking Property of Transnational Criminal Organizations,
   Exec. Order No. 13581, 76 Fed. Reg. 44757 ........................................................................... 13

## OTHER AUTHORITIES

Presidential Memorandum for Secretary of Defense, Attorney General, and the Secretary of
   Homeland Security titled, "Securing the Southern Border of the United States."  Presidential
   Memorandum,
   2018 WL 1633761 (Apr. 4, 2018) ........................................................................................... 7

President Donald J. Trump's Border Security Victory (Feb. 15, 2019),
   www.whitehouse.gov/briefings-statements/president-donald-j-trumps-border-security-victory
   ................................................................................................................................................. 10

The Funds Available To Address The Nat'l Emergency At Our Border (Feb. 26, 2019),
   www.whitehouse.gov/briefings-statements/funds-available-address-national-emergency-
   border .................................................................................................................................... 10

Letter from Secretary of Homeland Security Kirstjen M. Nielsen to the U.S. Senate and House of
   Representatives (Mar. 28, 2019),
   https://www.dhs.gov/sites/default/files/publications/19_0328_Border-Situation-Update.pdf
   (Nielsen Letter) ....................................................................................................................... 1

"Walls Work," DHS, Dec. 12, 2018,
https://www.dhs.gov/news/2018/12/12/walls-work ............................................................... 36

S. Comm. on Gov't Operations & the Special Comm. on Nat'l Emergencies and Delegated
Emergency Powers, 94th Cong., 2d Sess., The National Emergencies Act Source Book:
Legislative History, Texts, and Other Documents (1976) ........................................................ 10

Cont. of Nat'l Emergency With Respect to Iran,
2016 WL 6518765 (Nov. 3, 2016) (letter from President Obama).......................................... 13

## INTRODUCTION

On February 15, 2019, the President issued a proclamation declaring that a national emergency exists at the southern border.  *See* Presidential Proclamation on Declaring a Nat'l Emergency Concerning the S. Border of the United States, 84 Fed. Reg. 4949 (Feb. 15, 2019) (Proclamation).  Because the southern border is "a major entry point for criminals, gang members, and illicit narcotics" as well as "large-scale unlawful migration," the President determined that "[t]he current situation at the southern border presents a border security and humanitarian crisis that threatens core national security interests and constitutes a national emergency."  *Id.*  As the President has explained, tens of thousands of aliens are apprehended along the southern border each month and thousands of pounds of illegal drugs are smuggled across the border each year while, at the same time, migrants have begun organizing into caravans that include large numbers of families and unaccompanied children from Central American countries.  *See* Veto Message for H.R. J. Res. 46, 2019 WL 1219481 (Mar. 15, 2019) (Veto Messasge).  The increasing surge of migrants, the highest in over a decade, has placed a tremendous strain on the limited resources of the Department of Homeland Security (DHS) and exacerbated the risks to border security, public safety, and the safety of the migrants themselves.  *See* Letter from Secretary of Homeland Security Kirstjen M. Nielsen to the U.S. Senate and House of Representatives (Mar. 28, 2019), https://www.dhs.gov/sites/default/files/publications/19_0328_Border-Situation-Update.pdf (Nielsen Letter).  Facilities are overcrowded, officers are stretched too thin, and resources are being redirected away from law enforcement to address this humanitarian and security crisis.  *Id.*

The Government has been building barriers along the southern border since the 1990s pursuant to congressional authorization.  To address the current national emergency at the southern border, three statutory authorities and sources of funding have been identified to continue the construction of additional barriers, in addition to the $1.375 billion recently appropriated by

Congress to DHS for such construction:  (1) the Treasury Forfeiture Fund (31 U.S.C. § 9705); (2) the Department of Defense's (DoD) counter-drug support authority (10 U.S.C. § 284); and (3) the authority to reallocate funding from military construction projects, made available through the President's national emergency declaration (10 U.S.C. § 2808).  Only the last source of statutory authority—§ 2808—depends on the President's national emergency declaration.  The other two sources of authority—§ 9705 and § 284—are available regardless of the declared emergency.

The Proclamation follows a 40-year tradition of multiple Presidents of both parties declaring national emergencies to address a wide range of problems.  Indeed, many of these declarations concerned situations that did not involve suddenly emerging threats or the sort of national crisis that currently exists on the southern border.  Thus, for example, President Obama declared a national emergency to address "political repression" in Burundi, Exec. Order No. 13712, 80 Fed. Reg. 73633 (Nov. 23, 2015); President George W. Bush declared a national emergency to address the "fundamentally undemocratic March 2006 elections" in Belarus, Exec. Order No. 13405, 71 Fed. Reg. 35485 (June 16, 2006); and President Clinton declared a national emergency because "the Government of Burma has committed large-scale repression of the democratic opposition in Burma," Exec. Order No. 13047, 62 Fed. Reg. 28301 (May 22, 1997).  And Presidents similarly have used this power to address longstanding problems, such as when George H.W. Bush declared a national emergency in 1990 to address the "proliferation of chemical and biological weapons" around the world.  Exec. Order No. 12735, 55 Fed. Reg. 48587 (Nov. 16, 1990).  President Trump's Proclamation concerning the national emergency at our Nation's southern border is neither unprecedented nor fundamentally different from past uses of the same authority.  It is, in fact, more closely tied to exigent circumstances.

Plaintiffs seek to challenge the Proclamation and Defendants' reliance on all three statutory

authorities in addressing the border crisis, but the Court lacks jurisdiction to do so, and the Amended Complaint fails to state claims upon which relief may be granted.  As a threshold matter, judicial review of the Proclamation is not available under the National Emergencies Act (NEA), and in any event, such challenges raise political questions that courts are not equipped to answer, as courts have recognized.   Moreover, independent separation-of-powers concerns require dismissal of the President as a defendant because there is no cause of action against the President, and Plaintiffs may not obtain equitable relief directly against the President for his official conduct, particularly where, as here, relief could be provided by subordinate agency officials.   And the Court lacks jurisdiction to hear Plaintiffs' claims of National Environmental Policy Act (NEPA) violations because the Acting Secretary of Homeland Security has exercised his statutory authority to waive that law for various border construction projects identified in the Amended Complaint.

With the exception of CalWild's claim related to El Centro Project 1, Plaintiffs also lack standing to challenge Defendants' use of § 9705, § 284, and § 2808 to construct barriers along the southern border.   Plaintiffs do not plausibly plead standing to maintain this action based on unparticularized allegations of ecological harm.   Moreover, Dr. Ramirez and Carrizo/Comecrudo Nation of Texas (Carrizo/Comecrudo) lack Article III standing because Defendants are not constructing the specific border barrier project that allegedly harms them pursuant to the President's Proclamation, § 9705, § 284, or § 2808.   Ms. Hull lacks standing because, contrary to her allegations, no barrier project at all is currently planned on or near her property.   And RGISC's and Mr. Heins's claims are not ripe for review because no funding source has yet been identified for the border barrier projects they allege.   Finally, LCLAA's and GreenLatinos' allegations are insufficient to establish organizational or representational standing under Article III.

Assuming the Court has jurisdiction and Plaintiffs' claims are justiciable (which they are

not), they fail on the merits.  Their statutory claims are deficient for numerous reasons.  Plaintiffs' Administrative Procedure Act (APA) claim fails at the threshold level because they have not alleged any final agency action with respect to DoD's use of § 2808.  Moreover, any such use of § 2808 authority (assuming final action) and use of § 9705 authority are committed to agency discretion by law.  Even looking beyond these threshold issues, Plaintiffs fail to state a claim under the APA for violations of § 9705, § 284, § 2808, or the Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, 132 Stat. 2981 (2019) (CAA), because they do not identify agency action that is arbitrary or capricious, nor do they plausibly allege that any agency has exceeded its statutory authority.  For the same reasons, Plaintiffs' alternative claims alleging a nonstatutory right to review ultra vires agency action do not meet the high standard required to bring such claims.

Finally, Plaintiffs' constitutional claims should be dismissed because they merely repackage claims of statutory violations in constitutional terms.  Defendants are relying on express congressional authorization to fund border construction, not the President's independent Article II authority.  Plaintiffs' effort to reframe alleged statutory violations as independent violations of the Appropriations Clause and separation of powers contravenes the principle that "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims." *Dalton v. Specter*, 511 U.S. 462, 473 (1994).

For these reasons, as explained below, the Amended Complaint should be dismissed.

## BACKGROUND

**I.** **Congress's Express Authorization of Border Barrier Construction**

The Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) authorizes the Secretary of Homeland Security to "take such actions as may be necessary to install additional physical barriers and roads (including the removal of obstacles to detection of illegal entrants) in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into

the United States."  Pub. L. No. 104-208, Div. C., Title I § 102(a), 110 Stat. 3009 (1996), as

amended (codified at 8 U.S.C. § 1103 note).  In 2005, Congress grew frustrated by "[c]ontinued

delays caused by litigation" preventing border barrier construction and thus granted the Secretary

of Homeland Security authority to waive any "laws that impede the expeditious construction of

security infrastructure along the border."  *See* H.R. Rep. 109-72, at 171 (May 3, 2005); Pub. L.

No. 109-13, Div. B, Title I § 102, 119 Stat. 231, 302, 306 (IIRIRA § 102(c)).  Congress amended

IIRIRA again as part of the Secure Fence Act of 2006, requiring construction of "physical barriers,

roads, lighting, cameras, and sensors" across hundreds of miles of the southern border in five

specified locations, including in southern Texas.  Pub. L. No. 109-367, § 3, 120 Stat. 2638 (2006).

In 2007, Congress expanded this requirement and directed "construct[ion of] reinforced fencing

along not less than 700 miles of the southwest border."  Pub. L. No. 110-161, Div. E, Title V §

564, 121 Stat. 1844 (2007) (IIRIRA § 102(b)).

Relying on these authorities, DHS has installed approximately 650 miles of barriers along

the southern border.[1]  *See* S. Appropriations Hr'g on the DHS FY 2018 Budget, 2017 WL 2311065

(May 25, 2017) (Testimony of then-Secretary of Homeland Security John Kelly).  Courts have

consistently denied relief in lawsuits challenging DHS's construction of border barriers under

IIRIRA.  *See, e.g.*, *N. Am. Butterfly Ass'n v. Nielsen*, 2019 WL 634596 (D.D.C. Feb. 14, 2019);

*Save Our Heritage Org. v. Gonzalez*, 533 F. Supp. 2d 58 (D.D.C. 2008).

## II.  Congress's Authorization for DoD Support of DHS's Border Security Efforts

Congress also has expressly authorized DoD to provide a wide range of support to DHS at

---

[1] The Court may consider facts outside the Amended Complaint on a motion to dismiss without converting the motion into a motion for summary judgment when the facts are subject to judicial notice.  *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004).  The Court may take judicial notice of the publicly available information on official government websites cited herein.  *See Dinh Tran v. Dep't of Treasury*, 351 F. Supp. 3d 130, 133 n.5 (D.D.C. 2019); *Al-Aulaqi v. Panetta*, 35 F. Supp. 3d 56, 67 (D.D.C. 2014).

the southern border.  *See* 10 U.S.C. § 284; *see id.* §§ 271–83.  Since the early 1990s, military

personnel have supported civilian law-enforcement agency activities to secure the border, counter

the spread of illegal drugs, and respond to transnational threats.  *See* H. Armed Servs. Comm. Hr'g

on S. Border Defense Support (Jan. 29, 2019) (Joint Statement of John Rood and Vice Admiral

Michael  Gilday),  https://armedservices.house.gov/2019/1/department-of-defense-s-support-to-

the-southern-border (Joint Statement of Rood and Gilday).  For decades, U.S. military forces have

played an active role in barrier construction and reinforcement on the southern border.  Military

personnel were critical to construction of the first modern border barrier near San Diego,

California, in the early 1990s as well as other border fence projects.  *See* H.R. Rep. No. 103-200,

at 330–31 (1993) (commending DoD for its role in construction of the San Diego primary fence);

Hr'g Before the S. Comm. on Armed Servs. Subcomm. on Emerging Threats and Capabilities,

1999 WL 258030 (Apr. 27, 1999) (Testimony of Barry R. McCaffrey, Dir. of the Office of Nat'l

Drug Control Policy) (testifying that military personnel constructed over 65 miles of barrier

fencing).  In 2006, the National Guard improved the southern border security infrastructure by

building more than 38 miles of fence, 96 miles of vehicle barrier, more than 19 miles of new all-

weather road, and performing road repairs exceeding 700 miles.  *See* Joint Statement of Rood and

Gilday.  More recently, the U.S. Army Corps of Engineers (USACE) has assisted DHS by

providing planning, engineering, and barrier construction support.  *See, e.g.*, *Gringo Pass, Inc. v.*

*Kiewit Sw. Co.*, 2012 WL 12905166, at *1 (D. Ariz. Jan. 11, 2012).

**III.**    **DoD's Current Support for DHS's Efforts to Secure the Southern Border**

On January 25, 2017, the President issued an Executive Order directing federal agencies

"to deploy all lawful means to secure the Nation's southern border."  Exec. Order No. 13767, 82

Fed. Reg. 8793 (Jan. 25, 2017).  To "prevent illegal immigration, drug and human trafficking, and

acts of terrorism," *id.*, the Order required agencies to "take all appropriate steps to immediately

plan, design and construct a physical wall along the southern border," including "[i]dentify and, to the extent permitted by law, allocate all sources of Federal funds" to that effort, *id.* at 8794.

On April 4, 2018, the President issued a memorandum to the Secretary of Defense, Secretary of Homeland Security, and the Attorney General titled, "Securing the Southern Border of the United States." Presidential Memorandum, 2018 WL 1633761 (Apr. 4, 2018). The President stated "[t]he security of the United States is imperiled by a drastic surge of illegal activity on the southern border" and pointed to the "anticipated rapid rise in illegal crossings," as well as "[t]he combination of illegal drugs, dangerous gang activity, and extensive illegal immigration." *Id.* at *1. The President determined the situation at the border had "reached a point of crisis" that "once again calls for the National Guard to help secure our border and protect our homeland." *Id.* To address this crisis, the President directed the Secretary of Defense to support DHS in "securing the southern border and taking other necessary actions to stop the flow of deadly drugs and other contraband, gang members and other criminals, and illegal aliens into this country." *Id.* at *2. Over the last year, military personnel, both active duty and National Guard, have provided a wide range of border security support to DHS, including hardening U.S. ports of entry, erecting temporary barriers, and emplacing concertina wire. *See* Joint Statement of Rood and Gilday.

## IV. **The President's Proclamation Declaring a National Emergency at the Southern Border**

On February 15, 2019, the President issued a proclamation declaring that "a national emergency exists at the southern border of the United States." *See* Proclamation. The President determined that "[t]he current situation at the southern border presents a border security and humanitarian crisis that threatens core national security interests and constitutes a national emergency." *Id.* As the President explained, "[t]he southern border is a major entry point for criminals, gang members, and illicit narcotics. The problem of large-scale unlawful migration

through the southern border is long-standing, and despite the executive branch's exercise of existing statutory authorities, the situation has worsened in certain respects in recent years." *Id.* "[B]ecause of the gravity of the current emergency situation," the President determined that "this emergency requires use of the Armed Forces" and "it is necessary for the Armed Forces to provide additional support to address the crisis." *Id.* The Proclamation makes available to the Secretary of Defense the authority under 10 U.S.C. § 2808 to undertake "military construction projects . . . that are necessary to support such use of the armed forces." *See id.*; 10 U.S.C. § 2808(a).

On March 15, 2019, the President vetoed a joint resolution passed by Congress that would have terminated the President's national emergency declaration. *See* Veto Message. The President relied upon statistics published by U.S. Customs and Border Protection (CBP) as well as recent congressional testimony by the Secretary of Homeland Security to reaffirm that a national emergency exists along the southern border. *See id.* at *1. The President highlighted (1) the recent increase in the number of apprehensions along the southern border, including 76,000 CBP apprehensions in February 2019; (2) CBP's seizure of more than 820,000 pounds of drugs in 2018; and (3) arrests in 2017 and 2018 of 266,000 aliens previously charged with or convicted of crimes. *See id.* The President also emphasized that migration trends along the southern border have changed from primarily single adults from Mexico, who could be easily removed upon apprehension, to caravans that include record numbers of families and unaccompanied children from Central America. *See id.* The President explained that this shift requires frontline border enforcement personnel to divert resources away from border security to humanitarian efforts and medical care. *See id.* The President stated that criminal organizations are taking advantage of the large flows of families and unaccompanied minors to conduct a range of illegal activity. *See id.* The President stated that border enforcement personnel and resources are strained "to the breaking

8

point" and concluded that the "situation on our border cannot be described as anything other than a national emergency, and our Armed Forces are needed to help confront it." *See id.* at *2.

The situation at the southern border has continued to deteriorate, to the point of "a system-wide meltdown." *See* Nielsen Letter. "DHS facilities are overflowing, agents and officers are stretched too thin, and the magnitude of arriving and detained aliens has increased the risk of life threatening incidents." *Id.* In June 2019, the U.S. Border Patrol (Border Patrol) apprehended 94,897 people between ports of entry on the southern border, compared with 132,880 in May and 99,290 in April. *See* DHS Sw. Border Migration Statistics FY 2019, https://www.cbp.gov/newsroom/stats/sw-border-migration. So far this fiscal year, there have been 688,375 apprehensions between ports of entry compared to 396,579 for all of fiscal year 2018. *Id.*

## V.   The Use of Spending Authorities for Barrier Construction

Congress appropriated $1.375 billion of the total amount made available under the "U.S. Customs and Border Protection—Procurement, Construction, and Improvements" appropriation for "the construction of primary pedestrian fencing, including levee pedestrian fencing, in the Rio Grande Valley Sector." DHS Appropriations Act, 2019, Pub. L. No. 116-6, § 230(a), 133 Stat. 13 (2019) (DHS Act). The Act provided that these funds "shall only be available for operationally effective designs." *Id.* § 230(b). It further required, prior to the use of these appropriated funds for barrier construction in five specified areas, that DHS consult with local officials. *Id.* § 232. Finally, the Act proscribed the use of "funds made available by this Act or prior Acts . . . for the construction of pedestrian fencing" in five specific areas in the Rio Grande Valley. *Id.* § 231. It did not otherwise restrict the use of appropriated funds for border barrier construction.

On the same day the President issued the Proclamation, the White House publicly released a fact sheet announcing the sources of funding to be used to construct additional barriers along the southern border. In addition to the $1.375 billion appropriation to DHS, the fact sheet identifies

three additional sources of funding: (1) About $601 million from the Treasury Forfeiture Fund (§ 9705); (2) Up to $2.5 billion of DoD funds transferred for Support for Counterdrug Activities (§ 284); and (3) Up to $3.6 billion reallocated from DoD military construction projects pursuant to § 2808. *See* President Donald J. Trump's Border Security Victory (Feb. 15, 2019), www.whitehouse.gov/briefings-statements/president-donald-j-trumps-border-security-victory; *see also* The Funds Available To Address The Nat'l Emergency At Our Border (Feb. 26, 2019), www.whitehouse.gov/briefings-statements/funds-available-address-national-emergency-border.

## STATUTORY FRAMEWORK

## I.   <u>National Emergencies Act</u>

The NEA, Pub. L. No. 94-412, 90 Stat. 1255 (1976) (codified as amended at 50 U.S.C. § 1601 *et seq.*), was an effort by Congress to "establish procedural guidelines for the handling of future emergencies with provision for regular Congressional review." S. Rep. No. 94-922, at 1 (1976).[2]  Title II of the NEA—codified at 50 U.S.C. § 1621—prescribes rules for Presidential declarations of national emergencies.  Section 1621(a) authorizes the President to "declare [a] national emergency" with respect to statutes "authorizing the exercise, during the period of a national emergency, of any special or extraordinary power." 50 U.S.C. § 1621(a).  Section 1621(b) states that "[a]ny provisions of law conferring powers and authorities to be exercised during a national emergency shall be effective and remain in effect (1) only when the President (in accordance with subsection (a) of this section), specifically declares a national emergency, and (2) only in accordance with [the NEA]." *Id.* § 1621(b).

---

[2] The NEA was the culmination of a multi-year effort by Congress to examine the field of emergency statutes and procedures. *See* S. Comm. on Gov't Operations & the Special Comm. on Nat'l Emergencies and Delegated Emergency Powers, 94th Cong., 2d Sess., The National Emergencies Act Source Book: Legislative History, Texts, and Other Documents, at 3–9 (1976) (summarizing legislative history of NEA from 1972–1976, including extensive work conducted by the Senate Special Committee on National Emergencies) (NEA Source Book).

Congress did not define the term "national emergency" or place any conditions on the President's ability to declare a national emergency. Instead, Congress intentionally left this determination to the President. As the co-chairmen of the Special Congressional Committee on National Emergencies that studied the issue and drafted the NEA explained, "[W]e did review this possibility of defining what national emergencies might be comprehended; and we decided you would cause more trouble by trying to define it than just saying 'national emergency' . . . We felt it would be wrong to try to circumscribe with words with what conditions a President might be confronted." Nat'l Emergencies Act: Hr'gs Before the Subcomm. on Admin. Law and Governmental Relations, 94th Cong. 27 (March 6, 1975) (statement of Sen. Mathias); *see id.* at 31 ("[W]e didn't attempt to define it specifically because we were afraid we would circumscribe the President's constitutional powers."); *see id.* at 27 (statement of Sen. Church) ("[O]nce we got into that thicket [of defining a national emergency] it became evident that we would be creating more problems than we would be solving."). And during the final debate on the NEA, the House of Representatives specifically rejected an amendment that would have limited the circumstances in which the President could declare a national emergency to times of war or attacks upon the United States only. *See* NEA Source Book at 278–80; *see id.* at 280 (statement of Rep. Moorhead) ("[T]his amendment would completely take away from the President the flexibility of acting in times of crisis or an emergency" and "it is important that we give our President some flexibility from time to time."). At the time of its passage, Congress thus expressly recognized that the NEA "makes no attempt to define when a declaration of national emergency is proper." Statement of Sen. Mathias at 9 (quoting S. Rep. No. 94-1168 (1976)).

The NEA was "an effort by the Congress to establish clear procedures and safeguards for the exercise by the President of emergency powers conferred upon him by other statutes." *See* S.

Rep. No. 94-1168, at 3.  Accordingly, the NEA provides that "[w]hen the President declares a national emergency, no powers or authorities made available by statute for use in the event of an emergency shall be exercised unless and until the President specifies the provisions of law under which he proposes that he, or other officers will act." 50 U.S.C. § 1631.  The NEA thus establishes procedural guidelines for the President to follow before he may invoke other statutory authorities.

In the more than 40 years since Congress enacted the NEA, Presidents have exercised broad discretion in determining what challenges amount to national emergencies, declaring nearly 60 national emergencies addressing a wide variety of national and international challenges.  For example, prior national emergency declarations have authorized the invocation of statutory powers to restrict the trade in uncut diamonds used to fund Sierra Leone's civil war, Exec. Order No. 13194, 66 Fed. Reg. 7389 (Jan. 18, 2001); to address the spread of swine flu in the United States, Proc. No. 8443, 74 Fed. Reg. 55439 (Oct. 23, 2009); and to promote democracy or conflict resolution in countries around the world, *see, e.g.*, Exec. Order No. 13712, 80 Fed. Reg. 73633 (Nov. 22, 2015) (addressing "violence against civilians" and "political repression" in Burundi).

The NEA also authorizes the President to renew declared emergencies annually without limitation.  *See* 50 U.S.C. § 1622(d).  Thirty-one national emergencies remain in effect today, with many having been renewed by multiple Presidents over several decades.  For example, President Clinton declared a national emergency in 1996 after Cuban military aircraft intercepted and destroyed two unarmed U.S.-registered civilian aircraft in international airspace north of Cuba. *See* Proc. No. 6867, 61 Fed. Reg. 8843 (Mar. 1, 1996).  The emergency remains in effect today, having been renewed over the course of 23 years by Presidents Bush, Obama, and Trump, even though President Obama concluded in 2016 that "the descriptions of the national emergency set forth in Proclamations 6867 and 7757 no longer reflect the international relations of the United

States related to Cuba." *See* Proc. No. 9398, 81 Fed. Reg. 9737 (Feb. 24, 2016).  Indeed, the first national emergency declared under the NEA—President Carter's 1979 emergency declaration stemming from the Iran hostage crisis—has been in effect for 39 years and is now being continued because "relations with Iran have not yet normalized, and the process of implementing the agreements with Iran, dated January 19, 1981, is ongoing." *See* Cont. of Nat'l Emergency With Respect to Iran, 2016 WL 6518765 (Nov. 3, 2016) (letter from President Obama); *see also* 83 Fed. Reg. 56251 (Nov. 8, 2018) (renewal by President Trump).

Nothing in the NEA requires that a national emergency be a sudden or unforeseen event, as some emergencies build through an accretion of events and exist over a considerable period of time.  In 1990, for example, President George H. W. Bush declared a national emergency arising from the "proliferation of chemical and biological weapons" around the world.  Exec. Order No. 12735, *supra*.  Four years later, President Clinton added nuclear weapons proliferation to that emergency declaration.  Exec. Order No. 12938, 59 Fed. Reg. 58099 (Nov. 14, 1994).  President Clinton also declared a national emergency arising from narcotics trafficking centered in Colombia, Exec. Order No. 12978, 60 Fed. Reg. 54579 (Oct. 21, 1995), and President Obama declared a national emergency arising from the activities of certain transnational criminal organizations, Exec. Order No. 13581, 76 Fed. Reg. 44757 (July 24, 2011).  These declarations, like the President's Proclamation, addressed longstanding policy challenges confronting the United States, even though they were neither new nor unforeseen at the time they were declared to be a national emergency.  Indeed, the President's Proclamation acknowledged that the situation at the southern border is a "long-standing" problem and builds on previous efforts of President Obama to use emergency powers to address the threats along the southern border by declaring a national emergency targeting a Mexican cartel known as Los Zetas.  *See id.*

Recognizing that, by their very nature, declarations of national emergency require the need for flexibility in policy choices that are the province of the political branches of the federal government, Congress gave itself the exclusive authority to exercise oversight of a President's national emergency declaration.  As a remedy for potential overreach, Congress has authority to terminate a national emergency by enacting into law "a joint resolution."  50 U.S.C. § 1622(a)(1).[3] Emphasizing the political judgment that Congress must make, the NEA expressly requires Congress to meet "[n]ot later than six months after a national emergency is declared, and not later than the end of each six-month period thereafter that such emergency continues, . . . to consider a vote on a joint resolution to determine whether that emergency shall be terminated."  *Id.* § 1622(b); *see also id.* § 1622(c) (establishing procedure for both Houses of Congress to vote on a joint resolution terminating a national emergency).   Additionally, Congress has imposed extensive reporting requirements on the Executive Branch when the President declares a national emergency. *See id.* § 1641(a)–(b) (requiring the President and each executive agency to maintain a file and index of, and transmit to Congress, certain orders, rules, and regulations); § 1641(c) (requiring the President to transmit to Congress "a report on the total expenditures incurred by the United States Government . . . which are directly attributable to the exercise of powers and authorities conferred by such declaration").   The NEA provides no role for the courts to review a national emergency declaration; it creates no private right of action nor does it contain a civil enforcement mechanism.

---

[3] The original draft of the NEA would have automatically terminated a national emergency after six months unless extended by an act of Congress.  *See* NEA Source Book at 7.   Congress eliminated this provision during debate and replaced it with the requirement that Congress pass a "concurrent resolution" to terminate a national emergency.  *See id.*; *Beacon Prods. Corp. v. Reagan*, 814 F.2d 1, 4 (1st Cir. 1987) (Breyer, J.).   Congress later replaced the "concurrent resolution" requirement with one that calls for termination of a national emergency by "joint resolution."  Pub. L. No. 99-93, § 801, 99 Stat. 405, 448 (1985).  This amendment was the result of the decision in *INS v. Chadha*, 462 U.S. 919, 959 (1983), which invalidated a similar provision as unconstitutional.  *See United States v. Amirnazmi*, 645 F.3d 564, 581 n.26 (3d Cir. 2011).

## II.    31 U.S.C. § 9705

The Treasury Department's Treasury Forfeiture Fund (TFF) collects proceeds from "seizures and forfeitures made pursuant to any law (other than section 7301 or 7302 of the Internal Revenue Code of 1986) enforced or administered by the Department of the Treasury or the United States Coast Guard." 31 U.S.C. § 9705(a). The TFF's authorizing legislation, 31 U.S.C. § 9705, sets forth the purposes for which the fund's revenue may be used. *See* S. Rep. No. 102-398 (1992). As relevant here, § 9705(g)(4)(B) states that, after reserving certain statutorily required amounts, any surplus unobligated funds "shall be available to the Secretary, without fiscal year limitation, . . . for obligation or expenditure in connection with the law enforcement activities of any Federal agency or of a Department of the Treasury law enforcement organization."

On December 26, 2018, DHS submitted a request to the Department of the Treasury (Treasury) to use TFF to enhance border security infrastructure and operations in support of CBP's law enforcement efforts. *See* Second Decl. of Loren Flossman (Second Flossman Decl.) ¶ 9 (Ex. 1). "Treasury approved DHS' request and, on February 15, 2019, notified Congress of this action," as required by § 9705(g)(4)(C). *Id.* Treasury made $242 million available to CBP for obligation on March 14, 2019. *See* Decl. of Loren Flossman (Flossman Decl. (7/11/19)) ¶ 4 (Ex. 2). CBP made $222 million of this first tranche "available to [USACE] for obligation on June 20, 2019," and "retained $20 million for program support on the TFF funded projects." *Id.* CBP is awaiting a second tranche of $359 million, *id.*, which it expects will be made available "at a later date upon Treasury's receipt of additional anticipated forfeitures," *see* Second Flossman Decl. ¶ 10. CBP will use TFF funds exclusively for projects in the Rio Grande Valley Sector (RGV) and/or Laredo Sectors of Texas. *See* Flossman Decl. (7/11/19) ¶ 5.

## III.    10 U.S.C. § 284

10 U.S.C. § 284 authorizes DoD to provide "support for the counterdrug activities . . . of

any other department or agency of the Federal Government," 10 U.S.C. § 284(a), including for "[c]onstruction of roads and fences and installation of lighting to block drug smuggling corridors across international boundaries of the United States," *id.* § 284(b)(7).   Congress first provided DoD this authority in the National Defense Authorization Act for Fiscal Year 1991.   Pub. L. No. 101-510, § 1004, 104 Stat. 1485 (1991).   Congress regularly renewed § 1004 and praised DoD's involvement in building barrier fences along the southern border.   For example, in 1993, Congress "commend[ed]" DoD's efforts to reinforce the border fence along a 14-mile drug smuggling corridor in the San Diego-Tijuana border area.   H.R. Rep. No. 103-200, at 330–31.   Executive Branch officials and Congress have also noted the importance of DoD's involvement in border security projects to prevent drug smuggling.   *See* Hr'g Before the S. Comm. on Armed Servs. Subcomm. on Emerging Threats and Capabilities, 1999 WL 258030 (Apr. 27, 1999) (Testimony of Barry R. McCaffrey) (testifying about the "vital contributions" made by DoD to construct 65 miles of barrier fencing, 111 miles of roads, and 17 miles of lighting); *see, e.g.*, H.R. Rep. No. 110-652, 420 (2008) (describing border fencing as an "invaluable counter-narcotics resource" and recommending a $5 million increase to DoD's budget to continue construction).   In light of the threat posed by illegal drug trafficking, Congress permanently codified § 1004 at 10 U.S.C. § 284 in December 2016, directing DoD "to ensure appropriate resources are allocated to efforts to combat this threat."   H.R. Rep. No. 114-840, 1147 (2016).

In accordance with § 284, on February 25, 2019, DHS requested DoD's assistance in blocking 11 specific drug-smuggling corridors on federal land along certain portions of the southern border.   *See* Decl. of Kenneth Rapuano (First Rapuano Decl.) ¶ 3, Ex. A (Ex. 3).   "The request sought . . . the replacement of existing vehicle barricades or dilapidated pedestrian fencing with new pedestrian fencing, the construction of new and improvement of existing patrol roads,

and the installation of lighting." *Id.* As relevant to this case, the Acting Secretary of Defense approved six border barrier projects.[4]  *See id.* ¶ 4 (approving Yuma Project 1 in Arizona and El Paso Project 1 in New Mexico); *see* Second Decl. of Kenneth Rapuano (Second Rapuano Decl.) ¶ 6 (Ex. 4) (approving El Centro Project 1 in California and Tucson Projects 1, 2, and 3 in Arizona); *see also* First Rapuano Decl., Ex. A (describing project locations).

On April 24 and May 15, 2019, the Acting Secretary of Homeland Security exercised his authority under § 102(c)(1) of IIRIRA to waive the application of various laws to ensure expeditious construction of these projects.  *See* Determinations Pursuant to Section 102 of the IIRIRA, as Amended, 84 Fed. Reg. 17185-87 (Apr. 24, 2019); 21798-801 (May 15, 2019).  The waived laws include NEPA, along with "all federal, state, or other laws, regulations, and legal requirements of, deriving from, or related to the subject of, the [listed] statutes."  *Id.*

## IV.  <u>10 U.S.C. § 2808</u>

10 U.S.C. § 2808(a) provides:

> In the event of a declaration of war or the declaration by the President of a national emergency in accordance with the National Emergencies Act (50 U.S.C. 1601 et seq.) that requires use of the armed forces, the Secretary of Defense, without regard to any other provision of law, may undertake military construction projects, and may authorize the Secretaries of the military departments to undertake military construction projects, not otherwise authorized by law that are necessary to support such use of the armed forces.  Such projects may be undertaken only within the total amount of funds that have been appropriated for military construction, including funds appropriated for family housing, that have not been obligated.

Congress recognized that "it is impossible to provide in advance for all conceivable emergency situations" and filled "a gap that now exists with respect to restructuring construction priorities in the event of a declaration of war or national emergency."  H.R. Rep. No. 97-44, at 72 (1981).

---

[4] The Acting Secretary approved a seventh project (Yuma Project 2), however, the USACE has since decided not to construct that project pursuant to § 284.  *See* Second Declaration of Kenneth Rapuano (Second Rapuano Decl.) ¶ 4 (Ex. 4).

The term "military construction" in § 2808 "includes any construction, development, conversion, or extension of any kind carried out with respect to a military installation, whether to satisfy temporary or permanent requirements, or any acquisition of land or construction of a defense access road (as described in section 210 of title 23)."  10 U.S.C. § 2801(a).  Congress defined the term "military installation" as "a base, camp, post, station, yard, center, or other activity under the jurisdiction of the Secretary of a military department."  *Id.* § 2801(c)(4); *see also id.* § 2801(a) (defining "military construction project").

Presidents have invoked the military construction authority under § 2808 on two prior occasions.  First, President George H.W. Bush authorized the use of § 2808 in 1990 following the Government of Iraq's invasion of Kuwait.  *See* Exec. Order No. 12722, 55 Fed. Reg. 31803 (Aug. 2, 1990); Exec. Order No. 12734, 55 Fed. Reg. 48099 (Nov. 14, 1990).  Second, President George W. Bush invoked § 2808 in response to the terrorist attacks against the United States on September 11, 2001.  *See* Proc. No. 7463, 66 Fed. Reg. 48199 (Sept. 14, 2001); Exec. Order No. 13235, 66 Fed. Reg. 58343 (Nov. 16, 2001).  The national emergency declaration stemming from the terrorist attacks of September 11, 2001, remains in effect today, *see* 83 Fed. Reg. 46067 (Sept. 10, 2018), and DoD has used its § 2808 authority to build a wide variety of military construction projects, both domestically and abroad, over the past 17 years, *see* Cong. Research Serv., Military Construction Funding in the Event of a Nat'l Emergency at 1–3 & tbl. 1 (updated Jan. 11, 2019).

Here, the Acting Secretary has not yet decided to undertake or authorize any barrier construction projects under § 2808.  *See* Third Decl. of Kenneth Rapuano (Third Rapuano Decl.) ¶ 5 (Ex. 5).  DoD is currently undertaking an internal review process to inform any future decisions by the Acting Secretary about the use of § 2808 to fund border barriers, but that process remains ongoing and the Acting Secretary has not made any decisions at this time.  *See id.*

## PLAINTIFFS' CLAIMS

There are eight Plaintiffs in this action: Dr. Ramiro R. Ramirez, Mr. Joseph Hein, and Ms. Elsa Hull, landowners in southern Texas; Carrizo/Comecrudo, an association of indigenous people; and four nonprofit advocacy groups: RGISC, the Labor Council for Latin American Advancement (LCLAA), California Wilderness Coalition (CalWild), and GreenLatinos. Am. Compl. ¶¶ 9-16, ECF No. 28. They bring this suit against the President, the Acting Secretaries of Defense and of Homeland Security, and the Secretary of the Treasury in their official capacities. *Id.* ¶¶ 17-20. Plaintiffs allege violations of the CAA, the NEA, § 2808, § 284, and § 9705 under a claimed "right of action to enjoin and declare unlawful official action that is *ultra vires* and exceeds the President's statutory authority." *Id.* ¶ 133. They also bring constitutional claims pursuant to the Appropriations Clause, *id.* ¶ 1, and separation of powers, *id.* ¶ 154. Plaintiffs allege under the APA that the agency Defendants' use of § 2808, § 284, and § 9705 for barrier construction is contrary to the Constitution and in excess of statutory authority, and is arbitrary and capricious. *Id.* ¶¶ 157-61; 5 U.S.C. § 706(2)(A)-(C). Finally, Plaintiffs allege violations of NEPA. Am. Compl. ¶¶ 167-68. They seek declaratory and injunctive relief.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(1) requires dismissal of any claim over which a court lacks subject-matter jurisdiction. The complaining party has the burden of establishing the predicates to federal jurisdiction, including standing. *See Public Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1289 (D.C. Cir. 2007). In the absence of standing, a court lacks subject matter jurisdiction. *See id.* Moreover, a "justiciable 'controversy' [does not] exist[] when parties seek adjudication of a political question." *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 841 (D.C. Cir. 2010) (en banc) (quoting *Massachusetts v. EPA*, 549 U.S. 497, 516 (2007)). Although in evaluating Rule 12(b)(1) motions, the court must accept well-

19

pleaded factual allegations as true, "the district court may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction." *Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

Federal Rule of Civil Procedure 12(b)(6) mandates dismissal for failure to state a claim upon which relief can be granted. To pass muster, a complaint must contain "sufficient factual matter" to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint that "tenders 'naked assertion[s]' devoid of 'further factual enhancement'" warrants dismissal. *Id.* (quoting *Twombly*, 550 U.S. at 557). Although a court must accept as true well-pleaded factual allegations and construe them in the light most favorable to the plaintiff, it need not accept "legal conclusions" or "mere conclusory statements." *Id.* Neither is a court required to accept as true a complaint's factual allegations if they "contradict exhibits to the complaint or matters subject to judicial notice." *Kaempe v. Myers*, 367 F.3d 958, 963 (D.C. Cir. 2004). In addition to the facts alleged, a court may consider "documents attached as exhibits or incorporated by reference in the complaint, or documents upon which the plaintiff's complaint necessarily relies." *Cause of Action Inst. v. Eggleston*, 224 F. Supp. 3d 63, 70 (D.D.C. 2016) (internal quotation marks omitted).

## ARGUMENT

### I.   The Court Lacks Jurisdiction.

Plaintiffs' Amended Complaint suffers from jurisdictional defects. First, Plaintiffs' challenge to the President's Proclamation is nonjusticiable, both because the NEA impliedly precludes judicial review and because the declaration of a national emergency raises a political question courts are not equipped to answer. Furthermore, the President must be dismissed as a party because there is no cause of action against the President and Plaintiffs cannot obtain injunctive or declaratory relief against the President. Second, Plaintiffs (except CalWild) lack

standing to maintain this suit because, for varying reasons, their allegations fail to meet Article III requirements.  Accordingly, the Court should dismiss Plaintiffs' claims under Rule 12(b)(1).

A.    **Plaintiffs' Challenge to the President's Declaration of a National Emergency Should Be Dismissed.**

This Court lacks subject-matter jurisdiction over Plaintiffs' allegations concerning the NEA and the President's Proclamation.  Plaintiffs' challenge to the President's decision to issue the Proclamation is nonjusticiable, both because the NEA impliedly precludes judicial review and because the declaration of a national emergency raises a political question courts are not equipped to answer.  Congress has placed no limitations on the President's authority to declare a national emergency.  Because the NEA does not define the term "national emergency," the text and structure of the statute evidence Congress's choice to leave this determination to the President, subject only to congressional oversight as provided by the NEA.  But whether viewed as a statutory or separation-of-powers matter, the President is entitled to make a determination about what circumstances constitute a national emergency without judicial second-guessing.  Furthermore, the President must be dismissed as a party because there is no cause of action against the President, and Plaintiffs cannot obtain injunctive or declaratory relief against the President.

1.    The NEA Evidences Congress's Intent to Preclude Judicial Review.

The Supreme Court has instructed that in determining whether a statute "precludes judicial review," a court must examine the "express language" of the statute as well as "the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved."  *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984).  That Congress intended to preclude judicial review need only be "fairly discernible" from the evidence.  *Id.* at 351.

Here, Congress's intent to preclude judicial review is evidenced by the text of NEA, which does not define the term national emergency or provide courts with any standards by which to

evaluate the President's exercise of this authority. *See* 50 U.S.C. § 1621. The lack of a statutory definition reflects Congress's intentional decision to leave to the President the determination about when and under what circumstances to declare a national emergency. The absence of any judicially enforceable remedy is further supported by the fact that the NEA establishes only procedural and reporting guidelines that the President must follow when invoking other statutory authorities conditioned on an emergency declaration. *See* 50 U.S.C. §§ 1631, 1641. The NEA thus does not provide a means for litigants to have any role in the statutory process, let alone a role that Plaintiffs could enforce in court. *See United States v. Amirnazmi*, 645 F.3d 564, 581 (3d Cir. 2011) ("NEA places the onus on Congress to ensure emergency situations remain anomalous").

The lack of a judicial enforcement mechanism to challenge a national emergency declaration is reinforced by the NEA's exclusive remedial scheme for Congress to challenge through political means the President's determination that a particular national emergency exists. *See* 50 U.S.C. § 1622; *Middlesex Cty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 15 (1981) ("In the absence of strong indicia of a contrary congressional intent, we are compelled to conclude that Congress provided precisely the remedies it considered appropriate."). As explained above, Congress has the authority to terminate a national emergency by enacting into law "a joint resolution." 50 U.S.C. § 1622(a)(1). Further, the NEA expressly requires Congress to vote on whether to terminate the declared emergency within six months of the President's declaration and establishes expedited procedures for Congress to vote on such a measure once a termination resolution is introduced. *Id.* § 1622(b), (c). Here, majorities of both Houses of Congress attempted to terminate the President's national emergency declaration by passing a joint resolution, but the President vetoed that measure, and there was insufficient support for termination among members of Congress to override the President's veto to enact the joint resolution into law.

*See* Summary, H.R. J. Res. 46, 116th Cong. (2019), https://www.congress.gov/bill/116th-congress/house-joint-resolution/46.  The fact that there was insufficient congressional will to exercise its ability to terminate the Proclamation through the NEA's statutory procedures only underscores that this dispute should not be adjudicated by the Court.  *Cf. Ariz. State Leg. v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2664 (2015) ("Having failed to prevail in their own Houses, the suitors could not repair to the Judiciary to complain.").

Moreover, when Congress had the opportunity to change the oversight structure of the NEA in response to the Supreme Court's *Chadha* decision that declared the "legislative veto" unconstitutional, Congress notably changed the termination threshold from a "concurrent resolution," which does not involve Presidential approval, to a "joint resolution," which requires either Presidential approval or adequate congressional support to override a Presidential veto in order to be enacted.[5]  *See supra* 14.  Congress could have instituted a different mechanism, such as creating a judicial-enforcement regime, but Congress did not adopt other alternatives.  *See Beacon Prods. Corp. v. Reagan*, 814 F.2d 1, 4 (1st Cir. 1987) (Breyer, J.) ("This legislative history makes clear that Congress intended to impose upon itself the burden of acting affirmatively to end an emergency.").  Instead, Congress gave itself the power to oversee the President's use of statutory emergency authority, and there is no basis on which to create a new judicial remedy on top of Congress's carefully crafted framework.  Where, as here, the statute expressly provides Congress with authority to terminate a national emergency, it is "an 'elemental canon' of statutory construction that . . . courts must be especially reluctant to provide additional remedies."

---

[5] The NEA's "provision for termination by concurrent resolution is unconstitutional because, unlike a joint resolution, this type of termination would enable Congress to take legislative action without presenting the action to the President for his signature."  *Beacon Prods. Corp. v. Reagan*, 633 F. Supp. 1191, 1196 (D. Mass. 1986), *aff'd,* 814 F.2d 1 (1st Cir. 1987); *see supra* n.3.

*Karahalios v. Nat'l Fed'n of Fed. Emps., Local 1263*, 489 U.S. 527, 533 (1989) (citations omitted).

Further, the NEA was the product of a multi-year study by Congress to address the field of national emergency authorities, and nothing in that extensive legislative history suggests that Congress intended to allow judicial challenges to the President's national emergency declarations. To the contrary, the legislative history shows that Congress, not the courts, would be the branch of government to oversee the President's use of his emergency powers. *See* NEA Source Book at 338 ("every type and class of presidentially declared emergency will be subjected to congressional control" and "the legislative branch will be in a position to assert its ultimate authority"); *see also Block*, 467 U.S. at 349 (preclusion of judicial review may be implied from "specific legislative history" alone). Moreover, given the President's "unique position in the constitutional scheme," *Nixon v. Fitzgerald*, 457 U.S. 731, 749–50 (1982), any remedial scheme where litigants could sue the President to challenge a national emergency declaration would raise separation-of-powers concerns and create tension with the Supreme Court's admonition that federal courts have "no jurisdiction of a bill to enjoin the President in the performance of his official duties." *Mississippi v. Johnson,* 71 U.S. (4 Wall.) 475, 501 (1866). There is no indication in the legislative history that Congress gave consideration to those weighty issues or concluded that such lawsuits against the President should proceed. *See* NEA Source Book at 342 (stating that "there is [no] intent here to limit either the President's power or flexibility to declare a national emergency" and there is no intent to limit "the subject matter of the emergency or the timing of its declaration") (statements of Reps. Moorhead and Flowers). In the absence of clear congressional direction, the Court should not imply a remedy that would conflict with longstanding separation-of-powers principles. *Cf. Ziglar v. Abbasi*, 137 S. Ct. 1843, 1856 (2017) (inferring a cause of action is a "significant step under separation-of-powers principles" because it intrudes on the prerogatives of Congress).

In light of the NEA's text, structure, and legislative history, Congress has precluded judicial review of the President's national emergency Proclamation.

 2. <u>Plaintiffs' Challenge to the President's National Emergency Declaration Presents a Nonjusticiakle Political Question.</u>

Courts that have considered the issue have uniformly concluded that a Presidential declaration of a national emergency is a nonjusticiable political question. *See, e.g.*, *Amirnazmi*, 645 F.3d at 581 ("[F]ederal courts have historically declined to review the essentially political questions surrounding the declaration or continuance of a national emergency." (citation omitted)); *United States v. Spawr Optical Research, Inc.*, 685 F.2d 1076, 1081 (9th Cir. 1982) ("[W]e will not address these essentially-political questions . . . .").[6] Since passage of the NEA in 1976, there have been nearly 60 national emergencies declared by seven different Presidents, and even in the

---

[6] *See also Soudavar v. Bush*, 46 F. App'x 731 (5th Cir. 2002) (per curiam) (affirming district court decision dismissing a challenge to executive orders imposing national emergency sanctions on Iran as involving a "nonjusticiable political question"); *United States v. Yoshida Int'l, Inc.*, 526 F.2d 560, 579 (C.C.P.A. 1975) (courts will not "review the judgment of a President that a national emergency exists"); *Chichakli v. Szubin*, 2007 WL 9711515, at *4 (N.D. Tex. June 4, 2007) (holding that a challenge to President Bush's declaration of a national emergency with respect to the "unstable situation" in Liberia "presents a nonjusticiable political question"), *aff'd in part, vacated in part*, 546 F.3d 315 (5th Cir. 2008); *Beacon Prods. Corp.*, 633 F. Supp. at 1194–45 (whether national emergency existed with respect to Nicaragua presents a nonjusticiable political question); *Sardino v. Fed. Reserve Bank of N.Y.*, 361 F.2d 106, 109 (2d Cir. 1966) (concluding that President Truman's national emergency declaration concerning the situation in Korea is not justiciable and "courts will not review a determination so peculiarly within the province of the chief executive"); *Veterans & Reservists for Peace in Vietnam v. Reg'l Comm'r of Customs, Region II*, 459 F.2d 676, 679 (3d Cir. 1972) ("[A] President's declaration of national emergency is unreviewable."); *Santiago v. Rumsfeld*, 2004 WL 3008724, at *3 (D. Or. Dec. 29, 2004) (holding that plaintiffs challenge to "whether the national emergency declared by the President continues to apply to Afghanistan" has "raised an essentially political issue" and "[c]ourts should refrain from ruling on such issues"), *aff'd*, 403 F.3d 702 (9th Cir. 2005) *and aff'd* 407 F.3d 1018 (9th Cir. 2005); *United States v. Groos*, 616 F. Supp. 2d 777, 788–89 (N.D. Ill. 2008) ("The court cannot question the President's political decision" to declare a national emergency regarding "unrestricted access of foreign parties to U.S. goods and technology"); *Chang v. United States*, 859 F.2d 893, 896 n.3 (Fed. Cir. 1988) ("[T]o the extent that the plaintiffs' inquiry into the 'true facts' of the Libyan crisis would seek to examine the President's motives and justifications for declaring a national emergency, such an inquiry would likely present a nonjusticiable political question.").

few instances where the declarations have been challenged, *see supra* n.6, no court has ever reviewed the merits.[7]  Plaintiffs' request for this Court to take that unprecedented step is without merit, and this Court should not depart from this long line of unbroken authority.

"The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch."  *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986).  Both the separation-of-powers doctrine and the policy of judicial self-restraint require that federal courts refrain from intrusion into areas committed by the Constitution to the Legislative and Executive Branches of the Government.  *See Baker v. Carr*, 369 U.S. 186, 217 (1962).  The *Baker* Court set forth the factors that a court is to consider in determining whether a particular claim raises nonjusticiable political questions:

> Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id.*  The existence of any one of these factors indicates the existence of a political question.  *Id.*

Here, Plaintiffs' assertion that the situation along the southern border does not constitute a national

---

[7] Past practice also belies Plaintiffs' suggestion that this national emergency declaration is both justiciable and invalid because the President stated that he "[didn't] need" to issue the declaration and "could do the wall over a longer period of time."  *See* Am. Compl. ¶ 70.  A national emergency declaration necessarily reflects an exercise of discretion, and Presidents have often chosen to declare national emergencies to address circumstances that were neither new nor unforeseen at the time the declaration issued.  *See supra* 12-13.  No court has ever conducted the type of judicial second-guessing that Plaintiffs propose here by evaluating whether an emergency could have been addressed without relying on emergency statutory authorities.

emergency runs afoul of most, if not all, of these factors.

First, there are no judicially manageable standards to ascertain whether or when to declare a national emergency. As explained above, Congress intentionally chose not to define the term "national emergency" and left that determination to the President, subject only to oversight from Congress. *See supra* 11. The NEA sets forth no criteria from which the Court could judge the President's action or make a determination about whether a particular issue constitutes a national emergency. *See Spawr Optical Research*, 685 F.2d at 1080 ("The statute contained no standards by which to determine whether a national emergency existed or continued."). Plaintiffs ask the Court to take the remarkable step of supplanting the President's determination with the "courts' own unmoored determination of what United States policy toward [the southern border] should be." *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012). The Court could not decide this question "without first fashioning out of whole cloth some standard for when" a national emergency "is justified." *El-Shifa Pharm. Indus. Co.*, 607 F.3d at 845. To grant Plaintiffs' requested relief, the Court would have to make, with no judicially manageable standards to guide it, numerous political judgments about how the current humanitarian and security crisis at the border impacts immigration policy, foreign relations, public safety, and national security. "The judiciary lacks the capacity for such a task." *Id.*

Second, any such determinations would require precisely the sort of "policy determination of a kind clearly for nonjudicial discretion" that the Supreme Court has indicated is a hallmark of a political question. *Baker*, 369 U.S. at 217. As the Court has long recognized, illegal immigration creates "significant economic and social problems" in the United States. *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975); *see also Plyler v. Doe*, 457 U.S. 202, 237 (1982) (Powell, J., concurring) (recognizing illegal immigration as "a problem of serious national proportions").

More recently, in *Arizona v. United States*, 567 U.S. 387 (2012), the Court emphasized that the problems posed by illegal immigration "must not be underestimated" and it credited evidence of problems "associated with the influx of illegal migration across private land near the Mexican border," including "an epidemic of crime" and "safety risks." *Id.* at 397–98 (citation omitted).

The President has chosen to confront these and other challenges traceable to the current crisis at the border by declaring a national emergency and invoking the express powers delegated to him by Congress. *See* Proclamation. Under these circumstances, the Court cannot review the matter without second-guessing the President's policy determinations. Decisions "about how best to enforce the nation's immigration laws in order to minimize the number of illegal aliens crossing our borders patently involve policy judgments about resource allocation and enforcement methods." *New Jersey v. United States*, 91 F.3d 463, 470 (3d Cir. 1996). These "issues fall squarely within a substantive area clearly committed by the Constitution to the political branches; they are by their nature peculiarly appropriate to resolution by the political branches of government both because there are no judicially discoverable and manageable standards for resolving them." *Id.* (citation omitted); *see Sadowski v. Bush*, 293 F. Supp. 2d 15, 19 (D.D.C. 2003) ("[D]eciding how to best enforce existing immigration laws and policies and how to keep out illegal immigrants requires making policy judgments that are suited for nonjudicial discretion . . . ."). Accordingly, the President's Proclamation is not reviewable in this case.

Third, the type of policy decisions that Plaintiffs ask this Court to make are entrusted to the political branches, not the courts. "[T]he power to exclude aliens is inherent in sovereignty, necessary for maintaining normal international relations and defending the country against foreign encroachments and dangers—a power to be exercised exclusively by the political branches of government." *Kleindienst v. Mandel*, 408 U.S. 753, 765 (1972). As the Supreme Court explained:

> For reasons long recognized as valid, the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government.   Since decisions in these matters may implicate our relations with foreign powers, and since a wide variety of classifications must be defined in the light of changing political and economic circumstances, such decisions are frequently of a character more appropriate to either the Legislature or the Executive than to the Judiciary.

*Mathews v. Diaz,* 426 U.S. 67, 81 (1976) (footnote omitted); *see also Fiallo v. Bell*, 430 U.S. 787, 792 (1977) ("Our cases have long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.").   Moreover, "[t]he political branches are far better equipped (and more accountable to the people) for making the types of decisions that arise in the military setting," and "[j]udges have long respected this allocation of powers."   *Doe 2 v. Shanahan*, 917 F.3d 694, 719 (D.C. Cir. 2019) (Williams, J., concurring).   The President's decision to declare a national emergency is a quintessential policy decision in an area reserved to the political branches involving matters of immigration, foreign relations, use of military forces, and national security.   *See, e.g.*, *United States v. Delgado-Garcia*, 374 F.3d 1337, 1345 (D.C. Cir. 2004) ("[T]his country's border-control policies are of crucial importance to the national security and foreign policy of the United States.");   *Defs. of Wildlife v. Chertoff*, 527 F. Supp. 2d 119, 129 (D.D.C. 2007) (construction of border barriers "pertains to both foreign affairs and immigration control—areas over which the Executive Branch traditionally exercises independent constitutional authority").   The Court should not substitute its judgment for that of the President on these sensitive policy issues that are nonjusticiable political questions.

      3.   <u>The President Should Be Dismissed as a Party to this Lawsuit Because There is No Cause of Action Against the President and Plaintiffs Cannot Obtain Equitable Relief Against the President.</u>

Plaintiffs' claims against the President suffer from separate and independent problems:

there is no cause of action against the President, and Plaintiffs may not obtain—and the Court may not order—equitable relief directly against the President for his official conduct.

Plaintiffs lack a cause of action to sue the President. The actions of the President are not reviewable under the APA, *see Dalton*, 511 U.S. at 479, and likewise there is no implied equitable cause of action to do so. Although courts of equity may in some circumstances permit suits to "enjoin unconstitutional actions by . . . federal officers," *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015), the availability of such relief depends on whether it "was traditionally accorded by courts of equity," *Grupo Mexicano De Desarrollo S.A. v. All. Bond Fund*, 527 U.S. 308, 319 (1999). Here, there is no tradition of equitable relief against the President. To the contrary, the Supreme Court recognized over 150 years ago in *Mississippi v. Johnson* that federal courts lack jurisdiction to "enjoin the President in the performance of his official duties," 71 U.S. at 501, a principle the Court reaffirmed more recently in *Franklin v. Massachusetts*, 505 U.S. 788 (1992); *id.* at 827 (Scalia, J., concurring in part and concurring in the judgment) ("apparently unbroken historical tradition supports the view" that courts may not order the President to "perform particular executive . . . acts").

Moreover, the Supreme Court has twice held that causes of action that are available against other government officials should not be extended to the President absent a clear statement by Congress. *See Nixon*, 457 U.S. at 748 n.27 (declining to assume that *Bivens* and other implied statutory damages "cause[s] of action run[] against the President of the United States"); *Franklin*, 505 U.S. at 800-01 (declining to find cause of action against the President under the APA "[o]ut of respect for the separation of powers and the unique constitutional position of the President"). Accordingly, in the absence of an express statutory cause of action against the President or a tradition of recognizing such suits as a matter of equity, there is no basis for the Court to infer

equitable relief against the President.  "The reasons why courts should be hesitant to grant such relief are painfully obvious" given the President's unique constitutional role and the potential tension with the separation of powers.  *Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996). Further, the Supreme Court has taken a "traditionally cautious approach to equitable powers, which leaves any substantial expansion of past practice to Congress."  *Grupo Mexicano*, 527 U.S. at 329. Any expansion of an equitable remedy against the President here would create separation-of-powers problems by usurping "the role of Congress in determining the nature and extent of federal-court jurisdiction under Article III."  *See Abbasi*, 137 S. Ct. at 1858.

Lower courts have followed the logic of *Franklin* and *Massachusetts* by dismissing the President as a defendant and declining to impose either declaratory or injunctive relief against him in his official capacity.  *See Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554, 605 (4th Cir. 2017) ("In light of the Supreme Court's clear warning that such relief should be ordered only in the rarest of circumstances we find that the district court erred in issuing an injunction against the President himself."), *vacated and remanded*, 138 S. Ct. 353 (2017); *Hawaii v. Trump*, 859 F.3d 741, 788 (9th Cir. 2017) ("[T]he extraordinary remedy of enjoining the President is not appropriate here . . . ."), *vacated as moot and remanded*, 138 S. Ct. 377 (2017); *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) ("With regard to the President, courts do not have jurisdiction to enjoin him, and have never submitted the President to declaratory relief."); *Doe 2 v. Trump*, 319 F. Supp. 3d 539, 541 (D.D.C. 2018) (dismissing "the President as a party to this case").

In any event, Plaintiffs could potentially obtain the relief they seek against the agency Defendants because the gravamen of their claims is that the agencies, not the President, will construct or fund border barriers in excess of their statutory authorities or in violation of the Constitution.  Accordingly, in addition to the reasons explained above, the President should be

dismissed in order to avoid an unnecessary separation-of-powers conflict.  *See Swan*, 100 F.3d at 978 ("In most cases, any conflict between the desire to avoid confronting the elected head of a coequal branch of government and to ensure the rule of law can be successfully bypassed, because the injury at issue can be rectified by injunctive relief against subordinate officials.").[8]

## B.   The Court Lacks Jurisdiction to Hear Plaintiffs' NEPA Claims Because NEPA Has Been Waived.

Plaintiffs' NEPA claim should be dismissed because the Acting Secretary of Homeland Security has waived NEPA's requirements for the specific barrier projects identified in the Amended Complaint as being constructed pursuant to the disputed authorities, depriving the Court of jurisdiction over these claims.  *Accord Sierra Club v. Trump*, 2019 WL 2247689, at *26 (N.D. Cal. (May 24, 2019); *see also Sierra Club v. Trump*, 2019 WL 2715422, at *4 (N.D. Cal. June 28, 2019) ("the pertinent waivers issued by DHS are dispositive of the NEPA claims"), *denying stay* 2019 WL 2865491 (9th Cir July 3, 2019).

IIRIRA authorizes such waivers in conjunction with the statutory directive that the Secretary of Homeland Security "take such actions as may be necessary" to install "physical barriers" on the "United States border to deter illegal crossings in areas of high illegal entry into the United States."  IIRIRA § 102(a).  IIRIRA seeks to ensure expeditious construction pursuant to the statute's mandates by authorizing the Secretary of Homeland Security to waive a broad array of legal impediments to "the expeditious construction of security infrastructure along the border." *See* H.R. Rep. 109-72, at 171 (May 3, 2005).  Accordingly, "[n]otwithstanding any other provision

---

[8] Although district courts in some recent cases have declined to dismiss the President at the motion-to-dismiss stage on the ground that doing so would be premature in light of uncertainty about the relief that could be provided by the defendant-agencies, that is not the situation here.  *See Centro Presente v. DHS*, 332 F. Supp. 3d 393, 418 (D. Mass. 2018); *CASA de Maryland, Inc. v. Trump*, 355 F. Supp. 3d 307 (D. Md. 2018); *Saget v. Trump*, 345 F. Supp. 3d 287, 297 (E.D.N.Y. 2018). There is no question in this case that relief against the agencies would be sufficient to redress Plaintiffs' claims seeking to halt border barrier construction.  *See Swan*, 100 F.3d at 978.

of law, the Secretary of Homeland Security shall have the authority to waive all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads" under IIRIRA § 102.  IIRIRA § 102(c)(1).

Acting under § 102 of IIRIRA to take "such actions as may be necessary" to install border barriers, DHS requested that DoD, pursuant to § 284(b)(7), assist DHS by constructing fences, roads, and lighting for border barrier projects at issue in this case.  *See* First Rapuano Decl. ¶ 3, Ex. A.  The Acting Secretary of Homeland Security subsequently exercised his authority under § 102(c)(1) of IIRIRA to issue waivers for the six specific projects authorized by the Acting Secretary of Defense.  *See* Determinations Pursuant to IIRIRA, 84 Fed. Reg. 17185-87 (Apr. 24, 2019) (El Paso and Yuma projects); 21798-801 (May 15, 2019) (El Centro and Tucson projects). As relevant here, the waived laws include NEPA along with "all federal, state, or other laws, regulations, and legal requirements of, deriving from, or related to the subject of, the [listed] statutes."  *Id.*  Issuance of the IIRIRA waivers "deprives the Court of jurisdiction to hear [Plaintiffs'] NEPA" claim.  *N. Am. Butterfly Ass'n v. Nielsen*, 2019 WL 634596 (D.D.C. Feb. 14, 2019); *see In re Border Infrastructure Envtl. Lit.*, 915 F.3d 1213, 1221, 1225 (9th Cir. 2019); *Defs. of Wildlife v. Chertoff*, 527 F. Supp. 2d 119, 129 (D.D.C. 2007).  For these reasons, Plaintiffs' NEPA claim should be dismissed.[9]

---

[9] To the extent Plaintiffs seek to assert NEPA claims against projects other than those identified above, such claims also should be dismissed.  Plaintiffs vaguely allege that "border wall construction" generally violates NEPA without any reference to discrete, final agency action for specific barrier construction projects.  *See* Am. Compl. ¶¶ 166-68; *Pub. Citizen v. U.S. Trade Representative*, 5 F.3d 549, 551 (D.C. Cir. 1993) (NEPA actions must be brought under the APA and are subject to the APA's "final agency action" requirement).  Moreover, they do not allege there has been an "irreversible and irretrievable commitment of resources" for specific projects that would trigger NEPA's obligations.  *Wyoming Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 49 (D.C. Cir. 1999).  Plaintiffs cannot bring a "programmatic" NEPA claim against border barrier construction generally, *see Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990), and

### C.   With the Exception of CalWild, Plaintiffs Have Not Alleged Article III Standing.

Plaintiffs, except CalWild, also fail to plead allegations sufficient to satisfy Article III's standing requirement.  To demonstrate standing, Plaintiffs must satisfy a three-pronged test.  *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002) (citing *Defs. of Wildlife*, 504 U.S. at 560).  First, Plaintiffs must have suffered an injury-in-fact, defined as a harm that is "concrete and actual or imminent, not conjectural or hypothetical."  *Byrd v. EPA*, 174 F.3d 239, 243 (D.C. Cir. 1999) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998).  Second, the injury claimed must be fairly traceable to the governmental conduct alleged.  *Sierra Club*, 292 F.3d at 898.  No standing exists where the court "would have to accept a number of very speculative inferences and assumptions in any endeavor to connect [the] alleged injury with [the challenged conduct]."  *Winpisinger v. Watson*, 628 F.2d 133, 139 (D.C. Cir. 1980).  Finally, it must be likely that the requested relief will redress the alleged injury.  *Sierra Club*, 292 F.3d at 898.

### 1.   Plaintiffs Do Not Allege Particularized Injuries Based on the Alleged Environmental Harms of Border Wall Construction.

Plaintiffs do not plausibly plead standing to maintain this action based on the alleged ecological harms caused by barrier construction at the southern border.  *See* Am. Compl., Factual Allegations § V.A.  Although Plaintiffs contend that general border barrier construction would cause a variety of environmental harms, they do not connect those allegations to any "concrete and particularized injury" of a plaintiff in this suit.  *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009) (plaintiffs "can demonstrate standing only if application of the [challenged agency action] will affect *them* in the manner [they] describe[]").  As the Supreme Court has held, "generalized

---

the absence of allegations that the agencies have begun construction or made irreversible commitments as to the final location or design for specific projects warrants dismissal.

harm to . . . the environment will not alone support standing." *Id.* "The relevant showing for purposes of Article III standing" is "injury to the plaintiff," "not injury to the environment." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). Because Plaintiffs do not allege that any ecological harms described in § V.A. directly harm Plaintiffs in any way, these generalized environmental claims fail to demonstrate standing.

> 2. <u>Plaintiffs Ramirez and Carrizo/Comecrudo Do Not Satisfy the Traceability and Redressability Prongs of Article III's Standing Requirement.</u>

Dr. Ramirez and Carrizo/Comecrudo have not sufficiently pleaded a concrete and actual injury-in-fact that satisfies the traceability and redressability prongs of Article III's standing requirement. "The 'traceability' and 'redressability' requirements are closely related." *Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 801 (D.C. Cir. 1987) (Bork, J.) (citing *Von Aulock v. Smith*, 720 F.2d 176, 180 (D.C. Cir. 1983)). Both prongs can be said to focus on principles of causation: traceability turns on the causal nexus between the challenged agency action and the asserted injury, while redressability centers on the causal connection between the asserted injury and the requested judicial relief. *See Allen v. Wright*, 468 U.S. 737, 753 n.19 (1984), *overruled on other grounds in Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014).

> a. *Plaintiffs do not satisfy the traceability prong.*

Dr. Ramirez and Carrizo/Comecrudo fail to demonstrate how they suffer any injury that is traceable to the President's Proclamation or any actions of the agency Defendants undertaken pursuant to § 9705, § 284, or § 2808. Indeed, their allegations that such actions have caused their alleged injury are not only purely speculative,[10] they are simply incorrect. As explained by Loren

---

[10] Plaintiffs do not specifically allege facts establishing that construction of the border barrier projects alleged in the Amended Complaint will actually be funded by the challenged legal authorities. At most, Plaintiffs cite a list of "highest priority border wall miles" that DHS identified in late 2018 for potential use of *fiscal year 2019 appropriations*, subject to the amount of those

Flossman, the Acquisition Program Manager for CBP's Wall Program Management Office, the barrier project planned near the Jackson Ranch Church and Cemetery and Eli Jackson Cemetery in Hidalgo County, Texas, as relevant to Dr. Ramirez's and Carrizo/Comecrudo's allegations, "will be funded using CBP's Fiscal Year 2019 appropriated funds (Public Law 116-6, § 230)." Decl. of Loren Flossman (Flossman Decl. (5/31/19)) ¶ 8 (Ex. 6). "It will not be constructed . . . with funds transferred pursuant to the President's national emergency proclamation, including 10 U.S.C. § 2808, or pursuant to 10 U.S.C. § 284 or 31 U.S.C. § 9705." *Id.*

Evidentiary material in the record thus establishes that this specific project is not funded pursuant to any of the authorities challenged in this case. *See id.* Because Plaintiffs have not alleged that Defendants are acting pursuant to the statutory authorities they dispute, they cannot establish the traceability prong of Article III's standing requirement.[11] *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 412 (2013) (holding the plaintiffs failed to establish traceability where they could not show the government acted under the specific statutory authority being challenged);

---

appropriations. *See* Am. Compl. ¶ 105 & n.51 (citing "Walls Work," DHS, Dec. 12, 2018, https://www.dhs.gov/news/2018/12/12/walls-work). Beyond that single reference, Plaintiffs only surmise that the barrier projects at issue will be funded instead by § 9705, § 284, or § 2808. The Court need not accept Plaintiffs' "speculative inferences and assumptions" in determining whether they have "connect[ed] [the] alleged injury with [the challenged conduct]." *Winpisinger*, 628 F.2d at 139; *see Iqbal*, 556 U.S. at 678. The face of the Amended Complaint shows they have not.

[11] Carrizo/Comecrudo attempts to expand its alleged harms beyond the Eli Jackson Cemetery, claiming that "construction of the border wall would harm the Nation's mission of restoring and protecting [its ancestral burial] sites *along the southern border*." Am. Compl. ¶ 120 (emphasis added). Such "remote and speculative claims of possible future harm"—unsupported by facts connecting allegations of "actual or imminent" construction to any particular ancestral site— patently fail Article III's standing requirements. *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1294 (D.C. Cir. 2007). Indeed, Carrizo/Comecrudo identifies only two burial locations, the cemetery at issue and the Santa Ana Wildlife Refuge, *id.* ¶ 11.h., both of which are located in the RGV where barrier construction will be funded by appropriations, *see* Pub. L. No. 116-6, § 230(a). And pursuant to Congress's instructions, such appropriations will not be used for barrier construction in the Santa Ana Wildlife Refuge at all. *See id.* § 231(1).

Wright, Miller & Cooper, Fed. Practice & Procedure, § 3531.4 (2d ed. 1984) ("The very notion of injury implies a causal connection to the challenged activity; an injury caused by other events is irrelevant" to standing).

### b. *Plaintiffs do not satisfy the redressability prong.*

Dr. Ramirez and Carrizo/Comecrudo also have not established that the judgment they seek would redress the injuries they have identified.  "Redressability examines whether the relief sought, assuming that the court chooses to grant it, will likely alleviate the particularized injury alleged by the plaintiff."  *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663-64 (D.C. Cir. 1996). Here, Plaintiffs seek a declaratory judgment that the President's and agency Defendants' use of certain statutory authorities to further barrier construction at the southern border is unlawful, s*ee* Am. Compl., Prayer for Relief ¶ (A), and an injunction preventing the agency Defendants from using funds under those authorities to build the alleged border barrier projects.  *Id.* ¶ (B).  To demonstrate redressability, Plaintiffs would have to allege (and ultimately prove) that it is "likely," as opposed to merely "speculative," *Friends of the Earth, Inc. v. Laidlaw Env't Srvs., Inc.*, 528 U.S. 167, 181 (2000), that the requested judgment would redress their injuries.  Plaintiffs cannot.

Here, Dr. Ramirez and Carrizo/Comecrudo identify alleged harms resulting from a planned project near the Jackson Ranch Church and Cemetery and Eli Jackson Cemetery in Hidalgo County.  *See* Am. Compl. ¶¶ 115-17; *see also Freedom Republicans, Inc. v. Fed. Election Comm'n,* 13 F.3d 412, 416 (D.C. Cir. 1994) (redressability requires that the court first "identify the components of [Plaintiffs'] alleged harm").  Plaintiffs have not demonstrated that it is "likely" an order declaring the President's Proclamation unlawful, and enjoining the agency Defendants from using § 9705, § 284, or § 2808 to fund border barrier construction, will result in the removal of the harm they have identified.  *Steel Co.*, 523 U.S. at 107.  Even if this Court were to enter such relief,

it would have no effect on CBP moving forward with this planned project because the project is not being funded from appropriations that are disputed in the Amended Complaint. *See supra* 36. Accordingly, Dr. Ramirez and Carrizo/Comecrudo do not meet the redressability prong.

### 3. Plaintiff Hull Has Not Sustained Any Alleged Injury-in-Fact.

Ms. Hull's standing claim fails for the simple reason that she has not suffered any alleged injury-in-fact. Ms. Hull claims that, in February 2019, she learned that CBP planned to "build permanent, impermeable barriers on 150 river miles in Webb and Zapata Counties" in Texas. Am. Compl. ¶ 112. She further alleges that she lives on property located within 200 yards of the Rio Grande River in Zapata County, *id.* ¶ 12.a, and speculates without any factual support that any border barrier construction planned in her county will occur on her three-acre lot, *id.* ¶ 113. *See Iqbal*, 556 U.S. at 678 ("'naked assertion[s]' devoid of 'further factual enhancement'" are insufficient) (quoting *Twombly*, 550 U.S. at 557). To the contrary, as Mr. Flossman confirms, CBP currently has no ongoing or planned projects at all in Zapata County, Texas, including for the home address given by Ms. Hull. Flossman Decl. (5/31/19) ¶ 10; *see* Suppl. Decl. of Loren Flossman (Suppl. Flossman Decl.) ¶ 8 (Ex. 7). Accordingly, Ms. Hull has not pleaded, and in fact has not sustained, an actual injury-in-fact as required by Article III. *See Byrd*, 174 F.3d at 243.

### 4. Plaintiff RGISC's and Plaintiff Hein's Claims Are Not Ripe.

RGISC's and Mr. Hein's challenges are not ripe because CBP has not yet identified a funding source for the border barrier projects currently planned in the Laredo Sector. "The ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Nat'l Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803, 808 (2003). It "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies." *Id.* at 807. It

also "protect[s] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Id.* at 807–08; *see Chlorine Inst., Inc. v. Fed. R.R. Admin.*, 718 F.3d 922, 928 (D.C. Cir. 2013).

A case ripe for judicial review cannot be "nebulous or contingent but must have taken on fixed and final shape so that a court can see what legal issues it is deciding, what effect its decision will have on the adversaries, and some useful purpose to be achieved in deciding them." *Pub. Serv. Comm'n v. Wycoff Co.*, 344 U.S. 237, 244 (1952). Courts evaluate "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967), *overruled on other grounds in Califano v. Sanders*, 430 U.S. 99, 105 (1977); *Nat'l Oilseed Processors Ass'n v. Occupational Safety & Health Admin.*, 769 F.3d 1173, 1182 (D.C. Cir. 2014).

As explained by Mr. Flossman, "[b]uilding a border barrier in the Laredo Sector is a top priority requirement for CBP." Flossman Decl. (5/31/19) ¶ 5. It was recently decided that CBP will utilize TFF funds exclusively for barrier planning and construction in the Laredo and/or RGV Sectors. *See* Suppl. Flossman Decl. ¶ 5; Flossman Decl. (7/11/19) ¶ 5. At this time, however, "CBP is still determining which projects . . . within the Laredo Sector may be funded using TFF funds." Suppl. Flossman Decl. ¶ 6. Because there has been no final agency decision on the funding source for any particular Laredo Sector project, RGISC's and Mr. Hein's claims alleging that Defendants have exceeded their statutory and constitutional authority vis-à-vis border barrier projects in Laredo are not fit for judicial review at this time.[12] *Nat'l Oilseed Processors Ass'n*,

---

[12] Although a funding source for any specific project has not been identified, CBP has determined that no border barrier projects in the Laredo Sector will be funded under § 284. Flossman Decl. (5/31/19) ¶ 6. RGISC and Mr. Hein therefore fail to satisfy the traceability and redressability prongs of Article III standing for claims challenging Defendants' use of that authority. *See supra* § I.C.2.

769 F.3d at 1182 ("The 'fitness' factor takes into account whether the issue is purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final."); *cf. Abbott Labs*, 387 U.S. at 149–52 (case was ripe where the challenged regulations were definitive and no further administrative action was contemplated).

With respect to another authority challenged by RGISC and Mr. Hein—*i.e.*, § 2808, the Acting Secretary of Defense has received assessments about specific border barrier construction projects under such authority, but he has not yet decided to undertake or authorize any barrier construction projects under § 2808, let alone a specific project in the Laredo Sector where RGISC operates and where Mr. Hein owns a ranch. *See* Third Rapuano Decl. ¶¶ 5-6. When authorizing § 2808 construction, the Acting Secretary will have to determine that the particular project is "necessary to support such use of the armed forces." 10 U.S.C. § 2808. That determination can only be considered within the context of the Acting Secretary authorizing a specific military construction project presented to him for approval. Moreover, in order to fund any projects under § 2808, DoD will have to defer construction of an equal amount of appropriated, but unobligated, military construction projects, and none of those decisions have been made at this time. *See id.* In light of the absence of any final decision on the use of § 2808 for any project in the Laredo Sector and the need for the development of a concrete factual record about any such decision, it would be premature for the Court to decide RGISC's and Mr. Hein's claims concerning § 2808.[13] *See, e.g.,*

---

[13] In a related case presenting similar challenges to the Executive's funding of border barrier construction, the court held that the plaintiffs had standing for their § 2808 claims. *Sierra Club*, 2019 WL 2247689 at *15. *Sierra Club* found that the plaintiffs had "demonstrated that their members span the entire U.S.-Mexico border," thus making it "highly unlikely," in the court's view, that the Acting Secretary may use his § 2808 authority to fund construction in locations where the plaintiffs could not claim a cognizable injury. *Id. at* *16. The court, however, denied preliminary relief on the § 2808 claims because Plaintiffs did not show a likelihood of irreparable harm from § 2808-funded construction in "as-yet-unspecified locations." Id. at *25, 29. RGISC's

*Ariz. Pub. Serv. Co. v. E.P.A.*, 211 F.3d 1280, 1297–99 (D.C. Cir. 2000) (holding that "there is no decision 'fit' for judicial review" where the agency "has made no decision").

RGISC and Mr. Hein will suffer no hardship if the Court withholds review at this time. *See Nat'l Park Hosp. Ass'n,* 538 U.S. at 811–12; *Am. Petroleum Inst. v. E.P.A.*, 683 F.3d 382, 389 (D.C. Cir. 2012).  CBP has not determined a funding source for any specific barrier construction planned in the Laredo Sector, other than to determine that such construction will not utilize funding under § 284.  Until a funding source(s) for individual projects is identified, CBP will not initiate its standard procedures of "formally [contacting] landowners within the proposed barrier alignment to begin the process of surveying, appraising, and eventually acquiring land in the finalized alignment."  Flossman Decl. (5/31/19) ¶ 5; *see* Suppl. Flossman Decl. ¶ 6.

Because claims of future construction in the Laredo Sector are not fit for judicial decision and no hardship will result from delayed review, these unripe claims should be dismissed.

   5. <u>LCLAA and GreenLatinos Lack Both Organizational and Representational Standing.</u>

LCLAA and GreenLatinos lack standing to sue in their own right or on behalf of their members.  To establish standing on its own behalf, an organization must meet the familiar standing requirements that apply to individuals: (1) injury in fact; (2) causation; and (3) redressability.  *See, e.g.*, *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995).  The necessary facts "must affirmatively appear in the record" and "cannot be inferred argumentatively from averments in the pleadings."  *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990).

Plaintiffs' standing claims fail at the first step of the analysis.  Here, LCLAA and GreenLatinos were not the object of the Executive and agency actions they challenge in this

---

and Mr. Hein's claims are geographically-limited to discrete projects in one sector of the southern border.  The risk of imminent future injury is thus even more speculative.

lawsuit. [14]   Instead, the Amended Complaint reveals, at most, their dissatisfaction with the President's national emergency declaration and the agency Defendants' efforts to construct barriers at the southern border.   *See* Am. Compl. ¶¶ 1-3.   Federal courts do not sit to air arguments "at the behest of organizations or individuals who seek to do no more than vindicate their own value preferences," *Sierra Club v. Morton*, 405 U.S. 727, 740 (1972), or to resolve "generalized grievances more appropriately addressed in the representative branches," *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 12 (2004) (citation omitted), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components*, 134 S. Ct. 1377 (2014).   Thus, a "mere 'interest in a problem,' no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem," is insufficient to create standing.   *Sierra Club*, 405 U.S. at 739.   An "organization's abstract concern with a subject that could be affected by an adjudication does not substitute for the concrete injury required by Art[icle] III."   *Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 (1976)).

Rather, an organization claiming Article III standing on its own behalf must demonstrate a "concrete and demonstrable injury to [its] activities."   *Food & Water Watch, Inc. v. Vilsak*, 808 F.3d 905, 919 (D.C. Cir. 2015) (alteration in original) (quoting *PETA v. USDA*, 797 F.3d 1087, 1093 (D.C. Cir. 2015)); *see Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982).   The D.C. Circuit has set forth a two-part inquiry to determine whether an organization has pleaded a cognizable injury.   First, a court must ask first whether the defendant's action "injured the [organization's] interest."   *Food & Water Watch*, 808 F.3d at 919.   To allege such an injury, the

---

[14] CalWild's organizational standing claim fails for the same reasons discussed herein.   It is not necessary, however, for the Court to review the sufficiency of that claim here.   Defendants do not contest at this stage that CalWild has pleaded representational standing on behalf of members who recreate near El Centro Project 1.   Defendants reserve their right to challenge CalWild's standing at a later stage of the proceedings, as appropriate.

organization must show that the defendant's conduct "perceptibly impaired [its] ability to provide services" or, in other words, "inhibit[ed] . . . [its] daily operations." *Id.* If the organization shows "an initial impairment to its programs," *Ctr. for Responsible Sci. v. Gottlieb*, 346 F. Supp. 3d 29, 41 (D.D.C. 2018), the court must next determine "whether the organization used its resources to counteract that harm," *Food & Water Watch*, 808 F.3d at 919. A diversion of the organization's resources "cannot alone constitute the harm. Holding otherwise would be hopelessly circular." *Ctr. for Responsible Sci.*, 346 F. Supp. 3d at 41.

In *Food & Water Watch*, the D.C. Circuit held that an organization that advocated for safe food systems failed to demonstrate a cognizable organizational injury and thus lacked standing to challenge poultry-inspection regulations promulgated by USDA. *Food & Water Watch*, 808 F.3d at 921. Food & Water Watch (FWW) alleged that the new regulations injured the organization by causing it to increase the resources it spent on educating the public and its members about the regulation's alleged negative effects and encouraging its members to avoid certain poultry products. *Id.* at 920. The Court held that FWW alleged "nothing more than an abstract injury to its interests," and that its alleged increased expenditure of resources did not demonstrate that its "organizational activities ha[d] been perceptibly impaired in any way." *Id.* at 921. By contrast, the D.C. Circuit in *PETA v. USDA* held that PETA (an animal-welfare group) established standing to challenge the USDA's failure to promulgate bird-specific animal welfare regulations where the agency's inaction caused injuries "concrete and specific to the work" of PETA. 797 F.3d 1087, 1095 (D.C. Cir. 2015). In particular, the Court held that USDA's failure to apply such regulations to birds had "'perceptibly impaired [PETA's] ability' to both bring [statutory] violations to the attention of the agency charged with preventing avian cruelty and continue to educate the public," and that PETA consequently expended resources to counteract that harm. *Id.*

As in *Food & Water Watch*, the harms alleged by the organizational Plaintiffs in this case are insufficient to state a cognizable injury under D.C. Circuit precedent.   LCLAA and GreenLatinos do not point to any independent injury caused by the President's national emergency declaration or the subsequent actions of the agency Defendants challenged in this suit.   Instead, LCLAA and GreenLatinos allege that the actions in dispute "frustrate[]" their "mission and work" toward an improved immigration process.   Am. Compl. ¶ 127 (LCLAA); *see id.* ¶ 130 (GreenLatinos).   *Food & Water Watch* made clear, however, that a showing of injury requires more than a "frustration of [the organization's] purpose" or mere allegations that the organization's "mission has been compromised." *Food & Water Watch*, 808 F.3d at 919.  As the Court explained, "frustration of an organization's objectives 'is the type of abstract concern that does not impart standing.'"  *Id.*; *see Equal Rights Ctr. v. Post Properties, Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011) ( "a mere setback to [an organization's] abstract social interests" is not a cognizable injury for Article III standing); *see Int'l Academy of Oral Medicine & Toxicology v. FDA*, 195 F. Supp. 3d 243, 256-57 (D.D.C. 2018) ( "mission conflict . . . alone does not confer standing").

Plaintiffs' alleged diversion-of-resources injury fares no better.  The Amended Complaint plainly fails to allege that the Proclamation or the challenged agency actions have "inhibit[ed] [Plaintiffs'] daily operations." *Food & Water Watch*, 808 F.3d at 919.  LCLAA and GreenLatinos merely claim that they have diverted resources away from other work that furthers their mission in order to "oppose" the Executive's efforts to construct border walls—advocacy activities that Plaintiffs regard as at the core of their missions.  *See* Am. Compl. ¶ 127 (alleging that LCLAA officials are now spending 5-10% of their time "engaging with membership and other organizations about opposition to the wall, engaging in advocacy in Congress, and talking to the media"); *see id.* ¶131 (GreenLatinos) (alleging that GreenLatinos' policy director has focused a

"significant" amount of time on "responding to member concerns[,]" "organizing community events[,]" and "meeting with members of Congress" regarding the impacts of the proposed border wall). Allegations that an organization has reallocated resources to advocate or litigate against a government policy or action is insufficient for Article III purposes. *Food & Water Watch*, 808 F.3d at 919. "[S]uch budgetary choices merely reflect [the organization's] shifting priorities"—a type of harm that D.C. Circuit precedent has long held "amounts to a 'self-inflicted' wound." *New England Anti-Vivisection Soc. v. U.S. Fish & Wildlife Serv.*, 208 F. Supp. 3d 142, 167 (D.D.C. 2016) (quoting *ASPCA v. Feld Entm't, Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011) and *Turlock Irr. Dist. v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015)). And courts in this Circuit have repeatedly rejected similar standing claims grounded on pure issue-advocacy activities where, as here, an organization states only "a sincere and strong objection to the challenged government action and a stated intention to use [its] resources to oppose it." [15] *Id.* at 164 (non-profit animal welfare group's expenditures to thwart challenged action were insufficient to establish organizational standing).[16]

Although any diversion of resources by LCLAA and GreenLatinos may be relevant to the second step of the D.C. Circuit's organizational standing inquiry—"whether the organization used

---

[15] GreenLatinos also alleges that it "experienced decreased turnout" at one event in Tucson aimed at opposing the border wall because of alleged "fear connected to the proposed border wall and concomitant increased militarization of the border." Am. Compl. ¶ 129. At most, such claim amounts to an alleged "impairment" of GreenLatinos' "advocacy," *Turlock Irr. Dist.*, 786 F.3d at 24, that to the extent it states an injury at all results from the unfounded fears and independent actions of its members who are "third part[ies] not before the court," *Lujan*, 504 U.S. at 560. It therefore does not suffice for Article III standing.

[16] *See also, e.g.*, *Food & Water Watch*, 808 F.3d at 921; *Turlock Irr. Dist.*, 786 F.3d at 24 (expenditure of resources to oppose agency decision in administrative proceedings is not a cognizable organizational injury); *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1162 (D.C. Cir. 2005) (increased lobbying costs is not a cognizable organizational injury); *Int'l Academy of Oral Medicine & Toxicology*, 195 F. Supp. 3d at 256-58 (diversion of resources to advocate against a final agency rule did not constitute Article III injury).

its resources to counteract [the alleged] harm," *Food & Water Watch*, 808 F.3d at 919, Plaintiffs have not made the initial showing that their "organizational activities have been [harmed] in any way," *id.* at 921. A mere diversion of resources on its own—even if it impacts the organizations ability to take on "other opportunities" or to "meet member requests regarding other priority issues," Am. Compl. ¶ 131, is inadequate to meet Article III's standing requirement. *Ctr. for Responsible Sci.*, 346 F. Supp. 3d at 41 ("Plaintiff must show, therefore, that something about the challenged action itself — rather than the organization's response to it — makes the organization's task more difficult."). Plaintiffs thus fall well short of their burden to establish a cognizable injury to their own interests, and their organizational standing claim should be rejected.

LCLAA's and GreenLatinos' allegations also fail to establish standing to bring suit in a representational capacity. To establish "representational" (or "associational") standing to sue on behalf of its members, an association must show that "(1) at least one of its members has standing [to sue] in its own right; (2) the interests [the association] seeks to protect are germane to its purpose; and (3) neither the claim asserted nor the relief requested requires the participation of an individual [member.]" *Interstate Nat. Gas Ass'n of Am. v. FERC*, 494 F.3d 1092, 1095 (D.C. Cir. 2007). Plaintiffs fail, at minimum, on the first prong.

LCLAA and GreenLatinos make no effort to identify any specific members allegedly harmed by actual or impending border barrier construction undertaken pursuant to the challenged authorities. *See Summers*, 555 U.S. at 498 (association must "name the individuals who were harmed"); *Am. Chemistry Council v. Dep't of Transp.*, 468 F.3d 810, 820 (D.C. Cir. 2006) ("identity" of injured member must be "firmly established"). Rather, LCLAA alleges generally that it has chapters in San Diego and Texas and that "border wall[s] will negatively affect the quality of life of border communities." Am. Compl. ¶ 126. GreenLatinos claims it has members

who live "in and around the U.S. borderlands," *id.* ¶ 16.b., and that unspecified members are "concerned" about "increased militarization," "negative environmental impacts," and "heightened fear" "in and near their communities," *id.* ¶ 128.   And both Plaintiffs claim that either its "members" or "Latinos" in general have suffered racial discrimination as a result of the Executive actions in dispute.  *Id.* ¶¶ 126, 128.   None of these allegations, however, pleads facts sufficient to identify a specific member with standing for each claim LCLAA and GreenLatinos assert.  *See Am. Chemistry Council*, 468 F.3d at 820; *see also Iqbal*, 556 U.S. at 678.

Even if Plaintiffs are not required to identify a member by name at the pleading stage, they are undoubtedly required to allege specific facts which, if true, would establish that one of their members has suffered concrete injury traceable to the challenged Executive actions that would be redressed by judgment in favor of Plaintiffs.  *See Interstate Nat. Gas Ass'n of Am.*, 494 F.3d at 1095.   Here, LCLAA and GreenLatinos have alleged no specific facts whatsoever.  The Amended Complaint raises unparticularized injuries to unspecified members based on speculative "fear[s]" and "concern[s]."  Am. Compl. ¶ 128.   Such "allegations of *possible* future injury" based on "subjective fear[s]" have repeatedly been held insufficient to establish standing.  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 418 (2013) (speculative fear that the plaintiffs were subject to government surveillance did not demonstrate standing); *see Food & Water Watch, Inc.*, 808 F.3d at 918 (concerns about contaminated poultry did not establish standing to challenge poultry inspection regulation); *see also Bernstein v. Kerry*, 962 F. Supp. 2d 122, 127 (D.D.C. 2013), *aff'd*, 584 F. App'x 7 (D.C. Cir. 2014) (fear of terrorist attacks did not state an Article III injury-in-fact).

Plaintiffs' allegations of "racial profiling" and "hate speech" fare no better.  Am. Compl. ¶¶ 126, 128.   Even if LCLAA and GreenLatinos could establish that one of their members had suffered an actual, concrete injury as a result of racial discrimination, they have not sufficiently

alleged that such injuries are solely the result of the challenged Executive actions, rather than "the result of the independent action of third part[ies] . . . not before the court." *Lujan*, 504 U.S. at 560. Plaintiffs have not plausibly pleaded any causal connection between the President's emergency declaration, or any action of an agency Defendant, *itself* and the alleged discriminatory acts of non-parties.  Indeed, immigration policy and the security of the southern border has been an ongoing subject of heated public debate for decades, irrespective of the President's Proclamation or the agency Defendants' recent use of the statutory authorities at issue.  Similarly, Plaintiffs cannot establish that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 561.  It is entirely conjectural, if not altogether implausible, to suggest that a judicial finding that the Proclamation does not satisfy the NEA or that Defendants have exceeded their authority in funding the barrier construction at issue would remedy alleged acts of discrimination in southern border communities.  Because the proposed remedy does nothing to redress these asserted injuries, LCLAA and GreenLatinos lack standing for these claims.

## II.     Plaintiffs Have Not Satisfied the APA's Threshold Requirements for Review of Agency Action.

Plaintiffs claim, under the APA, that border barrier construction utilizing funds pursuant to § 9705, § 284, and § 2808 exceeds statutory and constitutional authority and is arbitrary and capricious. Am. Compl. ¶¶ 155–62.  But the challenge to the use of § 9705 and § 2808 fails at the threshold of APA review for two reasons.  First, Plaintiffs fail to allege "final agency action" with respect to § 2808 for the Court to review, as required under the APA.  5 U.S.C. § 704.  Second, any decision by DoD to engage in construction under § 2808 or determination by the Treasury Secretary to distribute TFF funds (§ 9705) for law enforcement activities would be of a sort "committed to agency discretion by law" and thus excluded from judicial review by the APA. 5 U.S.C. § 701(a)(2).

A.     **No "Final Agency Action" Exists With Respect to § 2808.**

Because § 2808 does not directly provide for judicial review, APA review, if available at all, is permitted only if there has been "final agency action." *See, e.g.*, *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 882 (1990); *Reliable Automatic Sprinkler Co. v. Consumer Product Safety Comm'n*, 324 F.3d 726, 731 (D.C. Cir. 2003).   Final agency action is marked by two characteristics.   First, final agency action "mark[s] the consummation of the agency's decisionmaking process"; it is not "tentative" or "interlocutory." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations omitted). Second, the action "must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* at 178 (internal citation omitted).   This requires a final agency action to have "an actual or immediately threatened effect." *Nat'l Wildlife Fed.*, 497 U.S. at 894.   Thus, preparatory activities, without more, are not final agency action under the APA. *See, e.g.*, *Reliable Automatic Sprinkler*, 324 F.3d at 731 (finding "a statement of the agency's intention to make a preliminary determination" was not final agency action).

Here, Plaintiffs have failed to allege any action that represents the consummation of DoD's decisionmaking process with respect to § 2808.   To the contrary, they assert only that DoD's "*assessment* of specific military construction projects to support the use of the armed forces . . . , and its *identification* of existing military construction projects of sufficient value to provide $3.6 billion of funding to be diverted for border wall construction" violate the CAA, § 2808, and the Constitution.   Am. Compl. ¶ 160 (emphases added).   But "assessment" and "identification" of projects demonstrate preparation for possible future action, not final action.   Such preparatory actions do not have "an actual or immediately threatened effect." *Nat'l Wildlife Fed.*, 497 U.S. at 894.   And the APA does not entitle Plaintiffs to challenge any decision by the Acting Secretary of Defense until it is final.

**B.      Even If There Were Final Agency Action, the Use of § 2808 Authority Is Committed to Agency Discretion by Law.**

Even if there were final agency action, any decision by the Acting Secretary of Defense to undertake military construction under § 2808 is not reviewable because it is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Under the APA, the Court may not review final agency action "if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). "[I]f no judicially manageable standards are available for judging how and when an agency should exercise its discretion, then it is impossible to evaluate agency action." *Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State, Bureau of Consular Affairs*, 104 F.3d 1349, 1353 (D.C. Cir. 1997) (quoting *Heckler*, 470 U.S. at 830). The determination of whether a matter has been committed to agency discretion takes into account "both the nature of the administrative action at issue and the language and structure of the statute that supplies the applicable legal standards for reviewing that action." *Sierra Club v. Jackson*, 648 F.3d 848, 855 (D.C. Cir. 2011) (quoting *Sec'y of Labor v. Twentymile Coal Co.*, 456 F.3d 151, 156 (D.C. Cir. 2006)). The D.C. Circuit has held that determinations requiring military expertise and those dealing with foreign policy issues are not proper subjects of judicial intervention. *See, e.g.*, *Dist. No. 1, Pac. Coast Dist., Marine Eng'rs' Beneficial Ass'n v. Mar. Admin.*, 215 F.3d 37, 41–42 (D.C. Cir. 2000) (determinations regarding "military value" and "judgments on questions of foreign policy and national interest" are "not subjects fit for judicial involvement"); *NFFE v. United States*, 905 F.2d 400, 406 (D.C. Cir. 1990) ("[T]he federal judiciary is ill-equipped to conduct reviews of the nation's military policy.").

The text of § 2808 makes clear that there is no meaningful standard by which to judge any decision by the Acting Secretary of Defense to exercise his authority. The use of § 2808 is predicated on a *Presidential declaration* of a national emergency "that requires the use of the

armed forces," and provides the Secretary of Defense with authority to "undertake military construction projects" that are "necessary to support such use of the armed forces." 10 U.S.C. § 2808(a). The statutory scheme leaves to the President the determination of whether a national emergency "requires use of the armed forces," and courts have uniformly concluded that a Presidential declaration of a national emergency is a nonjusticiable political question. *See supra* § I.A.2. The fact that § 2808 imposes an additional requirement that the national emergency "require[] use of the armed forces" does not change the conclusion that this determination is nonjusticiable. The Commander-in-Chief's decision to deploy the armed forces to address a national emergency is a quintessential political question. "'To attempt to decide such a matter without the necessary expertise and in the absence of judicially manageable standards would be to entangle the court in matters constitutionally given to the [other] branch[es].'" *Industria Panificadora, S.A. v. United States*, 763 F. Supp. 1154, 1160 (D.D.C. 1991) (quoting *In re Korean Air Lines Disaster of Sept. 1*, 597 F. Supp. 613, 616 (D.D.C. 1984)), *aff'd on other grounds*, 957 F.2d 886 (D.C. Cir. 1992); *Ange v. Bush*, 752 F. Supp. 509, 512 (D.D.C. 1990) (finding nonjusticiable a challenge to the President's deployment orders and activities in the Persian Gulf). Here, the Court has no judicially manageable standards to evaluate the President's decision to deploy the armed forces to the southern border. "[C]ourts lack the competence to assess the strategic decision to deploy" the armed forces "or to create standards to determine" whether use of the armed forces "was justified or well-founded." *El-Shifa Pharm. Indus. Co.*, 607 F.3d at 844.

The statute likewise gives significant discretion to the Acting Secretary of Defense, providing only that, in the event of a declaration of national emergency, the Secretary "may" authorize military construction projects "that are necessary to support such use of the armed forces." 10 U.S.C. § 2808(a). This is a quintessential military judgment, and the statute does not

specify any criteria that the Secretary must consider in making his determination. *See Gilligan v. Morgan*, 413 U.S. 1, 10 (1973) ("The complex subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments . . . ."). Nor does it include any specific prohibitions limiting the Secretary's determination of what would constitute a project "necessary" to support the use of the armed forces. *See Sierra Club*, 648 F.3d at 856 (administrative action unreviewable where "[t]here [was] no guidance to the Administrator or to a reviewing court as to what action is 'necessary'").

Even if § 2808 contained "standards to apply," such standards would not be "judicially manageable" because the determination regarding what is "necessary to support such use of the armed forces" is an inherent military judgment to which courts have routinely deferred. *See North Dakota v. United States*, 495 U.S. 423, 443 (1990) ("[W]e properly defer to the judgment of those who must lead our Armed Forces in battle."); *Orloff v. Willoughby*, 345 U.S. 83, 93 (1953) ("[J]udges are not given the task of running the Army."). Judicial review of any decision by the Acting Secretary of Defense to authorize border barrier construction under § 2808 as necessary to support the use of the armed forces would necessarily require this Court to second-guess the Acting Secretary's considered judgment on core military matters such as allocation of military resources, readiness, and the relative value of various military construction projects within the military's global national security strategy. There are no judicially manageable standards for conducting that type of review. *See NFFE*, 905 F.2d at 405–06 (concluding that decisions about which military bases to close were committed to agency discretion by law). Such judgment is "better left to those more expert in issues of defense," *id.* at 406, and inherently requires a determination of the "military value" of the proposed construction projects. *Dist. No. 1, Pac. Coast Dist., Marine Eng'rs' Beneficial Ass'n*, 215 F.3d at 41–42. For these reasons, there are no judicially manageable

standards to apply, and any determination by the Acting Secretary regarding the use of § 2808 will be committed to agency discretion by law under the APA.

### C.    The Use of § 9705 Authority Is Committed to Agency Discretion by Law.

Treasury's decision to allocate TFF funds is likewise committed to agency discretion by law and is thus unreviewable under the APA.  5 U.S.C. § 701(a)(2).  The Supreme Court has recognized that an agency's decision to allocate funds in a particular way is an unreviewable exercise of discretion because the agency must be allowed to administer its statutory responsibilities "in what it sees as the most effective or desirable way."  *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993).  Moreover, courts are not well equipped to review the "complicated balancing of a number of factors which are peculiarly within [the agency's] expertise: whether its resources are best spent on one program or another; whether it is likely to succeed in fulfilling its statutory mandate; whether a particular program best fits the agency's overall policies; and, indeed, whether the agency has enough resources to fund a program at all."  *Id.* at 193.  Even where Congress has dictated that funds be spent for a specific purpose, so long as it "left to the [agency's] sole judgment" the determination of the allocation of funds, the APA prohibits judicial review of how funds are allocated, *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002), if the allocation "meet[s] permissible statutory objectives," *Lincoln*, 508 U.S. at 193.[17]

As in *Lincoln* and *Milk Train*, Congress provided Treasury with broad authority to

---

[17] In *State of California v. Trump*, another related case pending before the same district judge as *Sierra Club*, the court held that Treasury's use of its § 9705 authority to transfer funds for border barrier construction is judicially reviewable and that *Lincoln* is inapposite because "the TFF arguably does not qualify as the sort of lump-sum appropriation present in *Lincoln*."  2019 WL 2247814, at *13 (N.D. Cal. May 24, 2019) (denying preliminary relief on the plaintiffs' TFF claims because the plaintiffs failed to show irreparable harm absent an injunction).  The D.C. Circuit in *Milk Train* did not read *Lincoln* that narrowly and extended *Lincoln*'s reasoning to an agency decision that did not involve a lump sum appropriation.  *Milk Train*, 310 F.3d at 751.

administer the TFF.  After the mandatory categories of expenses have been satisfied, *see* 31 U.S.C. § 9705(a)(1)(A), and funds have been reserved for these mandatory expenses in the next year, *see id.* § 9705(g)(1), (3)(C), (4)(b), the Secretary has wide discretion to use the remaining funds "in connection with the law enforcement activities of any Federal agency." 31 U.S.C. § 9705(g)(4)(B). Nothing in the statute prohibits using these funds or constrains the agency's decision to use these funds for border barriers.  And, as explained further below, the construction of border barriers to stem the flow of illegal immigration and drugs is unquestionably a law enforcement activity.  *See infra* 56.  Thus, funding the construction of border barriers is consistent with the statutory purposes of the TFF, such that the allocation of funds for this purpose is unreviewable.

## III.   Plaintiffs Have Not Stated a Statutory Claim.

Plaintiffs claim pursuant to the APA that the agency Defendants' use of § 9705, § 284, and § 2808 for border barrier construction is arbitrary and capricious and exceeds statutory authority under § 9705, § 284, § 2808, and the CAA.[18]  *See* 5 U.S.C. § 706(2); Am. Compl. ¶¶ 155–62.  But they offer no concrete allegations to support the claim that Defendants acted arbitrarily and capriciously.  Nor do they allege plausible violations of the statutory schemes challenged.

Plaintiffs alternatively seek nonstatutory review of Defendants' actions as ultra vires in violation of the NEA, § 9705, § 284, § 2808, and the CAA.  *See* Am. Compl. ¶¶ 133–41.  But the President's declaration of a national emergency is nonjusticiable, *see supra* § I.A, and the standard to state an ultra vires claim under a nonstatuory, implied cause of action is even more demanding than that of the APA, *see Sears, Roebuck & Co. v. USPS*, 844 F.3d 260, 265 (D.C. Cir. 2016).  As a result, ultra vires claims "rarely succeed."  *Nyunt v. Chairman, Broad. Bd. of Govs.*, 589 F.3d

---

[18] Plaintiffs also allege, pursuant to the APA, that Defendants' actions "violate the Appropriations Clause and the separation of powers laid out in Articles I and II of the Constitution."  Am. Compl. ¶¶ 157–60.  This component of Plaintiffs' APA claim is addressed in Section IV, *infra*.

445, 449 (D.C. Cir. 2009).   Thus, for the same reasons that Plaintiffs fail to state an APA claim,

Plaintiffs' ultra vires claims fail and should be dismissed.

### A.      Plaintiffs Fail To State a Claim Under the APA.

Plaintiffs fail to state a claim upon which relief can be granted under the APA.   They offer

no allegation whatsoever that Defendants acted arbitrarily and capriciously by "rel[ying] on factors

which Congress has not intended [them] to consider, entirely fail[ing] to consider an important

aspect of the problem, or offer[ing] an explanation for its decision that runs counter to the evidence

before the agency."   *Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,

463 U.S. 29, 43 (1983).    Instead, Plaintiffs allege that Defendants "acted arbitrarily and

capriciously in failing to articulate how [their use of statutory authorities] will address the

circumstances allegedly giving rise to the national emergency." Am. Compl. ¶ 161. This statement

is not only conclusory, but also fails to recognize that neither use of § 9705 nor use of § 284 is

predicated on a national emergency declaration.  *See* 31 U.S.C. § 9705; 10 U.S.C. § 284.  For these

reasons, Plaintiffs have not adequately alleged that Defendants acted arbitrarily or capriciously.

Nor do Plaintiffs plausibly allege that "the statutory text forecloses [Defendants'] assertion

of authority."  *City of Arlington v. FCC*, 569 U.S. 290, 301 (2013).  To the contrary, Defendants

have acted consistent with their statutory mandate with respect to § 9705, § 284, and § 2808.  Nor

have Defendants violated the CAA.

### 1.   31 U.S.C. § 9705

Plaintiffs' allegations are insufficient to support an APA claim that Defendants exceeded

their statutory authority with respect to the TFF.  Plaintiffs allege that § 9705 "restricts use of

[TFF] funds to specified purposes and construction of a border wall does not meet the requirements

of the statute." Am. Compl. ¶ 140.  As Plaintiffs recognize, however, § 9705(g)(4)(B) authorizes

the Secretary of the Treasury to distribute TFF funds not only for the specific purposes listed in

§ 9705(a), but also for "obligation or expenditure in connection with the law enforcement activities of any Federal agency."  31 U.S.C. § 9705(g)(4)(B); Am. Compl. ¶ 39.  That construction of a border wall is not specifically listed in § 9705(a) is irrelevant to whether the Treasury Secretary lawfully exercised this authority to distribute TFF funds for law enforcement activities.

Plaintiffs do not contest that construction of a barrier at the border is a law enforcement activity.  Nor could they.  CBP was established to "ensure the interdiction of persons and goods illegally entering or exiting the United States," "interdict . . . persons who may undermine the security of the United States," and "safeguard the borders of the United States," among other duties.  6 U.S.C. § 211(c)(2), (5), (6); *see Arizona*, 567 U.S. at 397.  Moreover, Congress has recognized that barriers prevent unlawful entries by aliens and smuggling of contraband across the border, *see* Secure Fence Act of 2006, Pub. L. No. 109-367, §§ 2–3, 120 Stat. at 2638–39, and thus help enforce the laws that prohibit such activities, *e.g.*, 8 U.S.C. § 1325 (improper entry by an alien); 18 U.S.C. § 545 (smuggling goods); 21 U.S.C. § 865 (smuggling methamphetamine).

## 2.   10 U.S.C. § 284

Nor have Plaintiffs pleaded facts sufficient to infer plausibly that Defendants have violated 10 U.S.C. § 284.  Plaintiffs allege that "Defendants have not identified particular drug smuggling corridors requiring construction of a wall at the border."  Am. Compl. ¶ 139.  This is simply untrue.

Section 284 permits DoD to "provide support for the counterdrug activities" of federal law enforcement agencies through, among other things, "[c]onstruction of roads and fences and installation of lighting to block drug smuggling corridors across international boundaries of the United States."  10 US.C. § 284(a), (b)(7).  It is a matter of judicially noticeable fact that DHS requested, and DoD agreed to provide, support to DHS in constructing barriers in specific drug smuggling corridors.  *See, e.g.*, Determination Pursuant to § 102 of IIRIRA, 84 Fed. Reg. 17185–87 (Apr. 24, 2019); Determination Pursuant to § 102 of IIRIRA, 84 Fed. Reg. 17187–88 (Apr. 24,

2019).  As DHS has explained publicly in the Federal Register, the specific areas in the vicinity of

the United States border where DoD has agreed to provide support for DHS's barrier construction

efforts have been identified as areas of high levels of illegal entry of people and drugs.  *See* 84

Fed. Reg. at 17186 (explaining that thousands of pounds of drugs were seized in the Border Patrol's

Yuma Sector in 2018 and noting that, in 2018, Border Patrol had "over 700 separate drug-related

events between border crossings in the El Paso Sector"); 84 Fed. Reg. at 17188 ("in fiscal year

2018, Border Patrol had over 1,400 separate drug-related events between border crossings in the

Yuma Sector, through which it seized" thousands of pounds of illegal drugs).  DHS has identified

the exact locations of these drug smuggling corridors.  *See id.*  Because these judicially noticeable

facts contradict the Amended Complaint's allegation that Defendants have not identified drug

smuggling corridors as required under § 284, the Court is not required to accept this allegation as

true.  *See Kaempe*, 367 F.3d at 963 ("Nor must we accept as true the complaint's factual allegations

insofar as they contradict exhibits to the complaint or matters subject to judicial notice.").

        To the extent Plaintiffs allege that DoD's transfer of funds pursuant to § 8005 of the DoD

Appropriations Act 2019, Pub. L. No. 115-245, 132 Stat. 2981 (2018) (DoD Act), violates § 284,

that claim has no merit.  *See* Am. Compl. ¶ 158.  Section 8005 provides DoD authority, within

certain parameters, to transfer funds among DoD appropriations.  Plaintiffs do not articulate how

an internal DoD transfer violates any provision of § 284—nor could it.  As such, all of Plaintiffs'

claimed § 284 violations lack merit and should be dismissed.

        3.  <u>10 U.S.C. § 2808</u>

        Even putting aside the threshold issue that Plaintiffs have not alleged final agency action

for § 2808, *see supra* § II.A, their APA claim fails because Plaintiffs cannot support their allegation

that DoD exceeded its statutory authority.  Plaintiffs allege that DoD's "assessment of specific

military construction projects to support the use of the armed forces" and "identification of existing

Case 1:19-cv-00720-TNM   Document 34   Filed 07/12/19   Page 77 of 85

military construction projects" which could be diverted to fund border barrier construction, Am. Compl. ¶ 160, violate the APA with respect to § 2808 because the underlying emergency does not "require use of the armed forces," border barriers are not a "military construction project[]," and that any project would not be "necessary to support such use of the armed forces," *id.* ¶ 138. As to the first and third claims, the President's determination that a national emergency "requires use of the armed forces" is a nonjusticiable political question, and a determination by the Acting Secretary of Defense that specific construction projects would be "necessary to support such use of the armed forces" is vested in the expertise of the Acting Secretary, and both are thus committed to agency discretion by law. *See supra* §§ I.A.2; II.B. Because the statute provides no judicially manageable standards, Plaintiffs cannot plausibly allege a § 2808 violation.

Nor can Plaintiffs plausibly allege that Defendants have violated § 2808's other statutory requirements. Although "military construction project" is a statutorily defined term, its definition is broad and illustrative, not specific or exclusive. *See* 10 U.S.C. § 2801(b). The term "military construction" is broadly defined to "*include*[] any construction . . . of any kind carried out with respect to a military installation." *Id.* § 2801(a) (emphasis added). A "military installation," in turn, "means a base, camp, post, station, yard, center, *or other activity* under the jurisdiction of the Secretary of a military department." *Id.* § 2801(c)(4) (emphasis added). This broad definition of military construction as "includ[ing]" (but not limited to, *see* 10 U.S.C. § 101(f)(4)) construction with respect to a military installation, and defining a military installation to include non-specified "other activity," does not "foreclose" the inclusion of border barrier construction. *See City of Arlington*, 569 U.S. at 301. In the face of such expansive statutory language, Plaintiffs offer no factual allegations whatsoever as to why border barrier construction under § 2808 would not constitute a military construction project. Without such allegations, Plaintiffs have provided

"nothing more than conclusions" unsupported by factual allegations.  *Twombly*, 556 U.S. at 679.

Their § 2808 claim cannot survive a motion to dismiss.[19]  *See id.*

### 4.  The Consolidated Appropriations Act

Plaintiffs also fail to state a claim under the APA that Defendants have violated the CAA.

They allege that Defendants' use of § 9705, § 284, and § 2808 for barrier construction exceeds the

CAA's "specific limits on appropriations for border fencing, the location of new fencing, and the

design of new fencing."   Am. Compl. ¶ 136.   Plaintiffs impermissibly ignore "plain and

unambiguous" statutory language.  *See Sherley v. Sebelius*, 644 F.3d 388, 400 (D.C. Cir. 2011).

Section 230(a) of the DHS Act, which is part of the CAA, provides that "[o]f the total

amount made available under 'U.S. Customs and Border Protection—Procurement, Construction,

and Improvements,'" $1.375 billion "shall be available only," as relevant here, for "the

construction of primary pedestrian fencing, including levee pedestrian fencing, in the Rio Grande

Valley Sector."  Pub. L. No. 116-6, div. A, § 230(a).  By their plain terms, these provisions limit

DHS's use of funds for border barrier construction.  But they do no more.

Contrary to Plaintiffs' claims, Congress's decision not to appropriate to DHS the full

amount of funds requested by the President for fiscal year 2019 border barrier construction does

not limit other agencies' ability to utilize other available statutory authorities for such construction.

"An agency's discretion to spend appropriated funds is cabined only by the text of the

appropriation."  *Salazar v. Ramah Navajo Chapter*, 567 U.S. 182, 200 (2012) (quotation omitted).

Plaintiffs have identified no restriction in the CAA on the funding of border barrier construction

pursuant to other statutory authorities, nor does its plain text include one.  *See generally* Pub. L.

---

[19] Although *Sierra Club* noted in dicta "concerns" with Defendants' statutory arguments, it did not address the merits of the plaintiffs' § 2808 claims and denied their request for preliminary relief on such claims.  *Sierra Club*, 2019 WL 2247689, at *25.

No. 116-6.  Congress did not modify any of the statutes at issue here in the CAA.  *See id.*  And the CAA's funding provisions do not otherwise alter the meaning or availability of permanent statutes already in effect.  *See Donovan v. Carolina Stalite Co.*, 734 F.2d 1547, 1558 (D.C. Cir. 1984) ("[W]hen appropriations measures arguably conflict with the underlying authorizing legislation, their effect must be construed narrowly."); *see also Building & Const. Trades Dep't., AFL-CIO v. Martin*, 961 F.2d 269, 273–74 (D.C. Cir. 1992).

Had Congress wanted to restrict all other border barrier construction—including construction where other statutory authorities authorized funding—it could have done so by imposing appropriations riders, as it has done in the past, including elsewhere in the very same appropriations act.  *See, e.g.*, Pub. L. No. 116-6, Div. A, § 219 ("None of the funds made available to the United States Secret Service by this Act or by previous appropriations Acts may be made available for the protection of the head of a Federal agency other than the Secretary of Homeland Security . . . .").  The President made clear prior to the CAA's passage his intention to use alternative statuory sources to fund barrier construction, *see* Am. Compl. ¶¶ 57–58, 64, but Congress nonetheless included no rider forbidding it.  At bottom, absent language to the contrary, the grant of a specific appropriation does not restrict the use of other funds appropriated to other agencies for similar purposes pursuant to other statutory authority.

Nor have Plaintiffs alleged a violation of any other provision of the CAA.  The DHS Act provides that barriers constructed using the $1.375 billion appropriation to CBP are required to be "operationally effective designs . . . such as currently deployed steel bollard."  *Id.* § 230(b).  Other provisions in the Act further restrict the use of DHS appropriated funds for border barrier construction, prohibiting barrier construction using any past or current DHS appropriations in five specific areas in the Rio Grande Valley, *see id.* § 231, and requiring consultation prior to use of

the $1.375 billion in funds appropriated to CBP for barrier construction in five cities or census

designated places, *id.* § 232.  Plaintiffs' claim that Defendants violated these provisions fails for

two reasons.  First, by their plain terms, these provisions do not apply to any barrier construction

funded by Treasury or DoD funds.  The restriction on the design of barriers to be used and the

consultation requirement explicitly apply only to the funds appropriated to CBP.  *See id.* § 230(b)

(applying design restriction to "[t]he amounts designated in subsection (a)(1)"); § 232 (applying

consultation requirement to "any funds made available by this Act for construction of physical

barriers").  The prohibition on the construction of pedestrian fencing in five designated areas in

the Rio Grande Valley applies to use of "funds made available by this Act or prior Acts," limiting

the restriction to DHS appropriations.  *See id.* § 231.  Plaintiffs cannot state a claim that the use of

funds appropriated to Treasury or DoD for barrier construction violates these provisions when the

provisions themselves limit their applicability to DHS appropriations.

But even if this were not the case, Plaintiffs' claim fails for a second reason: they have not

alleged any violation of these provisions.  The Amended Complaint includes no concrete allegation

that Defendants have utilized any barrier design other than that designated in the DHS Act; it does

not allege that Defendants have constructed barriers without prior consultation in any of the five

cities or census designated places identified in the DHS Act; nor does it allege that Defendants

have engaged in any construction of pedestrian fencing, using any source of funding, in the five

specified locations in the Rio Grande Valley in which the DHS Act prohibits such construction.

For these reasons, Plaintiffs have failed to state a claim for violation of the CAA.[20]

---

[20] To the extent Plaintiffs assert that DoD's transfers pursuant to § 8005 of the DoD Act violate the CAA, that claim fails for the same reasons, and for the additional reason that internal DoD transfers do not, by themselves, fund border barrier construction.  Section 284 provides DoD that authority.

### B.    Plaintiffs' Ultra Vires Claims Must Be Dismissed.

In the event that the Court agrees that Plaintiffs' statutory claims are unreviewable under the APA, Plaintiffs claim that alleged violations of § 9705, § 284, § 2808, and the CAA may be reviewed under a nonstatuory right of action for agency activities that are ultra vires.  As Plaintiffs seem to concede, the Court can only reach the merits of the ultra vires claims if APA review is unavailable.  *See Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43–44 (1991) (citing *Leedom v. Kyne*, 358 U.S. 184 (1958)) (review under an independent ultra vires cause of action is available only where the plaintiff would otherwise be "wholly deprive[d]" of a "meaningful and adequate means of vindicating its statutory rights").

Should the Court apply the ultra vires framework here, Plaintiffs' ultra vires claims fail for the same reason as their APA claims: their allegations do not plausibly allege a violation of the statute.  Indeed, the scope of ultra vires review is narrower than that of APA review.  *See Sears, Roebuck & Co.*, 844 F.3d at 265 ("The scope of non-APA review is narrow.").  Courts review ultra vires claims under a "very stringent standard" and such claims "rarely succeed." *Nyunt*, 589 F.3d at 449; *see also Trudeau v. FTC*, 456 F.3d 178, 189–90 (D.C. Cir. 2006).  To give rise to such a claim, the agency must "patently . . . misconstru[e]" a statute, "disregard[] a specific and unambiguous statutory directive," or "violate[] some specific command of a statute."  *Griffith v. FLRA*, 842 F.2d 487, 493 (D.C. Cir. 1988) (internal citations and quotation marks omitted).  Unless an agency has violated a "clear and mandatory" statutory provision, ultra vires review is not warranted.[21]  *Nat'l Air Traffic Controllers Ass'n AFL-CIO v. FSIP*, 437 F.3d 1256, 1263 (D.C.

---

[21] *Sierra Club* incorrectly found that "*ultra vires* review exists outside the APA framework" and that the "heightened standard for *ultra vires* review" did not apply to the plaintiffs' claims. *Sierra Club*, 2019 WL 2247689, at *17, *denying stay* 2019 WL 2865491, at *2 (9th Cir. July 3, 2019). Unlike that court, the D.C. Circuit has recognized that non statutory review is of "extremely limited

Cir. 2006) (quoting *Leedom*, 358 U.S. at 188).   Mere allegations that the agency improperly exercised its authority are not enough to justify ultra vires review.  *See, e.g.*, *Mittleman v. Postal Regulatory Comm'n,* 757 F.3d 300, 307–08 (D.C. Cir. 2014).   Because the standard to state an ultra vires claim is more demanding, for the same reasons Plaintiffs fail to state an APA claim that Defendants exceeded statutory authority, *see supra* § III.A, they have not alleged the violation of a clear and mandatory statutory provision.  The ultra vires claims should be dismissed.

## IV.   **Plaintiffs' Constitutional Claims Must Be Dismissed.**

Plaintiffs raise constitutional challenges to the Executive and agency actions at issue here. But these counts merely recast Plaintiffs' statutory claims in constitutional terms, and "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims." *Dalton*, 511 U.S. at 473.  The Government is not relying on independent Article II authority in order to undertake border construction; the actions alleged are being undertaken pursuant to statutory authority alone.  The President did not seek to reallocate appropriated funds based upon any claim of inherent constitutional authority.  Nor did the President claim that the declaration of a national emergency gave him any authority that had not been expressly conferred by Congress.   Rather, the Government relies solely upon available statutory authorities that Congress has delegated to the Executive.  The outcome of this case thus turns on whether the statutes at issue authorize Defendants' actions.  Because disagreements about how to construe statutes do not raise constitutional problems, the constitutional claims should be dismissed.

*Dalton* disposes of Plaintiffs' constitutional claims.   In *Dalton*, the Supreme Court specifically rejected the proposition that "whenever the President acts in excess of his statutory

---

scope" and presents a "more difficult course for [Plaintiffs] than would review under the APA," indicating that at least some higher level of scrutiny is appropriate. *Trudeau*, 456 F.3d at 190.

authority, he also violates the constitutional separation-of-powers doctrine." *Id.* at 471. The Court instead recognized that the "distinction between claims that an official exceeded his statutory authority, on the one hand, and claims that he acted in violation of the Constitution, on the other, is too well established to permit this sort of evisceration." *Id.* at 474; *see Harrington v. Schlesinger,* 528 F.2d 455, 457-58 (4th Cir. 1975); *Sierra Club v. Trump*, 2019 WL 2865491 at 29-32 (N.R. Smith, J., dissenting).

By asserting that actions that allegedly exceed statutory authority are, for that reason alone, constitutional violations, the Complaint does precisely what the Court disapproved of in *Dalton*. Plaintiffs assert no constitutional violation separate from the alleged statutory violations. They do not allege that Defendants' compliance with the statutes at issue would be unconstitutional; they assert that Defendants violated the statutes. Plaintiffs' Appropriations Clause claim is predicated on the allegation that Defendants violated alleged "specific limits on appropriations for border fencing, the location of new fencing, and the design of new fencing." Am. Compl. ¶ 146. The fact that this is a claim of statutory, not constitutional, violations is made plain by the fact that Plaintiffs state this allegation verbatim in support of their ultra vires claim. *See id.* ¶ 136. Plaintiffs' separation-of-powers claim likewise depends on the claim that the Executive and agency actions undertaken pursuant to statute violate the CAA.[22] *See id.* ¶ 154. Bare allegations of ultra vires statutory actions do not state constitutional claims. *See Dalton*, 511 U.S. at 473–74.

Plaintiffs do not allege that the President has exercised his inherent authority under Article II of the Constitution. Nor does the President purport to do so. This case stands in sharp contrast to *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), in which the President issued

---

[22] Despite references to the Presentment Clause, Plaintiffs make no concrete allegation that the President has attempted to "enact, amend, or repeal" any statute. *See* Am. Compl. ¶¶ 152–53. Accordingly, they have alleged no Presentment Clause violation.

an order directing the Secretary of Commerce to seize the nation's steel mills relying solely upon "the aggregate of his powers under the Constitution," thus conceding a lack of statutory authority. *Id.* at 585–87.   The Court held the action unconstitutional.   *Id.* at 589.   In concurrence, Justice Jackson emphasized that the President had acted in the absence of congressional authorization, where his "power is at its lowest ebb" and such exercise of power must be "scrutinized with caution."   *Id.* at 637–38 (Jackson, J., concurring).   Here, however, the President and his agents are acting "pursuant to an express . . . authorization of Congress," the situation in which "his authority is at its maximum."   *Id.* at 635 (Jackson, J., concurring).   *Youngstown* is therefore inapposite.   *See AFL-CIO v. Kahn*, 618 F.2d 784, 787 (D.C. Cir. 1979) (en banc); *see also Dalton*, 511 U.S. at 473.

If Plaintiffs' allegations were found to rise to the level of constitutional issues, then *every* allegation that the President or his agents exceeded their statutory authority in some way could be repleaded as a constitutional separation-of-powers claim.   The Supreme Court has foreclosed such tactics, recognizing their inconsistency with well-established precedent "distinguish[ing] between claims of constitutional violations and claims that an official has acted in excess of his statutory authority."   *Dalton*, 511 U.S. at 472.   Because where "the President concedes . . . that the only source of his authority is statutory, no constitutional question whatever is raised," this Court should dismiss all constitutional counts.   *Id.* at 474 n.6 (internal quotation marks omitted).

## CONCLUSION

For these reasons, Plaintiffs' Amended Complaint should be dismissed in full pursuant to Rules 12(b)(1) and 12(b)(6).[23]

---

[23] This judicial district does not provide a procedure to notice a motion on the Court's calendar for a hearing; however, upon the completion of briefing, Defendants stand ready to appear for argument at the Court's earliest convenience.

Dated:  July 12, 2019

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

JAMES M. BURNHAM
Deputy Assistant Attorney General

JOHN R. GRIFFITHS
Director, Federal Programs Branch

ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch


/s/ *Andrew I. Warden*_____
ANDREW I. WARDEN (IN Bar No. 23840-49)
Senior Trial Counsel, Federal Programs Branch

/s/ *Kathryn C. Davis*_____
KATHRYN C. DAVIS (D.C. Bar No. 985055)
MICHAEL J. GERARDI
LESLIE COOPER VIGEN (D.C. Bar No. 1019782)
RACHAEL L. WESTMORELAND
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Tel: (202) 616-8298
Fax: (202) 616-8470
Email: Kathryn.C.Davis@usdoj.gov

*Counsel for Defendants*