**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| RIO GRANDE INTERNATIONAL STUDY CENTER, *et al.,* ) ) ) ) | |
| Plaintiffs, ) ) | |
| v. ) ) | **CIVIL ACTION NO. 19-CV-720 (TNM)** |
| DONALD J. TRUMP, in his official capacity as President of the UNITED STATES OF AMERICA, *et al.,* ) ) ) ) ) | |
| Defendants. ) ) | |

**<u>PLAINTIFFS' OPPOSITION TO DEFENDANTS' SUPPLEMENTAL
MEMORANDUM ADDRESSING ZONE OF INTERESTS</u>**

# TABLE OF AUTHORITIES

**CASES**                                                        **PAGE(S)**

*Armstrong v. Exceptional Child Center, Inc.*,
    575 U.S. 320 (2015) ............................................................................. 3, 6

*Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*,
    397 U.S. 150 (1970) ........................................................................... 2, 10

*Bank of Am. Corp. v. City of Miami*,
    137 S. Ct. 1296 (2017) ............................................................................. 8

*Bennett v. Spear*,
    520 U.S. 154 (1997) ................................................................................. 3

*Bond v. United States*,
    564 U.S. 211 (2011) ............................................................................... 10

*Boston Stock Exch. v. State Tax Comm'n*,
    429 U.S. 318 (1977) ........................................................................... 9, 10

*California v. Trump*,
    407 F. Supp. 3d 869 (N.D. Cal. 2019) .................................................. 17

*Chamber of Commerce v. Reich*,
    74 F.3d 1322 (D.C. Cir. 1996) ................................................................ 9

*Cincinnati Soap Co. v. United States*,
    301 U.S. 308 (1937) ............................................................................... 11

*Clarke v. Sec. Indus. Ass'n*,
    479 U.S. 388 (1987) ......................................................................... 12, 13

*Clinton v. City of New York*,
    524 U.S. 417 (1998) ............................................................................... 11

*Cook v. Billington*,
    737 F.3d 767 (D.C. Cir. 2013) ......................................................... 12, 16

*Dames & Moore v. Regan*,
    453 U.S. 654 (1981) ............................................................................. 5, 9

*Dart v. United States*,
    848 F.2d 217 (D.C. Cir. 1988) ................................................................ 7

*El Paso Cty. v. Trump*,
  408 F. Supp. 3d 840, (W.D. Tex. 2019)................................................................. 4, 8

*First Nat. Bank & Tr. Co. v. Nat'l Credit Union Admin.*,
  988 F.2d 1272 (D.C. Cir. 1993) ............................................................. 13, 14, 15

*Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*,
  527 U.S. 308 (1999) .............................................................................................. 6

* *Haitian Refugee Center. v. Gracey*,
  809 F.2d 794 (D.C. Cir. 1987) ...................................................................... 3, 4, 5, 7

*House of Representatives v. Mnuchin*,
  379 F. Supp. 3d 8 (D.D.C. 2019)……………………………………………………15, 16

*Indian River Cty., Fla. v. U.S. Dep't of Transp.*,
  2019 WL 6972874 (D.C. Cir. 2019) .................................................................... 13

*INS v. Chadha*,
  462 U.S. 919 (1983).............................................................................................. 10

* *Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014)............................................................... 1, 2, 3, 8, 9, 12

*Mach Mining, LLC v. EEOC*,
  575 U.S. 480 (2015).............................................................................................. 19

* *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
  567 U.S. 209 (2012).......................................................... 2, 3, 12, 16, 17, 18

*Michigan v. EPA*,
  135 S. Ct. 2699 (2015).......................................................................................... 12

*Nat'l Credit Union Admin. v. First Nat. Bank & Tr. Co.*,
  522 U.S. 479 (1998).................................................................................... 16, 17

*Noel Canning v. NLRB*,
  705 F.3d 490 (D.C. Cir. 2013) ............................................................................. 11

*Patchak v. Salazar*,
  632 F.3d 702 (D.C. Cir. 2011) ............................................................................. 17

*Physicians for Soc. Responsibility v. Wheeler*,
  359 F. Supp. 3d 27 (D.D.C. 2019) ....................................................................... 12

*Scheduled Airlines Traffic Offices, Inc. v. Dep't of Def.,*
  87 F.3d 1356 (D.C. Cir. 1996) ........................................................................... 14, 15

*Sierra Club v. Trump,*
  379 F. Supp. 3d 883 (N.D. Cal. 2019) .............................................................. 3, 4, 8

\* *Sierra Club v. Trump,*
  929 F.3d 670 (9th Cir. 2019) .............................................. 5, 6, 8, 9, 10, 11, 12

*Tenn. Wine & Spirits Retailers Ass'n v. Thomas,*
  139 S. Ct. 2449 (2019) ........................................................................................... 9

*Trump v. Sierra Club,*
  140 S.Ct. 1 (2019) .................................................................................................. 8

*U.S. Dep't of Navy v. Fed. Labor Relations Auth.,*
  665 F.3d 1339 (D.C. Cir. 2012) ........................................................................... 11

*White Stallion Energy Ctr., LLC v. EPA,*
  748 F.3d 1222 (D.C. Cir. 2014) ........................................................................... 12

*Youngstown Sheet & Tube Co. v. Sawyer,*
  343 U.S. 579 (1952) ............................................................................................... 5

## STATUTES

10 U.S.C. § 2808 .................................................................................................... 19

10 U.S.C. § 284 ...................................................................................................... 19

22 U.S.C. § 1732 ...................................................................................................... 9

31 U.S.C. § 9705 .................................................................................................... 19

31 U.S.C. § 9705(a) ............................................................................................... 23

5 U.S.C. § 559 ........................................................................................................ 10

31 U.S.C. § 9705(g)(4) .......................................................................................... 23

Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, §§ 230-32, § 739,

  113 Stat. 13, 197 (2019) ....................................................................................... 17

**INTRODUCTION**

This action arises out of President Trump's multiple efforts to secure funding from Congress to build a border wall along the United States' southern border and, when those efforts proved unsuccessful, his decision to bypass Congress by directing the Secretaries of Defense, Treasury, and Homeland Security to use funds appropriated for other purposes to build the wall anyway.  Plaintiffs Rio Grande International Study Center (RGISC), Ramiro R. Ramirez, the Carrizo/Comecrudo Nation of Texas, Elsa Hull, Joseph Hein, California Wildlife Coalition (CalWild), the Labor Council for Latin American Advancement (LCLAA), and GreenLatinos challenge the Defendants' actions unlawfully diverting funds to construct a wall along the United States-Mexico border.  Many of the Plaintiffs are property owners whose lands and livelihoods are threatened by unlawful border wall construction, while other Plaintiffs have cultural, spiritual, environmental, recreational, and aesthetic interests in the borderlands that are protected by the limitations set out in the 2019 Consolidated Appropriations Act (2019 CAA).

Defendants' interpretation of the zone of interests test is at odds with the "lenient approach" mandated by the Supreme Court in *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014), and the D.C. Circuit.  Indeed, every court that has addressed Defendants' zone of interests argument in cases related to the actions at issue in this case has found either that the test does not apply, or that parties with interests similar to Plaintiffs' satisfy the test.  Likewise here, the zone of interest test does not apply to Plaintiffs' *ultra vires* claims and constitutional claims, and to the extent that the test may apply to Plaintiffs' alternative[1]

_____

[1] Defendants appear to conflate Plaintiffs' claims in this action with the claims raised by the plaintiffs in *Center for Biological Diversity, et al. v. Trump*, 19-cv-00408.  *Compare* Defs.' Suppl. Mem. 2 (Dkt. 67) ("Plaintiffs in these related cases challenge the Government's funding and construction of barriers along the southern border of the United States pursuant to various statutory authorities . . . .  Plaintiffs assert these claims through a cause of action under Administrative Procedure Act (APA) and, alternatively, an implied equitable cause of action

claims brought under the Administrative Procedure Act (APA), Plaintiffs easily meet the requirements.

## ARGUMENT

The zone of interests test originated in *Ass'n of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150 (1970), where the Supreme Court articulated a limit on causes of action under the APA that was separate from the Article III standing inquiry.  The Supreme Court recently clarified that the zone of interests test applies to not only claims brought under the APA, but to "all statutorily created causes of action."  *Lexmark*, 572 U.S. at 129.  Unlike Article III standing, the zone of interests test is not jurisdictional.  *Id*. at 128 n.4.  Courts apply the zone of interests test to "determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim."  *Id*. at 127.  A plaintiff satisfies the zone of interests test if his asserted interest is "arguably within the zone of interests to be protected or regulated by the statute that he says was violated."  *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012) (internal quotation omitted); *see also Ass'n of Data Processing Serv. Orgs.*, 397 U.S. at 154 (interests protected or regulated by a statute "may reflect aesthetic, conservational, and recreational as well as economic values") (internal quotation omitted).  The Supreme Court has "always conspicuously included the word 'arguably' in the test to indicate that the benefit of any doubt

---

alleging statutory and constitutional violations."), *with* Pls.' Opp. to Defs.' Mot. to Dismiss (Dkt. 39) at 55 ("Plaintiffs allege that Defendants' actions are unconstitutional because they are moving to spend $8.1 billion on a border wall without a Congressional appropriation for that purpose. Am. Compl. ¶¶ 142-154. In stating constitutional claims, Plaintiffs did not plead that Defendants exceeded their statutory authority; rather, Plaintiffs assert that the statutes invoked by Defendants provide no defense for their unconstitutional actions.") *and id.* at 58 (Plaintiffs have properly sought review of Defendants' *ultra vires* actions. . . .  While Plaintiffs bring APA claims in the alternative, the enactment of the APA did not repeal judicial review of *ultra vires* government actions.").

goes to the plaintiff." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians*, 567 U.S. at 225.

## I.    THE ZONE OF INTERESTS TEST DOES NOT APPLY TO PLAINTIFFS' *ULTRA VIRES* CLAIMS.

As the Supreme Court recently explained in *Lexmark*, the zone of interests test "applies to all *statutorily* created causes of action" and "Congress is presumed to 'legislat[e] against the background of' the zone-of-interests limitation, 'which applies unless it is expressly negated.'" 572 U.S. at 129 (emphasis added) (quoting *Bennett v. Spear,* 520 U.S. 154, 163 (1997)). Plaintiffs' *ultra vires* claims do not rely on "statutorily created causes of action."[2] Rather, Plaintiffs seek equitable relief, "a judge-made remedy," *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015), for injuries suffered as a result of government actions that are not authorized by any law, *see id.*

In *Sierra Club v. Trump*, 379 F. Supp. 3d 883, 910 (N.D. Cal. 2019), a case also challenging Defendants' border wall funding scheme, the court held that "where a plaintiff seeks equitable relief against a defendant for exceeding its statutory authority, the zone-of-interests test is inapposite. Any other interpretation would lead to absurd results." Citing *Lexmark*, 572 U.S. at 129, and the D.C. Circuit's decision in *Haitian Refugee Center. v. Gracey*, 809 F.2d 794, 811 n.14 (D.C. Cir. 1987)*,* the *Sierra Club* court found that the zone of interests test "only relates to statutorily-created causes of action," and that "[t]he test has no application in an *ultra vires* challenge, which operates outside of the APA framework." 379 F. Supp. 3d at 910. The court explained that "[t]he very nature of an *ultra vires* action posits that an executive officer has gone beyond what the statute permits, and thus beyond what Congress contemplated. It would

---

[2] Plaintiffs bring alternative claims under the Administrative Procedure Act (APA) and easily meet the zone of interests requirements for those claims. *See infra* at 11-15.

not make sense to demand that Plaintiffs—who otherwise have standing—establish that

Congress contemplated that the statutes allegedly violated would protect Plaintiffs' interests."

*Id*.  This reasoning applies equally here as Plaintiffs "otherwise have standing."[3]  *See id*.; *see*

*also El Paso Cty. v. Trump*, 408 F. Supp. 3d 840, 856 n.1 (W.D. Tex. 2019) (finding that

Defendants' border wall funding plan violates the 2019 CAA and agreeing with the district court

in *Sierra Club*, 379 F. Supp. 3d at 910, that "when a plaintiff seeks equitable relief against a

defendant for exceeding its statutory authority, the zone-of-interests test is inapposite").  To

require Plaintiffs to further show that Congress intended to protect their interests when enacting

statutes that the Plaintiffs claim provide no authority for the Defendants' challenged actions

would not make sense.

Moreover, contrary to Defendants' tortured reading of *Haitian Refugee Center. v.*

*Gracey*, 809 F.2d 794 (D.C. Cir. 1987), the D.C. Circuit has clearly stated that the zone of

interests test does not apply to *ultra vires* challenges.  *Compare* Defs. Suppl. Mem. 6 (Dkt. 67)

("the reasoning in *Haitian Refugee Center* suggests that the zone-of-interests requirement *does*

apply to claims challenging Executive action as *ultra vires*") (emphasis in original) *with Haitian*

*Refugee Ctr.*, 809 F.2d at 811 n.14 ("Appellants need not, however, show that their interests fall

within the zones of interests of the constitutional and statutory powers invoked by the President

in order to establish their standing to challenge the interdiction program as *ultra vires.*").  The

D.C. Circuit explained that "[o]therwise, a meritorious litigant, injured by *ultra vires* action,

---

[3] Defendants have conceded that at least RGISC and CalWild have standing.  Defs. Reply Supp.
Br. at 3, n. 1 (Dkt. 61) ("Defendants do not contest at this stage that CalWild has pleaded
representational standing with respect to El Centro Project 1 and that RGISC has pleaded
standing with respect to Laredo Project 7").  At oral argument, Defendants also appeared to
concede that Plaintiffs Joseph Hein and Elsa Hull—landowners whose property will be adversely
impacted by construction of Laredo Project 7—also have standing.

would seldom have standing to sue since the litigant's interest normally will not fall within the zone of interests of the very statutory or constitutional provision that he claims does not authorize action concerning that interest." *Haitian Refugee Ctr.*, 809 F.2d at 811-12 n.14 (also noting that plaintiffs in *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579 (1952) would not be required to satisfy the zone of interests test were that case to arise today); *see also Sierra Club v. Trump*, 929 F.3d 670, 701 (9th Cir. 2019) ("In other words, where the very claim is that *no* statutory or constitutional provision authorized a particular governmental action, it makes little sense to ask whether *any* statutory or constitutional provision was written for the benefit of any particular plaintiffs.") (emphasis in original).

Defendants ignore the D.C. Circuit's clear reasoning in *Haitian Refugee Center* and essentially argue that Plaintiffs must show that they fall within the zone of interests of whatever statutes Defendants cite in defense of their actions. *See* Defs. Suppl. Mem. 7-13 (Dkt. 67). Plaintiffs are unaware of any case that has applied the zone of interests test in such a manner, and Defendants cite none. To the contrary, in *Dames & Moore v. Regan*, 453 U.S. 654, 667 (1981)—more than a decade after the Supreme Court first applied the test—the Court reviewed plaintiff's claims that the President and Secretary of Treasury's actions "were beyond their statutory and constitutional powers" without applying the zone of interests test. While "the President purported to act under authority of both the [International Emergency Economic Powers Act] and 22 U.S.C. § 1732, the so-called Hostage Act," the Court did not require the plaintiff to show that he had a cause of action under either of those statutes. *Id*. at 675 (internal quotations omitted). Likewise, Plaintiffs here are not required to show that their *ultra vires* claims fall with the zone of interests of whatever statutes Defendants purport to act under.

Defendants also argue that this Court should apply a zone of interests test to Plaintiffs' *ultra vires* claims because: 1) the Judiciary Act of 1789 conferred on the federal courts jurisdiction over "all suits in equity," and thus, the theory goes, traditional equitable causes of action are, in fact, statutory causes of action, *see* Defs. Suppl. Mem. 5 (Dkt. 67) (citing *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.,* 527 U.S. 308, 318 (1999)); and 2) separation of powers principles are implicated because Congress, in enacting the APA, intended to limit the class of plaintiffs that may sue an agency. *Id.* at 5-6.  Neither argument has merit.

With regard to the first point, *Grupo Mexicano* simply states that the Judiciary Act of 1789 conferred on the federal courts "authority to administer in equity suits the principles of the system of judicial remedies which had been devised and was being administered by the English Court of Chancery at the time of the separation of the two countries."  527 U.S. at 318 (citations omitted).  Addressing Defendants' novel interpretation of the Judiciary Act as having converting all claims in equity into statutory claims, the Ninth Circuit found that "[a]lthough Defendants are correct that Congress granted federal courts equity jurisdiction by statute, we think it a stretch to conclude that the traditional equitable cause of action to enjoin a constitutional violation was therefore *created by statute*."  *Sierra Club*, 929 F.3d at 702 n.25 (citations omitted, emphasis in original).  "Indeed, the lower federal courts are created entirely by statute, but this does not mean that all constitutional claims filed in a federal district court are really statutory claims."  *Id.* (citations omitted).  *See also Armstrong*, 575 U.S. at 327 ("The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England.  It is a judge-made remedy.) (citations omitted).

As to the second point, allowing a potentially larger class of plaintiffs to sue an agency under an *ultra vires* cause of action than might be able to sue under the APA does not raise separation of powers concerns because Congress did not intend for the enactment of the APA to repeal judicial review of *ultra vires* government actions.  5 U.S.C. § 559 (judicial review chapter of the APA "do[es] not limit or repeal additional requirements imposed by statute or otherwise recognized by law"); *see also Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988) ("the APA states that judicial review is not available 'to the extent that statutes preclude [it].'  But, this serves only to take away what the APA has otherwise given—namely, the APA's own guarantee of judicial review.  It does not repeal the review of *ultra vires* actions that was recognized long before"); Pls. Op. to Defs.' Mot. to Dismiss 58-60 (Dkt. 39).  Nor does the availability of *ultra vires* review render the limitation on the class of people who can sue under the APA meaningless.  Not all APA claims can be framed as *ultra vires* claims.  Moreover, the purpose of *ultra vires* causes of action are to reign in executive officials when they act beyond the law.  *Dart*, 848 F.2d at 224.  ("When an executive acts ultra vires, courts are normally available to reestablish the limits on his authority.")  To apply a zone of interest test to suits seeking to reign in executive action that is untethered to the law would have the perverse effect of restricting review when the violation is most egregious.  *See Haitian Refugee Ctr.*, 809 F.2d at 811-12 n.14 "a meritorious litigant, injured by *ultra vires* action, would seldom have standing to sue since the litigant's interest normally will not fall within the zone of interests of the very statutory or constitutional provision that he claims does not authorize action concerning that interest.")  When a plaintiff has standing to challenge such an action, as Plaintiffs do here, the courts are acting in accordance with their constitutional authority and separation of powers is not implicated.

The Ninth Circuit, the Northern District of California, and the Western District of Texas[4] have all addressed the same zone of interests arguments that Defendants raise here, and, citing the Supreme Court's decision in *Lexmark* and the D.C. Circuit's decision in *Haitian Refugee Center*, each court concluded that the zone of interests test does not apply to *ultra vires* claims.[5] This Court should find likewise for the same reasons.

## II.   THE ZONE OF INTERESTS TEST DOES NOT APPLY TO CONSTITUTIONAL CLAIMS, BUT, REGARDLESS, PLAINTIFFS WOULD MEET THE TEST.

In *Lexmark*, the Supreme Court clarified application of the zone of interests test, focusing the inquiry on the question of legislative intent, a plainly statutory exercise: "Whether a plaintiff comes within the 'zone of interests' is an issue that requires us to determine, using traditional tools of statutory interpretation, whether a *legislatively conferred* cause of action encompasses a particular plaintiff's claim." *Id.* at 127 (citations omitted) (emphasis added).  The test turns on "whether [the plaintiff] has a cause of action under the statute." 572 U.S. at 128.  Because "the requirement at issue is in reality tied to a particular statute," the question "is whether the statute grants the plaintiff the cause of action that he asserts." *Bank of Am. Corp. v. City of Miami*, 137

---

[4] In *El Paso County*, the Defendants abandoned their zone of interests argument at summary judgment.  Nevertheless, the Court stated that even if the Defendants had continued to pursue it, "the Court agrees with the U.S. District Court for the Northern District of California, which reasoned that when a plaintiff seeks equitable relief against a defendant for exceeding its statutory authority, the zone-of-interests test is inapposite." *El Paso Cty.*, 408 F. Supp. 3d at 856 n.1 (citing *Sierra Club*, 379 F. Supp. 3d at 910).  *See also Sierra Club,* 929 F.3d at 701-02 (discussing *Haitian Refugee Center* and concluding "[f]or all of these reasons, we doubt that any zone of interests test applies to Plaintiffs' equitable cause of action").

[5]  In *Sierra Club*, the government filed a stay application with the Supreme Court challenging the Ninth Circuit's refusal to overturn the district court's preliminary injunction. The Supreme Court granted the stay on the basis that "the Government has made a sufficient showing at this stage that the plaintiffs have no cause of action to obtain review of the Acting Secretary's compliance with Section 8005." *Trump v. Sierra Club*, 140 S.Ct. 1 (2019).  The Supreme Court's statement on this preliminary ruling, based on a likelihood rather than the merits, did not reference the zone of interests test at all.

S. Ct. 1296, 1302 (2017).  To answer that question, courts "apply traditional principles of statutory interpretation" to "determine the meaning of the congressionally enacted provision creating a cause of action."  *Lexmark*, 572 U.S. at 128.

The Ninth Circuit, addressing Defendants' nearly identical zone of interests arguments in *Sierra Club*, noted that "[e]ven if a zone of interests test may have been applied to some cases considering constitutional claims like Plaintiffs' prior to *Lexmark*, we think that *Lexmark* has called into question its continuing applicability to constitutional claims."  *Sierra Club*, 929 F.3d at 701–02; *see also id.* at 702 ("Because the Constitution was not created by any act of Congress, it is hard to see how the zone of interests test would even apply.").  Indeed, Defendants cite to no post-*Lexmark* case where a court has applied the zone of interests test to an *ultra vires* or constitutional claim.  *See* Defs. Suppl. Mem. 3-7 (Dkt. 67); *compare Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449 (2019) (finding violation of dormant Commerce Clause without applying zone of interests test to plaintiffs) *with Boston Stock Exch. v. State Tax Comm'n*, 429 U.S. 318, 320-21 n.3 (1977) (pre-*Lexmark* case applying zone of interests test to plaintiffs seeking to enforce the dormant Commerce Clause).  Moreover, even prior to *Lexmark*, courts often reviewed *ultra vires* challenges without applying a zone of interests test.  *See, e.g., Dames & Moore*, 453 U.S. at 667 (1981) (reviewing whether President and Secretary of Treasury's actions "were beyond their statutory and constitutional powers"); *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1327-28 (D.C. Cir. 1996) (reviewing Executive Order through challenge brought against Secretary of Labor).

Even if the Court finds that a zone of interests test applies to Plaintiffs' constitutional claims, Plaintiffs clearly fall within the zone of interests of the Appropriations Clause and the Separation of Powers doctrine.  When, pre-*Lexmark,* the Supreme Court has applied the zone of

interests test to constitutional claims, particularly those concerning structural provisions of the

Constitution, "it has applied a very lenient version of that test." *Sierra Club*, 929 F.3d at 703.

In *Boston Stock Exch., at 318, 320 n.3,* a pre-*Lexmark* case, the Supreme Court applied the zone

of interests test to the plaintiffs' dormant Commerce Clause claim.  The implied dormant

Commerce Clause "functions as a limit on a state's power relative to that of Congress to regulate

interstate commerce." *Sierra Club*, 929 F.3d at 701 (citing *Boston Stock Exch.*, 429 U.S. at 320

n.3).  The Supreme Court held that stock exchanges that were "asserting their right under the

Commerce Clause to engage in interstate commerce free of discriminatory taxes on their

business" and alleging that a certain transfer tax "indirectly infringes on that right," are

"arguably within the zone of interests to be protected…by the…constitutional guarantee in

question." *Boston Stock Exch.*, 429 U.S. at 320 n.3 (citing *Ass'n of Data Processing Serv. Orgs.*,

397 U.S. at 153).

Plaintiffs' interests are, at the very least, arguably related to constitutional provisions that

serve to protect not only the co-equal branches of government from one another, but also to

protect individuals who are harmed by one branch's unconstitutional enlargement of its power.

*See Bond v. United States*, 564 U.S. 211, 223 (2011) ("individuals, too, are protected by the

operations of separation of powers and checks and balances; and they are not disabled from

relying on those principles in otherwise justiciable cases and controversies."); *see also INS v.

Chadha*, 462 U.S. 919 (1983) (individual facing deportation allowed to challenge "legislative

veto" under the Constitution's Presentment Clauses and bicameralism requirement).  The D.C.

Circuit too has recognized that "[t]he Constitution's separation of powers features…do not

simply protect one branch from another.  These structural provisions serve to protect

the *people,* for it is ultimately the people's rights that suffer when one branch encroaches on

another." *Noel Canning v. NLRB*, 705 F.3d 490, 510 (D.C. Cir. 2013), *aff'd* 573 U.S. 513 (2014)

(internal citation omitted, emphasis in original).

The Appropriations Clause is an integral element of the structural protections built into

the Constitution.  It is:

> a bulwark of the Constitution's separation of powers among the three branches of
> the National Government. It is particularly important as a restraint on Executive
> Branch officers: If not for the Appropriations Clause, the executive would possess
> an unbounded power over the public purse of the nation; and might apply all its
> monied resources at his pleasure.

*U.S. Dep't of Navy v. Fed. Labor Relations Auth.*, 665 F.3d 1339, 1347 (D.C. Cir. 2012)

(Kavanaugh, J.) (internal quotation omitted).  The Ninth Circuit has held that "[t]he

Appropriations Clause [] operates as a structural protection built into our constitutional system,"

similar to the structural protections provided by the Presentment Clause as addressed by the

Supreme Court in *Clinton v. City of New York*, 524 U.S. 417 (1998).  *Sierra Club*, 929 F.3d at

701.  "The Appropriations Clause is a vital instrument of separation of powers, which has as its

aim the protection of individual rights and liberties—not merely separation for separation's

sake." *Id.* at 704.

The Appropriations Clause guarantees that Congress—the peoples' representatives, and

not the Executive, will decide how much and under what conditions money will be spent.

*Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937) (the Appropriations Clause "was

intended as a restriction upon the disbursing authority of the Executive department," and "means

simply that no money can be paid out of the Treasury unless it has been appropriated by an act of

Congress.").  The Executive's use of funds in excess of what Congress appropriated for border

wall construction directly harms the Plaintiffs' homes, lands and livelihoods and trammels on

their cultural, spiritual, environmental, recreational, and aesthetic interests.  In line with the

Supreme Court's reasoning in *Boston Stock Exchange*, "Plaintiffs' claim that their rights or liberties were infringed by a violation of the Appropriations Clause therefore falls within any zone of interests required to enforce that clause's provisions." *Sierra Club*, 929 F.3d at 704.

### III.   PLAINTIFFS FALL WITHIN THE ZONE OF INTERESTS OF THE 2019 CAA.

Plaintiffs' property, business, cultural, and recreational interests align with the 2019 CAA; as such, Plaintiffs easily meet the lenient zone of interests standard for their alternative claims under the APA, which arise out of the CAA. *See Cook v. Billington*, 737 F.3d 767, 771 (D.C. Cir. 2013) (Kavanaugh, J.) ("A plaintiff with Article III standing satisfies the requirement unless his interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." (quotation omitted)). In the APA context, the zone of interests test is not "especially demanding" and "the benefit of any doubt goes to the plaintiff." *Lexmark*, 572 U.S. at 130 (quoting *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians*, 567 U.S. at 225).

As this Court has noted, "the zone of interest test does not require any 'indication of congressional purpose to benefit the would-be plaintiff.'" *Physicians for Soc. Responsibility v. Wheeler*, 359 F. Supp. 3d 27, 38 (D.D.C. 2019) (McFadden, J.) (quoting *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399-400 (1987). Rather, the zone of interests test is "concerned with 'whether, in view of Congress' evident intent to make agency action presumptively reviewable, a particular plaintiff should be heard to complain of a particular agency action.'" *Id.* (quoting *Clarke*, 479 U.S. at 399); *see also White Stallion Energy Ctr., LLC v. EPA*, 748 F.3d 1222, 1269 (D.C. Cir. 2014) (Kavanaugh, J., concurring in part and dissenting in part) ("*Clarke* confirmed the capacious view of the zone of interests requirement. . . . It reaffirmed the presumption in favor of allowing suit and made clear that the suit should be allowed unless the statute evinces discernible congressional intent to preclude review."), *rev'd sub nom. Michigan v. EPA*, 135 S.

Ct. 2699 (2015).  "In other words, the test is mainly concerned with *which* private party may sue to challenge an agency action, not whether *any* party may sue at all."  *Id.* (emphasis in original).

Plaintiffs are proper parties to challenge the Defendants' violation of the 2019 CAA.  *See First Nat. Bank & Tr. Co. v. Nat'l Credit Union Admin.*, 988 F.2d 1272, 1275 (D.C. Cir. 1993) (parties who are "suitable challengers to [a] statute because their interests coincide with the interests which Congress did intend to protect" satisfy zone of interests test) (internal quotation omitted).

 Defendants' arguments to the contrary ignore the context in which the 2019 CAA was passed, and fail to address the specific harms to Plaintiffs' property, business, cultural, and recreational interests caused by the Defendants' flouting of the Act.  *See Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 401 (1987) (zone of interests analysis must consider "overall context" and "overall purposes" of congressional action); *see also Indian River Cty., Fla. v. U.S. Dep't of Transp.*, 2019 WL 6972874, at *9 (D.C. Cir. Dec. 20, 2019) (holding that because county's "environmental and safety concerns are matters of the sort that DOT surely will have 'in mind' when exercising its authority" to allocate tax-exempt bonds pursuant to a statute in the Internal Revenue Code, county's "asserted interests at least arguably fall within the zone-of-interests protected by [the statute]").

Following the longest government shutdown in U.S. history, Congress passed and the President signed the 2019 CAA, which provided $1.375 billion—a fraction of the $5.7 billion requested by the President—for border barrier construction limited to the Rio Grande Valley and subject to other restrictions.  Pub. L. No. 116-6, §§ 230-32, 113 Stat. 197 (2019).  In addition to the location and design limitations set out in Sections 230-232, Section 739 of the 2019 CAA provided that

> [n]one of the funds made available in this or any other appropriations Act may be used to increase, eliminate, or reduce funding for a program, project, or activity as proposed in the President's budget request for a fiscal year until such proposed change is subsequently enacted in an appropriation Act, or unless such change is made pursuant to the reprogramming or transfer provisions of this or any other appropriations Act.

Pub. L. No. 116-6, § 739, 113 Stat. 13 (2019).  Through the actions challenged here, Defendants have increased funding for border wall construction by billions of dollars using money that Congress appropriated for other purposes, and will use those funds to construct border wall outside of the Rio Grande Valley.  The overall context and purpose of the 2019 CAA clearly show that Congress considered the impacts of building additional barriers along the southern border—including in areas where Plaintiffs reside, work, worship, and recreate—and prohibited the very actions that Defendants now take.  Plaintiffs' interests coincide with the interests that Congress intended to protect in the 2019 CAA and are thus "suitable challengers" to Defendants' coordinated funding plan that increases border wall spending beyond amounts appropriated for that purpose.  *See First Nat. Bank.*, 988 F.2d at 1275.

The D.C. Circuit's decision in *Scheduled Airlines Traffic Offices, Inc. v. Dep't of Def.*, 87 F.3d 1356, 1360 (D.C. Cir. 1996), is instructive here.  In *Scheduled Airlines*, the Court found that an individual plaintiff "arguing that its competitors are benefitting from an agency's scheme to raise money at Treasury's expense" was within the zone-of-interests of the Miscellaneous Receipts Act, a statute intended to benefit the "public fisc and Congress's appropriation power." 87 F.3d at 1360.  The Court determined that Congress' objective in enacting that statute "was primarily to ensure that [certain] expenses resulted from proper appropriations, rather than depending on the whims of executive branch officials." *Id*. at 1359-60.  Nonetheless, the Court found that the plaintiff was a "suitable challenger[ ] to enforce the statute" because its interests were "sufficiently congruent with those of the [Treasury's]" and that the plaintiff was not more

14

likely to frustrate than to further . . . statutory objectives." *Id*. at 1360 (alteration in original, internal quotations omitted).

The *Scheduled Airlines* court noted that the funds at issue there were either "covered by the statute or they are not"; thus, there was a "statutory demarcation" that made it impossible for the plaintiff's interests to diverge from the statute's, and the court ran "[no] risk that the outcome could . . . in fact thwart the congressional goal." *Id*. 1360-61 (alteration in the original, internal quotations omitted). The same is true here. It is not possible for Plaintiffs' interests to diverge from those of the 2019 CAA, even if, as Defendants contend, the 2019 CAA is nothing more than "a directive from Congress to Executive agencies setting forth the specific amounts and purposes for which appropriations may be spent." [6] *See* Defs'. Suppl. Mem. 13 (Dkt. 67). Either Congress placed a limit on funds that can be used for border wall construction or it did not. There is no risk that the outcome of this case could thwart Congress's goal in "setting forth specific amounts and purposes for which appropriations may be spent." *See id*.

The 2019 CAA expresses Congress's deliberate appropriations decision. Congress has an interest in ensuring that its appropriations decisions are duly executed. Because Plaintiffs' interests align with Congress's interest, Plaintiffs are within the zone of interests of the CAA. Although Congress's attempts to assert its appropriation authority have been unsuccessful,[7]

---

[6] For this same reason, Plaintiffs' interests "coincide systematically" with the 2019 CAA. *See Twin Rivers Paper Co. LLC v. Sec. & Exch. Comm'n*, 934 F.3d 607, 616 (D.C. Cir. 2019); *see also First Nat. Bank & Tr. Co.*, 988 F.2d at 1278.

[7] On February 26, 2019, the House of Representatives passed a resolution pursuant to the National Emergencies Act to terminate the President's declaration of emergency. H.J. Res. 46, 116th Cong. (2019). In the Senate, a bipartisan majority likewise voted 59-41 to terminate the President's declaration of emergency. On March 15, 2019, President Trump vetoed the disapproval resolution. Six months later, on September 25, 2019, the Senate again approved a bipartisan resolution to disapprove the emergency. S.J. Res. 54, 116th Cong. (2019). On September 27, the House passed this resolution as well. *See also House of Representatives v. Mnuchin*, 379 F. Supp. 3d 8 (D.D.C. 2019).

Plaintiffs are suitable challengers to Defendants' violations of the 2019 CAA.  *See House of Representatives v. Mnuchin*, 379 F. Supp. 3d 8, 22 (D.D.C. 2019) (noting the availability of actions by private litigants, including Plaintiffs in this case, asserting that the President's declaration of national emergency and use of § 284 and § 2808 to build the wall violate the Appropriations Clause and the 2019 CAA).

## IV.   PLAINTIFFS' INTERESTS WOULD FALL WITHIN THE ZONE OF INTERESTS OF 10 U.S.C. § 2808, 10 U.S.C. § 284, AND 31 U.S.C. § 9705.

As argued above, Plaintiffs are not required to show that they fall within the zone of interests of the statutes Defendants that cite in defense of their actions.  *Supra*, 5.  Even if there were such a requirement, the Supreme Court has emphasized that the zone of interests test "forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians*, 567 U.S. at 225 (internal quotations and citation omitted).  Moreover, the zone of interests test is not "especially demanding" with respect to matters arising under the APA, and "the benefit of any doubt goes to the plaintiff."  *Id.* (citation omitted).  Finally, the Supreme Court has "consistently held that for a plaintiff's interests to be arguably within the 'zone of interests' to be protected by a statute, there does not have to be an 'indication of congressional purpose to benefit the would-be plaintiff.'"  *Nat'l Credit Union Admin. v. First Nat. Bank & Tr. Co.*, 522 U.S. 479, 492 (1998) (citation omitted).  Under this "low bar," Plaintiffs easily fall within the zone of interests of 10 U.S.C. § 2808, 10 U.S.C. § 284, and 31 U.S.C. § 9705.  *See Cook*, 737 F.3d at 771 (Kavanaugh, J.).

A.      Plaintiffs fall within the zone of interests of § 2808.

The President has invoked 10 U.S.C. § 2808 as the source of his authority to spend $3.6 billion on wall construction, Am. Compl. ¶ 69, but Congress expressly limited that statute to undertakings that 1) respond to a national emergency "that requires use of the armed forces," and 2) are "military construction projects" that "are necessary to support such use of the armed forces."  10 U.S.C. § 2808.  "[P]residents have only invoked Section 2808 twice since it was enacted in 1982," and "a president has never before invoked Section 2808 to secure funding for projects that Congress specifically declined to fund in its appropriations judgment." *California v. Trump*, 407 F. Supp. 3d 869, 878 (N.D. Cal. 2019) (citations omitted).  Plaintiffs need not point to any "indication of congressional purpose to benefit" them to fall within the statute's zone of interests, *Nat'l Credit Union Admin.*, 522 U.S. at 492, and no court has held that a plaintiff's property, business, cultural, and recreational interests necessarily fall outside of Section 2808's zone of interests.

The D.C. Circuit's decision in *Patchak v. Salazar*, 632 F.3d 702 (D.C. Cir. 2011), *aff'd and remanded sub nom. Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209 (2012), is helpful in discussing why Plaintiffs would fall within Section 2808's zone of interests.  *Patchak* concerned a challenge to the Secretary of Interior taking land into trust under the Indian Reorganization Act, which allows for the acquisition of property "for the purpose of providing land for Indians," so the Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians could develop the property for gaming.  *Id*. at 706 (citation omitted).  Significantly, the plaintiff in *Patchak* was not a member of an Indian tribe, nor did he have any property interest in the land at issue.  *Id*. at 705.  Rather, the plaintiff was a nearby landowner who "alleged that the rural character of the area would be destroyed, that the value of his property would be diminished and that he would lose the enjoyment of the agricultural land surrounding the casino

17

site." *Id*. at 707.  The Department of Interior argued that because the Indian Reorganization Act is "not concerned with the interests that Patchak asserts" but is instead designed to "give the Indians the control of their own affairs and of their own property," that Patchak falls outside of the zone of interests of the Act.  *Id*. at 705.  The D.C. Circuit disagreed, holding that "Patchak did not have to show that the Indian Reorganization Act was meant to benefit those in his situation. . . .  the analysis focuses, not on those who Congress intended to benefit, but on those who in practice can be expected to police the interests that the statute protects."  *Id.*  The D.C. Circuit found that the plaintiff's "stake in opposing the Band's casino is intense and obvious," bringing him within the zone of interests of the Indian Reorganization Act.  *Id*. at 707 ("The zone-of-interests test weeds out litigants who lack a sufficient interest in the controversy, litigants whose 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.' Patchak is surely not in that category.") (internal citation omitted).  The Supreme Court agreed. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians*, 567 U.S. at 227 (considering impacts of implementing the statute in zone of interests test).

Plaintiffs here allege no emergency exists at the southern border that requires use of the armed forces, and that any building of border barriers is, therefore, unnecessary and unauthorized.  *See* Pls. Opp. to Mot. to Dismiss 71-74 (Dkt. 39).  Moreover, Plaintiffs allege that the impact of Defendants' use of funds under Section 2808 to construct a border wall would, among other things, destroy ecosystems along the border, Am. Compl. ¶¶ 98-104, 122-124; damage and diminish the value of their property, *id.* ¶¶ 111-113; impede their scientific and community-based activities and frustrate their organizational missions; *id.* ¶¶ 107-109; 125-31; and impair their use and enjoyment of their own properties; *id.* ¶¶111-113, 122-124.  Under

*Patchak* and *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians*, Plaintiffs easily fall

within the zone of interests of Section 2808.[8]  Defendants' attempts to distinguish *Match-E-Be-*

*Nash-She-Wish Band of Pottawatomi Indians* on the grounds that Section 2808 "make[s] no

mention of any issues at all related to environmental or recreational concerns," Defs.' Suppl.

Mem. 9 (Dkt. 67), ignores the reasoning on which the Supreme Court affirmed the D.C. Circuit's

decision: the statute does not have to contemplate the specific impacts that may directly result

from application of the statute in order for a plaintiff experiencing those impacts to fall within

the zone of interests of the statute.  As the Supreme Court explained, "the Secretary will typically

acquire land with its eventual use in mind, after assessing potential conflicts that use might

create. . . .  And so neighbors to the use (like Patchak) are reasonable—indeed, predictable—

challengers of the Secretary's decisions: Their interests, whether economic, environmental, or

aesthetic, come within [the statute's] regulatory ambit."  Likewise, § 2808 allows the Secretary

of Defense to reprogram funds for the construction of military installations.  Neighbors to these

military installations—indeed landowners whose property the Department of Defense seizes for

such construction—are reasonable and predictable challengers to the Secretary of Defense's

decisions.  Regardless of whether Section 2808 mentions environmental or recreational concerns,

the severe and direct impact of Defendants' use of Section 2808 funds to build border wall on

and near Plaintiffs' properties satisfies the zone of interests inquiry.

---

[8] The Court should not accept Defendants' invitation to read Section 2808's "notwithstanding" clause as an implicit limitation on the availability of judicial review.  Defs. Suppl. Br. 9-10 (Dkt. 67).  Defendants' position is essentially that no one is within the zone of interests of Section 2808, but "the agency bears a heavy burden in attempting to show that Congress prohibited all judicial review of the agency's compliance with a legislative mandate."  *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 486 (2015) (quotation and alteration marks omitted).  Defendants have not met that burden here.

B.    Plaintiffs fall within the zone of interests of § 284.

For reasons similar to those stated for Section 2808, Plaintiffs fall within the zone of interests of 10 U.S.C. § 284; tellingly, Defendants spend only a short paragraph arguing otherwise.  Defs. Suppl. Br. 10-11 (Dkt. 67).  In enacting 10 U.S.C. § 284, Congress authorized the Secretary of Defense to provide various forms of small-scale support to law enforcement agencies, such as the "construction of roads and fences and installation of lighting to block drug smuggling corridors across international boundaries of the United States."  *Id*. § 284(b)(7).  Citing Section 284, Defendants plan to spend $2.5 billion on border barriers in excess of what Congress appropriated for that purpose.  Am. Compl. ¶ 89.  Because of the negative impacts of that unauthorized border wall construction to Plaintiffs' interests, Plaintiffs fall within the zone of interests of Section 284.  *See supra*, IV, A.

C.    Plaintiffs fall within the zone of interests of § 9705.

Congress established the Treasury Forfeiture Fund to permit the use of forfeited funds for specifically delineated law enforcement purposes relating to the seizure and forfeiture program.  *See* 31 U.S.C. § 9705(a).  Section 9705(g)(4)(B) provides that after required reserves and required transfers, "any unobligated balances remaining in the Fund . . . shall be available to the Secretary . . . for obligation or expenditure in connection with the law enforcement activities of any Federal agency. . . ." 31 U.S.C. § 9705(g)(4)(B).  Any expenditure "in excess of $500,000 with respect to an unobligated balance described in subparagraph (B) may not be made by the Secretary unless the Appropriations Committees of both Houses of Congress are notified at least 15 days in advance of such obligation or expenditure."  *Id.* § 9705(g)(4)(C).

On January 8, 2020, Defendants filed a notice confirming their use of Treasury Forfeiture Funds to fund border wall construction and provide additional detail regarding whether and how those funds would be spent.  Notice Regarding Use of the Treasury Forfeiture Fund (Dkt. 68).

Specifically, $11 million will be used to fund a contract option that will increase the height of a planned segment of barrier in Starr County (RGV 09) from 18 to 30 feet, *see* Decl. of Loren Flossman 3-4 (Dkt. 68-1); $113 million will be used to fund an additional 10 miles of barrier in Hidalgo and Cameron Counties, a portion of which will be located within half a mile of the Eli Jackson Cemetery, *see id.* at 4, 10; and $216 million will be used in the RGV sector to fund cost overruns on projects funded with the 2019 appropriation, *id.* at 4.  Because of the negative impacts of the unauthorized use of these funds for border wall construction on or adjacent to the Jackson Ranch Church and Cemetery and the Eli Jackson Cemetery, Plaintiffs fall within the zone of interests of Section 9705.

## CONCLUSION

For the above reasons, as well as those set forth in Plaintiffs' prior briefing and at oral argument, Defendants' motion to dismiss should be denied.

Respectfully submitted this 17th day of January, 2020.

*/s/ Sarah H. Burt*
SARAH H. BURT
California Bar No. 250378
(appearing under LCvR 83.2(c)(1))
Earthjustice
50 California Street, Suite 500
San Francisco, CA 94111
Tel: (415) 217-2000
Fax: (415) 217-2040
sburt@earthjustice.org

*/s/ Tania Galloni*
TANIA GALLONI
Florida Bar. No. 619221
(appearing under LCvR 83.2(c)(1))
Earthjustice
4500 Biscayne Blvd., Ste 201
Miami, FL 33137
Tel: (305) 440-5432
tgalloni@earthjustice.org

21

*/s/ Marisa C. Ordonia*
Marisa C. Ordonia
Washington Bar No. 48081
(appearing under LCvR 83.2(c)(1))
Earthjustice
705 Second Avenue, Suite 203
Seattle, WA 98104-1711
Ph.: (206) 343-7340
Fax: (206) 343-1526
mordonia@earthjustice.org

*/s/ Gordon E. Sommers*
GORDON E. SOMMERS (D.C. Bar No. 1034060)
Earthjustice
1625 Massachusetts Ave., NW, Suite 702
Washington, DC 20036
gsommers@earthjustice.org
Tel: 202-667-4500
Fax: 202-667-2356
gsommers@earthjustice.org

*Counsel for Plaintiffs Rio Grande International Study Center, Ramiro R. Ramirez, the Carrizo/Comecrudo Nation of Texas, Elsa Hull, Joseph Hein, Labor Council for Latin American Advancement, California Wilderness Coalition, and GreenLatinos.*