|  |  |
|---|---|
| **CENTER FOR BIOLOGICAL DIVERSITY**, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> **DONALD J. TRUMP**, *et al.*, <br><br> Defendants. | Case No. 1:19-cv-00408 (TNM) |
| **RIO GRANDE INTERNATIONAL STUDY CENTER**, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> **DONALD J. TRUMP**, *et al.*, <br><br> Defendants. | Case No. 1:19-cv-00720 (TNM) |

## <u>MEMORANDUM OPINION</u>

A year ago, the President asked Congress to allocate $5.7 billion to build 253 miles of barriers along the Nation's southern border. CBD Am. Compl. ¶ 93 ("CBD Compl."), CBD ECF No. 16; RGISC Am. Compl. ¶ 53 ("RGISC Compl."), RGISC ECF No. 33. After extensive negotiations and a 35-day Government shutdown, Congress responded by appropriating only $1.375 billion in the 2019 Consolidated Appropriations Act to construct a wall in one sector of the southern border. Pub. L. No. 116-6, div. A, 133 Stat. 13 (2019). The Administration then turned to alternative sources of funding.

Plaintiffs—who include nonprofit organizations, residents along the southern border, and the Carrizo/Comecrudo Nation of Texas—filed two lawsuits claiming that the Administration's

alternative means of funding are unlawful. The Government moved to dismiss both cases under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. Defs.' CBD Mot. Dismiss ("Defs.' CBD Mot."), CBD ECF No. 22; Defs.' RGISC Mot. Dismiss ("Defs.' RGISC Mot."), RGISC ECF No. 34. The Court held joint oral argument on these motions and now addresses the Government's motions together.[1] For the reasons explained below, the Court will grant in part and deny in part the Government's Motions to Dismiss.

## I. BACKGROUND

At the beginning of 2019, the Department of Homeland Security ("DHS") started reporting an "unprecedented" increase in illegal crossings along the United States' southern border. *See* Letter from Secretary of Homeland Security Kirstjen M. Nielsen to the U.S. Senate and House of Representatives (Mar. 28, 2019), https://www.dhs.gov/sites/default/files/ publications/19_0328_Border-Situation-Update.pdf ("Nielsen Letter"). In 2018, DHS reported "apprehending 50,000–60,000 migrants a month." *Id.* But in February 2019, it "apprehended or encountered more than 75,000, the highest in over a decade." *Id.*

The rapid surge of migrants included an increase in "vulnerable populations." *Id.*; *see also* Press Release, U.S. Customs and Border Protection ("CBP"), CBP Releases Fiscal Year 2019 Southwest Border Migration Stats (Mar. 5, 2019), https://www.cbp.gov/newsroom/national-media-release/cbp-releases-fiscal-year-2019-southwest-border-migration-stats (reporting a 300% increase in 2019 of the number of family units crossing the southwest border). But CBP also reported that it arrested a higher number of criminal migrants with outstanding warrants and seized larger quantities of illegal drugs than in previous

---

[1] The Court also received supplemental briefing from the parties on whether Plaintiffs met the zone of interests test for their claims. *See* CBD ECF Nos. 48, 49, 51; RGISC ECF Nos. 67, 69, 71. Although this Opinion discusses the two cases together, the Court has carefully considered the arguments and factual allegations made by the individual Plaintiffs and addresses them separately as necessary below.

years.  *See* U.S. Customs and Border Protection, CBP Enforcement Statistics FY 2019, https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics-fy2019.

This extraordinary influx of migrants placed an enormous strain on DHS's resources. DHS reported that its "facilities [were] overflowing, agents and officers [were] stretched too thin, and the magnitude of arriving and detained aliens ha[d] increased the risk of life-threatening incidents."  *See* Nielsen Letter.  This drain on DHS's resources forced them to "begin releasing large numbers of aliens."  *Id.*  It feared it was facing a "system-wide meltdown."  *Id.*

Still, Congress's 2019 Consolidated Appropriations Act ("CAA") allocated only $1.375 billion to construct a border wall within the Rio Grande Valley Sector.  *See* CAA § 230(a).  It attached geographic restrictions to this appropriation, CAA § 231, and required DHS to "confer" with "local elected officials" in affected areas "[p]rior to use of any funds" appropriated in the CAA "for the construction of physical barriers" within the cities in the Rio Grande Valley Sector, CAA § 232.  Though this appropriation fell far short of the President's request, he signed the CAA into law.  *See* CBD Compl. ¶ 117; RGISC Compl. ¶ 65.  But that was not all he did.

That same day, the President issued a Proclamation declaring that "a national emergency exists at the southern border of the United States."  *See* Presidential Proclamation on Declaring a Nat'l Emergency Concerning the S. Border of the United States ("Proclamation"), 84 Fed. Reg. 4949 (Feb. 20, 2019).  The Proclamation explained that the southern border "is a major entry point for criminals, gang members, and illicit narcotics."  *Id.*  Since the situation at the border has "worsened in certain respects in recent years," the President proclaimed that the border situation "threatens core national security interests" and makes it "necessary for the Armed Forces to provide additional support to address the crisis."  *Id.*  Based on this finding, the

Proclamation authorized the Secretary of Defense to exercise his authority under 10 U.S.C. § 2808 to respond to the national emergency. *Id.*

Section 2808 is one of several statutes that the President may invoke upon declaration of a national emergency that invests executive officials with special authority to address that emergency.[2] *See* 10 U.S.C. § 2808; 50 U.S.C. § 1631. Under § 2808, the Secretary of Defense "may undertake military construction projects" or authorize the military departments to undertake military construction projects "without regard to any other provision of law." *See* 10 U.S.C. § 2808(a). But the statute contains two prerequisites: (1) that the national emergency "requires use of the armed forces"; and (2) that the military construction projects are "necessary to support such use of the armed forces." *Id.* Following the Proclamation, the Secretary of Defense invoked his § 2808 powers to authorize use of $3.6 billion in "unobligated military construction funds" for eleven border wall projects in California, Arizona, New Mexico, and Texas. *See* Notice of Decision by the Department of Defense to Authorize Border Barrier Projects Pursuant to 10 U.S.C. § 2808 ("2808 Notice") at 2, CBD ECF No. 37; RGISC ECF No. 49.[3]

The Administration also published a "fact sheet" identifying additional sources of funding for border wall construction. CBD Compl. ¶ 91; RGISC Compl. ¶ 69. This included:

a) $601 million from the Department of Treasury's Treasury Forfeiture Fund ("TFF"), 31 U.S.C. § 9705(g)(4)(B), *see* CBD Compl. ¶ 1; RGISC Compl. ¶ 69; and

b) $2.5 billion from the Department of Defense's ("DoD") fund for "Support for Counterdrug Activities," 10 U.S.C. § 284. The Defense Secretary transferred these funds

---

[2] The Proclamation also granted executive officials authority under 10 U.S.C. § 12302 to order members of the Ready Reserve to active duty. *See* Proclamation; 10 U.S.C. § 12302.

[3] All page citations refer to the pagination generated by the Court's CM/ECF system.

to the counterdrug account using his "general transfer" authority under § 8005 of the 2019 Department of Defense Appropriations Act.  CBD Compl. ¶ 1; RGISC Compl. ¶ 89.

**Treasury Forfeiture Fund.**  The TFF collects proceeds from "seizures and forfeitures made pursuant to any law."  31 U.S.C. § 9705(a).  Section 9705 allows the Treasury to make specific uses of those proceeds.  *See id.*  Under the TFF, the Treasury Secretary may allocate "unobligated balances" remaining in the fund to any "obligation or expenditure in connection with the law enforcement activities of any Federal agency."  31 U.S.C. § 9705(g)(4)(B).  In January 2020, CBP announced that it would allocate $340 million of TFF funds to border barrier projects in the Rio Grande Valley Sector in Texas and another $261 million to "real estate planning activities for future year barrier construction . . . along the southwest border."  *See* Notice Regarding Use of the Treasury Forfeiture Funds 1–2, RGISC ECF No. 68 ("TFF Notice").

**10 U.S.C. § 284**.  Under § 284, the DoD can, when requested, "provide support for the counterdrug activities . . . of any other department or agency of the Federal Government," 10 U.S.C. § 284(a), including "[c]onstruction of roads and fences and installation of lighting to block drug smuggling corridors across international boundaries of the United States," 10 U.S.C. § 284(b)(7).  In November 2019, DHS requested DoD help block eleven drug-smuggling corridors.  Defs.' RGISC Mot. at 35–36.  DoD responded by approving six border barrier projects.  *Id.* at 36.

**Department of Defense Appropriations Act, § 8005.**  The DoD funded these § 284 projects, in part, by authorizing transfer of $2.5 billion from other DoD appropriations to its counterdrug account through its general transfer authority under § 8005 of the 2019 Department of Defense Appropriations Act.  *See* Defs.' Notice of Statement 5, CBD ECF No. 26-2.  This

general transfer authority permits DoD to transfer funds to "higher priority items, based on unforeseen military requirements, than those for which originally appropriated and in no case where the item for which funds are requested has been denied by the Congress." Pub. L. No. 115-245, 132 Stat. 2981 (2018).

The Center for Biological Diversity ("CBD") and two other nonprofit organizations sued, arguing that the President's Proclamation was *ultra vires* and that the Federal Defendants' actions under §§ 2808 and 8005 violate the CAA, the Administrative Procedure Act ("APA"), and the Constitution, or alternatively, are *ultra vires* acts. *See generally* CBD Compl. The Rio Grande International Study Center ("RGISC")—along with three residents who live along the border, the Carrizo/Comecrudo Nation, and three nonprofit organizations—separately sued alleging that the President and executive officials' acts under the National Emergency Act, §§ 2808, 284, and 9705 were unconstitutional and *ultra vires* or, in the alternative, violations of the APA and the CAA.[4] *See generally* RGISC Compl.

*      *      *

Plaintiffs are not the first to raise these challenges. Twice in the last year, other federal district courts have granted injunctions against the Administration over similar allegations involving the border wall, only to have those injunctions swiftly stayed by higher courts.

In the Northern District of California, the Sierra Club alleged that the Administration's plans to fund border barrier construction "(1) violate Congress's most-recent appropriations legislation, (2) are unconstitutional, (3) exceed Defendants' statutory authority—in other words,

---

[4] Unless otherwise noted, "CBD" refers to all Plaintiffs in *Center for Biological Diversity, et al. v. Trump et al.*, 19-cv-00408: Center for Biological Diversity, Defenders of Wildlife, and the Animal Legal Defense Fund. "RGISC" refers to all Plaintiffs in *Rio Grande International Study Center, et al. v. Trump et al.*, 19-cv-00720: Rio Grande International Study Center, Ramiro R. Ramirez, Carrizo/Comecrudo Nation of Texas, Elsa Hull, Joseph Hein, Labor Council for Latin American Advancement, California Wilderness Coalition, and GreenLatinos.

are *ultra vires*—and (4) violate NEPA [the National Environmental Policy Act]." *Sierra Club v. Trump*, 379 F. Supp. 3d 883, 908 (N.D. Cal. 2019). The district court granted Sierra Club a preliminary injunction on its claim "that the reprogramming of $1 billion under Section 8005 to the Section 284 account for border barrier construction [was] unlawful." *Id.* at 918. The Government, it concluded, had failed to prove that the border wall was a project that met the statutory requirements of § 8005. *Id.* at 912–15.

But the court refused to grant a preliminary injunction against the DoD's use of § 2808. *Id.* at 921–22. Sierra Club failed to show a likelihood of irreparable harm, since DoD had not yet identified where it would use § 2808 funds for border wall construction. *Id.* The court also rejected Sierra Club's claim that DHS's NEPA waivers were invalid, finding that DHS could waive NEPA requirements, even if funding for DHS projects came through the DoD. *Id.* at 922–23. The district court later granted partial summary judgment for Sierra Club and issued an injunction on Sierra Club's § 8005 claim. *Sierra Club v. Trump*, No. 19-cv-00892, 2019 WL 2715422, at *3 (N.D. Cal. June 28, 2019). It decided that its ruling "obviate[d] the need to independently assess the lawfulness of Defendants' invocation of Section 284." *Id.*

The Government sought an emergency stay of this injunction, which the Ninth Circuit, over the vigorous dissent of Judge N. Randy Smith, denied. *Sierra Club v. Trump*, 929 F.3d 670, 677 (9th Cir. 2019). The majority opinion characterized Sierra Club's claim as "at its core, one alleging a constitutional violation[.]" *Id.* at 688–89. Sierra Club alleged that the Government had no authority under § 8005 to reprogram DoD funds for border wall construction. *Id.* at 689. If this proved true, it meant "Defendants [were] acting outside of any statutory appropriation and [were] therefore spending funds contrary to Congress's appropriations decisions" in contravention of the Constitution's Appropriations Clause. *Id.* In other words, a statutory

violation was a *de facto* constitutional violation. Under this theory, the court concluded that Sierra Club had two avenues to challenge the Government's actions: either "through an equitable action to enjoin unconstitutional official conduct" or through the APA.[5] *Id*. at 694. The panel agreed with the district court's conclusion that DoD could not reprogram funds through § 8005 and found that DoD's attempt to "spend these funds therefore violates the Appropriations Clause[.]" *Id*.

In dissent, Judge Smith criticized the majority for "turning every question of whether an executive officer exceeded a *statutory* grant of power into a *constitutional* issue." *Id*. at 707 (N.R. Smith, J., dissenting) (emphasis in original). According to Judge Smith, the panel invented a constitutional violation where none existed. Relying on *Dalton v. Specter*, 511 U.S. 462 (1994), he explained that a claim that an executive official violated a statute is *statutory*, not constitutional. *Id*. at 709–12. Sierra Club's claim "entirely rises or falls on whether the DoD complied with the limitations in § 8005." *Id*. at 710. To treat this as a constitutional violation "would turn our current system of administrative review on its head, directing courts in this circuit to deem *unconstitutional* any reviewable executive actions . . . that exceed a *statutory* grant of authority." *Id*. at 712 (quoting *Dalton*, 511 U.S. at 472) (emphasis and alteration in original).

Treating the claim as statutory rather than constitutional, Judge Smith concluded that Sierra Club lacked a cause of action to challenge § 8005. *Id*. at 709. It had no implied cause of action under § 8005 because "there is no express suggestion that Congress intended a direct judicial remedy for a § 8005 violation[.]" *Id*. at 712 (cleaned up). It had no APA claim because

---

[5] Since the Ninth Circuit characterized Sierra Club's claim as constitutional, rather than statutory, the court found that Sierra Club fell within the zone of interests of the Appropriations Clause and did not consider whether Sierra Club could separately satisfy the zone of interests test for § 8005. *Sierra Club*, 929 F.3d at 703.

Sierra Club fell outside the zone of interests of § 8005 since the statute only "protects Congress and those who would have been entitled to the funds as originally appropriated" and did not protect Sierra Club's "aesthetic, recreational, and generalized environmental interests." *Id.* at 715. Finally, even if Sierra Club could allege constitutional violations, Judge Smith concluded that it had no equitable constitutional cause of action because "an avenue for challenging the DoD's reprogramming action exists under the APA—just not for these Plaintiffs." *Id.* at 716. The court should thus not "resort to the extraordinary step of implying an equitable cause of action for these Plaintiffs." *Id.*

On appeal, the Supreme Court disagreed with the Ninth Circuit's decision and issued an emergency stay. *Trump v. Sierra Club*, 140 S. Ct. 1, 1 (2019). The Court found that the Government had "made a sufficient showing at this stage that the plaintiffs have no cause of action to obtain review of the Acting Secretary's compliance with Section 8005." *Id.* By granting the stay, the Court implicitly found a fair prospect that it would reverse the decision below.[6]

In another case, El Paso County argued that the Administration's plan to fund border barrier construction "exceed[ed] the Executive Branch's lawful authority under" the CAA, the Appropriations Clause, § 2808, § 284, and the National Emergency Act. *El Paso Cty. v. Trump*, 408 F. Supp. 3d 840, 844 (W.D. Tex. 2019). On summary judgment, the district court relied on the Supreme Court's stay in *Sierra Club* to reject the County's argument "that the DoD Secretary exceeded his statutory authority under § 284," finding the claim "unviable." *Id.* Still, it granted summary judgment for the County and issued an injunction because it concluded that the

---

[6] For the Supreme Court to issue an emergency stay, the petitioner must establish "(1) a reasonable probability that [the] Court will grant certiorari, (2) a fair prospect that the Court will then reverse the decision below, and (3) a likelihood that irreparable harm will result from the denial of a stay." *Maryland v. King*, 567 U.S. 1301 (2012) (cleaned up).

Administration's funding plan "violates the CAA generally and specifically violates § 739."[7]  *Id.* at 856.

Again, the Government sought an emergency stay.  *El Paso Cty. v. Trump*, No. 19-51144, slip. op. at 1 (5th Cir. Jan. 8, 2020).  The Fifth Circuit granted the stay because, "among other reasons, [there was a] substantial likelihood that Appellees lack[ed] Article III standing."  *Id.* at 2.[8]

Plaintiffs now raise many of these same claims in their own challenge to the Government's plan to fund border wall construction.

## II. STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(1), a plaintiff must establish the predicates to jurisdiction, including standing, by a preponderance of the evidence.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  When ruling on this motion, a court must "assume the truth of all material factual allegations in the complaint and construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged."  *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (cleaned up).  If a court determines that it lacks jurisdiction for any claim, it must dismiss that claim.  Fed. R. Civ. P. 12(b)(1), 12(h)(3).

To establish jurisdiction, each plaintiff must meet the "irreducible constitutional minimum of Article III standing: injury-in-fact, causation, and redressability."  *Shaw v. Marriott*

---

[7]  Since resolution of the CAA claim granted the County full relief, the court did not address El Paso County's other constitutional, NEA, and APA claims.  *El Paso Cty.*, 408 F. Supp. 3d at 856.

[8]  Just a few weeks ago, another district court granted the State of Washington's request to enjoin the diversion of funding for construction of a naval base to the border wall.  *See State of Washington v. Trump*, --- F. Supp. 3d ---, No. 2:19-cv-01502, 2020 WL 949934, at *1 (W.D. Wash. Feb. 27, 2020).  It is unclear whether the Government will appeal this decision.

*Int'l, Inc.*, 605 F.3d 1039, 1042 (D.C. Cir. 2010) (internal quotations omitted). Individual plaintiffs must establish that "(i) they have suffered a concrete and particularized injury in fact, (ii) that was caused by or is fairly traceable to the actions of the defendant, and (iii) is capable of resolution and likely to be redressed by judicial decision." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 914 (D.C. Cir. 2015) (internal citations omitted). Organizations too may establish standing either on their own behalves, *id.* at 919, or on behalf of their members, *Interstate Nat. Gas Ass'n of Am. v. FERC*, 494 F.3d 1092, 1095 (D.C. Cir. 2007).

At the motion to dismiss stage, plaintiffs need only "state a plausible claim" that they meet the requirements for standing. *Food & Water Watch*, 808 F.3d at 913 (internal citations omitted). The "plaintiff's burden to demonstrate standing grows heavier at each stage of the litigation." *Osborn v. Visa Inc.*, 797 F.3d 1057, 1063 (D.C. Cir. 2015).

Even if a court has jurisdiction, to survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual allegations that, if true, "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A court must "treat the complaint's factual allegations as true and must grant the plaintiffs the benefit of all inferences that can be derived from the facts alleged." *L. Xia v. Tillerson*, 865 F.3d 643, 649 (D.C. Cir. 2017) (cleaned up). But courts need not accept the truth of legal conclusions or "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). The court must consider only "the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the court] may take judicial notice." *Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017) (alterations in original).

# III. ANALYSIS

## A. Jurisdiction

### 1. All Plaintiffs, except the Labor Council for Latin American Advancement ("LCLAA") and GreenLatinos, plausibly alleged standing.

Before proceeding to the merits of the case, the Court "must satisfy itself that the parties have standing to raise the challenges they advance." *Pub. Citizen v. FTC*, 869 F.2d 1541, 1545 (D.C. Cir. 1989). The Government makes three concessions on Plaintiffs' standing. First, in *Rio Grande International Study Center v. Trump*, the Government concedes that CalWild has "pleaded representational standing on behalf of members who recreate near El Centro Project 1" to challenge the Defense Secretary's use of counterdrug funding under 10 U.S.C. § 284. Defs.' RGISC Reply 23, RGISC ECF No. 47. Next, it admits that RGISC pleaded organizational standing to "challenge the construction of one of the § 2808 projects, Laredo Project 7." Defs.' Suppl. Br. 2–3 ("Defs.' § 2808 Br."), RGISC ECF No. 56. Finally, in *Center for Biological Diversity v. Trump*, the Government does not challenge Plaintiffs' standing to bring any but their § 8005 claim. Defs.' CBD Mot. at 51. The Court agrees with these concessions.

The Government challenges standing for all other Plaintiffs and claims.

#### a. Hull, Ramirez, Hein, and the Carrizo/Comecrudo Nation of Texas have plausibly alleged standing.

RGISC's Complaint alleges that the border wall—funded by the designated statutory authorities—will cause Plaintiffs harm. *See* RGISC Compl. ¶ 105–32. Joseph Hein, the owner of a ranch 20 miles downstream from Laredo, Texas, alleges that CBP's plans to build the border wall in the Laredo Sector would "diminish [his] use and enjoyment of his land, reduce his property's value, and harm his business" since the wall will either cut off access to his ranch's sole water supply or "adversely impact the water quality." RGISC Compl. ¶¶ 110–11. Elsa Hull, a homeowner downstream from Laredo, claims that the wall in the Laredo Sector will "cut

off [her] access to the river, disrupt the wildlife she values observing, increase the risk of damage to her property due to flooding, diminish her use and enjoyment of her land, and reduce her property's value." *Id.* ¶¶ 112–13. Dr. Ramiro Ramirez and the Carrizo/Comecrudo Nation of Texas claim that barrier construction in Hidalgo County, Texas, will desecrate and cut off access to an ancestral cemetery. *Id*. ¶¶ 114–20. These Plaintiffs proffer that a favorable decision from this Court will grant them relief. *See* RGISC Opp'n at 24, 26.

The Government's objections to RGISC Plaintiffs' standing largely rest on the continued uncertainty surrounding the Government's use of the funds from §§ 2808, 284, and the TFF. RGISC alleges that the Government will use funds designated for border barrier construction under these statutes to build barriers in sectors where Plaintiffs or Plaintiffs' members live, work, or recreate. *See* RGISC Compl. ¶¶ 105–32. The Government does not disagree that the wall—if built as RGISC alleges—will injure Plaintiffs. Instead, it responds that there is no evidence that it will use those sources of funding to build the barriers on or near the land used by Plaintiffs. Defs.' RGISC Mot. at 54–57; Defs.' § 2808 Br. at 4–7; Mot. to Dismiss Hr'g Tr. 99:24–100:4 (Dec. 16, 2019).

But Plaintiffs point to authorities that suggest that the border barrier construction in their sectors *cannot* occur, as the Government argues, *without* use of the TFF, § 2808, and § 284. *See* RGISC Opp'n 23, RGISC ECF No. 39. Indeed, that has already proved true.

The Government's designation and use of funds for border wall construction is constantly evolving. In fact, since the Government first moved to dismiss RGISC's case, the Government has filed seven notices advising the Court of updated plans for border barrier funding and construction. *See* RGISC ECF Nos. 46, 49, 51, 55, 59, 68, 70. These changes affect Plaintiffs' standing. The Government's initial motion argued that RGISC and Joseph Hein lacked standing

because the Defense Secretary had not yet decided whether to "undertake or authorize any barrier construction projects under § 2808, let alone a specific project in the Laredo Sector where RGISC operates and where Mr. Hein owns a ranch." Defs.' RGISC Mot. at 59. Two months later, the Government withdrew that argument after the Secretary authorized use of § 2808 funds in Laredo Project 7. Defs.' § 2808 Br. at 2–3.

Similarly, at oral argument, the Government suggested the Court dismiss all claims related to use of the TFF, since CBP had not yet decided where to use those funds. *See* Hr'g Tr. at 99:20–100:9. But, one month later, CBP announced that it would use a portion of the funds in Hidalgo County, a half mile from the Carrizo/Comecrudo Nation's ancestral cemetery. *See* TFF Notice at 2; RGISC Suppl. Br. 25 ("RGISC ZOI Br."), RGISC ECF No. 69.

Plaintiffs' bar at the motion to dismiss stage is low. They must only "plausibly allege" standing. *See Food & Water Watch*, 808 F.3d at 913. Given the quickly evolving nature of the challenged actions, the Court finds that these Plaintiffs have plausibly alleged that they will *likely* suffer injury because of the agency's actions.

This may change at later stages of litigation. A "court's determination that a plaintiff has established standing at the motion to dismiss stage by *alleging* sufficient facts in her pleadings is only the first step, because that finding does not obviate the court's responsibility to ensure that the plaintiff can actually *prove* those allegations when one or both parties seek summary judgment." *Scenic Am., Inc. v. U.S. DOT*, 836 F.3d 42, 48 (D.C. Cir. 2016) (emphasis in original); *see also Cal. Cattlemen's Ass'n v. U.S. Fish & Wildlife Serv.*, 369 F. Supp. 3d 141, 145 & n.3 (D.D.C. 2019).

**b. LCLAA and GreenLatinos lack standing.**

LCLAA and GreenLatinos failed to establish either representational standing or standing in their own right. Neither organization has pleaded a "concrete and demonstratable injury to its activities" to establish its own standing. *See Food & Water Watch, Inc.*, 808 F.3d at 919 (cleaned up); Defs.' RGISC Mot. at 60–64. And neither has alleged facts that any members are harmed by the border wall construction. *See* Defs.' RGISC Mot. at 65–67.

LCLAA and GreenLatinos do not disagree. Rather, they argue that because the Government has conceded that CalWild has standing, this "satisfies the standing inquiry for all of the organizational plaintiffs." RGISC Opp'n at 30. In other words, they do not independently need to show standing.

Not so. Though the D.C. Circuit has stated that "if one party has standing in an action, a court *need not* reach the issue of standing of other parties when it makes no difference to the merits of the case," *see Ry. Labor Execs.' Ass'n v. United States*, 987 F.2d 806, 810 (D.C. Cir. 1993) (emphasis added), that does not mean the Court must give all Plaintiffs an automatic "pass" when one meets the standing requirements. It means that the Court, in its discretion, *need not* analyze standing for each individual plaintiff when it will not affect the case. *Id.* Here, the Court declines to exercise that discretion since LCLAA and GreenLatinos have completely failed to establish organizational standing. These Plaintiffs will be dismissed from the case.

**c. CBD Plaintiffs have standing to challenge the Defense Secretary's action under § 8005.**

The Government suggests that CBD Plaintiffs lack standing to challenge the Secretary of Defense's § 8005 transfer of funds. Defs.' CBD Mot. at 51–53. Plaintiffs cannot show an injury, the Government contends, because they have "no legally protected interest in the transferred funds" and the use of § 8005 "does not directly result in the border barrier

construction Plaintiffs claim will injure them." *Id.* at 52.

Plaintiffs claim no interest in the transferred funds. CBD Opp'n 27, CBD ECF No. 31. Their injury is based on the effects of the border wall construction, not on an entitlement to the DoD funds. They have undoubtedly pleaded that this construction will cause injury. *See* CBD Opp'n Ex. 3, CBD ECF No. 31-3. So the only question is whether the Defense Secretary's § 8005 transfer *caused* this injury.

Plaintiffs' injuries must be "fairly traceable" to Defendants' actions. *Lujan*, 504 U.S. at 560. But that action need not be "the very last step in the chain of causation" for Plaintiffs to have standing. *Bennett v. Spear*, 520 U.S. 154, 168–69 (1997). While it is easier for Plaintiffs to establish standing when an action directly caused their injury, they may still establish causation by showing that "the injury does not result from 'the independent action of some third party not before the court.'" *Exhaustless Inc. v. FAA*, 931 F.3d 1209, 1212 (D.C. Cir. 2019) (quoting *Lujan*, 504 U.S. at 560, 562).

CBD has met that burden. CBD alleges that the Defense Secretary used § 8005 to transfer $2.5 billion from other appropriated DoD funds to the DoD's counterdrug account. *See* CBD Opp'n at 29 (citing Decl. of Kenneth Rapuano ¶¶ 4–5 ("First Rapuano Decl."), Defs.' CBD Mot. Ex. 1, CBD ECF No. 22-1; Second Decl. of Kenneth P. Rapuano ¶¶ 6–7 ("Second Rapuano Decl."), CBD ECF No. 25-1). Then, the next day, he transferred these funds to another account to help DHS with barrier construction using § 284. *Id.* (citing First Rapuano Decl. ¶ 6; Second Rapuano Decl. ¶ 9). The funds that the Defense Secretary routed through the counterdrug account using § 8005 are *directly* traceable to the funds allocated for border wall construction under § 284. Not only was the same amount of money transferred in and out of the counterdrug account within one day, but the Secretary of Defense—who is a named Defendant—

took both actions. *See id.* There is no concern that an independent party took the action that injured Plaintiffs. CBD Plaintiffs, then, have satisfactorily pleaded injury, causation, and redressability to establish standing at the motion to dismiss stage.[9]

**2. The Court Lacks Jurisdiction Over Plaintiffs' *Ultra Vires* Challenges to the President's Emergency Declaration Because They Present Non-Justiciable Political Questions.**

The President declared a national emergency under the National Emergency Act ("NEA"), 50 U.S.C. § 1621. *See* Proclamation. The NEA authorizes the President to declare an emergency to make certain "special or extraordinary" statutory powers available. 50 U.S.C. § 1621. CBD and RGISC each allege that the President's Proclamation was *ultra vires*. According to RGISC, the Proclamation was unlawful because "no colorable emergency within the meaning of the NEA exists to invoke the statute." RGISC Compl. ¶ 135. CBD, on the other hand, concedes that an emergency may exist, but argues that the President exceeded his authority under the NEA because he used that authority "as a political negotiating tactic." CBD Compl. ¶ 149; *see* Hr'g Tr. at 27:21–25. Either way, the Government responds that to resolve these claims, the Court would need to answer a non-justiciable political question. Defs.' CBD Mot. at 43–48; Defs.' RGISC Mot. at 44–48. The Court agrees.

The political question doctrine is a "narrow exception" to the general rule that the "Judiciary has a responsibility to decide cases properly before it, even those it would gladly avoid." *Zivotofsky ex. rel. Zivotofsky v. Clinton*, 566 U.S. 189, 194 (2012) (cleaned up). The doctrine precludes judicial review of claims that "revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221, 230

---

[9] The Government does not argue that CBD's § 8005 claim lacks redressability. The Court agrees that CBD has sufficiently shown that the equitable relief requested would redress its injuries. *See generally* CBD Opp'n Ex. 3.

(1986).  So the availability of judicial review turns not on whether the case concerns political decisions, but on whether the Court must weigh in on "policy choices and value determinations." *Id*.  The Court's analysis, then, must account for not only what political action Plaintiffs challenge, but also what question each Plaintiff raises about that action.  *See bin Ali Jaber v. United States*, 861 F.3d 241, 245 (D.C. Cir. 2017) (quoting *Baker v. Carr*, 369 U.S. 186, 211 (1962)).

In the D.C. Circuit, this analysis proceeds through a three-step inquiry.  *Al-Tamimi v. Adelson*, 916 F.3d 1, 8 (D.C. Cir. 2019).  First, the Court must identify the questions that Plaintiffs' claims raise.  *Id*.  Second, the Court considers whether these issues present a political question by using the factors that the Supreme Court identified in *Baker v. Carr*.  *Id*.  And finally, the Court must determine whether these political questions are "inextricable from the case."  *Id*.  In other words, could the Court resolve the merits of Plaintiffs' claims without weighing in on the political questions?

Because CBD and RGISC take different approaches to challenge the same presidential action—potentially raising different questions about the President's conduct—the Court considers each in turn.

> **a. RGISC's challenge to the President's Proclamation presents a non-justiciable political question.**

The NEA authorizes the President to "declare [a] national emergency."  50 U.S.C. § 1621.  RGISC insists no emergency exists, so the President had no authority to make his Proclamation.  RGISC Compl. ¶ 135.  RGISC's claim raises one obvious question: was the President correct that a national emergency exists at the southern border?

The trouble is that this is a quintessential political question.  Many Presidents have declared national emergencies for many reasons.  For instance, President Clinton invoked the

NEA to prohibit new investment in Burma because of the Burmese government's "large-scale repression of the democratic opposition," Exec. Order No. 13,047, 62 Fed. Reg. 29,301 (May 22, 1997), and to prohibit importation of "all rough diamonds from Sierra Leone" because of Sierra Leone's "flagrant violation of the Lomé Peace Agreement," Exec. Order 13,194, 3 C.F.R. § 13194 (Jan. 18, 2001). President George W. Bush and President Obama used the NEA to block the property of certain persons "contributing to the conflict in Côte d'Ivoire," Exec. Order 13,396, 71 Fed. Reg. 7,389 (Feb. 10, 2006), "undermining democratic processes or institutions in Belarus," Exec. Order 13,405, 71 Fed. Reg. 35,485 (June 20, 2006), "threatening the peace, security, or stability of Yemen," Exec. Order 13,611, 3 C.F.R. § 13611 (May 16, 2012), and "contributing to the situation in Ukraine," Exec. Order 13,660, 79 Fed. Reg. 13,493 (Mar. 10, 2014). President Bush also used the NEA to respond to Hurricane Katrina, Proclamation 7924, 70 Fed. Reg. 54,225 (Sept. 13, 2005), and the 9/11 attacks, Proclamation 7463, 3 C.F.R § 7463 (Jan. 1, 2002). Just last month, President Trump invoked the NEA to declare a national emergency because of the COVID-19 outbreak. Proclamation 9994, 85 Fed. Reg. 15,337 (Mar. 18, 2020). Indeed, the Nation remains under at least 32 national emergencies declared by this and former Presidents. *See generally* Emily E. Roberts, Declarations under the National Emergencies Act, Part 1: Declarations Currently in Effect (Congressional Research Serv., 2019), https://fas.org/sgp/crs/natsec/LSB10252.pdf.

Although presidential declarations of emergencies—including this Proclamation—have been at issue in many cases, *no* court has ever reviewed the merits of such a declaration. *See, e.g.*, Defs.' RGISC Mot. at 44 n.6 (collecting cases in which courts note that the President's declaration of an emergency is unreviewable). In part, this is because the declaration of a national emergency raises questions about national security or foreign policy. And "[m]atters

intimately related to foreign policy and national security are rarely proper subjects for judicial intervention," since the Constitution commits those issues to the Executive and Legislative Branches.  *See Haig v. Agee*, 453 U.S. 280, 292 (1981); *see Baker*, 369 U.S. at 217 (noting that a political question exists when there is a "textually demonstrable constitutional commitment of [an] issue to a coordinate political department").

*Baker*'s second factor even more strongly suggests that this is a political question.  The NEA provides no "judicially discoverable and manageable standards" to help the Court determine whether the situation at the border is a "national emergency."  *See Baker*, 369 U.S. at 217.  The NEA, in relevant part, states:

> With respect to Acts of Congress authorizing the exercise, during the period of a national emergency, of any special or extraordinary power, the President is authorized to declare such national emergency.  Such proclamation shall immediately be transmitted to the Congress and published in the Federal Register.

50 U.S.C. § 1621.  In other words, the statute simply allows the President to declare an emergency to activate special emergency powers created by Congress.  Nothing else guides how the President should make this decision.

RGISC suggests that determining whether the President exceeded his authority under the NEA is a simple matter of statutory interpretation—something that courts routinely do.  RGISC Opp'n at 39.  To be sure, statutory claims are "less likely to present a political question—both because statutory interpretation is generally committed to the judicial branch and because statutory language is likely to include judicially manageable standards."  *Al-Timimi*, 916 F.3d at 12 n.6.

For instance, in *Al-Timimi*, the D.C. Circuit found that a claim under the Alien Tort Statute was justiciable even though the court would need to determine whether Israeli soldiers were committing genocide in a Palestinian village.  *Id.* at 11.  This question touched on intensely

sensitive political issues.  But the court noted that it was a "purely legal issue" capable of judicial review because "[g]enocide has a legal definition."  *Id.*

Though that claim was not barred by the political question doctrine, the court noted that a statutory question *would* raise a non-justiciable political question if it "require[d] the court to make an integral policy choice."  *Id*. at 12 n.6.  For example, previously the Circuit refused to consider an Antiterrorism and Effective Death Penalty Act claim because the court would need to determine whether "terrorist activity 'threatens the security of United States nationals or the national security of the United States,' an element of a claim under the [Act]."  *Id.* (citing *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 843 (D.C. Cir. 2010)) (cleaned up).

Another time, the Circuit declined to resolve a statutory claim under the Federal Tort Claims Act when appellants asked it to determine "whether military action was 'wrongful'"—an element of that statute.  *Id.* (citing *Schneider v. Kissinger*, 412 F.3d 190, 196–97 (D.C. Cir. 2005)).  In those cases, resolving the merits would have required the court to "reconsider[] the wisdom of discretionary decisions made by the political branches in the realm of foreign policy or national security."  *See El-Shifa*, 607 F.3d at 842.  This the judiciary will not do.

So too here.  This Court can no more determine whether illegal border crossings "threaten[] core national security interests and constitute[] a national emergency," *see* Proclamation, than the D.C. Circuit could find that terrorist activity "threatens . . . the national security of the United States."  *Al-Timimi*, 916 F.3d at 12 n.6 (citing *El-Shifa*, 607 F.3d at 843) (cleaned up).  Although RGISC's *ultra vires* claim challenges the President's *statutory* authority, Congress provided no guidance to help courts assess whether a situation is dire enough to qualify as an "emergency."  And with good reason.  *Cf.* The Federalist No. 70, at 231 (Alexander Hamilton) (Benediction Classics, 2017) ("Energy in the Executive is a leading character in the

definition of good government. It is essential to the protection of the community against foreign attacks[.]"). Whether a crisis reaches the point of a national emergency is inherently a subjective and fact-intensive inquiry. Any standard that the Court chose would require it to make "integral policy choices" about this country's national security, immigration, and counterdrug policies.[10]

RGISC's entire claim hinges on whether the Court agrees with the President or RGISC's assessment of the situation along the southern border. Because this political question is inextricable from the merits of RGISC's claim, the Court will dismiss RGISC's NEA claim from Count I of its Complaint.

### b. CBD's challenge to the President's Proclamation presents a non-justiciable political question.

Center for Biological Diversity tries to sidestep the political question doctrine by conceding that the situation at the southern border may qualify as a "national emergency." *See* CBD Opp'n at 48; Hr'g Tr. at 27:21–25. It claims the President's Proclamation is *ultra vires* for a different reason: the President "unlawfully" used his authority under the NEA as a "political negotiating tactic." *See* CBD Compl. ¶ 149. In other words, even if the President's actions fully complied with the NEA's requirements, his asserted reasons were an unlawful pretext for a politically motivated decision.

Though framed differently than RGISC's argument, CBD's claim presents a similar non-justiciable political question. Rather than ask the Court to decide whether the President was *correct* in declaring a national emergency, CBD asks the Court to consider whether the President's motives were pure in declaring the emergency. This again raises a political question

---

[10] The Court will therefore not review any portion of the President's emergency declaration, including his determination that the emergency "requires the use of the armed forces." *See* Proclamation. "In military matters in particular, the courts lack the competence to assess the strategic decision to deploy force or to create standards to determine whether the use of force was justified or well-founded." *El-Shifa*, 607 F.3d at 844.

because of the "'lack of judicially discoverable and manageable standards for resolving' the question." *Zivotofsky*, 566 U.S. at 197 (quoting *Baker*, 369 U.S. at 217).

The NEA nowhere mentions the President's motivations and thus provides no standards for the Court to use to evaluate whether his motivations were "lawful." Yet, citing *Department of Commerce v. New York*, 139 S. Ct. 2551 (2019), CBD suggests that the Court can invalidate an otherwise lawful action if the reasons justifying that action were a "sham." Hr'g Tr. at 22. In *New York*, the Supreme Court engaged in two separate inquiries to determine whether, first, the Secretary of Commerce lawfully added a question to the census questionnaire, and, second, whether his reasons for doing so were pretextual. 139 S. Ct. at 2573. So, CBD argues, even if the emergency declaration itself were lawful, the President's pretextual reasons could supply a separate basis for review. Hr'g Tr. 24:8–14.

What CBD fails to account for is that *New York* arose in the APA context. As the Supreme Court acknowledged in that case, there is a general rule against "inquiring into 'the mental processes of administrative decisionmakers.'" 139 S. Ct. at 2573 (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 409 (1971)). "Judicial inquiry into executive motivation represents a substantial intrusion into the workings of another branch of Government and should normally be avoided." *Id.* (cleaned up). Within the APA context, there is a "narrow *exception* to [this] general rule" where there is a "strong showing of bad faith or improper behavior," since this behavior suggests arbitrary and capricious decisionmaking. *Id.* at 2573–74 (quoting *Overton Park*, 401 U.S. at 420) (emphasis added). But CBD cites nothing to suggest that this exception extends beyond the APA context to *ultra vires* review to allow the Court to second-guess the motives behind declarations of national emergencies.

Just as RGISC is asking the Court to second-guess the President's determination that a national emergency exists, CBD is asking the Court to investigate *why* the President invoked the NEA. As with RGISC's claim, this not only requires the Court to draw standards for "lawful motivations" from whole cloth, but also forces the Court into the realm of discretionary policy decisions. *See Baker*, 369 U.S. at 217 (noting that a political question is present when the court cannot decide an issue "without an initial policy determination of a kind clearly for nonjudicial discretion"). These policy decisions are for the political, not judicial, branches to resolve. "For the judiciary to probe the reasoning which underlies this Proclamation would amount to a clear invasion of the legislative and executive domains." *See United States v. George S. Bush & Co.*, 310 U.S. 371, 380 (1940). The Court will therefore dismiss Count I of CBD's Amended Complaint.

### c. The President will be dismissed as a party.

The Government argues that if the Court dismisses Plaintiffs' NEA claims, President Trump should no longer be a party to this case. Hr'g Tr. at 18:6–12. Both sets of Plaintiffs named the President as a defendant and seek declaratory relief against him. CBD Compl. ¶ 18; RGISC Compl. ¶ 17.

Granting direct relief against the President in any form is an extraordinary measure given the President's unique position in our system of government. *See, e.g.*, *Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996) ("[I]njunctive relief against the President personally is an extraordinary measure not lightly to be undertaken."). And the D.C. Circuit counsels that "[i]n most cases, any conflict between the desire to avoid confronting the elected head of a coequal branch of government and to ensure the rule of law can be successfully bypassed, because the injury at issue can be rectified by injunctive relief against subordinate officials." *Id.*

Plaintiffs admit that is the case here. Though CBD and RGISC could only obtain equitable relief for their NEA claims by suing the President, both parties agree that injunctive and declaratory relief for all their other claims will be available through other Defendants. Hr'g Tr. at 13, 34.

RGISC suggests that despite these alternative avenues to relief, the Court should decline dismissing the President at the motion to dismiss stage. Hr'g Tr. at 33. The Court disagrees.

The Supreme Court has noted repeatedly in the qualified immunity context that officers against whom there is no viable claim should be dismissed at the "earliest possible stage in litigation," *Hunter v. Bryant*, 502 U.S. 224, 227 (1991), so they can avoid the "unwarranted demands customarily imposed upon those defending a long drawn out lawsuit," *Siegert v. Gilley*, 500 U.S. 226, 232 (1991). Pretrial matters, such as discovery, should be avoided if possible, since "inquiries of this kind can be peculiarly disruptive of effective government." *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 817 (1982)).

Though the doctrine of qualified immunity does not apply here, the principles undergirding it are instructive. The doctrine counsels against retaining executive officials in a lawsuit longer than necessary because litigation disrupts "effective government." *Id.* Here also, retaining the President as a defendant, even when all Plaintiffs agree that they can obtain the relief they seek through the other Defendants, prolongs these disruptive effects for no reason. Since Plaintiffs may obtain relief for all remaining claims through the other Defendants, the Court will dismiss the President as a party to this lawsuit. *See Doe v. Trump*, 319 F. Supp. 539, 542 (D.D.C. 2018) (dismissing the President before summary judgment because dismissal would "have little or no substantive effect on this litigation" since "Plaintiffs [could] still obtain all of the relief that they [sought] from the other Defendants").

### 3. The Court Lacks Jurisdiction Over Plaintiffs' NEPA Claims Because the Secretary of Homeland Security Waived NEPA for These Barrier Projects.

The National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). CBD and RGISC allege that the Government violated NEPA by failing to conduct environmental impact reports, solicit public engagement, and properly coordinate between agencies to engage in the "NEPA process." *See* CBD Compl. ¶¶ 182–93; RGISC Compl. ¶¶ 163–68. The Government responds that the Court lacks jurisdiction to hear CBD and RGISC's claims because the Secretary of Homeland Security waived NEPA for the challenged border projects. Defs.' CBD Mot. at 53–55; Defs.' RGISC Mot. at 51–52.

The Court agrees with the Government here. The Secretary waived NEPA for the challenged border wall construction. And because he had the authority to do so under the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"),[11] the Court will dismiss Plaintiffs' NEPA claims. *See N. Am. Butterfly Ass'n v. Nielsen*, 368 F. Supp. 3d 1, 8 (D.D.C. 2019) ("It is undisputed that the DHS Secretary's October 2018 Waiver Determination, if validly exercised, deprives the Court of jurisdiction to hear plaintiff's NEPA . . . claims."); *see also In re. Border Infrastructure Envtl. Litig.*, 915 F.3d 1213, 1221 (9th Cir. 2019) ("[A] valid waiver of the relevant environmental laws under section 102(c) is an affirmative defense to all the environmental claims.").

Through IIRIRA, Congress tasked the Secretary of Homeland Security to "take such actions as may be necessary" to install "physical barriers" on the border "to deter illegal crossings in areas of high illegal entry into the United States." IIRIRA § 102(a). To allow DHS

---

[11] Pub. L. No. 104-208, Div C, Title I, Subtitle A, § 102(a)–(c), 110 Stat. 3009–554 (1996); Pub. L. No. 109–13, Div B, Title I, § 102, 119 Stat. 306 (2005); Pub. L. No. 109–367, § 3, 120 Stat. 2638 (2006); Pub. L. No. 110–61, Div E, Title V, § 564, 121 Stat. 2090 (2007).

to undertake construction expeditiously, Congress gave the Secretary "authority to waive all legal requirements" when he determines it is "necessary to ensure expeditious construction of the barriers[.]"  IIRIRA § 102(c)(1).

DHS requested that the DoD, under § 284, assist with its barrier construction projects, finding this "necessary" to install barriers along the southern border.  *See* First Rapuano Decl. ¶ 3.  Later, relying on his authority under IIRIRA, the Secretary of Homeland Security waived NEPA for those barrier projects.  *See* Determination Pursuant to Section 102 of IIRIRA, 84 Fed. Reg. 17,185–87 (Apr. 24, 2019); 84 Fed. Reg. 21,798–801 (May 15, 2019).

CBD and RGISC contend that these waivers were ineffective because IIRIRA permits the Secretary of Homeland Security to waive "all legal requirements" only for "construction of the barriers . . . *under this section*."  *See* RGISC Opp'n at 52–53 (citing IIRIRA § 102(c)); CBD Opp'n at 58 (same).  Here, they say, DHS is not building barriers under IIRIRA (*i.e.,* "this section").  *See* RGISC Opp'n at 53; CBD Opp'n at 58.  Rather, DoD is constructing barriers under § 284.  *See* RGISC Opp'n at 53; CBD Opp'n at 58.

That is not fully accurate.  DHS is building barriers pursuant to IIRIRA.  So the DHS Secretary is allowed to waive NEPA.  To be sure, DHS is not working alone to erect the barriers envisioned under IIRIRA.  But nothing in the text of the statute orders that it do so.  The statute grants DHS broad authority to "take such actions as may be necessary" to construct the barriers, *see* IIRIRA § 102(a)—which, here, included requesting assistance from DoD.  Congress permits DoD to aid other agencies, like DHS, in constructing "fences . . . to block drug smuggling corridors across international boundaries of the United States."  10 U.S.C. § 284(a), (b)(7).

When these two interests coincide—such as in the sectors where the agencies are using § 284 funding—nothing in IIRIRA prohibits agency cooperation.  Since DHS is constructing

barriers under IIRIRA, though with the aid of DoD, the Secretary was well within his statutory authority to waive NEPA's requirements. The Court thus lacks jurisdiction to review CBD and RGISC's NEPA claims. *Accord N. Am. Butterfly Ass'n*, 368 F. Supp. 3d at 8.

## B. APA Claims

Since the Court has jurisdiction to hear Plaintiffs' remaining claims, the Court now turns to the Government's contention that CBD and RGISC lack a cause of action under the APA. First, the Government argues that Plaintiffs' § 2808 and § 9705 claims fail to meet the APA's threshold requirements for review of agency action. Next, the Government suggests that CBD and RGISC fall outside the zone of interests of all their statutory claims. Finally, the Government urges that Plaintiffs fail to state a claim under the APA. The results here are a mixed bag—the Court will dismiss some of Plaintiffs' APA claims, but others may proceed.

### 1. Plaintiffs' Claims Generally Meet the APA's Threshold Requirements for Review of Agency Action.

Agency action is presumptively reviewable under the APA unless a statute precludes judicial review, the action "is committed to agency discretion by law," or the action is not final. *See Transactive Corp. v. United States*, 91 F.3d 232, 236 (D.C. Cir. 1996) (citing 5 U.S.C. § 701(a)(1), (a)(2)). The Government does not contest that Plaintiffs may use the APA to challenge the agencies' actions under § 284, § 8005, or the CAA (even if it believes these APA claims fail for other reasons, *see infra* III.B.2 & III.B.3). But it does claim that Plaintiffs cannot use the APA to challenge Defendants' authorization of border wall construction under § 2808 and § 9705 because those decisions were "committed to agency discretion by law."[12] *See* Defs.' CBD Mot. at 57–60; Defs.' RGISC Mot. at 69–73.

---

[12] The Government withdrew its argument that no "final agency action" existed for funding under § 2808 once the Defense Secretary allocated those funds to Laredo Sector construction. *See* Defs.' § 2808 Br. at 3.

Consider first § 2808. When a national emergency "requires the use of the armed forces," § 2808 allows the Secretary of Defense to "undertake military construction projects" that "are necessary to support such use of the armed forces." 10 U.S.C. § 2808(a). The Government zeroes in on the phrase "necessary to support . . . armed forces." Defs.' CBD Mot. at 57–59; Defs.' RGISC Mot. at 69–70. It suggests the Court has no "standard to apply," because the Secretary had no factors to consider before authorizing construction. Defs.' CBD Mot. at 58–59; Defs.' RGISC Mot. at 70–71. Determining whether military construction is "necessary," the Government urges, is an "inescapably discretionary judgment." Defs.' RGISC Reply at 36–37; *see also* Defs.' CBD Mot. at 59.

Not so. "The exception for agency action 'committed to agency discretion by law' is a 'very narrow' one, reserved for 'those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply.'" *Hi-Tech Furnace Sys. v. FCC*, 224 F.3d 781, 788 (D.C. Cir. 2000). The Court must weigh whether the statute provides any "statutory reference point" by which it can judge the Secretary's actions. *See Milk Train, Inc. v. Veneman*, 310 F.3d 747, 752 (D.C. Cir. 2002). It considers "both the nature of the administrative action at issue and the language and structure of the statute that supplies the applicable legal standards for reviewing that action." *Sierra Club & Valley Watch, Inc. v. Jackson*, 648 F.3d 848, 855 (D.C. Cir. 2011).

Section 2808 appears to provide several "statutory reference points." For instance, the Court can evaluate whether the border barrier qualifies as "military construction." CBD Opp'n at 55; RGISC Opp'n at 73. Congress defined the phrase "military construction" in § 2801 as "any construction, development, conversion, or extension of any kind carried out with respect to a military installation, whether to satisfy temporary or permanent requirements, or any

acquisition of land or construction of a defense access road."  10 U.S.C. § 2801(a).  Answering whether the border wall qualifies as "military construction," then, is a simple matter of statutory interpretation, something that is well within the judiciary's competence.  *See El-Shifa*, 607 F.3d at 858 n.5.

Neither is the phrase "necessary to support [the] armed forces" so broadly drawn that "there is no law to apply."  *Hi-Tech Furnace Sys.*, 224 F.3d at 788.  Though the Defense Secretary undoubtably has significant discretion under this statute, it is not limitless.  Ultimately, the inquiry into whether something "supports the armed forces" and is "necessary" is objective. Had Congress wished, it could have committed this decision to the Secretary's subjective discretion.  For instance, in *Webster v. Doe*, the Supreme Court determined that a statute was "committed to agency discretion by law," because it "allow[ed] termination of an Agency employee whenever the Director 'shall *deem* such termination necessary or advisable in the interests of the United States', not simply when the dismissal *is* necessary or advisable to those interests."  486 U.S. 592, 600 (1988) (emphasis on original); *see also e.g.*, IIRIRA § 102(c) ("[T]he Secretary of Homeland Security shall have the authority to waive all legal requirements such Secretary, *in such Secretary's sole discretion, determines necessary* to ensure expeditious construction of the barriers and roads under this section." (emphasis added)).  No such language appears in § 2808 committing the decision fully to the Secretary's discretion.

But even if the statute provides "standards to apply," a decision may still be "committed to agency discretion by law," and thus unreviewable, if those standards are not "judicially manageable."  *See Legal Assist. for Vietnamese Asylum Seekers v. Dep't of State*, 104 F.3d 1349, 1353 (D.C. Cir. 1997).  Here, the Government suggests that § 2808's standards are not "judicially manageable" because the statute "calls for sensitive judgments that Congress plainly

intended military officials to make[.]"  Defs.' RGISC Reply at 37; *see also* Defs.' CBD Mot. at 59.  And on this point, the Court agrees.  This portion of Plaintiffs' § 2808 claim does not meet the APA's threshold requirements.

In *NFFE v. United States*, the D.C. Circuit declined to review claims that the Defense Secretary's base closing and realignment decisions were arbitrary and capricious because the Secretary's decisions were "committed to agency discretion by law."  905 F.2d 400, 405 (D.C. Cir. 1990).  Though the court recognized that the Act was not "devoid of criteria"—in fact, the Act provided "nine specific criteria to be considered in making base closing decisions"— "the rub [was] that the subject matter of those criteria is not 'judicially manageable.'"  *Id.*  Evaluating the Secretary's decision would require the court to pass judgment on the "Secretary's assessment of the nation's military force structure and the military value of the bases."  *Id.* at 406.  This, the judiciary is "ill-equipped" to do.  *Id.*; *El-Shifa*, 607 F.3d at 844 ("In military matters in particular, the courts lack the competence to assess the strategic decision to deploy force or to create standards to determine whether the use of force was justified or well-founded.").

Though the Court can objectively determine whether the Defense Secretary is using funds from § 2808 to engage in "military construction" and whether that construction supports the use of the armed forces, the statute lacks *judicially manageable* standards to determine whether the military construction is "necessary."  That decision crosses the line into military policy, since review of that decision "would necessarily involve second guessing the Secretary's assessment of . . . the military value" of the military construction.  *See NFFE*, 905 F.2d at 406.  The Court therefore will not review whether the Secretary erred in determining, under § 2808, that the border barrier construction was "necessary."

Next, the Government suggests that the Treasury Secretary's exercise of authority under § 9705 is "committed to agency discretion by law." It is not. The TFF allows the Treasury Secretary to expend funds "in connection with the law enforcement activities of any Federal agency[.]" *See* 31 U.S.C. § 9705(g)(4)(B). The Government argues that the "broad authority" granted to the Treasury Secretary to administer the TFF precludes judicial review. Defs.' RGISC Mot. at 72–73.

But even if the Secretary's discretion is broad, it is not limitless. Here again, there is a distinction between the Court venturing into areas "committed to agency discretion"—such as how best to use TFF funds—and the Court applying statutory interpretation principles to determine whether the Secretary's actions follow Congress's dictates. The Treasury Secretary may not use TFF funds for any purpose he chooses. It restricted his use of these particular funds to expenditures connected to "law enforcement activities of any Federal agency." 31 U.S.C. 9705(g)(4)(B). "This limitation affords a 'statutory reference point' by which the court is able to review the Secretary's" decision to use TFF funds for border wall construction. *See Milk Train, Inc. v. Veneman*, 310 F.3d 747, 752 (D.C. Cir. 2002). Although the Court cannot venture into whether it was a wise policy choice to use TFF funds to construct the border wall, it can competently determine whether the construction qualifies as "law enforcement activities of any Federal agency."

### 2. Plaintiffs Fall Outside the Zone of Interests of All Challenged Statutes, Except the CAA.

The APA's threshold requirements ensure that an agency action is properly before the Court. The "zone of interests" test ensures that the proper plaintiffs are challenging that agency action. *See Phys. for Soc. Respon. v. Wheeler*, 359 F. Supp. 3d 27, 38 (D.D.C. 2019) ("[T]he [zone of interests] test is mainly concerned with which private party may sue to challenge an

agency action, not whether any party may sue at all."). Here, the Government contends that Plaintiffs are the wrong parties to allege violations of the 2019 Consolidated Appropriations Act and §§ 2808, 284, 9705, and 8005. Defs.' Suppl. Mem. Addressing Zone of Interests 7–14 ("Defs.' ZOI Br."), CBD ECF No. 48; RGISC ECF No. 67. Except for the CAA, the Court agrees. The Court will thus dismiss all APA claims related to §§ 2808, 284, 9705, and 8005.

Not every plaintiff can challenge every agency action. APA review is limited to a plaintiff whose interests "arguably" fall "within the zone of interests to be protected or regulated by the statute that he says was violated." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012) (internal citations omitted). In other words, the Court must consider whether these Plaintiffs' interests "systematically, not fortuitously," align with the interests Congress had "in mind" when enacting these statutes. *Hazardous Waste Treatment Council v. Thomas*, 885 F.2d 918, 924, 927 (D.C. Cir. 1989).

Consider *Hazardous Waste*, where the D.C. Circuit explained that a trade association for hazardous waste treatment companies, HWTC, did not fall within the zone of interests of the Resource Conservation and Recovery Act ("RCRA"). *Id.* at 924. HWTC posited that its interest in more stringent treatment standards aligned with the RCRA's purpose of protecting health and the environment. *Id.* But the Circuit discerned that although HWTC's interests aligned with the statute's in *that* case, this was a fortuitous, not systematic, alignment. *Id.* at 924–25. HTWC's true interest was not in environmental protection—it was "in making money." *Id.* at 924. True, HTWC supported stricter treatment standards in that case, but this was because it was pursuing a regulation that helped it "get[] more revenue by increasing the demand for [its] particular treatment services." *Id.* The Circuit speculated that its interests would *not* align if the EPA pursued regulations under the RCRA that "might be less profitable." *Id.* at 924–25. In other

words, HTWC was not really policing the RCRA's interests. Its monetary interests just happened to coincide momentarily with environmental interests.

Put another way, the zone of interests test requires Plaintiffs to be "reasonable—indeed, predictable—challengers of the Secretary's decisions[.]" *See Match-E-Be-Nash-She-Wish*, 567 U.S. at 227. If their suit is "more likely to frustrate than to further statutory objectives," Plaintiffs cannot fall within the zone of interests. *Hazardous Waste*, 885 F.2d at 922 (quoting *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 397 n.12 (1987)).

### a. Sections 2808, 284, and 9705

Recall that § 2808 allows the Secretary of Defense to authorize military construction during a national emergency. 10 U.S.C. § 2808(a). It permits the Secretary to undertake this construction "without regard to any other provision of law" as long as the construction is "necessary" to support the use of the armed forces. *Id.* This military defense statute, the Government argues, cannot in any way align with RGISC or CBD's environmental, property, business, cultural, and recreational interests. Defs.' ZOI Br. at 10. Instead, the statute seems to disregard those interests by permitting the DoD to undertake military construction even if it means trampling on a host of regulations that would normally protect RGISC's interests. Defs.' ZOI Br. at 9–10.

Likewise, § 284 allows DoD to assist other agencies seeking to "block drug smuggling corridors across international boundaries of the United States." 10 U.S.C. § 284(a), (b)(7). And under § 9705 the Treasury Secretary can allocate the proceeds of forfeited funds to support law enforcement activities. 31 U.S.C. § 9705(g)(4)(B). The Government contends that Plaintiffs have not pointed to anything in these statutes that suggests that Congress meant to protect

environmental, recreational, property, or other interests in the land affected by these transferred funds. *Id*. at 10–13.

Though RGISC seems to acknowledge that these statutes on their face do not reflect its asserted interests, it responds that this is not dispositive.[13] RGISC ZOI Br. at 21. Citing *Patchak v. Salazar*, 632 F.3d 702 (D.C. Cir. 2001), and *Match-E-Be-Nash-She-Wish*, 567 U.S. at 227, RGISC argues that its interest in the property affected by the Secretaries' actions is enough to place it within the statutes' zone of interests. RGISC ZOI Br. at 21–23.

But those cases do not stand for the idea that anyone who experiences adverse effects from agency action will always fall within a statute's zone of interests. Rather, those decisions found that—even though Congress did not *intend* to protect or benefit plaintiffs—their interests aligned with the statute's interests.

Take the Supreme Court's opinion in *Match-E-Be-Nash-She-Wish*. There, the Department of the Interior took property into trust for an Indian tribe to build a casino. 567 U.S. at 211–12. An owner of nearby property, asserting "economic, environmental, and aesthetic harms from the casino's operation," claimed that the "Secretary lacked authority under § 465 to take title to the land." *Id.* at 212. The Government argued that this landowner fell outside the statute's zone of interests because the plaintiff's interests related to the "land's *use* as a casino," while "the statute focuses on land *acquisition*." *Id.* at 225 (emphasis in original). But the Supreme Court disagreed.

The zone of interests test, it explained, simply asks whether the interests raised by the plaintiffs "fall within the zone protected or regulated by the statute." *Id.* at 227 (cleaned up).

---

[13] CBD does not argue that it falls within the zone of interests for §§ 2808, 284, or 8005. Instead, it argues that these statutes are "intertwined" with its claim under the CAA for which, it argues, it does fall within the zone of interests. *See* CBD ZOI Br. at 14–16. The Court will therefore address CBD's arguments separately. *See infra* at III.B.2.c.

Plaintiffs fall outside that zone if their "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id*. at 225 (quoting *Clarke*, 479 U.S. at 399). Turning to the language of that statute, the Court determined that the plaintiff "satisfie[d] that standard, because [the statute] has far more to do with land use than the Government . . . acknowledge[d]." *Id*. at 225–26. In fact, "from start to finish, the decision whether to acquire the [property] under § 465 involved questions of land use." *Id.* at 227. In other words, based on the language and context of that statute, both the statute and the property owner had related interests: the use of the acquired land. *Id*.; *see also Patchak*, 632 F.3d at 705 (holding that the zone of interests "analysis focuses, not on those who Congress intended to benefit, but on those who in practice can be expected to police the *interests that the statute protects*" (emphasis added)).

Not so with RGISC. RGISC says that, like the plaintiff in *Match-E-Be-Nash-She-Wish*, it has an interest in the land. RGISC ZOI Br. at 21–22. It thus reasons that it must also fall within the zone of interests of §§ 2808, 284, and 9705, since these statutes negatively impact the land along the border. *Id.* But *Match-E-Be-Nash-She-Wish* does not automatically place any plaintiff with an interest in the land affected by a statute within that statute's zone of interests. The use of the land was at the heart of the statute at issue in *Match-E-Be-Nash-She-Wish*. 567 U.S. at 227. The Court here must consider the language of §§ 2808, 284, and 9705 to determine whether *these* statutes contemplate RGISC's asserted interest. RGISC's interest in the land is much further removed from statutes dealing with the use of funds in DHS and Treasury accounts. *See Grocery Mfrs. Ass'n v. EPA*, 693 F.3d 169, 179 (D.C. Cir. 2012) (noting that a "food group's interest in low corn prices is much further removed from a provision about cars and fuel than a neighboring land owner's interest is from a statute about land acquisition").

Nothing in §§ 284 or 9705 reflects an interest in land use. These statutes govern how and when the Executive Branch may use certain funds—the counterdrug account and TFF.[14] They do not focus on the acquisition or use of property, as the statute at issue in *Match-E-Be-Nash-She-Wish* did. Instead, they solely address the agencies' use of funds for various law enforcement activities. So a general claim to an interest in the property where these funds are expended is not enough to place RGISC within the zone of interests of *these* statutes. RGISC's conservationist, environmental, recreational, and economic interests in the use of the TFF and counterdrug account funds are "so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke*, 479 U.S. at 399.

This is even clearer for § 2808. The language there allowing the Defense Secretary to disregard other laws when engaging in military construction suggests that the construction may supersede any interest in the land itself. Section 2808 shows an intent to give the Secretary maximum flexibility to respond to quickly evolving needs in a national emergency without regard to the effects of that response. So rather than having interests aligned with the statute, by seeking to enjoin the barrier construction, RGISC is frustrating the Secretary's ability to respond to an emergency. *Hazardous Waste*, 885 F.2d at 922 (quoting *Clarke*, 479 U.S. at 397 n.12). Since RGISC's interests "may be fundamentally inconsistent with the interests Congress had in mind when it enacted the statute," RGISC is a "peculiarly *un*suitable proxy for those whom

---

[14] Recall that § 284 states: "The Secretary of Defense may provide support for the counterdrug activities or activities to counter transnational organized crime of any other department or agency of the Federal Government . . . [including] [c]onstruction of roads and fences and installation of lighting to block drug smuggling corridors across international boundaries of the United States." 10 U.S.C. § 284(a), (b)(7). Section 9705 allows the Treasury Secretary to use "unobligated balances" in the TFF "for obligation or expenditure in connection with the law enforcement activities of any Federal agency or of a Department of the Treasury law enforcement organization." 31 U.S.C. § 9705(g)(4)(B).

Congress intended to protect." *Id*. at 927 (emphasis in original). This cannot place it within § 2808's zone of interests.[15]

### b. 2019 Consolidated Appropriations Act

RGISC and CBD do, though, arguably fall within the zone of interests of the CAA. As with the other statutes, the Government contends that this cannot be so because the CAA "regulate[s] the relationship between Congress and the Executive Branch regarding federal spending, and in no way protect[s] the public's generalized interest in the expenditure of appropriations." Defs.' ZOI Br. at 13. While Plaintiffs' ability to fall within the CAA's zone of interests may be doubtful, "the benefit of any doubt goes to the plaintiff." *Match-E-Be-Nash-She-Wish*, 567 U.S. at 225.

Despite the Government's argument, neither CBD nor RGISC assert a "generalized interest in the expenditure of appropriations." Defs.' ZOI Br. at 13. Instead, Plaintiffs claim that their "conservational, recreational, scientific, [and] aesthetic" interests are the *same* interests protected by §§ 230–232 and 739 of the CAA. *See* CBD Suppl. Br. 10–11 ("CBD ZOI Br."), CBD ECF No. 49*; see also* RGISC ZOI Br. at 18.

The Court concludes that the CAA may indeed embrace the conservationist interests that Plaintiffs seek to protect. Plaintiffs note that § 231's prohibition on border barrier construction within five wildlife refuges and parks and § 232's requirement that DHS confer with local

---

[15] In *Sierra Club*, the Ninth Circuit determined that Sierra Club satisfied the zone of interests test because it treated Sierra Club's statutory claim as a constitutional claim. 929 F.3d at 703. It thus determined that the proper question was "whether Plaintiffs fall within the zone of interests of the Appropriations Clause, not of section 8005." *Id*. The Court disagrees with this approach. Plaintiffs' claims here are statutory, not constitutional. As explained *infra* III.D., the Supreme Court in *Dalton* explicitly held that "claims simply alleging that the President has exceeded his statutory authority *are not 'constitutional' claims*, subject to judicial review." 511 U.S. at 473 (emphasis added). Since Plaintiffs allege that Defendants exceeded their statutory authority—not that they were acting pursuant to constitutional authority or that the statutes themselves are unconstitutional—they have not stated constitutional claims. *See infra* III.D. The proper question, then, is not whether their interests align with certain constitutional provisions but whether they fall within "the zone of interests to be protected or regulated by the statute[s] that [Plaintiffs say were] violated." *Match-E-Be-Nash-She-Wish*, 567 U.S. at 224.

officials where it plans barrier construction hint "that Congress considered the [environmental] impacts of building additional barriers along the southern border." *See* RGISC ZOI Br. at 18. If so, this conservational interest would align with Plaintiffs'. Though it is debatable whether the CAA protects the interests that Plaintiffs assert, all that Plaintiffs must show is that they are "arguably within the zone of interests" of the CAA. *See Match-E-Be-Nash-She-Wish*, 567 U.S. at 2210. They have done so.

But, the Government retorts, the Court should not even consider the environmental interests in §§ 231 and 232. Defs.' Reply Suppl. Mem. Addressing Zone of Interests 11 ("Defs.' ZOI Reply"), CBD ECF No. 51; RGISC ECF No. 71. The Government observes that Plaintiffs do not allege violations of those provisions. *Id.* at 12. So, it concludes, the Court should consider only whether CBD and RGISC fall within the zone of interests of the challenged provisions: §§ 230 and 739. *Id.* at 11–12. Plaintiffs respond that §§ 230 and 739 are "integrally related" to §§ 231 and 232 and thus these latter two provisions are relevant to the zone of interests inquiry for §§ 230 and 739. CBD ZOI Br. at 11–13. Plaintiffs are correct.

Recently, the D.C. Circuit reiterated that when considering whether a plaintiff's interests fall within a statute's zone of interests, a court should not "look at the specific provision said to have been violated in complete isolation, but rather in combination with other provisions to which it bears an 'integral relationship.'" *Indian River Cty. v. U.S. DOT*, 945 F.3d 515, 530 (D.C. Cir. 2019) (quoting *Nat'l Petrochemical & Refiners Ass'n v. EPA*, 287 F.3d 1130, 1147 (D.C. Cir. 2002)) (cleaned up). Here, Plaintiffs have reasonably shown that §§ 230, 231, 232, and 739 are all "integrally related."

Sections 230, 231, and 232 contain Congress's appropriation of funds to build a segment of a border wall and restrictions on those funds. Though divided into different sections, the full

"context and purpose" of these provisions is to explain the permitted uses of the funds allocated in § 230. *See Indian River*, 945 F.3d at 530. Section 739 also bears an "integral relationship" to these provisions since it preserves the integrity of each appropriation in the CAA. This section—which prohibits use of funds from "this or any other appropriations Act" to "increase . . . funding for a program, project, or activity as proposed in the President's budget request for a fiscal year"—would be meaningless if not paired with other provisions of the CAA. Sections 230, 231, and 232 of the CAA put flesh on § 739's bare mandate. These sections thus bear an "integral relationship" with the others.

Because CBD and RGISC's environmental interests appear to align with at least some interests protected in §§ 231 and 232, the Court cannot say with certainty that Plaintiffs' interests are "so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *See Clarke*, 479 U.S. at 399 (1987). CBD and RGISC may therefore assert APA claims for violating the CAA.

### c. CBD fails the zone of interests test for §§ 2808 and 8005.

The Government also urges dismissal of CBD's APA claims because it contends that CBD does not fall within the zone of interests of §§ 2808 and 8005. Defs.' ZOI Br. at 9–12. Indeed, in reply, CBD does not even try to argue that it can fall within the zone of interests of those statutes. Instead, it claims that since it falls within the zone of interests of the CAA, it essentially gets a "pass" on meeting the zone of interests test for §§ 2808 and 8005. CBD ZOI Br. at 14–15. This is because it claims that the Court must decide whether the Defense Secretary violated §§ 2808 and 8005 for the Court to decide whether he also violated the CAA. *Id.* at 14 ("[The Court must] resolve defendants' assertions that the provisions of [§§ 2808 and 8005] provide alternative funding mechanisms that would essentially provide an exception [to the CAA].").  But CBD cannot escape the zone of interests requirement so easily.

The Court need not determine whether Defendants *unlawfully* used §§ 2808 and 8005 to decide whether they violated the CAA, an entirely different Act. CBD's Complaint alleges that the Defense Secretary's and Army Corps of Engineers' implementing actions under §§ 2808 and 8005 violated the CAA by (1) "exceeding and falling outside of the Act's monetary and geographic limitations, respectively, on border wall funding," CBD Compl. ¶¶ 164, 175, and (2) violating the CAA's prohibition that "[n]one of the funds made available in this or any other appropriations Act may be used to increase . . . funding for a program, project, or activity as proposed in the President's budget request for a fiscal year until such proposed change is subsequently enacted in an appropriation Act, or unless such change is made pursuant to the reprogramming or transfer provisions of this or any other appropriations Act," *id.* ¶¶ 165, 176.

Neither of these two claims requires the Court to separately determine whether Defendants violated §§ 2808 and 8005. Nor do they allege that the *unlawfulness* of Defendants' actions under §§ 2808 or 8005 is what violates the CAA. These claims require the Court to determine only whether Defendants (1) violated the geographical and monetary restrictions in § 230 of the CAA, and (2) used §§ 2808 and 8005 to increase funding for a project proposed in the President's budget. The Court can assume that Defendants lawfully used these provisions to transfer funds to border projects and still consider whether doing so violated the CAA's provisions.

Since CBD does not even attempt to explain how it independently falls within the zone of interests of §§ 2808 and 8005, the Court will dismiss those APA claims.

### 3. CBD and RGISC State a Claim for a Violation of the CAA § 739.

Even though Plaintiffs fall within the CAA's zone of interests, the Government argues that their claims should be dismissed for failure to state a claim. Defs.' CBD Mot. at 66–69;

Defs.' RGISC Mot. at 78–80. Mindful that the Court must "treat the complaint's factual allegations as true and must grant the plaintiffs the benefit of all inferences that can be derived from the facts alleged," *L. Xia*, 865 F.3d at 649 (cleaned up), the Court will not dismiss Plaintiffs' claim for a violation of § 739. The Court will, though, dismiss CBD and RGISC's claims for a violation of § 230.

Recall that § 230 makes $1.375 billion "available only" for "the construction of primary pedestrian fencing, including levee pedestrian fencing, in the Rio Grande Valley Sector." *See* CAA § 230(a)(1). CBD claims that the Defense Secretary and Army Corps of Engineers violated this provision by "exceeding and falling outside [§ 230's] monetary and geographic limitations." CBD Compl. ¶¶ 164, 175. RGISC's Complaint generally alleges that Defendants' actions "violate[] the 2019 Consolidated Appropriations Act" without alleging violations of specific sections of the CAA. *See* RGISC Compl. ¶¶ 157–160.

In neither Complaint do Plaintiffs allege that the Government violated § 230 by using the $1.375 billion in a manner or geographic area not permitted under §§ 230, 231, and 232. Instead, Plaintiffs suggest that Congress's narrow appropriation of $1.375 billion for border wall construction in the Rio Grande Valley Sector precludes all other border barrier construction using other appropriated funds—even if those more general appropriations may also permit border construction.

For support, Plaintiffs turn to *Nevada v. DOE*, 400 F.3d 9 (D.C. Cir. 2005). *See* CBD Opp'n at 64 n.27; RGISC Opp'n at 67. There, Congress's 2004 appropriations act gave Nevada $1 million "to conduct scientific oversight responsibilities and participate in licensing activities pursuant to the [Nuclear Waste Policy Act]." *Id*. at 12. Nevada claimed that it was also entitled

to other funds for its licensing and scientific oversight activities under another, more general, provision in the appropriations act. *Id.* The D.C. Circuit disagreed.

It explained that, based on the general-specific canon of statutory interpretation, "an appropriation for a specific purpose is exclusive of other appropriations in general terms which might be applicable in the absence of the specific appropriation." *Id.* at 16 (internal quotations omitted). As an example, the court cited a GAO opinion, where the GAO concluded that "an appropriation expressly for repairing jails in Alaska, made from a fund comprised of 'fines, forfeitures, [and] judgments,' precluded the financing of repairs to an Alaskan jail with funds appropriated from the Treasury for the more general purpose of 'repairs, betterments, and improvements of United States jails.'" *Id.* (citing 4 Comp. Gen. 476 (1924)) (alternation in original). Since Congress had already allocated money for a "specific purpose . . . financing 'scientific oversight' and 'licensing activities,'" Nevada could not increase that appropriation through other funding sources. *Id.*

Plaintiffs similarly try to invoke the general-specific canon to allege a violation of § 230. They suggest that the Government cannot use other general appropriations to construct border barriers when Congress has already provided a specific appropriation for border barrier construction in the Rio Grande Valley Sector. *See* CBD Opp'n at 64 n.27; RGISC Opp'n at 67. But Plaintiffs misunderstand *Nevada* and the general-specific canon.

The general-specific canon may be invoked when "both specific and general provisions cover the same subject," *Norwest Bank Minn. Nat'l Ass'n v. FDIC*, 312 F.3d 447, 451 (D.C. Cir. 2002), and when the two provisions are in conflict, *see* Antonin Scalia & Bryan A. Garner, Reading Law 183 (2012). When this occurs, "the specific provision is treated as an exception to the general rule." Scalia & Garner, *supra*, at 183. But "[o]nly [the general rule's] application to

cases covered by the specific provision is suspended; it continues to govern all other cases." *Id.* at 184. In *Nevada*, since both the general and specific appropriation covered the same subject (scientific oversight and licensing activities), the more specific appropriation created an exception to the general one. 400 F.3d at 16.

The general-specific canon applies only when the two provisions "cover the *same subject*." *Norwest Bank*, 312 F.3d at 451 (emphasis added). Yet here no one alleges that the Government is using general appropriations to inflate the specific appropriation to Rio Grande Valley Sector barrier construction. Plaintiffs instead allege that the Government is using these general appropriations to construct additional miles of border barriers never specifically funded in the CAA. *See* CBD Opp'n at 63–64 RGISC Opp'n at 67. In other words, the Government is using general appropriations to fund a *different*, though similar, subject. This is not the type of claim where the general-specific canon applies.

In *Nevada*, the court prohibited supplementing a congressional appropriation with more general appropriations—for instance, using the $2.5 billion from the § 284 fund to increase the $1.375 billion allocated to Rio Grande Valley Sector barrier construction project.[16] The court did not prohibit the use of funds from more general appropriations to finance similar, but distinct, projects authorized by those funding sources. The prohibition on using general appropriations for the border wall "only appli[es] to cases covered by the specific provision . . . it continues to govern all other cases." Scalia & Garner, *supra*, at 184.

---

[16] CBD worries that permitting DoD to use § 8005 to fund border wall construction will "render the specific monetary and geographic limitations placed on border wall construction by the CAA without effect." CBD Opp'n at 64. For example, "while Congress expressly prohibited border wall construction within all of one, and a portion of another National Wildlife Refuge . . . the government's argument here would sanction the use of the [§ 8005] to construct border walls on numerous protected federal borderlands . . . without restriction." *Id.* But if the Government tried to use § 8005 transfer authority to build border barriers within the geographic limitations of § 231, it would be using a more general appropriation to increase a specific appropriation, which *Nevada v. DOE* prohibits. 500 F.3d at 16. The geographic and monetary restrictions in §§ 230–232 are therefore not rendered meaningless.

Since Plaintiffs' Complaints do not allege that the Government has used general funds to supplement the more specific appropriation to the Rio Grande Valley Sector project, they cannot rely on the general-specific canon to assert a violation of CAA § 230. And since their claim rests on this theory, they have not stated a claim for a violation of § 230.

Even though § 230 does not automatically prohibit use of general appropriations for border wall construction, Congress still holds the reins of these more general appropriations. And it has the authority, if it wishes, to ensure that the Executive Branch does not misuse these more general appropriations statutes to finance items that it specifically chooses not to fund. Thus, Congress included § 739 in the CAA, which states:

> None of the funds made available in this or any other appropriations Act may be used to increase, eliminate, or reduce funding for a program, project, or activity as proposed in the President's budget request for a fiscal year until such proposed change is subsequently enacted in an appropriation Act, or unless such change is made pursuant to the reprogramming or transfer provisions of this or any other appropriations Act.

Plaintiffs allege that the Government violated this provision of the CAA and, here, Plaintiffs have stated a claim. CBD and RGISC allege Defendants used funds from other appropriations to increase funding for a "project" in the President's budget: barriers along the southern border. *See* CBD Compl. ¶ 176; RGISC Compl. ¶ 157–60. Though the Government argues that this is not so, the Court must "treat the complaint's factual allegations as true." *L. Xia*, 865 F.3d at 649. CBD and RGISC have thus stated a claim under the APA for a violation of CAA § 739.

### C. *Ultra Vires* Claims

#### 1. Plaintiffs May Proceed Under an *Ultra Vires* Cause of Action.

The main thrust of RGISC's Complaint is that the Administration acted *ultra vires* by using §§ 2808, 284, and 9705 to fund border wall construction. RGISC Compl. ¶¶ 133–41.

CBD pleads *ultra vires* claims in the alternative to its APA claims. CBD Compl. ¶¶ 167–70, 178–81. The Government urges that both sets of claims must be dismissed. Defs.' CBD Mot. at 69; Defs.' RGISC Mot. at 81. According to the Government, "the Court can only reach the merits of the ultra vires claims if APA review is unavailable." Defs.' CBD Mot. at 69; Defs.' RGISC Mot. at 81. But even if the Court did address Plaintiffs' claims, the Government suggests Plaintiffs could not survive the heightened level of scrutiny attached to *ultra vires* claims. Defs.' CBD Mot. at 69; Defs.' RGISC Mot. at 81–82.

CBD and RGISC counter that they have a separate equitable cause of action available to them—whether styled as a "non-statutory" cause of action, *see* CBD Opp'n at 65, or a "traditional equitable" action, *see* RGISC Opp'n at 61—even if they also have APA claims. RGISC explains that—long before the enactment of the APA—the Supreme Court found that when "an official violates the law to the injury of an individual the courts generally have jurisdiction to grant relief." *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108 (1902). This equitable cause of action, they claim, is still available to them because "enactment of the APA did not repeal the review of ultra vires action recognized long before." CBD Opp'n at 65 (citing *Chamber of Commerce of the U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996)); *see* RGISC Opp'n at 58 (citing *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988)).

RGISC and CBD also contend that their claims are not subject to the heightened level of scrutiny that the Government tries to apply to their claims. CBD Opp'n at 66; RGISC Opp'n at 61–63. To be sure, RGISC and CBD admit that courts have applied a heightened level of scrutiny to *ultra vires* claims in some circumstances. CBD Opp'n at 66; RGISC Opp'n at 62–63. For instance, the Supreme Court in *Leedom v. Kyne*, 358 U.S. 184 (1958), permitted "narrow" *ultra vires* review for claims "where Congress is understood generally to have precluded

46

review." *Griffith v. Fed. Labor Relations Auth.*, 842 F.2d 487, 492 (D.C. Cir. 1988). When plaintiffs bring *ultra vires* claims where Congress has precluded review, they must show that "(i) the statutory preclusion of review is implied rather than express; (ii) there is no alternative procedure for review of the statutory claim; and (iii) the agency plainly acts in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 509 (D.C. Cir. 2019) (internal quotations omitted). But Plaintiffs argue they are not subject to this "narrow" *ultra vires* review since Congress has not precluded review of §§ 2808, 284, 8005, or 9705. CBD Opp'n at 66; RGISC Opp'n at 61–63.

The Government offers no meaningful response to this. Instead, in reply to RGISC, it reiterates that "the APA is the proper framework" for RGISC's claims and RGISC "should not be allowed to bypass the strictures of the APA by seeking nonstatutory review." Defs.' RGISC Reply at 40. It never tries to respond to RGISC's argument that its claims are not subject to a heightened scrutiny. The Government merely says that it relies on *Leedom* "to illustrate the point that nonstatutory review requires a higher level of scrutiny[.]" *Id.* But it misses the point: RGISC argues that *Leedom* does not apply to its claim because Congress has not precluded review.

The Government's response to CBD's argument is even less adequate. It addresses CBD's argument in one sentence: "Plaintiffs' ultra vires claim alleging § 2808 violations fail . . . because the standard to state a nonstatutory ultra vires claim is higher than that [] under the APA, and such claims 'rarely succeed.'" Defs.' CBD Reply 29, CBD ECF No. 33. It again makes no effort to rebut CBD's contention that heightened scrutiny does not apply here.

The Court doubts that Plaintiffs can bring an equitable claim when a statutory cause of action is available to it. *See Sierra Club*, 929 F.3d at 716 (N.R. Smith, J., dissenting) (arguing that the court should not take the "extraordinary step of implying an equitable cause of action" when "an avenue for challenging the [agencies'] action exists under the APA—just not for these Plaintiffs"). But this is the Government's Motion to Dismiss and it bears the burden of persuading the Court that Plaintiffs' claims must be dismissed. *See Intelsat USA Sales Corp. v. Juch-Tech, Inc.*, 24 F. Supp. 3d 32, 48 n.10 (D.D.C. 2014) ("While it is a plaintiff's burden to allege facts supporting the elements of its claim, all federal courts are in agreement that the burden is on the moving party in a Rule 12(b)(6) motion to prove that no legally cognizable claim for relief exists." (cleaned up)). The Government has not done so with these claims. Given the early stage of these proceedings and Plaintiffs' colorable claim that they have an equitable cause of action to bring their *ultra vires* claims, the Court will permit these claims to proceed.

## 2. Plaintiffs Need Not Fall Within the Zone of Interests for *Ultra Vires* Claims.

The Government urges that the Court must dismiss Plaintiffs' *ultra vires* claims for a second reason: they fail to meet the zone of interests for the challenged statutes. Defs.' ZOI Br. at 4. In *Lexmark*, the Supreme Court "presume[d] that a statutory cause of action extends only to plaintiffs whose interests fall within the zone of interests protected by the law invoked." 572 U.S. at 129 (internal quotations omitted). But the Supreme Court has never squarely addressed whether the zone of interests test applies to *ultra vires* claims. And the D.C. Circuit has expressed doubt that it would. *See Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 811 n.14 (D.C. Cir. 1987).

In *Haitian Refugee Center*, the court announced—admittedly, in *dicta*—that,

Appellants need not, however, show that their interests fall within the zones of interests of the constitutional and statutory powers invoked by the President in order to establish their standing to challenge the interdiction program as *ultra vires*. Otherwise, a meritorious litigant, injured by *ultra vires* action, would seldom have standing to sue since the litigants' interest normally will not fall within the zone of interests of the very statutory or constitutional provision that he claims does not authorize action concerning that interest.

*Id*.; *see also Sierra Club*, 929 F.3d at 700 ("[W]e are skeptical that there could be a zone of interests requirement for a claim alleging that official action was taken in the absence of all authority[.]").

Though this *dictum* is not binding, the Court finds it persuasive. If the Government were to use a Medicare statute, for example, to justify building the border wall on someone's property, it would make little sense to require that person to show that he was a Medicare beneficiary or provider to argue that the Medicare statute did not permit border barrier construction. It is no different here where Plaintiffs claim they are injured by the Government's use of statutes that, they say, it had no right to use for these purposes. CBD and RGISC thus need not satisfy the zone of interests test for their *ultra vires* claims.

### 3. CBD and RGISC Have Stated *Ultra Vires* Claims.

The Government finally argues that Plaintiffs' *ultra vires* claims must fail because Plaintiffs have not stated a claim that the Government exceeded its authority under §§ 2808, 8005, 284, 9705, and the CAA. For the reasons already stated, Plaintiffs have stated a claim that the Government exceeded its authority under § 739 of the CAA, but not § 230. *See supra* III.B.3. For the reasons below, the Court finds that CBD has also stated *ultra vires* claims for

violations of §§ 2808 and 8005. RGISC has stated claims for violations of §§ 2808 and 284, but not § 9705.

### a. CBD has stated claims that the Government exceeded its statutory authority under §§ 2808 and 8005.

CBD's Complaint alleges that the Defense Secretary's and Army Corps of Engineers' "implementing actions to identify, transfer, and obligate emergency funds from military construction housing to border wall construction," exceeds the authority given to those Defendants under the "plain language of [§ 2808]." CBD Compl. ¶¶ 163, 169. Particularly, CBD contends that the Government is not engaging in "military construction" that is "necessary to support [the] use of the armed forces" under the statute.[17] *Id.* ¶¶ 158–59. As defined in § 2801, "military construction" must be "carried out with respect to a military installation," which includes "a base, camp, post, station, yard, center, or other activity under the jurisdiction of the Secretary of a military department." 10 U.S.C. § 2801(a), (c)(4). CBD claims that "[t]he vast majority, if not all, of the border wall construction that the proclamation would fund occurs on lands that do not constitute a military installation, and in any event, the border wall is not a military construction project and thus is not lawfully eligible for emergency military construction transferred appropriations." CBD Compl. ¶ 158. And it claims that the border wall in "no way supports the armed forces." *Id.* ¶ 159.

The Government makes two attacks on this claim. First, it suggests that CBD has no claim because the "broad definition" of "military installation to include non-specified 'other activity,' does not 'foreclose' the inclusion of border barrier construction." Defs.' CBD Mot. at

---

[17] As explained in III.B.1, the Court will not consider whether the Defense Secretary complied with the § 2808's requirements that the construction is *necessary* to support [] use of the armed forces." 10 U.S.C. § 2808(a) (emphasis added).

64. But, as above, the broad parameters of §§ 2808 and 2801 do not preclude review under those statutes. *See supra* III.B.1.

Second, the Government argues that CBD's claims that the lands "do not constitute a military installation," that the wall "is not a military construction project," and that the wall does not support the armed forces are "nothing more than conclusions unsupported by factual allegations." Defs.' CBD Mot. at 65 (cleaned up). But CBD offers more than "mere conclusions." CBD's Complaint explains that the Defense Secretary and the Army Corps of Engineers allocated funds to border barrier construction under § 2808. CBD Compl. ¶ 125. It alleges that this construction will occur in the "highest priority areas," including the San Diego, El Centro, Yuma, El Paso, and Laredo sectors. *Id*. ¶ 128. It alleges that the "vast majority" of these lands are not military installations. *Id*. ¶ 158. And it alleges that the border wall is supporting domestic law enforcement agencies, not the military. *Id.* at ¶ 160.

Whether CBD's allegations are true is not currently before the Court. The Court must "treat the complaint's factual allegations as true and must grant the plaintiffs the benefit of all inferences that can be derived from the facts alleged." *L. Xia*, 865 F.3d at 649 (cleaned up). The Court thus concludes that CBD has stated a claim that Defendants exceeded their statutory authority under § 2808.

CBD also states a claim under § 8005. CBD alleges that Defendants exceeded their authority under § 8005 by transferring appropriated funds when "the item for which funds [were] requested has been denied by the Congress." CBD Compl. ¶ 174. The Complaint alleges that an item—the additional mileage of the border wall—was denied by Congress in the CAA. Since Defendants used § 8005 to funnel funds through the counterdrug account to assist DHS with border construction, *see* CBD Compl. ¶ 124, CBD claims that this action was unlawful under

§ 8005.  The Government disagrees with CBD's characterization of the "item" and "denial."  Defs.' CBD Mot. at 65–66.  But at this stage of the litigation, the Court is careful to accept Plaintiffs' allegations as true.  Since CBD plausibly alleges that Defendants used § 8005 to fund border wall construction and that Congress denied funds for this border wall project, CBD has stated a claim that Defendants' actions were *ultra vires*.

> ### b. RGISC has stated claims that the Government exceeded its statutory authority under §§ 2808 and 284.

Like CBD, RGISC alleges that the § 2808 does not authorize border wall construction because it "is not 'necessary to support [the] use of the armed forces'" and "is not a 'military construction project.'"  RGISC Compl. ¶ 138.  And, as with CBD, the Government responds that RGISC's claims are "nothing more than conclusions unsupported by factual allegations."  Defs.' RGISC Mot. at 77–78.  RGISC's Complaint, though, alleges that the Administration will allocate § 2808 funds along the southern border, RGISC Compl. ¶¶ 92–93, 105, and explains that "the hundreds of miles along the Mexico border on which Defendants intend to construct a wall do not constitute a military [installation]," RGSIC Opp'n at 73.  RGISC also contends that the border wall will support civilian agencies, not the military.  RGISC Opp'n at 72–73.  Later on, it may prove true that the Government did indeed use § 2808 funds exclusively on military construction to support the armed forces.  But RGISC's allegations are plausible enough to overcome a motion to dismiss, especially considering the shifting landscape of these border barrier funding decisions.  *See supra* III.A.1.a.

For similar reasons, RGISC has plausibly alleged at this stage that the funds transferred from DoD's counterdrug account violated the parameters of § 284.  That section allows DoD to "provide support for the counterdrug activities . . . of any other department or agency of the Federal Government," 10 U.S.C. § 284(a), including "[c]onstruction of roads and fences and

installation of lighting to block drug smuggling corridors across international boundaries of the United States," 10 U.S.C. § 284(b)(7). Based on the limited information that RGISC had at the pleadings stage of litigation, it plausibly alleged that DoD and DHS would not be using the $2.5 billion transferred from this account to build fences at "particular drug smuggling corridors" in violation of the statute. RGISC Compl. ¶ 139. The Court credits that allegation at this stage and will not dismiss this claim.

### c. RGISC has not stated a claim that the Government exceeded its statutory authority under § 9705.

RGISC's Complaint alleges that "[u]se of the Treasury Forfeiture Fund under 31 U.S.C. § 9705 to construct the border wall violates the Consolidated Appropriations Act of 2019. . . . The President cannot fund the border wall from the Treasury Forfeiture Fund because 31 U.S.C. § 9705 restricts use of those funds to specified purposes and construction of a border wall does not meet the requirements of the statute." RGISC Compl. ¶ 140. At first blush, it is unclear whether RGISC's claim is that the Treasury Secretary's use of § 9705 exceeded his statutory authority under the CAA or whether RGISC contends that using TFF funds for border wall construction exceeds the bounds of the TFF. Assuming RGISC intended to bring a distinct claim that the Treasury Secretary violated § 9705, the Court finds that RGISC has failed to state a claim.[18]

Nothing in RGISC's Complaint or brief in opposition to the Government's Motion to Dismiss explains how the Treasury Secretary exceeded his authority under § 9705. The TFF permits the Treasury Secretary to allocate "unobligated balances" remaining in the fund to any "obligation or expenditure in connection with the law enforcement activities of any Federal

---

[18] However, to the extent that RGISC only intended to bring a claim alleging a violation of the CAA, RGISC has stated a claim for a violation of the CAA § 739. *See supra* III.B.3. The Court will therefore consider in this litigation whether the Treasury Secretary's use of TFF funds violated § 739 of the CAA.

agency." 31 U.S.C. § 9705(g)(4)(B). The Government explained in its motion that construction of border barriers *is* at least partially, not exclusively, a law enforcement activity: "Congress has recognized that barriers prevent unlawful entries by aliens and smuggling of contraband across the border, *see* Secure Fence Act of 2006, Pub. L. No. 109-367, §§ 2–3, 120 Stat. at 2638–39, and thus help enforce the laws that prohibit such activities[.]" Defs.' RGISC Mot. at 75.

In response, RGISC did not try to explain how the border barrier construction is not "in connection with law enforcement activities." Instead, it focused its argument on how the TFF's appropriations "cannot overrule the targeted limitations on border wall construction expressed in the CAA." RGISC Opp'n at 69. This is a claim that the Treasury Secretary violated the CAA, not § 9705. Since RGISC makes no effort to explain how the use of TFF funds violated the terms of § 9705, the Court will dismiss this claim for failure to state a claim.

### D. Constitutional Claims

Finally, the Government urges the Court to dismiss CBD and RGISC's constitutional claims because "these counts merely recast Plaintiffs' statutory claims in constitutional terms." Defs.' CBD Mot. at 70 (citing *Dalton v. Spector*, 511 U.S. 462 (1994)); Defs.' RGISC Mot. at 82 (same). The Court agrees that *Dalton* disposes of these claims.

In *Dalton*, state officials and shipyard employees tried to enjoin the Secretary of Defense "from carrying out a decision by the President to close the Philadelphia Naval Shipyard." 511 U.S. at 464. Under the Defense Base Closure and Realignment Act of 1990, an independent commission would consider military base closure recommendations from the Secretary of Defense and make a recommendation directly to the President. *Id*. at 465. The President would then would either approve or disapprove the recommendation. *Id.* After the President approved the closure of the Philadelphia Shipyard, the plaintiffs sought review under the APA, alleging

that the President's decision was unlawful because the Secretary and commission violated the substantive and procedural requirements of the Act. *Id.* at 466. The Supreme Court determined that the plaintiffs could not seek review under the APA since they were challenging the President's decision, which is unreviewable under the APA. *Id.* at 470–71.

The Court then considered whether it could review a separate constitutional claim that the President acted beyond his statutory authority. *Id.* at 471–72. After reviewing several prior related cases, the Court found that no constitutional claim existed. There, "the claim raised [was] a statutory one: The President [was] said to have violated the terms of the 1990 Act by accepting procedurally flawed recommendations." *Id.* at 474. The Court held that prior Supreme Court cases "establish that claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims, subject to judicial review.'" *Id.* at 473; *see Sierra Club*, 929 F.3d at 712 (N.R. Smith, J., dissenting) ("[O]ur cases do not support the proposition that every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." (quoting *Dalton*, 511 U.S. at 472) (emphasis and alterations in original)).

Plaintiffs try to distinguish *Dalton*. First, RGISC suggests that "the holding in *Dalton* is narrow and its facts are easily distinguishable from the instant case." RGISC Opp'n at 56. Particularly, it contends that the Court's holding in *Dalton* hinges on the fact that the President's action there "concern[ed] unreviewable presidential discretion," which is not present here. *Id.* Although *Dalton* did involve a decision committed to the President's discretion, the Court never mentioned that fact when it determined there was no constitutional claim. *See Dalton*, 511 U.S. at 471–74. Instead, it only mentioned the President's broad discretion under the statute when it considered whether it could infer a *statutory* claim against the President outside the APA

55

context.  *Id.* at 474 (assuming "some claims that the President has violated a statutory mandate are judicially reviewable outside the framework of the APA . . . [but] such review is not available when the statute in question commits the decision to the discretion of the President").[19]  For that reason, RGISC's attempt to distinguish this case from *Dalton* on factual grounds fails.

Next, CBD seeks to narrow *Dalton* by saying that the Government is trying to "transmute *Dalton's* holding that statutory-based claims against the President are not *automatically* or even *presumptively* also constitutional claims into a *prohibition* on the connection between such claims."  CBD Opp'n at 67 (emphasis in original).  But *CBD* is "transmuting" *Dalton's* holding. *Dalton's* holding is *not*—as CBD characterizes—that statutory-based claims are not "automatically" or "presumptively also constitutional claims."  *Dalton's* holding is explicit: "[C]laims simply alleging that the President has exceeded his statutory authority *are not 'constitutional' claims*, subject to judicial review."  511 U.S. at 473 (emphasis added).

CBD's Complaint alleges that "[t]he proclamation and agency implementing actions to identify, transfer, and obligate appropriated funds violate 10 U.S.C. § 2808, DoD FY19 Defense Appropriations Act, and 2019 Consolidated Appropriations Act."  CBD Compl. ¶ 197.  In that same paragraph, CBD contends that "Defendants' unlawful transfer and obligation of appropriated funds for border wall construction violates the Appropriations Clause."  *Id.*  It also alleges that the President failed to "faithfully execute" those statutes.  *Id*. ¶ 201.  Though CBD insists that its constitutional claims are "specific and separate" from its statutory claims, CBD

---

[19]  RGISC cites a line from *Chamber of Commerce v. Reich* to support its "narrow holding" proposition.  *See* RGISC Opp'n at 56 ("*Dalton's* holding merely stands for the proposition that when a statute entrusts a discrete specific decision to the President and contains no limitations on the President's exercise of that authority, judicial review of an abuse of discretion claim is not available." (quoting *Chamber of Commerce of the United States v. Reich*, 74 F.3d 1322, 1331 (D.C. Cir. 1996))).  But RGISC pulls that quote from a section of the court's opinion dealing with whether the plaintiff had a *statutory* cause of action against the President outside the APA.  *See Reich*, 74 F.3d at 1330–32 (quoting *Dalton*, 511 U.S. at 477).  Its reference to *Dalton* cites only the statutory portion of the Supreme Court's analysis.  *Id.*  It does not discuss the constitutional portion of *Dalton.*

Opp'n at 67–68, the Court agrees with the Government that CBD is merely recasting its statutory claims.

CBD builds its entire constitutional argument around the allegation that Defendants *unlawfully* transferred and obligated appropriated funds. But CBD does not argue that §§ 2808 or 8005 themselves are unconstitutional—merely that Defendants misused those statutes to circumvent the CAA. And nowhere does CBD dispute that agencies acted using statutory, not constitutional, authority. At bottom, this is just an allegation that Defendants exceeded their statutory authority. Similarly, CBD's Take Care Clause claim essentially alleges that the executive officials failed to correctly apply and follow § 2808, § 8005, and the CAA. This again is another way of saying that the President and officials violated those statutes. Under *Dalton*, CBD cannot recast these types of claims as constitutional. 511 U.S. at 471–72.

RGISC's constitutional claims fare no better. RGISC's Complaint alleges that the President and executive officials violated the Appropriations Clause and the Constitution's Separation of Powers doctrine. RGISC Compl. ¶¶ 142–154. It suggests that its constitutional claims are distinguishable from its statutory claims because Plaintiffs do not allege "that Defendants exceeded their statutory authority; rather, Plaintiffs assert that the statutes invoked by Defendants provide no defense for their unconstitutional actions." RGISC Opp'n at 55.

But the statutes *do* provide a valid defense if the officials acted lawfully under each statute. RGISC does not claim that the statutes themselves are unconstitutional. So if the Government lawfully transferred and used appropriated funds as permitted by Congress through §§ 284, 2808, and 9705, then Defendants' actions could not violate the Appropriations Clause or the Constitution's Separation of Powers doctrine. As the Government points out, saying that the statutes are "no defense" is essentially the same as saying "Defendants' actions exceed the

authority the statutes at issue provide." Defs.' RGISC Reply at 43. As explained above, this argument conflicts with *Dalton*.

Finally, RGISC suggests that it is not bringing a statutory claim because the President relied on his *constitutional*—not just statutory—powers to proclaim a national emergency. RGISC Opp'n at 55. The President declared a national emergency "by the authority vested in me by the Constitution and the laws of the United States of America, including sections 201 and 301 of the National Emergencies Act (50 U.S.C. 1601 *et seq.*)." *See* Proclamation. RGISC suggests that the phrase "by the authority vested in me by the Constitution" means that the President was trying to rely on his Article II as well as statutory powers when he declared an emergency. RGISC Opp'n at 55.

The Government responds, and the Court agrees, that this argument is meritless. *See* Defs.' RGISC Reply at 42. The reference to the Constitution "simply acknowledges the President's constitutional role as chief executive[.]" *Id.* The NEA requires that the President— and not some other executive official—declare the national emergency. The Government makes no claim of extra-statutory authority here, and the Court will not infer such a power on the President's behalf. RGISC cannot use this hail Mary argument to allege a constitutional violation where only a statutory one exists.

## IV. CONCLUSION

For these reasons, the Defendants' Motions to Dismiss will be granted in part and denied in part. Plaintiffs LCLAA and GreenLatinos will be dismissed as Plaintiffs. President Trump will be dismissed from both cases as a Defendant. The Court will also dismiss Count II and IV of Center for Biological Diversity's Complaint, except for its CAA § 739 claims; it will also dismiss Counts I, VI, VII, VIII. Counts II, III, and V of Rio Grande International Study Center's

Complaint will be dismissed entirely.  The Court will also dismiss RGISC's § 9705 and NEA claims under Count I.  It will dismiss all of Count IV of RGISC's Complaint, except for its CAA § 739 claim.  Separate orders will issue.


Dated: April 2, 2020                                    TREVOR N. McFADDEN, U.S.D.J.